# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

OSVALDO LUACES and
MARITZA LUACES,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

vs.

DIRECTV, INC.,

      Defendant.

_____/

**NIGHT BOX**
FILED

APR 1 6 1998

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

**CASE NO. 97-2324-Civ-Highsmith**
**Magistrate Judge Dube**

## PLAINTIFFS' CONSOLIDATED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND COSTS AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs hereby move for Final Approval of the Settlement described in the Amended Stipulation of Settlement dated effective October 29, 1997 (the "Settlement"). Plaintiffs further request that the Court approve the subsequently negotiated Settlement Agreement whereby DirecTV agreed to pay class counsel a total of $900,000.00 in attorneys fees and costs. Although this Defendant paid fee will not be taxed against the class recovery, it amounts to less than four percent (4%) of the "common fund" available for the benefit of the Class. For the reasons set forth below, the Court should approve the Settlement as fair, adequate, and in the best interest of all Class members, thereby concluding this litigation. The Court should therefore enter the Proposed Final Judgment, Order and Injunction that was attached as Exhibit "B" to the parties' Stipulation of Settlement. The Court should also approve Class counsel's application for attorneys' fees and costs.

LAW OFFICES
**HANZMAN CRIDEN KORGE CHAYKIN**
**PONCE & HEISE, P.A.**



Case No. 96-2324-Civ-Highsmith

## I.   THE LITIGATION

While this Court is familiar with the circumstances surrounding this class action litigation, a brief summary of the underlying allegations of the case is helpful in analyzing the fairness of the settlement. On July 22, 1997, Plaintiff Osvaldo Luaces and Maritza Luaces ("Plaintiffs" or "Representative Plaintiffs") filed this class action complaint against DirecTV, Inc. ("DirecTV"). On August 8, 1997, Plaintiff moved to certify the Class and shortly thereafter filed extensive discovery requests. DirecTV filed several requests enlarging the time to respond to the Complaint and the discovery. During this time, the parties informally exchanged discovery and reviewed extensive documentation in conjunction with repeated settlement discussions. As a result of those meetings, the case settled as detailed below.

As the basis of the lawsuit, Plaintiffs have alleged that DirecTV changed the programming offered to subscribers of Total Choice and Total Choice Gold who had pre-paid for one year of programming as part of a cash back promotion. Specifically, Plaintiffs allege it was improper for DirecTV to change the programming to eliminate the seven Encore movie channels after the subscribers had pre-paid for this programming. If these subscribers wanted to continue receiving the Encore channels, DirecTV charged an additional $4 per month charge for those seven movie channels.

In contrast, DirecTV has denied and continues to deny each and every one of the claims and contentions alleged by the Representative Plaintiffs and the Class in this litigation. DirecTV asserts that the programming change was made in accordance with the Customer Agreement that every subscriber received. DirecTV notes that it simply changed the programming mix and added seven

**2**

Case No. 96-2324-Civ-Highsmith

new channels (including Superstation WGN, Discovery Animal Planet and Trinity Broadcasting among others) and that there was no increase in price for pre-paid subscribers. Moreover, DirecTV believes that, based on information it received regarding viewer preferences, the majority of its customers prefer the new programming mix to the old one or are indifferent.

While Plaintiffs believe that DirecTV's arguments could have been overcome, there was a significant risk to the Class that the Court would agree with DirecTV's view of the case and either deny class certification or rule in DirecTV's favor on the merits. For example, it was quite possible that the Court would empathize with DirecTV's uncontested assertion that it added the same number of channels that it deleted as it was allowed to do under the Customer Agreement and therefore that no customer suffered any loss. Moreover, the Court could have accepted DirecTV's argument that, pursuant to the arbitration clause contained in each Customer Agreement, each class member's claim must be arbitrated and therefore class certification would have been denied. See, e.g., Hill v. Gateway 2000, Inc., 105 F.3d 1147 (7th Cir. 1997) (parties compelled to arbitration where customer received Customer Agreement that contained an arbitration clause).

After considerable investigation and negotiation, DirecTV agreed to settle this case by providing the Class members the opportunity to obtain the lost Encore Channels at no additional cost. Specifically, DirecTV agreed to provide credits to all class members who preferred the original program mix in place at the time they purchased their annual subscriptions, which, until April 10, 1997, included the Encore movie channels. Thus, for example, if a Class member's one year contract expired in July, 1997, that Class member is eligible to receive credits for the months of April, May and June, 1997 for which that Class member would have had the Encore movie

3

Case No. 96-2324-Civ-Highsmith

channels but for DirecTV's programming change. In short, the settlement provides the Class members who actually preferred the old program mix with the opportunity to have that program mix restored for the length of time that remained on their annual subscription when DirecTV made the programming change.

Based on these settlement terms, on October 29, 1997, the Court granted preliminary approval of the Settlement and ordered that Class members be given until February 9, 1998 to exclude themselves from the Class or to file objections to the settlement. The Court Order further scheduled a final fairness hearing for March 9, 1998. While preparing the materials to be forwarded to the Class members, DirecTV continued to negotiate a settlement with various state Attorneys General involving the same allegations before this Court. DirecTV and these Attorneys General entered into an Assurance of Voluntary Compliance that closely parallels the settlement in this matter. To incorporate the suggestions and requests of the Attorneys General regarding the procedures for providing relief to class members, the parties negotiated and filed an Amended Stipulation. The relief being offered to the Class members is the same as in the original Stipulation; the only differences are in the mechanics as to how Class members will receive the relief provided for in the Stipulation, namely, DirecTV will provide credits rather than certificates to its own customers, and a small subset of former subscribers whose own actions indicate that they actually preferred the old programming mix will automatically receive the credits.

To comply with these procedural changes, the final fairness hearing date was rescheduled for April 24, 1998 and the deadline for filing exclusions or objections was moved to March 25, 1998. To comply with the Amended Order of Preliminary Approval, notice to 757,457 possible class

4

Case No. 96-2324-Civ-Highsmith

members was given. *See* DirecTV's Interrogatory Responses (Tab A in Appendix of Exhibits hereto). That Notice described the settlement in detail and advised Class members that DirecTV had agreed to pay class $900,000 in attorneys' fee and costs. That agreement was negotiated only after the parties had reached a settlement of the class claims. To date, counsel has received 77 objections and 91 requests for exclusions from the settlement. Affidavit of Michael A. Hanzman (Appendix Tab B).

While a detailed discussion of the issues is unnecessary for purposes of this motion, it is clear that the case against DirecTV was far from a "sure thing." A trial of the issues in the case would have been extremely expensive and undoubtedly a bitterly fought battle, both factually and legally. It must also be recognized that even a victory against DirecTV at the trial stage would not have been a guarantee of ultimate success. Assuming Plaintiffs were successful at the trial level and obtained a judgment for more than presently provided for by the proposed settlement, DirecTV could be expected to appeal such a judgment, which could seriously and adversely affect the scope of the ultimate recovery, if not the recovery itself. *See, e.g.*, Berkey Photo, Inc. v. Eastman Kodak, Inc., 603 F.2d 263 (2d Cir. 1979) (reversing multi-million dollar judgment after a lengthy trial); Transworld Airlines, Inc. v. Hughes, 312 F. Supp. 478 (S.D.N.Y. 1970) (plaintiffs' judgment overturned after years of litigation and appeals). Under the circumstances, and for the reasons set forth in greater detail below, this Court should give its final approval to the proposed Settlement.

## II.     **THE SETTLEMENT**

DirecTV has agreed to provide credits (or certificates, for National Rural Telecommunications Cooperative subscribers) to all class members who wish to participate in the

5

Case No. 96-2324-Civ-Highsmith

relief available under this settlement because they prefer the original program mix in place at the time they purchased their annual subscriptions, which, until April 10, 1997 included the Encore channels. Those class members who have not previously received credits from DirecTV related to the Encore programming change, and who have not received the Encore channels after April 10, 1997 (or who have paid an additional fee to add the Encore channels) may request a credit (or certificate) enabling the class member to receive the Encore channels at no additional cost *or* to upgrade to a premium package including the Encore channels for a $4.00 discount for each month of Encore remaining on their pre-paid one year subscriptions as of April 10, 1997. By way of example, if a class member's contract expired in July 1997, that class member may request three such credits (or certificates) for the months of April, May and June, 1997. Those class members who are no longer subscribers may re-subscribe and request the credits (or certificates) described above *or* request a refund of $4.00 per month remaining on their annual subscription as of April 10, 1997. In addition to these benefits to the class, and after all substantive terms of the settlement were agreed upon, DirecTV also agreed to separately pay Plaintiffs' counsel attorneys' fees, costs and other expenses incurred in connection with this action in the amount of $900,000.

## III.    GOVERNING LEGAL STANDARDS FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT

"Compromises of disputed claims are favored by the Courts." <u>Williams v. First Nat'l. Bank</u>, 216 U.S. 582, 585 (1910). This policy applies with particular force to class action suits, the complexity and expense of which impose special burdens borne by the judicial system as well as the litigants. <u>In re U.S. Oil and Gas Litig.</u>, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly

6

Case No. 96-2324-Civ-Highsmith

favors the pretrial settlement of class action lawsuits."); Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977 ("Particularly in class action suits, there is an overriding public interest in favor of settlement."). As the Court observed in Behrens v. Wometco Enter., Inc., 118 F.R.D. 534, 538 (S.D. Fla. 1988), settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice . . . ."

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of any class action settlement. The requirement of judicial approval, manifested in both the substantive and procedural aspects of Rule 23, is designed to afford protection to absent class members "whose interests may be compromised in the settlement process." Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1169 (5th Cir. 1978). "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find the settlement is fair, adequate and reasonable and not the product of collusion between the parties." Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977). In reaching this determination, the "inquiry should focus upon the terms of the settlement," together with "an analysis of the facts and the law relevant to the proposed compromise." Id. at 1330. Specifically, the settlement terms should be compared "with the likely rewards the class would have received following a successful trial of the case," subject to the following qualifications. Id.

First, courts, including those in this circuit, have continuously stressed that it should not "be forgotten that compromise is the essence of settlement." Id. As a result, in evaluating the terms of the compromise in relation to the likely benefits of a successful trial, "the trial judge ought not try

7

Case No. 96-2324-Civ-Highsmith

the case in the settlement hearings," nor should the court "make a proponent of a proposed settlement justify each term of the settlement against a hypothetical or speculative measure of what concessions might have been gained. . . ." Id. To the contrary, "the court must be mindful that inherent in compromise is a yielding of absolutes and an abandonment of highest hopes." Ruiz v. McKaskle, 724 F.2d 1149 (5th Cir. 1984) (citing Cotton, 559 F.2d at 1330). As the former Fifth Circuit Court of Appeals succinctly stated in Young v. Katz, 447 F.2d 432, 433 (5th Cir. 1971), a procedure requiring a mini-trial on the underlying merits for purposes of approving a settlement "would emasculate the very purpose for which settlements are made." It is for this reason that:

> The Court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and exercise business judgment in determining whether the proposed settlement is reasonable. And, in weighing the benefits provided by the settlements against those dependent upon the likelihood of recovery, the courts cannot be expected to balance the scales with the nicety of an apothecary. The very object of a compromise is to avoid the determination of sharply contested and dubious issues.

Id. (citation omitted).

Secondly, courts in general, including those in this circuit, also have consistently stressed that in performing the balancing test necessary to determine the propriety of the settlement against the risk of continued litigation, the district court "is entitled to rely upon the judgment of experienced counsel for the parties." Cotton, 559 F.2d at 1330; Behrens v. Wometco, supra. In fact, a review of pertinent decisions in this area leads to the conclusion that "[c]ourts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching." In re King Resources Co. Sec. Litig., 420 F. Supp. 610, 625 (D. Colo. 1976).

8

Case No. 96-2324-Civ-Highsmith

Thirdly, the courts have also stressed that "litigants should be encouraged to determine their respective rights between themselves," and that there is an overriding public interest in favor of settlement." Cotton, 559 F.2d at 1331. This principle is particularly compelling in class action suits, which "have a well deserved reputation as being most complex." Id. As the Eleventh Circuit emphasized in In re U.S. Oil and Gas Litig., 967 F.2d 489, 493 (11th Cir. 1992):

> Public policies strongly favor the pretrial settlement of class action lawsuits. Complex litigation -- like the instant case -- can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering the meaningful relief increasingly illusive.

Id. (emphasis added). See also United States v. Miami, 614 F.2d 1322 (5th Cir. 1980) (compromises are extremely favored); Miller v. Republic Nat'l Life Ins. Co., 559 F.2d 426 (5th Cir. 1977) (same).

Finally, in addition to examining the merits of the proposed settlement and ascertaining the views of counsel, the court should also take into account practical considerations such as the complexity of the case, the expense and likely duration of the litigation, and the settling defendants' ability to pay, Susquehanna Corp. v. Korholz, 84 F.R.D. 315 (E.D. Ill. 1979). One of those practical considerations the Court should consider is the vagaries of litigation, and the benefits of an immediate recovery by way of a compromise as compared to "to the mere possibility of relief in the future, after protracted and expensive litigation." In re King Resources, 420 F. Supp. at 625. In this respect, "it has been held proper 'to take the bird in the hand instead of a prospective flock in the bush.'" Id.

Guided by these overriding principles, the Eleventh Circuit has outlined several factors useful in determining whether a proposed class action settlement is fair, adequate and reasonable. See

9

Case No. 96-2324-Civ-Highsmith

Bennett v. Behring Corp., 737 F.2d 982 (11th Cir. 1984). These factors are: (a) the likelihood of success at trial; (b) the range of possible recovery; (c) the point at or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (d) the complexity, expense, and duration of the litigation; (e) the substance and amount of opposition to the settlement; (f) the stage of proceedings at which the settlement is achieved. Id. at 987. See also Leverso v. Southtrust Bank of Ala., N.A., 18 F.3d 1527, 1530 (11th Cir. 1994); Behrens v. Wometco Enter., Inc., 118 F.R.D. 534, 538-39 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990). A review of these standards, guided by the principles described above, fully supports the conclusion that the proposed settlement before this Court should be approved.

## A.    PLAINTIFFS' LIKELIHOOD OF SUCCESS AT TRIAL

Although the case presented a variety of issues, Plaintiffs believe that they were likely to succeed at trial against DirecTV. The Court's analysis of this factor, however, must be tempered by DirecTV's equally firm belief that they would ultimately prevail, and the risk that a class may not have been certified for a host of reasons, including the possibility of being compelled to arbitration. Gateway, supra. DirecTV has expressly denied liability in the settlement papers, and they have asserted substantial defenses, both procedurally and substantively. Indeed, if Plaintiff lost the single issue of class certification, the Class members' ability to recover anything would have been eviscerated.

In any event, the Court should not resolve the parties' disagreement on the merits by issuing an advisory opinion about Plaintiffs' likely success, nor is a specific finding regarding Plaintiffs' likelihood of success necessary or appropriate to evaluate the fairness of the settlement:

LAW OFFICES
HANZMAN CRIDEN KORGE CHAYKIN
PONCE & HEISE, P.A.

Case No. 96-2324-Civ-Highsmith

> As settlements are construed upon compromise, the merits of the
> parties' claims and defenses are deliberately left undecided. Judicial
> evaluation of a proposed settlement of a class action thus involves a
> limited inquiry into whether the possible rewards of continued
> litigation with its risks and costs are outweighed by the benefits of the
> settlement.

Ressler v. Jacobson, 822 F. Supp. 1551, 1552-1553 (M.D. Fla. 1992). Such a "limited inquiry" in

this context clearly favors approval of this settlement, given the substantial benefits obtained for the

Class.

**B.    THE AMOUNT OF THE SETTLEMENT IS FAIR, WHEN COMPARED
WITH THE RANGE OF POSSIBLE RECOVERY**

The determination of a "reasonable" settlement is not susceptible to a simple mathematical

equation yielding a particular sum. Rather, "there is a range of reasonableness with respect to a

settlement." Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied, 409 U.S. 1039 (1972). Or,

stated differently, "a just result is often no more than an arbitrary point between competing notions

of reasonableness." Behrens v. Wometco, 118 F.R.D. at 538 (citation omitted).

The fairness of a proposed settlement cannot be determined in a vacuum. In Bennett v.

Behring Corp., 737 F.2d 982 (11th Cir. 1984), the court specifically identified the "range of possible

recovery" and the range of a fair settlement as two of six factors properly considered in evaluating

a class action settlement. Those two closely linked factors, which are discussed in this section of

Plaintiffs' Memorandum, are key to an evaluation of the Settlement.

Here, there is no question the settlement is fair when compared to the range of possible

recovery. The Class members had their Encore channels taken away and, as a result of this

litigation, they now may request that these Encore channels be restored. For Class members that

LAW OFFICES
HANZMAN CRIDEN KORGE CHAYKIN
PONCE & HEISE, P.A.

Case No. 96-2324-Civ-Highsmith

have canceled their subscriptions, they may request a refund of $4.00 per month for the time remaining on their annual subscription as of April 10, 1997. This figure was agreed upon because it is the monthly charge DirecTV now bills customers who wish to add the Encore movie channels. By providing an opportunity for complete relief to the Class, Plaintiffs have obtained an outstanding result by any standard, even without regard to the risks, costs and delays of continued litigation.

Indeed, settlements providing for much smaller recoveries have been approved. As Judge King held in approving a settlement constituting 5% of the claimed damages:

> The mere fact that the proposed settlement of $.20 per share is a small fraction of the desired recovery of $3.50 per share is not indicative of an inadequate compromise. A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.

Behrens v. Wometco Enter., Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988); see also Weinberger v. Kendrick, 698 F.2d 61, 74-79 (2d Cir. 1982) cert. denied 464 U.S. 818 (1983) ($2.84 million settlement approved where plaintiffs had claimed losses of $250 million to $1 billion). The amount of this settlement, which provides the customers with the full opportunity to obtain the lost Encore channels at no additional cost, is on its face extraordinary and clearly merits this Court's approval.

## C.    COMPLEXITY AND STAGE OF THE LITIGATION

Consideration of the complexity and the stage of the litigation also militates in favor of the approval of the settlement as being fair, reasonable and adequate. Due to the nature of this case, any future proceedings would be costly and time consuming. Such costs would reduce any ultimate recovery obtained on behalf of the Class. Avoidance of such costs is a clear benefit to the Class. Further, if the Settlement were not approved, future proceedings would include a lengthy trial

LAW OFFICES
HANZMAN CRIDEN KORGE CHAYKIN
PONCE & HEISE, P.A.

Case No. 96-2324-Civ-Highsmith

followed by appeals. The Settlement, on the other hand, provides for definite, immediate benefits without waiting additional years, and provides complete relief to Class members.

The stage of the proceeding also supports settlement because the necessary discovery undertaken to date has enabled Class Counsel to be in a position to properly analyze the benefits of the Settlement compared to the risk of proceeding to trial in an effort to obtain a larger recovery against DirecTV. This is particularly true when it is remembered that settlements are strongly encouraged, from which it follows that "only some reasonable amount of discovery should be required to make these determinations." Ressler, 822 F. Supp. At 1555. Given the necessary information that has been reviewed to date, the proposed Settlement is unquestionably fair. In re Warner Communications Sec. Litig., 618 F. Supp. at 735, 740 (S.D. N.Y. 1985) aff'd 798 F.2d 35 (2d Cir. 1986).

## D.    THE REACTION OF THE CLASS TO THE SETTLEMENT

The reaction of the Class to the Settlement also favors approval. Copies of a detailed Class Notice were mailed to seven hundred fifty seven thousand, four hundred and fifty seven (757,457) known and possible members of the Class. Class members were required to file objections by March 25, 1998. Only 77 objections to the Settlement were received. Affidavit of Michael A. Hanzman (Appendix Tab "B"). The infinitesimally small percentage (.00102%) of class members filing objections, of course, is an important factor in evaluating the fairness, reasonableness and adequacy of the settlement. Maher v. Zapata Corp., 714 F. 2d 436, 456 n.35 (5th Cir. 1983); In re Warner Communications, 618 F. Supp. at 746; Ressler v. Jacobson, 822 F. Supp. 1551, 1556 (M.D. Fla.

13

Case No. 96-2324-Civ-Highsmith

1992) ("The fact that there are no objections to the settlement is excellent evidence of the settlement's fairness and adequacy.").

On its face, this number of objections represents an extremely small percentage (.00102%) of customers objecting to the Settlement. Beyond the numbers, the substance of the objections does not call into question the fairness of the Settlement. The vast majority of "objections" were not objections to the terms of the Settlement, but instead were simply customers who wished to express their displeasure with having their Encore channels removed. A handful of other objectors thought that the Settlement should involve different remedies, including requests for punitive damages and for removal of the DirecTV equipment. One final group of objections involved several class members who had downgraded their subscription to another level-- namely, Select Choice. These class members questioned whether they were required to upgrade to Total Choice to obtain the benefits of the Settlement. They do not. As with all members of the Class, they simply need to return they Claim Form indicating they were dissatisfied with the change in programming and they also will automatically receive the Encore channels for the time remaining on their original contracts.

In fact, a number of those objectors withdrew their objections once the terms of the Settlement Agreement was explained to them. In short, the objections in this case do not present any reason to disapprove the Settlement.[1]

---

[1]Likewise, the number of persons requesting exclusion also supports approval of the settlement. Only 91 class members filed requests to exclude themselves from the benefits of this Settlement. Compared to the class size of 757,457, this number of exclusions supports approval of the Settlement.

14

Case No. 96-2324-Civ-Highsmith

In sum, through the Settlement, Plaintiffs have achieved a substantial victory for the Class. This settlement falls well within the range of reasonableness under the criteria set forth by the Eleventh Circuit in <u>Bennett</u> and should therefore be approved.

## IV.    THE FEE REQUEST

Plaintiffs' counsel also seek approval of the settlement agreement reached between the parties that DirecTV will pay an award of attorneys' fees and costs in the amount of $900,000 representing 3.75% of the approximately twenty four million dollar ($24,000,000) monetary benefit created for the class. This request, together with the remainder of the Settlement, should be approved since (a) it is well within the range of fees awarded in this type of class action; (b) the fees are being paid pursuant to the settlement of this issue between counsel and DirecTV to eliminate the need to litigate the attorneys' fee issue and the uncertainty both parties would have faced in litigating this issue before the Court; and (c) the attorneys' fee and costs are being paid by DirecTV separate and apart from the relief obtained for the benefit of the Class members and therefore would not at all affect or diminish the recovery by Class members.

As detailed in the Affidavit of Michael A. Hanzman, the Settlement provided that DirecTV would pay any attorneys' fees and costs awarded by the Court. This provision guaranteed that the class recovery would not be subject to any reduction. Under controlling law in this Circuit, counsel have the right to request an award of between 20% and 30% of the settlement fund, with 25% being the "bench mark." <u>Camden I Condominium Ass'n v. Dunkle</u>, 946 F.2d 768 (11th Cir. 1991). <u>After, and only after</u>, the parties agreed upon the terms settling the Class members' claims, including the term requiring that DirecTV pay any awarded attorneys' fees and costs, counsel attempted to

15

Case No. 96-2324-Civ-Highsmith

negotiate an appropriate amount of fees and expenses. Eventually, DirecTV and Plaintiffs' counsel agreed to a $900,000 payment to cover attorneys' fees as well as expenses. In doing so, both sides have avoided litigating this issue. Furthermore, as discussed in detail below, this negotiated figure is far less than the Court could have awarded and, most importantly for Class members, comes directly from DirecTV so that Class members will not lose any amount from their recovery in order to pay Plaintiffs' counsel.

Approval of the fees and expenses sought by counsel is appropriate and reasonable here given the extraordinary recovery obtained, substantial risks involved in prosecuting this action, contingent nature of counsel's fees and the consequent risk of nonpayment, the complexity of this action, the time invested, the skill required to produce the result obtained and the proposed settlement and, finally, the fact that its payment does not affect Class members' recovery in any way.

## V.   THE FEE REQUEST SATISFIES APPLICABLE LEGAL STANDARDS AND IS FAIR AND REASONABLE UNDER THE CIRCUMSTANCES

### A.   COURTS ENCOURAGE RESOLUTION OF ATTORNEYS' FEES ISSUE AS WAS ACCOMPLISHED AT BAR.

With the increasingly heavy burden placed upon courts, settlements of disputes, including negotiation of attorneys' fees, such as those paid in class actions, must be encouraged. See Malchman v. Davis, 761 F.2d 893, 905 (2d Cir. 1985) ("Absent special circumstances . . . the negotiation of attorneys' fees cannot be excluded from this principle.") (citing Prandini v. National Tea Co., 557 F.2d 1015, 1021 (3d Cir. 1977) and White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 453 n.15 (1982)); see also Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their

16

Case No. 96-2324-Civ-Highsmith

best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorneys' fees.") Recognizing this important principle, the parties here negotiated a settlement on the issue of attorney's fees and expenses. Initially, the parties agreed that DirecTV would be responsible for paying all fees and expenses. Thereafter, once the terms of the settlement were finalized, the parties began negotiating resolution of the amount DirecTV would pay for fees and expenses, which was ultimately done. In this manner, the settlement of the issues of fees and expenses had no impact upon the settlement previously negotiated for the Class members. Under these circumstances, the Court should not hesitate to approve the settlement of the attorney's fees and costs. See Malchman, 761 F.2d at 905. Indeed, this precise type of procedure was approved in a recent case involving a $5,000,000 request for fees and expenses. Elkins v. Equitable Life Ins. Co. Of Iowa, 1998 U.S. Dist. Lexis 1557 *97 (M.D. Fla. Jan. 28, 1998) (recognizing where Defendant agrees to pay fee, Defendant has particular incentive to keep the fee as low as possible; where there is no evidence of collusion, "the Court gives great weight to the negotiated fee in considering the fee request.").

## B.    COUNSEL WHO CREATE A COMMON FUND ARE ENTITLED TO A PERCENTAGE FEE

The Supreme Court has recognized that when attorneys create a common fund for the benefit of a class, "a reasonable fee is based on the percentage of the fund bestowed on the class." Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984); Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (Since the 1880s, "this Court has recognized consistently that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable

17

Case No. 96-2324-Civ-Highsmith

attorney's fee from the fund as a whole."). Awards of attorneys' fees from a common fund, such as

that created here, serve the dual purpose of encouraging redress for damages caused to entire classes

of persons, and discouraging future similar misconduct:

> [C]ourts . . . have acknowledged the economic reality that in order to encourage `private attorney general' class actions brought to enforce the securities laws on behalf of persons with small individual losses, a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid.

Mashburn v. Nat'l Healthcare, Inc., 684 F. Supp. 679, 687 (M.D. Ala. 1988). See also Grace v.

Ludwig, 484 F.2d 1262, 1267 (2d Cir. 1973), cert. denied, 416 U.S. 905 (1974) (holding that courts

should "encourage the vigilance of private attorneys general to provide corporate therapy protecting

the public investor who might otherwise be victimized"); Dolgow v. Anderson, 43 F.R.D. 472, 494

(E.D.N.Y. 1968) ("In some areas of the law, society is dependent upon the 'initiative of lawyers for

the assertion of rights' and the maintenance of desired standards of conduct.") (citations omitted).

## C. THE ELEVENTH CIRCUIT EMPLOYS THE PERCENTAGE OF THE FUND APPROACH

Reflecting the overwhelming trend across the country toward use of the percentage-of-the-

fund method, the Eleventh Circuit has held that attorneys' fees in common fund cases, such as this

case, must be based on a reasonable percentage of the common fund. Under controlling precedent,

counsel are entitled to request court-ordered attorneys' fees based upon a percentage of the common

fund they created for the benefit of the Class:

> After reviewing Blum, the [1985 Third Circuit] Task Force Report, and the foregoing cases from other circuits, we believe that the percentage of the fund

**18**

Case No. 96-2324-Civ-Highsmith

approach is the better reasoned in a common fund case. **Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.**

Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991) (rejecting the "lodestar" times multiplier regime of Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except in statutory fee-shifting cases) (emphasis added). The Camden I court pointed out that "[t]he majority of common fund fee awards fall between 20% to 30% of the fund," while 25% of the fund is viewed as a "bench mark percentage fee award." Id. at 774-75 (noting that 50% of the fund generally represents an upper limit, "although even larger percentages have been awarded"). In calculating the appropriate percentage, pertinent factors to analyze include the time required to reach the settlement, whether there are substantial objections by class members to the settlement terms or the fees requested by counsel, the monetary benefits conferred upon the class by the settlement, the non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting the case. Id. at 775. In most cases, like this one, there will also be additional factors unique to a particular case that will be relevant to the Court's consideration. Id. at 774-75.[2]

The Camden I court held that "there is no hard and fast rule mandating a certain percentage of a common fund which may reasonably be awarded as a fee because the amount of any fee must

---

[2] Although the Camden I court rejected the "lodestar" approach in common fund cases, certain time and hourly fee-related factors remain pertinent to the reasonableness of the percentage award, including "the time required to reach a settlement" and factors used in statutory fee-shifting cases under Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) (where the lodestar method is appropriate), which include "the time and labor required" and "the customary fee." Camden I, 946 F.2d at 775, 772 and n.3.

**19**

Case No. 96-2324-Civ-Highsmith

be determined upon the facts of each case." 946 F.2d at 774-75. A review of counsel's efforts herein demonstrates that they satisfy the criteria of Camden I, and that the particular circumstances of this case more than merit the requested fee.

### D.    THE CAMDEN I FACTORS SUPPORT COUNSEL'S REQUESTED FEE

Initially, significant "time and labor was required" in investigating and thereafter litigating this case which was "the time required to reach a settlement." Camden I, 946 F.2d at 775, 772 n.3 (quoting Johnson, 488 F.2d at 718 (5th Cir. 1974)). It also is beyond dispute that this litigation is of a complex nature, involving novel issues of law and fact. Plaintiffs argued that DirecTV's unilateral decision to change programming and eliminate the Encore channels breached the contract with Class members and entitled the Class members to reinstatement of the Encore channels. DirecTV countered and denied, inter alia, that it violated the agreement merely by changing the programming mix. Additionally, in other cases involving a similar arbitration clause, courts have compelled arbitration, which may have precluded certification. See Gateway supra. In short, there was no neat pigeonhole into which this case could be fit, and no on-point precedent addressing many of the issues raised. The complexity of this litigation and "novelty and difficulty of the questions involved," see Camden I, 946 F.2d at 772 n.3, highlights the nature and magnitude of the risk assumed by Plaintiff's Counsel in accepting representation on a fully contingent basis.

Counsel fees should also reflect the degree of skill, experience and competence necessary to achieve the proposed settlement and create the common fund. Camden I, 946 F.2d at 772 n.3. Another court in this District recently noted that the "experience and competency" of Plaintiff's Counsel in another class action was "evident in both their pleadings and oral presentations to the

LAW OFFICES
HANZMAN CRIDEN KORGE CHAYKIN
PONCE & HEISE, P.A.

Case No. 96-2324-Civ-Highsmith

Court." Walco v. Thenen, 168 F.R.D. 315, 327 (S.D. Fla. 1996). Counsel's competence and

experience in class actions clearly was a significant factor in obtaining the result achieved for the

Class. In assessing the quality of representation by the Plaintiffs' counsel, the Court also should

consider the quality of the opposition. See, e.g., Camden I, 946 F.2d at 772 n.3; Johnson, 488 F.2d

at 718; Ressler v. Jacobson, 149 F.R.D. 651 (M.D. Fla. 1992); Angoff v. Goldfine, 270 F.2d 185,

192 (1st Cir. 1959). The excellent quality of that opposition has been no less apparent. The

Defendant was ably and aggressively represented by senior lawyers from the national firms of

Kirkland & Ellis and Richman, Greer, Weil, Brumbaugh, Mirabito & Christensen, P.A.[3]

### E.    PLAINTIFFS' COUNSEL ASSUMED THE RISK OF NONPAYMENT BY PROSECUTING THE ACTION ON A FULLY CONTINGENT BASIS

One of the pertinent factors noted by the Eleventh Circuit, for purposes of determining the

appropriate percentage fee, is "the economics involved in prosecuting a class action." Camden I, 946

F.2d at 775, 772 n.3 (related Johnson factor is "whether the fee is fixed or contingent"). This action

was prosecuted by Class Counsel on a purely contingent basis, thereby assuming the risk of no

payment for a considerable amount of work over an extended time period. As discussed above, it

is clear that the claims against DirecTV were risky and difficult. Nevertheless, counsel expended

---

[3]Further, Plaintiffs obtained this result without "piggybacking" upon work done by any governmental agency, which also reflects the diligence and skill of counsel. See Ressler, 149 F.R.D. at 654; In re Warner Communications Sec. Litig., 618 F. Supp. 735, 748 (S.D.N.Y. 1985). Instead, various state Attorneys General contacted Plaintiff's counsel to obtain information. The states settled their dispute after this class action settled. The Settlement was thereafter amended to include procedural changes requested by the states' Attorneys General. The states, however, did not confer any greater benefit to the Class members. In short, this is clearly not a case where the plaintiffs rode the government's coattails.

LAW OFFICES
HANZMAN CRIDEN KORGE CHAYKIN
PONCE & HEISE, P.A.

Case No. 96-2324-Civ-Highsmith

approximately one hundred and fifty thousand dollars ($150,000.00) in time at their regular hourly

rates and were prepared to fully litigate this case and bear the risk of non payment absent success.

Thus, the contingency risk in this case was substantial. The cases discussed below make clear that

a percentage fee of 3.75% is justified by the excellent results achieved and the efforts required to

achieve them.[4]

## F.   THE RESULTS OBTAINED IN THIS CASE ARE EXCELLENT

Class Counsel Plaintiffs' have provided the opportunity for complete relief as the benefit to

the Class. As a result, the "results obtained" are excellent, see Camden I, 946 F.2d at 775, 772 n.3,

particularly in light of the legal and factual complexity of the case and the difficulties of establishing

liability. Taking into account the difficulties presented by this case, it is undeniable that the result

achieved is outstanding.

---

[4]In this case even if the Court conducted a lodestar analysis (although Camden requires a percentage fee) with a reasonable multiplier, the fee of $900,000 is still entirely justifiable. In many other cases, including cases in this jurisdiction, multiples as high as twelve have been approved. E.g., Weiss v. Mercedes-Benz of North America, Inc., 1995 U.S. Dist. LEXIS 14708 (D.N.J. 1995) (multiple of 9.3 times lodestar); In re RJR Nabisco, Inc. Sec. Litig., Fed. Sec. L. Rep. (CCH) ¶ 96,984 (S.D.N.Y. 1992) (multiple of 6); Cosgrove v. Sullivan, 759 F. Supp. 166 (S.D.N.Y 1991) (multiple of 8.74); Glendora Community Redevelopment Agency v. Demeter, 155 Cal. App. 3d 465 (1984) (multiple of 12). Grimshawe v. New York Life Insurance Co., Case No. 96-0746-Civ-Nesbitt (S.D. Fla. 1996) (percentage-based fee award equivalent to a multiple of 8.5). The total fee requested in this case will amount to approximately 6 times counsels' total lodestar, and is certainly fair and reasonable given the circumstances of this case. Affidavit of Michael A. Hanzman (Appendix Tab "B") ¶¶12-13. Indeed, to hold otherwise would penalize Plaintiffs' counsel for settling expeditiously rather than needlessly prolonging the litigation. See In re: Metro Mobile CTS, Inc. Shareholders Litigation, Case No. 12300 (Del. Ch. Ct. August 18, 1993) ("Counsel did not undertake representation on an hourly basis and they should not be encouraged to litigate longer than necessary in order to justify a fee request.").

LAW OFFICES
HANZMAN CRIDEN KORGE CHAYKIN
PONCE & HEISE, P.A.

Case No. 96-2324-Civ-Highsmith

### G.    THE FEE REQUESTED COMPORTS WITH AWARDS IN SIMILAR CASES AND THE CUSTOMARY FEE

Plaintiff's Counsel are applying to the Court for an award of attorneys' fees and expenses of $900,000, which will amount to approximately 3.75% of the common fund available to the Class. Considering "awards in similar cases", see Camden I, 946 F.2d at 775, 772 n.3, recent decisions in this Circuit awarding up to (and sometimes in excess of) one-third of the settlement value, confirm the fairness and reasonableness of the fee requested here. Certain recent common fund opinions of Southern and Middle District of Florida courts are unpublished. We have been able to obtain and provide those indicated with a double asterisk (**) under Appendix Tab "C." See, e.g., Waters v. Int'l Precious Metals Corp., Case No. 90-6863-Civ-Ungaro-Benages (S.D. Fla. 1997) (awarding 33 1/3% of $40 million fund)[5]; In re Int'l Recovery Corp. Sec. Litig.,** Case No. 92-1474-Civ-Atkins (S.D. Fla., June 2, 1994) (fee award represented 30% of class benefit); In re Sound Advice, Inc. Sec. Litig.,** Case No. 92-6457-Civ-Ungaro-Benages (S.D. Fla. Mar. 25, 1994) (awarding 30%); In re Perfumania, Inc. Sec. Litig., Case No. 92-1490-Civ-Marcus (S.D. Fla. Sept.

---

[5]Plaintiffs have provided the Final Order and Judgment Approving Settlement in Waters, together with the transcript of the final fairness hearing at Appendix Tab "D". In paragraph 14 of the Final Order, the court awarded counsel 33 1/3% of the $40,000,000 settlement fund, plus reimbursement of costs. The settlement approved in Waters represented a recovery of approximately twenty percent (20%) of the investors' losses, before deducting the court- awarded fees and costs. See transcript (Appendix Tab "D") at 59. The Waters court emphasized that in securities fraud cases where the settlement amount exceeded $10 million, "the average and median settlement value as a percentage of damages for that period [1991-96] was 11.1% percent and 6.6 percent respectively." Id. The Waters court also observed that the average attorney's fee awarded in securities class actions in the Eleventh Circuit from 1991 to mid-1996 was 29.92% of the total settlement, and the nationwide average and median attorneys' fees awards expressed as percentages of settlement, in class actions that settled for between $10 million and $49 million in that time period, were 31.72% and 33.33%, respectively. See id at 87.

23

22, 1993) (awarding 30%); Tapken v. Brown, Case No. 90-0691-Civ-Marcus (S.D. Fla. 1995) Case No. 96-2324-Civ-Highsmith (awarding 33%); In re Belmac Corp. Sec. Litig., Case No. 92-1814-Civ-T-23-(C) (M.D. Fla. 1994) (awarding 31%); Holloway v. Chapnick, ** Consol. Case No. 89-6572-Civ-Paine (S.D. Fla. 1994) (awarding 30%); In re Royce Lab. Inc. Sec. Litig.,** Case No. 92-0923-Civ-Moore (S.D. Fla. 1993) (awarding 30%); Kaser v. Swann, Case No. 90-607-Civ-Orl-3A18 (M.D. Fla. 1993) (awarding 30%); Ressler, 149 F.R.D. at 655-6 (awarding 30%); In re Aero Systems, Inc. Sec. Litig., Case No. 90-0083-Civ-Paine (S.D. Fla. 1993) (awarding 28%); Ludeman v. C&S/Sovran,** 92-8368-Civ-Highsmith (S.D. Fla. 1995) (awarding 27.5%); C.V. Reit, Inc. v. Levy, Case No. 91-8177-Civ-Gonzalez (S.D. Fla. 1993) (awarding 27%); In re Dycom Corp. Sec. Litig.,** Case No. 91-8395-Civ-Graham (S.D. Fla. 1994) (awarding 26.5%); In re Southeast Bank Corp. Sec. Litig.,** Case No. 90-0760-Civ-Moore (S.D. Fla. 1993) (awarding 25%); In re FPL Group Consol. Litig., Case No. 90-8461-Civ-Nesbitt (S.D. Fla. 1992) (awarding 25%); and In re Home Shopping Network Sec. Litig., Case No. 87-428-T-13(A) (M.D. Fla. Oct. 15, 1991) (awarding 33% fee).[6]

---

[6]    Other recent class actions in which the fee award equaled or exceeded 30% are listed at Appendix Tab "E." They include: In re BusinessLand Sec. Litig., Fed.Sec.L.Rep. (CCH) ¶ 96,059 (N.D. Cal. 1991) (awarding 30% of $6 million common fund); Mashburn v. Nat'l Healthcare, Inc., 684 F. Supp. 679, 697, n.8 (M.D. Ala. 1988) (awarding 30%, listing over 20 cases awarding more than 25%); Meyer v. Citizens & Southern Nat'l Bank, 117 F.R.D. 180 (M.D. Ga. 1987) (30% of common fund); Howes v. Atkins, 668 F. Supp. 1021 (E.D. Ky. 1987) (40% of common fund); Bello v. Integrated Resources, Inc., Fed.Sec.L.Rep. (CCH) ¶ 95,731 (S.D.N.Y. 1990) (30% of common fund); In re Avon Prod. Inc. Sec. Litig., Fed.Sec.L.Rep. (CCH) ¶ 97,061 (S.D.N.Y. 1992) ("The request for 30% is in line with numerous awards in this court and elsewhere in recent litigation."); In re Crazy Eddie Sec. Litig., 824 F. Supp. 320, 325-27 (E.D.N.Y. 1993) (awarding $14.2 million fee, representing 30% of $34 million settlement); Long v. Trans World Airlines, Inc., 1993 U.S. Dist. LEXIS 5063 (N.D. Ill. Apr. 15, 1993) (awarding 32% fee); In re Public Service Co., Fed.Sec.L.Rep. (CCH) ¶ 96,988 (S.D. Cal. 1992) (awarding 33% fee); Roberts v. Heim, Fed.Sec.L.Rep. (CCH) ¶ 96,221, at 91,155-56 (N.D. Cal. 1991) (awarding 30% fee); In re M.D.C.

24

Case No. 96-2324-Civ-Highsmith

## H.    THE REQUESTED FEE COMPORTS WITH THAT CHARGED IN THE MARKETPLACE

It is also significant that the amount sought is less then the standard contingent fee amount found in the marketplace. "The object in awarding a reasonable attorney's fee . . . is to simulate the market." In re Continental Illinois Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992); accord RJR Nabisco, Inc. Sec. Litig., Fed.Sec.L.Rep. (CCH) ¶ 96,984, at 94,268 (S.D.N.Y. 1992) ("what should govern [fee] awards is . . . what the market pays in similar cases . . .") (awarding percentage fee). See also Kirchoff v. Flynn, 786 F.2d 320, 325 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'") (emphasis in original); Swedish Hospital Corp. v. Shalala, 1 F.3d 1261, 1269 (D.C. Cir. 1993).

The requested fee is consistent with practice in the private marketplace where contingent fee arrangements ranging from 30% to 40% are customary. See Affidavit of Michael A. Hanzman (Appendix Tab "B"). In their concurring opinion in Blum v. Stenson, 465 U.S. 886 (1984), Justices Brennan and Marshall observed that:

> In tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.

Id. at 904; see Kirchoff, 786 F.2d at 323, 325 n.5 (observing that "40% is the customary fee in tort litigation"); In re Public Service Co., Fed.Sec.L.Rep. (CCH) ¶ 96,988, at 94,291-92 (S.D. Cal. 1992)

---

Holdings Sec. Litig., Fed.Sec.L.Rep. (CCH) ¶ 95,315 (N.D. Cal. 1989) awarding 30% fee; In re Warner Comm. Sec. Litig., 618 F. Supp. 735, 749-50 (S.D.N.Y. 1985) ("Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%-50% range in class actions.") (citing cases).

25

Case No. 96-2324-Civ-Highsmith

("If this were a non-representative litigation, the customary fee arrangement would be contingent on a percentage basis, and in the range of 30% to 40% of the recovery."). Had the consumers retained counsel on an individual basis, as the named Plaintiffs did, they would have paid a contingent fee greater than the amount requested.

## VI.    CONCLUSION

The Bennett factors clearly support final approval of this settlement as one that is fair, adequate and reasonable. The settlement, accordingly, should be approved and the proposed Final Judgment and Order of Dismissal should be entered. In addition, the fee requested is fair and reasonable and more than satisfies the guidelines of Camden I, especially in light of the fact that DirecTV is paying the fee and expenses above and beyond the relief being provided to Class members. For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Final Approval of Settlement and Award of Attorneys' Fees and Costs.

Respectfully submitted,

HANZMAN, CRIDEN, KORGE,
 CHAYKIN, PONCE & HEISE, P.A.
2100 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
(305) 579-1222

BY: _____
       MICHAEL A. HANZMAN
       F.B.N. 510637
       MARK J. HEISE
       F.B.N. 771090

26

Case No. 96-2324-Civ-Highsmith

- and -

Mark A. Dresnick, Esq.
Sean M. Ellsworth, Esq.
DRESNICK & ELLSWORTH, P.A.
Grand Bay Plaza, Suite 201
2665 South Bayshore Drive
Miami, Florida 33133
(305) 854-9100
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was hand delivered

to Alan G. Greer, Esq., RICHMAN, GREER, WEIL, BRUMBAUGH, MIRABITO &

CHRISTENSEN, P.A., Miami Center, 10th Floor, 201 South Biscayne Blvd., Miami Florida 33131,

on April 16, 1998.

BY_____
MARK J. HEISE

27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SOUTHERN DIVISION

CASE NO. 97-2324-CIV-Highsmith
Magistrate Judge Dube

OSVALDO LUACES and
MARGARITA LUACES, et al.,

      Plaintiffs,

v.

DIRECTV, INC.,

      Defendant.

_____/

## DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' INTERROGATORIES

This response to Plaintiffs' Interrogatories is provided by Defendant DIRECTV, Inc. pursuant to Federal Rule of Civil Procedure 33.

### RESERVATION OF RIGHTS

DIRECTV, Inc. provides these responses without waiving or intending to waive, but on the contrary preserving and intending to preserve:

1.    the right to object to any other interrogatories from Plaintiffs that in the aggregate exceed 25 in number, including all discrete subparts;

2.    all questions as to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the responses or subject matters thereof, in any subsequent proceeding in, or the trial of, this or any other action;

1

3.      the right to object on any ground to the use of any of said responses, or the subject matter thereof, in any subsequent proceeding in, or the trial of, this or any other action;

4.      the right to object on any ground at any time to a demand for further responses to these or any other interrogatories or other discovery procedures involving or related to the subject matters of the interrogatories responded to herein; and

5.      the right, at any time, to revise, correct, add to, or clarify any of the responses provided herein.

## Definitions

As used herein,

1.      "Unduly burdensome" means that it is impossible to provide a response that is complete and sufficient without making an unreasonably complex or onerous investigation or incurring unreasonable expense.

2.      "Vague" means ambiguous, confusing, subject to varying interpretations, or not specified with reasonable particularity.

3.      "Overbroad" means that the Interrogatory either seeks information or documents not in the possession, custody, or control of DIRECTV or is beyond the scope of discovery permitted by Rules 26 and 34 of the Federal Rules of Civil Procedure.

## General Objections to Plaintiffs' Interrogatories

1.      DIRECTV objects to Plaintiffs' Interrogatories to the extent they seek to impose obligations greater than those imposed by the Federal Rules of Civil Procedure.

2.      DIRECTV objects to each of Plaintiffs' Interrogatories to the extent that they seek information or documents that are protected by the attorney-client privilege, that are protected by

2

the attorney work product doctrine, that were prepared in anticipation of litigation or in preparation for trial, that constitute or disclose the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of DIRECTV concerning this or any other litigation, or that are protected by any other privilege or immunity. To the extent that Plaintiffs' Interrogatories call for documents protected by the attorney-client privilege, attorney work product immunity, or other privileges or immunities, such documents will not be produced, but will be identified on a separate log as required by Federal Rule of Civil Procedure 26(b)(5).

3.      DIRECTV objects to Plaintiffs' Interrogatories to the extent they seek information not within the possession, custody, or control of DIRECTV. Any response or objection to any or all of Plaintiffs' Interrogatories does not necessarily mean that any information responsive to Plaintiffs' Interrogatories is in the possession, custody, or control of DIRECTV.

4.      DIRECTV objects to Plaintiffs' Interrogatories to the extent they seek information already in the possession of, or otherwise available to, Plaintiffs.

5.      DIRECTV objects to each of Plaintiffs' Interrogatories to the extent that they require DIRECTV to provide the same information more than once on the ground that such duplicative disclosure is unduly burdensome.

6.      DIRECTV objects to each of Plaintiffs' Interrogatories to the extent that they are overly broad, vague, ambiguous, or unduly burdensome to answer and respond to, and to the extent that they seek information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence or is otherwise outside the scope of discovery as set forth in Federal Rules of Civil Procedure 26 and 33.

7.    In each and every answer, or subpart thereof, where DIRECTV interposes an objection, such objection shall be construed to preserve all of DIRECTV's rights to enter similar objections as to any future supplemental answer to such requests. Moreover, a failure to object herein shall not constitute a waiver of any objections that DIRECTV may interpose as to future supplemental answers.

8.    DIRECTV's failure to object to a request on a particular ground or grounds shall not be construed as any type of waiver of its right to object on the ground or any additional grounds.

9.    DIRECTV objects to production of the responses contained herein except under the terms of Paragraph 26 of the Amended Stipulation of Settlement, regarding confidentiality of "any information received from DIRECTV in connection with" this action.

10.    The specific responses set forth below are based upon information now available to DIRECTV and DIRECTV reserves the right at any time to revise, correct, add to, or clarify the objections or responses set forth herein.

## RESPONSES AND OBJECTIONS TO SPECIFIC REQUESTS

**INTERROGATORY NO. 1:** Identify how DIRECTV determined the identity of all consumers who entered into a prepaid one year contract with DIRECTV between August 22, 1996 and April 10, 1997, for the Total Choice programming package. (Hereinafter referred to as "class members").

**RESPONSE:** Subscriber account records are maintained in DIRECTV's billing system database. Subscribers who entered into one-year pre-paid contracts with DIRECTV for Total Choice programming were assigned unique service codes when they activated their DIRECTV

4

service. To create a mailing list consisting of all class members, a report was run off the billing system that included all subscriber accounts containing this service code who had a service activation date on or before April 30, 1997. The resulting report, listing 757,457 accounts meeting the class definition, formed the mailing list used to send notices and claim forms to class members.

**INTERROGATORY NO. 2:** Identify the number of consumers who entered into a prepaid one year contract with DIRECTV during the following months: a) August 1996 (after August 22); b) September 1996; c) October 1996; d) November 1996; e) December 1996; f) January 1997; g) February 1997; h) March 1997; i) April 1997.

**RESPONSE:** DIRECTV derived the following monthly information from the report described in the response to Interrogatory No. 1, above:

| | | | |
|---|---|---|---|
| August 22-31 1996 | 12,261 | January 1997 | 91,117 |
| September 1996 | 107,880 | February 1997 | 62,679 |
| October 1996 | 95,080 | March 1997 | 63,799 |
| November 1996 | 111,730 | April 1997 | 58,332 |
| December 1996 | 154,579 | | |

**INTERROGATORY NO. 3:** Identify the individuals responsible for answering questions relating to consumer questions regarding the subject class action lawsuit.

**RESPONSE:** In order to provide subscribers with information about the class action lawsuit, DIRECTV set up a special toll free telephone number, which provided a series of recorded messages concerning the status of the lawsuit. The messages were recorded in English

and Spanish. Callers were directed through a menu of options describing the various messages. Callers could leave their name and address and receive a copy of the settlement notice and claim form. Customer service operators handling calls received at DIRECTV's call centers were instructed to refer any questions regarding the class action lawsuit to the special toll free number. To the extent the question calls for the names of each customer service operator, DIRECTV specifically objects on the grounds that the request is overbroad, unduly burdensome, and calls for information that is irrelevant in light of the instruction given to customer service operators.

Calls were also received and answered by DIRECTV's counsel, Kirkland & Ellis in Los Angeles, California, and Richman, Greer, Weil, Brumbaugh, Mirabito & Christensen, P.A., in Miami, Florida. All calls received by Kirkland & Ellis were routed to Mariel Mulet, case paralegal. All calls received by Richman, Greer were routed to Manuel A. Garcia-Linares, Esquire. As a general matter, Mr. Garcia-Linares and Ms. Mulet referred callers to the DIRECTV toll free number, although they did occasionally provide a brief explanation of the settlement to callers who seemed to be having difficulty understanding why they had received the notice of settlement. Callers with more substantive questions were referred to the toll free number and/or Michael Hanzman.

**INTERROGATORY NO. 4:** Identify the names and addresses of all subscribers who contacted DIRECTV after February 5, 1998, regarding the subject class action lawsuit.

**RESPONSE:** The list of individuals who left their names through the toll free number to request copies of the settlement notice and claim form is attached as Exhibit 1. Callers who utilized the toll free number but did not leave their names cannot be identified. Callers who contacted customer service representatives and were referred to the toll free number by them

6

were not recorded. Calls to Mariel Mulet at Kirkland & Ellis, are listed at Exhibit 2. Calls to Manuel Garcia-Linares of Richman, Greer, are listed at Exhibit 3.

**INTERROGATORY NO. 5:** Identify the names and addresses of all subscribers who have sent any correspondence to DIRECTV regarding the subject class action lawsuit.

**RESPONSE:** DIRECTV objects that this request is unduly burdensome. DIRECTV has received over 72,000 claim forms to date in response to the class notice. DIRECTV is providing a list of subscribers who sent correspondence other than the claim form to DIRECTV mentioning the class action lawsuit. See Exhibit 4.

Dated:        April 2, 1998

AS TO OBJECTIONS AND LEGAL CONTENTIONS:

Michael E. Baumann
John C. Eastman
KIRKLAND & ELLIS
300 S. Grand Ave., Suite 3000
Los Angeles, CA 90071
(213) 680-8400

Alan G. Greer
Manuel A. Garcia-Linares
RICHMAN, GREER, WEIL, BRUMBAUGH,
        MIRABITO & CHRISTENSEN
Miami Center, 10th Floor
201 South Biscayne Boulevard
Miami, FL 33131
(305) 373-4000

Attorneys for DIRECTV, Inc.

7

## VERIFICATION

I, Christopher A. Murphy, declare under penalty of perjury that I have read the foregoing DIRECTV's Response to Plaintiffs' Interrogatories, and to the best of my knowledge and belief the factual responses set forth therein are true, correct and complete.

April 2, 1998

_Christopher A. Murphy_
DIRECTV, Inc.

Exhibit 1

| Account # | First Name | Last Name | Address | City | State | Zip | Date of Call |
|---|---|---|---|---|---|---|---|
| 1 | | DTV/ EDDY HARTENSTEIN | 2230    E IMPERIAL HWY | EL SEGUNDO | CA | 90245 | 19980217 |
| 2 | | HUGHES CORPORATE | 7200    HUGHES TER | LOS ANGELES | CA | 90045 | 19980316 |
| 3 | MARIA | KOCHAN | PO BOX 1114 | OROVILLE | WA | 98844 | 19980311 |
| 756 | PAUL | KELLER | 2701 DURANT AVE | OAKLAND | CA | 94605 | 19980310 |
| 999 | RITA | CALLAHAN | 5514 GRAND AVE | OMAHA | NE | 68104 | 19980306 |
| 999 | RITA | CALLAHAN | 5514 GRAND AVE | | | | 19980306 |
| 1010 | GEORGE | DELL | 1 Main St | El Segundo | CA | 90620 | 19980204 |
| 1609 | JUANITA | CRUZ | | | | | 19980212 |
| 2196 | JIM | ADAMS | 21830    RASHDALL AVE | CARSON | CA | 90745 | 19980202 |
| 2196 | JIM | ADAMS | 21830    RASHDALL AVE | CARSON | CA | 90745 | 19980212 |
| 2196 | JIM | ADAMS | 21830    RASHDALL AVE | CARSON | CA | 90745 | 19980223 |
| 2767 | PAUL | KELLER | 2701 Durant Ave | Oakland | CA | 94605 | 19980225 |
| 48151 | ANGELINE | STATON | HC 67 BOX 3105 | PILGRIM | KY | 41250 | 19980212 |
| 79403 | ROBERT | DUBERRY | 1440 Inestring Dr | Las Vegas | NV | 89134 | 19980209 |
| 82593 | LAWRENCE | HARRIS | 28631    NEWPORT DR | WARREN | MI | 48093 | 19980301 |
| 97234 | GINNY | WATKINS | 351 W ORSTRANDLE AVE | | | | 19980213 |
| 101611 | PAUL | COSTAGLIOLA | 641  CLEMENTS BRIDGE RD | BARRINGTON | NJ | 8007 | 19980209 |
| 105256 | HAROLD | MCLAMB | RR 2 BOX 240-A3 | WADE | NC | 28395 | 19980225 |
| 105256 | HAROLD | MCLAMB | RR 2 BOX 240-A3 | WADE | NC | 28395 | 19980225 |
| 119728 | MR MARVIN | LEE | 995    ARCHER RD | WRIGHT CITY | MO | 63390 | 19980211 |
| 140950 | ALFRED | WASHINGTON | 515    N EAST AVE | BALTIMORE | MD | 21205 | 19980211 |
| 158849 | PAUL | MCHENRY | 61    HARBOUR ROW DR | COLDSPRING | TX | 77331 | 19980318 |
| 173247 | GEORGE | EVACQUA | 848    1ST STREET | ELIZABETH | NJ | 7206 | 19980228 |
| 291581 | G. | BARTON GRIFFIN | PO BOX 238 | STOWE | VT | 5672 | 19980612 |
| 317932 | ESTHER | WEISS | 40    YATES BLVD | POUGHKEEPSIE | NY | 12601 | 19980323 |
| 328471 | DR WARREN | GOODWIN | 3797   LAKECREST DR | BLOOMFIELD HILLS | MI | 48304 | 19980223 |
| 361407 | DOMINIC | LANGIANO | PO Box 75 | Auburn | IL | 62615 | 19980227 |
| 404768 | JIM | ANDREWS | 9101    LYNNWOOD LN | ROCKFORD | TN | 37853 | 19980303 |
| 406055 | MARK | SMITH | PO Box 970 | Lees Summit | MO | 64063 | 19980215 |
| 410019 | VERNON | KELLY | 3316    OLD RIVER ROAD | CARTHAGE | NC | 28327 | 19980227 |
| 414303 | KRYSTAL | YOUNG | 45    SWEETLAND HILL RD | CHENANGO FORKS | NY | 13746 | 19980316 |
| 461277 | MICHAEL | MEGEATH | PO BOX 187 | WATERFORD | VA | 22190 | 19980321 |
| 549036 | MICHAEL | NUNN | HC 60 BOX 2020 | LAKEVIEW | OR | 97630 | 19980215 |
| 583769 | HAROLD | GAY | 15401   PEA BRIDGE RD | LAURINBURG | NC | 28352 | 19980303 |
| 592228 | MALISSA | HAROLD WASHINGTON | 5338    PLATEAU CT | FAYETTEVILLE | NC | 28303 | 19980225 |
| 593513 | RUTHERFORD | JONES | 4040    MARIETTA DR | VESTAL | NY | 13850 | 19980317 |
| 639941 | BETTY | SMITH | 4875    E MELISSA ST | TUCSON | AZ | 85711 | 19980305 |
| 654130 | DENNIS | JACKSON | 50014 Richardson Rd | Amory | MS | 38821 | 19980223 |
| 657999 | WILLIAM | WILMES | 2933    S HWY 83 | SONOITA | AZ | 85637 | 19980311 |
| 679532 | GARY | KNIGHT | 6277    LAKEHAVEN DR | FAYETTEVILLE | NC | 28304 | 19980226 |
| 768895 | GEORGE | JOHNSON JR | 3572    COUNTY ST | SOMERSET | MA | 2726 | 19980210 |
| 779954 | TROY | ANDRE | 850    MERRILLS COVE RD | ASHEVILLE | NC | 28803 | 19980323 |
| 788458 | BETTY | PYPER | 1528    MAPLE ST-HASKELL | BENTON | AR | 72015 | 19980224 |
| 800723 | JANICE | DIAZ | 17    AURORA DR | ROLLING HILLS | CA | 90274 | 19980204 |
| 800723 | GLEN | WARREN | | EL SEGUNDO | CA | 90620 | 19980204 |
| 800723 | | | 5921 Los Angeles Way | Buena Park | CA | 90620 | 19980204 |
| 829517 | ROBERT | GOULD | 10220    63RD LN | PINELLAS PARK | FL | 34666 | 19980224 |
| 880944 | JEROME | KINLAW | 2266    MERCER MILL RD | LUMBERTON | NC | 28358 | 19980302 |
| 882939 | | RAYMOND WELLS | 5923    WITT ST | SAINT LOUIS | MO | 63140 | 19980305 |
| 914090 | ROBERT | MILLER | RR 4 BOX 2015 | LEBANON | PA | 17042 | 19980228 |
| 972324 | RICH | GLASGOW | 2630    BELLAR RD | GREENBRIER | TN | 37073 | 19980212 |
| 972324 | WESLEY | LEE | 373 NORTH AVE | | | | 19980303 |
| 972324 | SHARON | MCDUFF | | | | | 19980207 |
| 988626 | THOMAS | ZINKHAN SR/ LOIS ZINKHAN | 2420    TODDVILLE RD | WINGATE | MD | 21675 | 19980217 |
| 988626 | THOMAS | ZINKHAN SR/ LOIS ZINKHAN | 2420    TODDVILLE RD | WINGATE | MD | 21675 | 19980217 |
| 994661 | LG | BOWLING | 1025    SEVEN LKS N | WEST END | NC | 27376 | 19980225 |
| 1015510 | ROBERT | CLAYTON | NORTHWEST CREEK MARIN | NEWBERN | NC | 28560 | 19980225 |
| 1018596 | LORI | GIBSON | 368    BLANCHARD RD | SANFORD | NC | 27330 | 19980302 |
| 1032367 | GEORGE | PETERS | 1726    MARTINDALE DR | FAYETTEVILLE | NC | 28304 | 19980225 |
| 1051555 | FRANK | COSTELLO | 4474    E FARM ROAD 94 | SPRINGFIELD | MO | 65803 | 19980219 |
| 1058742 | O.FRED | MILLER | 43    S LIBERTY DR | STONY POINT | NY | 10980 | 19980220 |
| 1092514 | ROBERT | BUCKERT | 17200    W BELL RD | SURPRISE | AZ | 85374 | 19980223 |
| 1149755 | MYRTLE | THOMAS | 3850    STURBRIDGE DR | HOPE MILLS | NC | 28348 | 19980225 |
| 1150936 | SQUIRE | THOMAS JR | 648    LAKERIDGE DR | CAMERON | NC | 28326 | 19980225 |
| 1198920 | CURTIS | SMITH | 509    DOWD RD | CARTHAGE | NC | 28327 | 19980312 |
| 1292769 | RICHARD | STUBBLEFIELD | 3324    CHARITY LN | TONEY | AL | 35773 | 19980215 |
| 1325434 | ELMER | GAUGER | 2450    W WATER ST | YUMA | AZ | 85364 | 19980326 |
| 1331052 | DOUG | PEPPER | 15    SOUTH CENTRAL AVE | QUARTZSITE | AZ | 85346 | 19980222 |
| 1331237 | EDDIE | STRAKA | 8210    S VICTORIA RD | WICHITA | KS | 67233 | 19980206 |

EXHIBIT 1

| ID | First | Last | Address | City | State | Zip | Date |
|---|---|---|---|---|---|---|---|
| 1331249 | GERALD | SCHWEIKART | 5032    LANES BRIDGE RD | JESUP | GA | 31545 | 19980212 |
| 1331657 | STEPHEN | ZWERLING | 25    BOAT LN | LEVITTOWN | NY | 11756 | 19980305 |
| 1332986 | NORMAN | STRAHAN | 2038    PALM ST, # 162 | LAS VEGAS | NV | 89104 | 19980213 |
| 1333331 | PAUL | GROSSI | 3672    TOWNSHIP RD. #154 | MILLERSBURG | OH | 44654 | 19980220 |
| 1333331 | PAUL | GROSSI | 3672    TOWNSHIP RD. #154 | MILLERSBURG | OH | 44654 | 19980325 |
| 1334279 | RICHARD | PEKRUHN | 151 AUGUSTA NATIONAL CT | JOHNS ISLAND | SC | 29455 | 19980210 |
| 1334749 | DOUGLAS | INMAN | 4971    DEER HAVEN LN | ASH | NC | 28420 | 19980318 |
| 1335680 | C | LESLIE | RR 1 BOX 1290 | HOMEDALE | ID | 83628 | 19980227 |
| 1336028 | CHARLIE | KIDD | 1172 TOWNSHIP RD 126 RR 1 | NOVA | OH | 44859 | 19980305 |
| 1336406 | BARBARA | WILLIAMS | 8133    SAINT CHARLES LN | SAINT LOUIS | MO | 63114 | 19980212 |
| 1337940 | RICHARD | AYCOCK | 1691    NOR AM RD | PIKEVILLE | NC | 27863 | 19980211 |
| 1338277 | RODNEY | BLANKS | 265    DOGWOOD TRL | REMLAP | AL | 35133 | 19980322 |
| 1339358 | GENE | DUBOIS | 12541    DOWNEY AVE | DOWNEY | CA | 90242 | 19980311 |
| 1344125 | GERALD | KERTZ | 19535    WHITE SANDS RD | SAINTE GENEVIEVE | MO | 63670 | 19980320 |
| 1345584 | CLIFFORD | MC GEE | 1345    FARGO DR | SAINT LOUIS | MO | 63135 | 19980305 |
| 1345794 | TOMMY | TEER | 5265    COHAY RD | HORN LAKE | MS | 38637 | 19980321 |
| 1346677 | CAROLYN | QUIGLEY | 2605    CHERNUCHA AVE | MERRICK | NY | 11566 | 19980214 |
| 1348740 | SCOT | PRICE | 13581 WEST WASHINGTON ST. | CORRIE | PA | 16407 | 19980319 |
| 1348930 | DONNA | PERRY | 382    CHARLIE LOOP | LONOKE | AR | 72086 | 19980309 |
| 1350431 | LOUIE | RAYMOND | 215    W SERPENT | DEERWOOD | MN | 56444 | 19980303 |
| 1350431 | MILLIE | RAYMOND | RR 1 BOX 352A | Rio Hondo | TX | 78583 | 19980303 |
| 1350431 | | | PO Box 156 | Deerwood | MN | 56444 | 19980303 |
| 1350978 | DENNIS | CANFIELD | 6444    E LONG CIR S | ENGLEWOOD | CO | 80112 | 19980206 |
| 1351369 | SANJAY | PARIKH | 350    CHEYENNE FLS | AVON LAKE | OH | 44012 | 19980220 |
| 1352007 | JACK | BLEVINS | 5770    SWEET OLA HWY | SWEET | ID | 83670 | 19980326 |
| 1353120 | JACOB | LEVY | 9356    RHEA AVE | NORTHRIDGE | CA | 91324 | 19980209 |
| 1354308 | JUSTIN | RICE | 219    CEDAR ST | WALLACE | ID | 83873 | 19980323 |
| 1354378 | WILLIAM | SHENEFELT | 2810 Schade Rd | Irwin | PA | 15642 | 19980214 |
| 1355194 | WILLIAM | SUTHERLAND | 6801    MORGAN RD E | BATTLE CREEK | MI | 49017 | 19980209 |
| 1356631 | MAGED | BASILIOS | 1136    N COLUMBUS AVE, #218 | GLENDALE | CA | 91202 | 19980215 |
| 1356771 | GEORGE | STORMS | 7613    LOWER RIVER RD | GRANTS PASS | OR | 97526 | 19980220 |
| 1360294 | NIGEL | HANSROUTIE-GOPAUL | 7177    UNITY AVE N | MINNEAPOLIS | MN | 55429 | 19980306 |
| 1360343 | TERRY | LUEDER | 954    CARLSON DR NW | STANTON | MI | 48888 | 19980211 |
| 1360908 | RAYMOND | LIPPMAN | 2500    WESTWOOD DR | LEAVENWORTH | KS | 66048 | 19980225 |
| 1360908 | RAYMOND | LIPPMAN | 2500    WESTWOOD DR | LEAVENWORTH | KS | 66048 | 19980225 |
| 1362419 | FREDDY | VAUGHN | 12838    HIGHWAY 193 | CHICKAMAUGA | GA | 30707 | 19980324 |
| 1362779 | LACHELLE | DRURY | 12920    JULIEN RD | GRACEY | KY | 42232 | 19980210 |
| 1364198 | NEIL | FEIST | 5100    COE AVE, #52 | SEASIDE | CA | 93955 | 19980221 |
| 1364413 | VICKI | STONE | 7788    DENUNE RD | JOHNSTOWN | OH | 43031 | 19980326 |
| 1365455 | RUSSELL | MACKEY | 213    BEAR CREEK RD | KELSO | WA | 98626 | 19980324 |
| 1368131 | LORNA | JONES | 1336    QUEENS HWY | FRONT ROYAL | VA | 22630 | 19980210 |
| 1368490 | BARBARA | GAGE | 14 FORREST AVE | CORTLAND | NY | 13045 | 19980312 |
| 1369238 | MARK | BENSKY | 239    CENTRAL AVE | MILTON | MA | 2186 | 19980225 |
| 1370474 | JAMES | WOMBLE | 189    CHESTNUT WAY | CHAPEL HILL | NC | 27516 | 19980212 |
| 1373004 | MICHAEL | POWELL | 337    POKE RD #136 | COVE | AR | 71937 | 19980303 |
| 1375749 | PATRICIA | RODRIGUEZ | 520    3RD ST, A | HUMBLE | TX | 77338 | 19980211 |
| 1378296 | JOYCE | RAUTIO | 2596    W 5650 S | ROY | UT | 84067 | 19980211 |
| 1378296 | JOYCE | RAUTIO | 2596    W 5650 S | ROY | UT | 84067 | 19980302 |
| 1378686 | IDA | MINNIS | 3336    OAK TREE CV | MEMPHIS | TN | 38118 | 19980217 |
| 1379106 | DAVID | PROVENCHER | N5059    CO RD 607 | IRON MOUNTAIN | MI | 49801 | 19980323 |
| 1380569 | JAN | LARSEN | 17106    SW 30TH AVE | NEWBERRY | FL | 32669 | 19980319 |
| 1380693 | PAUL | WILKERSON | 5212    GIBSON DR | THE COLONY | TX | 75056 | 19980214 |
| 1380905 | DOUGALS | BOSS | 2667 Dunhaven Ct | Snellville | GA | 30078 | 19980305 |
| 1380993 | THOMAS | BUCK | 108    PINEWOOD RD | PROVIDENCE | NC | 27315 | 19980211 |
| 1381961 | RICK | BATEMAN | 745    YOCUMTOWN RD | ETTERS | PA | 17319 | 19980217 |
| 1382868 | FRANK | SCANDARIATO | 273    N ERIE AVE | LINDENHURST | NY | 11757 | 19980211 |
| 1383520 | ROGER | TAFT | 2959    S IVY LANEL | YUMA | WA | 85364 | 19980220 |
| 1386790 | NICK | ZORBAS | PO BOX 93 | FORESTVILLE | PA | 16035 | 19980219 |
| 1387129 | JAMES | BROG | 5708    DAVIS CIR | ROHNERT PARK | CA | 94928 | 19980323 |
| 1388635 | MARCELINO | SILVA | 2114    ROLLING OAK LN | GARLAND | TX | 75044 | 19980322 |
| 1388635 | MARCELINO | SILVA | 2114    ROLLING OAK LN | GARLAND | TX | 75044 | 19980305 |
| 1390234 | AUBRY | CLARK | 100    N POPLAR ST | CAMBRIDGE | IL | 61238 | 19980212 |
| 1392360 | CLARENCE | CHESTER JR | 4320    GRANDIN RD | LENOIR | NC | 28645 | 19980214 |
| 1392651 | ANGEL | GOMEZ | 3358    W DIVISION ST, 2nd F | CHICAGO | IL | 60651 | 19980315 |
| 1392947 | NANCY | MATHERS | 1002    W PERRY ST | LANTANA | FL | 33462 | 19980218 |
| 1393059 | JOHNNIE | WATKINS | 98    DETOUR RD | SEABROOK | SC | 29940 | 19980211 |
| 1394563 | DANA | REALIN | 111 SHAWNEE TRAIL | GENEVA | FL | 32732 | 19980323 |
| 1395018 | ELIZABETH | JOE | 1505    GARFIELD AVE | YAKIMA | WA | 98902 | 19980323 |
| 1395248 | CONNIE | BIANCARDI | 8502    SIR GALAHAD | SAN ANTONIO | TX | 78240 | 19980320 |
| 1396876 | BETTY | MOORE | 119    CLOVERDALE HTS | CHARLES TOWN | WV | 25414 | 19980306 |

Exhibit 1

| 1396957 | PAMELA | KERKHOFF | 20257 | LAUREL RD | LAUREL | IN | 47024 | 19980219 |
|---|---|---|---|---|---|---|---|---|
| 1399047 | LENORA | BRUMIT | 408 | KINHAWK CT | NASHVILLE | TN | 37211 | 19980323 |
| 1404257 | | | 229 Buckhalter Rd | | Savannah | GA | 31405 | 19980224 |
| 1404768 | CLARENCE | WILLIAMS | 11327 | DOVEDALE CT | HOUSTON | TX | 77067 | 19980324 |
| 1404939 | JACOB | MILLER | 207 | BUEL CT | DAYTON | OH | 45433 | 19980226 |
| 1407860 | GARY | KORKALA | 19 | CALICO LN | NUTLEY | NJ | 7110 | 19980213 |
| 1407860 | GARY | KORKALA | 19 | CALICO LN | NUTLEY | NJ | 7110 | 19980317 |
| 1409583 | DAVID | HILL | 745 | LIME HOLLOW RD | NORFOLK | NY | 13667 | 19980227 |
| 1412963 | SALLY | ROBERTSON | 916 | WARRIOR RD | WEST POINT | MS | 39773 | 19980227 |
| 1414711 | CAROL | OSHINS | 1936 | GLENVIEW DR | LAS VEGAS | NV | 89134 | 19980210 |
| 1415212 | ANNE | BANERIAN | 2957 | LORENCITA DR | SANTA MARIA | CA | 93455 | 19980328 |
| 1415404 | ROBERT | DEPOY | 125 | S MONROE ST | MACOMB | IL | 61455 | 19980323 |
| 1416370 | FREDERIC | SPENCER | 193 | E DUNCAN ST | COLUMBUS | OH | 43202 | 19980327 |
| 1417573 | ROBERT | NICHOLS | 3100 | S KINNEY RD, #65 | TUCSON | AZ | 85713 | 19980209 |
| 1425627 | ELENO | CERVANTES | 2125 | E SAN MATEO ST | COMPTON | CA | 90221 | 19980304 |
| 1425784 | KENT | TAYLOR | 27881 | MOODY RD | LOS ALTOS | CA | 94022 | 19980302 |
| 1435803 | TODD/RONDA | VANDRUFF | 200 | THERESA DR | WEIRTON | WV | 26062 | 19980212 |
| 1435856 | RONALD &TA | SENA | | PO BOX 606 | FT SUMNER | NM | 88119 | 19980210 |
| 1435856 | RONALD &TA | SENA | | PO BOX 606 | FT SUMNER | NM | 88119 | 19980211 |
| 1435999 | JOHN | YIMOYINES | 46 | HILLTOP RD | BETHANY | CT | 6524 | 19980209 |
| 1436984 | MIKE | BREEDLOVE | 1109 | POLO DR | RALEIGH | NC | 27603 | 19980302 |
| 1445044 | LORI | BROWN | 6631 | ALANANCE CO LINE RD | LIBERTY | NC | 27298 | 19980316 |
| 1447418 | ULYSSES | BOYD | 6117 | REGIS CT | FAYETTEVILLE | NC | 28314 | 19980212 |
| 1447440 | ROBERT | LOPEZ | 2316 | TORRES DR | SAINT BERNARD | LA | 70085 | 19980214 |
| 1447798 | JEROME | ROACHE | 837 | E 3RD ST | FLORENCE | NJ | 8518 | 19980207 |
| 1455967 | ROBERT | STEFFENSMEIER | 8137 | 9TH AVE SW | SEATTLE | WA | 98108 | 19980211 |
| 1456860 | JEROME | HANSLER | 10464 | 80th ST | Little Falls | MN | 56345 | 19980224 |
| 1457928 | DEWARD | NOBLE | 5507 | RIVERMONT RD | DELAWARE | AR | 72835 | 19980227 |
| 1458888 | ANGEL | MENDEZ | 2824 | W DEVOY DR | ANAHEIM | CA | 92804 | 19980206 |
| 1462240 | RICHARD | MCGRADY | 339 | ROCKER RD | BROOKLET | GA | 30415 | 19980213 |
| 1465960 | JOHN | STALDER | 1603 | WESTWOOD DR | JEFFERSON | IA | 50129 | 19980312 |
| 1469186 | JAMES | HABIGER | 0 | HCR    2-2071-5 | SHELL KNOB | MO | 65747 | 19980323 |
| 1469166 | JIM | HABIGER | HC 2 BOX 2071 5 | | SHELL KNOB | MO | 65747 | 19980323 |
| 1469561 | DENNIS | MARY SMITH | 1300 | CERRO GORDO RD | OLIVEHILL | TN | 38475 | 19980211 |
| 1470652 | ZENEYDA | MARTINEZ | 10142 | SE HIGHWAY 42 | SUMMERFIELD | FL | 34491 | 19980211 |
| 1471026 | RUTH | CUMMINS | | RR 1 BOX 107 | HEWITT | MN | 56453 | 19980211 |
| 1471262 | WILBUR | SCHAEFER | 870 | N PEMBERTON RD | BLOOMFIELD HILLS | MI | 48302 | 19980212 |
| 1471477 | OSCAR | STEINLEY | 6480 | N 16TH ST | COEUR D ALENE | ID | 83814 | 19980227 |
| 1473105 | ROBERT | RADFORD | | PO BOX 601 | HENRIETTA | NC | 28076 | 19980221 |
| 1473816 | DENISE | HUTT | 1092 | DOUGHERTY LAKE ESTATE | SAINT LOUIS | MO | 63122 | 19980325 |
| 1474088 | RICK | HIGGINS | 7758 | S 780 W | RENSSELAER | IN | 47978 | 19980212 |
| 1477421 | JEANNE | SCHROEDER | 207 | S ELM | WHITEWATER | KS | 67154 | 19980216 |
| 1477455 | ERIC | LOSCIALE | 250 Shady Branch Trl | | Deland | FL | 32724 | 19980220 |
| 1479138 | OLIVER | AMELINE | 4 | HORSE CREEK RD | WILSALL | MT | 59086 | 19980212 |
| 1480258 | DOUG | BERNER | 1338 | 33RD ST | DES MOINES | IA | 50311 | 19980219 |
| 1480765 | KEVIN | MCINTIRE | 7326 | STATE ROUTE 19 | MOUNT GILEAD | OH | 43338 | 19980303 |
| 1481043 | GEORGE | KELLY | | ISLA BLANCA PARK C12 | SOUTH PADRE ISLAND | TX | 78597 | 19980221 |
| 1482299 | JOE AND | PAULA GREEN | 803 | N GUIGNARD DR | SUMTER | SC | 29150 | 19980211 |
| 1482299 | JOE AND | PAULA GREEN | 803 | N GUIGNARD DR | SUMTER | SC | 29150 | 19980211 |
| 1483271 | DEREK | BARR | 11 | NORFOLK AVE | SWAMPSCOTT | MA | 1907 | 19980316 |
| 1484775 | JAMES | MOORE | 16033 | HEMLOCK ST | DETROIT | MI | 48235 | 19980213 |
| 1484797 | CLARADORA | GIBSON | 23283 | MN HIGHWAY 15 | DASSEL | MN | 55325 | 19980217 |
| 1489949 | SY | COSCIA | 505 | S 26TH ST | BROKEN ARROW | OK | 74014 | 19980303 |
| 1491490 | LEO | LANGFORD | | PO Box 218 | Sunrise Beach | MO | 65079 | 19980301 |
| 1492573 | ROBIN | BUSSHAUS | | PO Box 293 | Cross Fork | PA | 17729 | 19980221 |
| 1493351 | DONALD | KELLEY | 36 | DOGWOOD LN | TERRA ALTA | WV | 26764 | 19980324 |
| 1493810 | DOROTHY | MATHEWS | 2430 | N MARKET ST | SHAWNEE | OK | 74801 | 19980221 |
| 1494873 | B | MATHEWS | 1 | RED OAK RD | SHAWNEE | OK | 74801 | 19980220 |
| 1499259 | BEATRICE | MARTINEZ | 609 | MACARTHUR BLVD | GRAND PRAIRIE | TX | 75050 | 19980218 |
| 1500331 | JAMIE | GIBSON | 7784 | BROOKDALE DR | WEST CHESTER | OH | 45069 | 19980217 |
| 1506220 | PEI | PAN | 3980 | KIAWA DR | ORLANDO | FL | 32837 | 19980320 |
| 1511798 | CHARLES | OLIVER | | PO BOX 575 | CENTER | CO | 81125 | 19980212 |
| 1516351 | TODD | GRINGER | 4 | BANBURY LN | HUNTINGTON | NY | 11743 | 19980227 |
| 1517392 | PORNELIUS | THOMAS | 109 | LINCOLN AVE | BROOKLYN | NY | 11208 | 19980211 |
| 1520132 | ROBERT | HUTSON | 606 | S LAYTON AVE | DUNN | NC | 28334 | 19980209 |
| 1520738 | RICHARD | ZANDI | | HC 1 BOX 907 | SHEFFIELD | PA | 16347 | 19980311 |
| 1520738 | RICHARD | ZANDI | | HC 1 BOX 907 | SHEFFIELD | PA | 16347 | 19980311 |
| 1522549 | JOSEPH | BOWLES | 2814 | SALENA ST | SAINT LOUIS | MO | 63118 | 19980216 |
| 1539376 | OSCAR | SAN MIGUEL | 2709 | HEATTER AVE | SPRING LAKE | NC | 28390 | 19980225 |
| 1540117 | KENNETH | LEVINS | 332 | KNICKERBOCKER RD | TENAFLY | NJ | 7670 | 19980218 |

Exhibit 1

| 1540738 | JON | DEUTSCH | 3001 | HILLPOINT DR | CHARLESTON | WV | 25302 | 19980315 |
|---|---|---|---|---|---|---|---|---|
| 1543099 | AURELIO | SCOTT-SANJUR | 140 | W 4TH ST, 4-A | JUNCTION CITY | KS | 66441 | 19980214 |
| 1545733 | BILLY JOE | CRISPIN | 324 1/2 | W PATTERSON ST | LAKELAND | FL | 33803 | 19980321 |
| 1552954 | LEWIS | HOGGATT | 1762 | SUNNY HEIGHTS DR | LOS ANGELES | CA | 90065 | 19980305 |
| 1553194 | LARRY | ROWLAND | 2123 | SAINT PAUL ST | BALTIMORE | MD | 21218 | 19980312 |
| 1564718 | TOM | NOWELL | | RR 1 BOX 181 | STAUNTON | IL | 62088 | 19980309 |
| 1569967 | ELWOOD | STANLEY | 4394 | ELLESWAY NW | SHALLOTTE | NC | 28470 | 19980324 |
| 1573811 | LILLIAN | PULETZ | 5984 | ANSEL FERREL RD | TALLAHASSEE | FL | 32308 | 19980312 |
| 1574727 | DOMINICK | SENNA | 34 | NEWARK AVE | NUTLEY | NJ | 7110 | 19980210 |
| 1575636 | EUGENE | HASTINGS | 1617 | SW 39TH ST | OKLAHOMA CITY | OK | 73119 | 19980218 |
| 1580322 | SONNY | MAYNARD | 13902 | S KAW DR | OLATHE | KS | 66062 | 19980216 |
| 1581337 | THEO | BRIGGS | 50 | DORTCH CIR | LAMAR | MS | 38642 | 19980320 |
| 1586309 | MARION | CRABILL | | RR 2 BOX 155 | EWING | MO | 63440 | 19980322 |
| 1591478 | DAVID | SCOTT | 8006 | BYERLY DR | HOPE MILLS | NC | 28348 | 19980225 |
| 1596774 | CHARLES | PERRY JR | 3940 | GUYAN RIVER RD | SALT ROCK | WV | 25559 | 19980224 |
| 1597185 | ELAINE | ARNOLD | 5218 | TYNER STNW | CANTON | OH | 44708 | 19980218 |
| 1606092 | GILBERT | FINN | 131 | R2 | GALENA | MO | 65656 | 19980307 |
| 1815248 | BOBBIE | BIERMANN | 54101 | BEECH RD | OSCEOLA | IN | 46561 | 19980211 |
| 1616186 | WESLEY | VANDERHOFF | 12080 | FOLEY RD | EMMETT | MI | 48022 | 19980210 |
| 1616186 | WESLEY | VANDERHOFF | 12080 | FOLEY RD | EMMETT | MI | 48022 | 19980210 |
| 1623875 | STEVEN | ROTIO | 470 | BOULEVARD | GARFIELD | NJ | 7026 | 19980216 |
| 1627113 | TED | MATTHEISZ | 616 | ORANGE DR, #205 | ALTAMONTE SPRINGS | FL | 32701 | 19980323 |
| 1640018 | WILLIAM | WRIGHT | 3037 | WEDGEWOOD DR | FAYETTEVILLE | NC | 28301 | 19980225 |
| 1660445 | ANN | YOUNG | 902 | S LOOP 499, F7 | HARLINGEN | TX | 78550 | 19980313 |
| 2027416 | KARL | COX | 7402 | GEORGE HORN RD | NASHVILLE | TN | 37221 | 19980218 |
| 2048404 | LISA | NORMAN | 200 | PINE CEDAR CIR | BROOKS | GA | 30205 | 19980226 |
| 2112880 | STEPHEN | BRIGGS | 6925 | CYPRESS LAKE CT | SAINT AUGUSTINE | FL | 32086 | 19980305 |
| 2142192 | WILLIAM | BRADY | 3001 | MIDLAND CT | FAYETTEVILLE | NC | 28306 | 19980303 |
| 2142192 | WILLIAM | BRADY | 3001 | MIDLAND CT | FAYETTEVILLE | NC | 28306 | 19980303 |
| 2160597 | DANNY | JENKINS | 198 | MILL CREEK RD | FALKVILLE | AL | 35622 | 19980308 |
| 2169653 | MARK | BLACO | 7105 | E 204TH TER | BELTON | MO | 64012 | 19980224 |
| 2177728 | DANA | ANDREWS | 30 | JEFFERSON ST | BREWER | ME | 4412 | 19980312 |
| 2212924 | BRIAN | LOGA | 118 | JAMES ST | PIERRE PART | LA | 70339 | 19980317 |
| 2235434 | RONALD | LE CLAIR | 198 | WEBSTER ST | HUDSON | NH | 3051 | 19980302 |
| 2236386 | BRADLEY | KATHY KING | 910 | NE COLLIER RD | TOPEKA | KS | 66617 | 19980206 |
| 2241777 | CHARLES | BRITT | 214 | CHARMETT RD | LUMBERTON | NC | 28359 | 19980225 |
| 2254540 | TODD | BERCOVITCH | 116 | W SERVICE RD, #1057 | CHAMPLAIN | NY | 12919 | 19980302 |
| 2258721 | LAWRENCE | MILLER | 9 | DINNERPOT ROAD | OLDWICK | NJ | 8858 | 19980220 |
| 2272580 | STEPHEN | TUTOR | 1211 | BEN BOW DR | DURHAM | NC | 27704 | 19980227 |
| 2333415 | D | ROBINSON | 2056 | N HALLOCK ST | KANSAS CITY | KS | 66101 | 19980215 |
| 2357021 | MORRIS | BROWN | 24719 | SHIAWASSEE DR | DETROIT | MI | 48219 | 19980219 |
| 2421940 | GERARD | LANG | 1521 | SHIRLEY LN | WOODBINE | GA | 31569 | 19980216 |
| 2484108 | CARL | BRONSTEIN | 777 | CO OP CITY BLVD, 4K | BRONX | NY | 10475 | 19980219 |
| 2484108 | CARL | BRONSTEIN | 777 | CO OP CITY BLVD, 4K | BRONX | NY | 10475 | 19980309 |
| 2524413 | FREDERICK | THOMAS | | RR 1 BOX 212HE | WADE | NC | 28395 | 19980226 |
| 2537967 | JOYCE | LANTRIP | 12754 | SPRINGRIDGE RD | TERRY | MS | 39170 | 19980223 |
| 2540733 | CHARLES | CORBISHLEY | 1486 | N LAKESHORE RD | PORT SANILAC | MI | 48469 | 19980328 |
| 2562244 | SHERLEY | KINNEY | 121 | MEADOW VIEW LN | EBENSBURG | PA | 15931 | 19980214 |
| 2563720 | GARY | BRENNAN | W8299 County Highway B | | Shell Lake | WI | 54871 | 19980216 |
| 2563720 | GARRY | GRONNING | | RR 2 | SHELL LAKE | WI | 54871 | 19980216 |
| 2573065 | MARVIN | HOWVE | | RR 1 BOX 630 | NEWBERN | AL | 36765 | 19980312 |
| 2586375 | AUGUSTINA | REYNA | | RR 1 BOX 235B | BEEVILLE | TX | 78102 | 19980210 |
| 2588061 | JERRY | SHADE | 17 | MONMOUTH CT | PINEHURST | NC | 28374 | 19980302 |
| 2605020 | MARY | MONROE | 460 | PURVIS ST | RAEFORD | NC | 28376 | 19980225 |
| 2646109 | JEFF | MONDAY | 639 | SAINT GEORGE AVE | ROSELLE | NJ | 7203 | 19980211 |
| 2669347 | GEORGE | ANTHONY | 55321 | ANTHONEY LN | INDEPENDENCE | LA | 70443 | 19980213 |
| 2676514 | DENNIS | O'HARA | 6713 | TYLER DR | MILTON | FL | 32570 | 19980212 |
| 2682062 | JOHN | DUNCAN | 3508 | BEECHNUT CT | FAYETTEVILLE | NC | 28311 | 19980327 |
| 2686537 | TOM | BRODERICK | 9045 | PENNYSTONE AVE | LAS VEGAS | NV | 89134 | 19980225 |
| 2738986 | BONNIE | MOSS | 6531 | AMANDA CIR | FAYETTEVILLE | NC | 28304 | 19980225 |
| 2772409 | WALTER | SCOTT | 4725 | GUM BRANCH RD | JACKSONVILLE | NC | 28540 | 19980316 |
| 2797231 | BOBBY | PENDER | 658 | COUNTY ROAD 558 | HANCEVILLE | AL | 35077 | 19980216 |
| 2828648 | RICHARD | THOMAS | 10 | MARTIN WAY | WHISPERING PINES | NC | 28327 | 19980223 |
| 2864110 | BOBBIE | GORDON | 101 | CARDINAL AVE | RAEFORD | NC | 28376 | 19980226 |
| 2882407 | MAX | MONACO | 14 | CEDAR WAX WING RD | HACKETTSTOWN | NJ | 7840 | 19980311 |
| 2893757 | JAMES | DAVIS | | RR 1 BOX 955 | SOUTH HILL | VA | 23970 | 19980306 |
| 2907535 | PAUL | MCCUE | 139 | FRANKLIN AVE | LONG BRANCH | NJ | 7740 | 19980323 |
| 2927575 | JUDY | NEWKIRK | 723 | BRAY ST | WALLACE | NC | 28466 | 19980211 |
| 2932403 | TONY | WALKER | 1176 | BELLTOWN RD | TELLICO PLAINS | TN | 37385 | 19980211 |
| 2936595 | SCOTT | GRINSTEAD | 1802 | 14TH AVE S | NASHVILLE | TN | 37212 | 19980211 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2942209 | BETTY | BRIGGS | 104 | WAYSIDE LN | DOBSON | NC | 27017 | 19980328 |
| 2943524 | JANIE | THOMPSON | 17480 | COUNTY ROAD 4309 | LARUE | TX | 75770 | 19980216 |
| 2947106 | JOSE | MARTINEZ | 100 | MAIN ST | MAYPEARL | TX | 76064 | 19980218 |
| 2965204 | FRED | MILLER II | 165 | E US HIGHWAY 52 | MENDOTA | IL | 61342 | 19980216 |
| 2970582 | DAVID | BRADSHAW | 3410 | LANKMOORE AVE | EL PASO | TX | 79904 | 19980215 |
| 2972594 | DILLARD | JOHNSON | 13711 | MAPLE ROW | GARFIELD HEIGHTS | OH | 44105 | 19980214 |
| 2973046 | THOMAS | WEBBER | 4160 | SHELBY BASIN RD | MEDINA | NY | 14103 | 19980306 |
| 2974502 | ROBERT | QUINN | 2912 | S 148TH ST | OMAHA | NE | 68144 | 19980210 |
| 2975817 | DECLAN | LEE | 6806 | BOUDIN ST NE | PRIOR LAKE | MN | 55372 | 19980308 |
| 2976527 | EUGENE | SCAMBRAY | 4762 | MINTWOOD DR | CONCORD | CA | 94521 | 19980214 |
| 2979177 | JOHN | CAVEDO | 100 | CASPIAN TERN CT | HAMPSTEAD | NC | 28443 | 19980210 |
| 2980791 | ALLAN | LANE | 23 | ORILEOLE | BEDFORD | NH | 3110 | 19980322 |
| 2980820 | OTIS | BUTLER | 1912 | MURSEY RD | LILLINGTON | NC | 27545 | 19980226 |
| 2980820 | OTIS | BUTLER | 1912 | MURSEY RD | LILLINGTON | NC | 27545 | 19980226 |
| 2980930 | MARY | CONSOLI | 215 | KELLY RIDGE RD | TOWNSEND | TN | 37882 | 19980303 |
| 2985382 | MARVIN | JOHNSON | 11324 | 169TH ST | JUPITER | FL | 33478 | 19980216 |
| 2993434 | ALFRED | INGAGLIATO | 2930 | SAINT PETERS CHURCH R | WALDORF | MD | 20601 | 19980224 |
| 2999566 | JOHNNIE | WELLS | 10304 | LONE PINE LN | FORT WORTH | TX | 76108 | 19980210 |
| 3004035 | FRANCES | PEEL | 10470 | 124TH TER | LARGO | FL | 33773 | 19980215 |
| 3005491 | ALEXANDER | CONOLLY | 25 | GULL LN | PINEHURST | NC | 28374 | 19980223 |
| 3005605 | DELORES | LANE | 218 | VASHTI DR | HOUSTON | TX | 77037 | 19980221 |
| 3009642 | ANDREW | ROWLEY | 507 | SILVERMINE RD | NEW CANAAN | CT | 6840 | 19980309 |
| 3009721 | RONNIE | GAZAWAY | 4296 | GAZAWAY RD SE | DALTON | GA | 30721 | 19980212 |
| 3012613 | WILLIAM | ONEIL | 655 | DAN ST | AKRON | OH | 44310 | 19980209 |
| 3013011 | DONALD | KNEZICK | 323 | ISLAND RD | COLUMBUS | NJ | 8022 | 19980207 |
| 3019409 | JEANNE | SCHAFFER | 11730 | HESBY ST | N HOLLYWOOD | CA | 91607 | 19980309 |
| 3019889 | JOHN | GABBARA | 1432 | 9TH ST, #3 | SANTA MONICA | CA | 90401 | 19980304 |
| 3023242 | JOHN | SHAW | 4030 | NE 5TH DR | GRESHAM | OR | 97030 | 19980310 |
| 3024575 | ROGER | WHITE | 2140 | SAINT ANDREWS CT | BYRON | CA | 94514 | 19980221 |
| 3025423 | STEVE | NAGY | 7471 | DALT RD | JACKSON | MI | 49201 | 19980224 |
| 3027327 | JENNIFER | CHRISTINSON | 95 | CRESKIN DR | ROUND LAKE | IL | 60073 | 19980307 |
| 3027952 | RANDY | BAILEY | | PO Box 120 | Panther | WV | 24872 | 19980217 |
| 3029103 | MR/MRS | KATZ | 877 | CRESTVIEW AVE | NORTH WOODMERE | NY | 11581 | 19980208 |
| 3032971 | ANNA | VAIL | | RR 2 BOX 386 | WELLSBORO | PA | 16901 | 19980210 |
| 3035372 | MAUD | FERRIS | 8881 | LAMAR ST. #1 | SPRING VALLEY | CA | 91977 | 19980212 |
| 3036884 | TIM | WHYNOT | | 70 State St | Brewer | ME | 4412 | 19980228 |
| 3037731 | TOD | RICHARDS | 930 | HIGHWAY 14 BYP. 4 | BROOKINGS | SD | 57006 | 19980302 |
| 3039440 | ANIELLO | PENTANGELO | | RR 1 BOX 80 | SHICKSHINNY | PA | 18655 | 19980212 |
| 3041783 | GERALD | PATTERSON | 17 | OLD FELLOWSHIP RD | ELLISVILLE | MS | 39437 | 19980213 |
| 3043156 | CHARLES | FORESYTH | 139 | DOGWOOD LN | LAKEVIEW | AR | 72642 | 19980325 |
| 3045773 | FAYE | BROWN | 3316 | OLD PEACHTREE RD | DACULA | GA | 30019 | 19980217 |
| 3045933 | BILL | WYNN | 1273 | HOPE ST | STAMFORD | CT | 6907 | 19980211 |
| 3050729 | ROBERT | WATERSTONE | 140 | N LAKESIDE DR | KENNESAW | GA | 30144 | 19980223 |
| 3051331 | KENNETH | GENTSCH | 601 | CENTRAL AVE | FEASTERVILLE | PA | 19053 | 19980207 |
| 3052553 | HARVARD | HOLMES JR. | 26 | PINKHAM ST | LINCOLN | ME | 4457 | 19980213 |
| 3053063 | DOUG | MOORE | 433 | MANUEL RD | MAYODAN | NC | 27027 | 19980303 |
| 3055833 | RUTH | CLARK | 132 | CLARK RD | NEWPORT | NC | 28570 | 19980224 |
| 3056021 | RICHARD | DARBY | 716 | VINE ST | ERIE | PA | 16503 | 19980311 |
| 3056074 | TERRY | LOGAN | 452 | ROGERS RD | LANCASTER | KY | 40444 | 19980213 |
| 3056074 | TERRY | LOGAN | 452 | ROGERS RD | LANCASTER | KY | 40444 | 19980307 |
| 3057997 | HOLLY | MANESS | 130 | JESSE ST | BENTON | KY | 42025 | 19980209 |
| 3058070 | JOE | GRAY | 350 | GRAY RD | GURLEY | AL | 35748 | 19980208 |
| 3058230 | LAWRENCE | MELILLO | 8002 | ONYX CT SW | TACOMA | WA | 98498 | 19980222 |
| 3058538 | BILL | BRUDERS | 5604 | WESTGATE ST | SHAWNEE MISSION | KS | 66216 | 19980212 |
| 3058561 | | | | RR 2 BOX 791 | Drums | PA | 18222 | 19980213 |
| 3060094 | CURTIS | STRACHAN | 1280 | CHAPARRAL DR | ELKO | NV | 89801 | 19980225 |
| 3064157 | EDWARD | WITSELL | 3201 | TURKEY DR | PHENIX CITY | AL | 36869 | 19980219 |
| 3064691 | JERRY | BUTTLES | 36028 | PAULINE AVE | MADERA | CA | 93638 | 19980213 |
| 3066891 | C | GRAFFAGNINO | 20232 | FOXBOROUGH ST | WYANDOTTE | MI | 48192 | 19980313 |
| 3069565 | GERALD | PRANTE | 159 | WOODS MILL DR | STAUNTON | IL | 62088 | 19980209 |
| 3071706 | EDWARD | CULLUM | 10200 | SIERRA RD | OAKDALE | CA | 95361 | 19980211 |
| 3076052 | KENNETH | JONES | 6401 | WHITE HORSE RD | GREENVILLE | SC | 29611 | 19980228 |
| 3079652 | JOHN | LAFORGE | 2107 | STUDEWOOD ST | LUFKIN | TX | 75901 | 19980209 |
| 3079676 | GREG | JOHNSON | 328 | CLEARFIELD AVE | CHESAPEAKE | VA | 23320 | 19980301 |
| 3080454 | GIANNI | CINELLI | 444 | DUNSTER DR | WEST HEMPSTEAD | NY | 11552 | 19980228 |
| 3080968 | PAUL | PALIAFERRO | 709 | JEFFERSON ST | LAWTON | OK | 73501 | 19980316 |
| 3082184 | HARRY | SALEM | 10736 | S 69TH EAST AVE | TULSA | OK | 74133 | 19980223 |
| 3082917 | BILL | HOLZER | 46 | TENAKILL ST | CLOSTER | NJ | 7624 | 19980204 |
| 3086072 | SUSIE | HOLMES | 2319 | EAGLEROCK DR | HOUSTON | TX | 77080 | 19980225 |
| 3087109 | PATRICK | PRIEST | | ROUNDTREE MOBILE HOME, #4 | ELIZABETH TOWN | NC | 28337 | 19980309 |

Page 5

Exhibit 1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3089211 | ROBERT | STEIN | 3313 | LANCASTER DR | STATESVILLE | NC | 28677 | 19980220 |
| 3090003 | LESLIE | MCCOWN | 1686 | CEASAR RD | CARRIERE | MS | 39426 | 19980329 |
| 3090232 | RICHARD | PAYNE | 404 | MOUNTAIN VW | LAKEVIEW | OR | 97630 | 19980216 |
| 3091365 | AL | DONOVAN | 66 | FAIRBANKS RD, #34 | MORENCI | AZ | 85540 | 19980223 |
| 3091645 | LUVERN | TIX | 23871 | LEWISTON BLVD | HAMPTON | MN | 55031 | 19980223 |
| 3091907 | JERRY | KINGHAM | 2140 Surreygate Dr | | Columbus | OH | 43235 | 19980217 |
| 3091968 | LINDA | PEELER | 212 | CATHERINE ST | KINGS MOUNTAIN | NC | 28086 | 19980224 |
| 3092103 | ROBERT | COLLINS JR. | 10230 | HERITAGE DR | NEW ORLEANS | LA | 70127 | 19980302 |
| 3092402 | MARK | WELLS | RR 2 BOX 115 | | HENRIETTA | TX | 76365 | 19980327 |
| 3092413 | NATHAN | HOUSEHOLDER | 2542 | LINCOLN AVE | GRANITE CITY | IL | 62040 | 19980220 |
| 3092594 | EDWARD | HOWARD | 4113 | UTICA PIKE | JEFFERSONVILLE | IN | 47130 | 19980218 |
| 3092828 | WENDY | MOORE | 506 | LEAD MINE VALLEY RD S | CLEVELAND | TN | 37311 | 19980304 |
| 3095307 | STEPHEN | SINCLAIR | RR 1 BOX 240 | | PITTSFIELD | ME | 4967 | 19980223 |
| 3098218 | GARY | TANNER | 20648 | N 41ST LN | GLENDALE | AZ | 85308 | 19980223 |
| 3100726 | JEFF | GALPIN | 3608 | CEDAR KNOLL CIR. #187 | WATERLOO | IA | 50701 | 19980210 |
| 3103495 | GROVER | HAWKINS | 2391 | WINDSOR PARK CT | WALDORF | MD | 20602 | 19980218 |
| 3105681 | JOHN | DODS | 108 | E 65TH TER | KANSAS CITY | MO | 64113 | 19980215 |
| 3106350 | CARLA | NIRO | 130 | CLARA ST | BROOKLYN | NY | 11218 | 19980311 |
| 3109940 | CARL | STUART | 13124 NW 8th Way APT B | | Vancouver | WA | 98685 | 19980210 |
| 3113794 | HERB | NEUMEYER | 423 | S 2100 RD | WHITE CITY | KS | 66872 | 19980210 |
| 3113794 | HERB | NEUMEYER | 423 | S 2100 RD | WHITE CITY | KS | 66872 | 19980210 |
| 3114832 | JONAH | BARKER | 3516 | TOWNSHIP ROAD 124 | MILLERSBURG | OH | 44654 | 19980222 |
| 3118310 | JOSEPH | PLEIN | 5207 | RUBY ST | TORRANCE | CA | 90503 | 19980225 |
| 3118310 | JOSEPH | PLEIN | 5207 | RUBY ST | TORRANCE | CA | 90503 | 19980303 |
| 3122707 | TROY | HUNT | 1835 | 43RD ST | PENNSAUKEN | NJ | 8110 | 19980210 |
| 3123624 | FLOYD | ECKHOFF | CR 421 | | CADET | MO | 63630 | 19980321 |
| 3123624 | FLOYD | EDCOFF | PO BOX 136 | | CADET | MO | 63630 | 19980321 |
| 3125997 | BURTON | STANLEY | 2108 | LORD ASHLEY DR | SANFORD | NC | 27330 | 19980213 |
| 3126511 | TONY | IBARRA | 6021 | STAMM LN | NAMPA | ID | 83687 | 19980226 |
| 3127138 | HOWARD | MYLOTT | 7507 | ENGLISH HILLS RD | VACAVILLE | CA | 95688 | 19980316 |
| 3129926 | RICK | KING | 3009 | OAK SPRINGS DR | GARLAND | TX | 75044 | 19980211 |
| 3129926 | RICK | KING | 3009 | OAK SPRINGS DR | GARLAND | TX | 75044 | 19980223 |
| 3131320 | JASON | FREEMAN | 715 | BUCKEYE TER | ROCK HILL | SC | 29732 | 19980306 |
| 3133258 | MARION | SAATHOFF | 2451 | N RAINBOW BLVD. #2047 | LAS VEGAS | NV | 89108 | 19980316 |
| 3135000 | ROSE ANN | GUNTER | 417 | MASTERS LN | HAMPSTEAD | NC | 28443 | 19980209 |
| 3137096 | CHARLES | VESELY | 28225 | VESELY LN | PRINCESS ANNE | MD | 21853 | 19980226 |
| 3137857 | HERBERT | PETERSEN | 703 | PIN OAK RD | SEVERNA PARK | MD | 21146 | 19980217 |
| 3138038 | COLRINE | MOORE | 6583 | NC HIGHWAY 306 N | AURORA | NC | 27806 | 19980213 |
| 3138631 | JOSEPH | OUYANG | 3412 | TULANE DR. #21 | HYATTSVILLE | MD | 20783 | 19980323 |
| 3139352 | LEONARD | PRESIDENT | 3706 | 24TH ST NE | WASHINGTON | DC | 20018 | 19980212 |
| 3139352 | LEONARD | PRESIDENT | 3706 | 24TH ST NE | WASHINGTON | DC | 20018 | 19980316 |
| 3140648 | JEFFREY | COOK | 7720 B | | | | | 19980327 |
| 3143424 | DENNIS | MAHAR | 1235 HAMPTON CT | | SLIDELL | LA | 70460 | 19980306 |
| 3144932 | FRANCES | LORENZEN | 7503 | S MONITOR RD | GRAND ISLAND | NE | 68803 | 19980210 |
| 3151458 | RON | MANSO | 16100 | EDGE WOOD | PINE MOUNTAIN CLUB | CA | 93222 | 19980209 |
| 3152116 | BILL | DOYLE | 1829 | EXETER ROAD | EXETER | ME | 4435 | 19980212 |
| 3154802 | JAMES | KILCOYNE | 708 | TANGERINE DR | LADY LAKE | FL | 32159 | 19980216 |
| 3154802 | JAMES | KILCOYNE | 708 | TANGERINE DR | LADY LAKE | FL | 32159 | 19980309 |
| 3156197 | TOM | CULLIS | 418 | SNUG HARBOR RD | NEWPORT BEACH | CA | 92663 | 19980210 |
| 3156470 | LARRY | JONES | 712 | W PARKTOWN DR | DEER PARK | TX | 77536 | 19980212 |
| 3157399 | DENNIS | MAIN | 305 | WOOD ST | ELLWOOD CITY | PA | 16117 | 19980217 |
| 3157777 | DANIEL | MORALES JR | 111 | PERSIMMON DR | VALLEJO | CA | 94589 | 19980227 |
| 3158355 | MORRIS | JOHNSON | 2922 | GRAND OAK DR | GARLAND | TX | 75044 | 19980307 |
| 3162442 | JEFF | HERNDON | 700 | HAMLIN AVE | TUPELO | MS | 38801 | 19980210 |
| 3165926 | TIM | BURROW | 2642 | SE 175TH TERRACE RD | SILVER SPRINGS | FL | 34488 | 19980329 |
| 3166899 | JOHN | WILLIAMS | 400 | LAZY J DR | SMITHFIELD | NC | 27577 | 19980212 |
| 3169814 | STEVEN | BOWERS | 456 | S MOLLISON AVE | EL CAJON | CA | 92020 | 19980212 |
| 3172324 | MARK | QUINN | 363 | CROSSTIMBER DR | ORANGE | TX | 77632 | 19980309 |
| 3176704 | WILLIAM | SMIRL | 386 | TYROL | BIG BEAR LAKE | CA | 92315 | 19980227 |
| 3182033 | RICK | LANDIS | 4749 | 9TH ST | ZEPHYRHILLS | FL | 33540 | 19980210 |
| 3183534 | STEPHEN | LEWANDOWSKI | 811 | TAMARACK ST | MANISTEE | MI | 49660 | 19980216 |
| 3184186 | CHARLES | CHING | 2241 | HAM BROWN RD | KISSIMMEE | FL | 34746 | 19980302 |
| 3186394 | MELVIN | MURPHY | 2270 | N TOWNE AVE. #4 | POMONA | CA | 91767 | 19980302 |
| 3187244 | MURIEL | GREEN | 92 | S HARBOR RD | ELSBERRY | MO | 63343 | 19980318 |
| 3190230 | RICHARD | SALZER | 7715 | N COLLEGE PARK DR | MINNEAPOLIS | MN | 55445 | 19980324 |
| 3192839 | JOHN | CAMPBELL | 1800 | SPANISH RIVER RD | BOCA RATON | FL | 33432 | 19980307 |
| 3192878 | INES | ARNOLD | 7351 | W 90TH ST | LOS ANGELES | CA | 90045 | 19980206 |
| 3193381 | ALBERT | COUCH | R R 5 | BOX 228 | GRAVOIS MILLS | MO | 65037 | 19980210 |
| 3194177 | THEODORE | OSTROWSKI | 346 | W.MIDDLE AVE | BONDBROOK | NJ | 8805 | 19980206 |
| 3194859 | STEVE | GOLDSMITH | PO BOX 43374 | | PHOENIX | AZ | 85080 | 19980215 |

Exhibit 1

| 3196338 | GENE | THOMPSON | 23 | ACAPULCO DR | PUTNAM | IL | 61560 | 19980224 |
|---|---|---|---|---|---|---|---|---|
| 3196779 | CAROLYN | WILLIAMSON | 327 | KENILWORTH ST | DETROIT | MI | 48202 | 19980320 |
| 3197912 | | MEDIA SYSTEMS | 5561 | OLD PROVIDENCE RD | VIRGINIA BEACH | VA | 23464 | 19980319 |
| 3198300 | DAN | ROBBINS | RR 2 BOX 430A | | Snow Hill | NC | 28580 | 19980215 |
| 3199258 | BRIAN | TREML | 22 | TAYLOR TRL | MOORESVILLE | IN | 46158 | 19980209 |
| 3201900 | STEVE | LOPEZ | 1250 | BURKHOLDER RD, #16 | CLYDE | OH | 43410 | 19980212 |
| 3205739 | KENNETH | STEWART | 2717 OATES DR | | PLANO | TX | 75093 | 19980312 |
| 3207369 | ROBERT | SWIFT | 18831 | NW 14TH CT | MIAMI | FL | 33169 | 19980217 |
| 3208337 | RAUL | BERMAN | 7601 | BYRON AVE, #2C | MIAMI | FL | 33141 | 19980212 |
| 3210646 | DIANE | LANCASTER | 1145 | E FIREBAUGH AVE | EXETER | CA | 93221 | 19980227 |
| 3210646 | DIANE | LANCASTER | 1145 | E FIREBAUGH AVE | EXETER | CA | 93221 | 19980316 |
| 3211311 | STEVEN | WINSTEAD | 8551 | SAINT MICHAELS ST | BAYOU LA BATRE | AL | 36509 | 19980212 |
| 3215566 | ROY | YOCHEM | 1428 | UNDERHILL TER | GLENDORA | CA | 91741 | 19980302 |
| 3217926 | JAMES | BENICH | 804 | N CENTER ST | NEWTON FALLS | OH | 44444 | 19980303 |
| 3217926 | JAMES | BENICH | 804 | N CENTER ST | NEWTON FALLS | OH | 44444 | 19980303 |
| 3218719 | STEVE | KELLEHER | RR 1 BOX 176 | | COMER | GA | 30629 | 19980217 |
| 3220644 | EILLEN | SEIFERT | 104 | HELEN ST | EXCELSIOR SPRINGS | MO | 64024 | 19980217 |
| 3222066 | | ERNEST | 1927 20th St | | Lake Charles | LA | 70601 | 19980218 |
| 3222873 | JOHN | COVINGTON | 625 PB AVE | | ALBEMARLE | NC | 28001 | 19980306 |
| 3225306 | LOUIS | DETOLLA | 13608 | BARDON RD | PHOENIX | MD | 21131 | 19980303 |
| 3225924 | LP | MELTON | 610 | E 8TH ST | CHANDLER | OK | 74834 | 19980202 |
| 3227376 | WALTER | NELSON | 10813 | S RIVER LN | CORNELL | MI | 49818 | 19980303 |
| 3228880 | CHARLES | PRIEST | 15076 | PLAINVIEW AVE | DETROIT | MI | 48223 | 19980213 |
| 3232618 | BETTY | HOARD | 28 | COUNTY ROAD 3140 | BOONEVILLE | MS | 38829 | 19980206 |
| 3234840 | LARRY | MOORE | 11720 | POST OAK RD | WILLIS | TX | 77378 | 19980325 |
| 3238931 | SHAWN | WYATT | 4222 | BEECHWOOD CT | DORR | MI | 49323 | 19980213 |
| 3238993 | JASON | DACKO | 1040 | 4TH STREET EXT | CHARLEROI | PA | 15022 | 19980210 |
| 3239412 | PAUL | KOWELL | 6 | WALLER RD | GANSEVOORT | NY | 12831 | 19980303 |
| 3240700 | SUSAN | SERWATKA | 976 | STATE ROUTE 9G | HYDE PARK | NY | 12538 | 19980208 |
| 3240706 | CONSTANC | SOWIN | 40338 | REED CT | WADSWORTH | IL | 60083 | 19980221 |
| 3241009 | DONALD | STRUSZ | 216 | CHATSWORTH DR | MANKATO | MN | 56001 | 19980322 |
| 3249219 | JEFFREY | WOOD | 1032 | GREENHURST RD | WINSTON SALEM | NC | 27104 | 19980309 |
| 3252360 | ERNIE | FLOYD | 12207 | KODIAK CT | DRAPER | UT | 84020 | 19980213 |
| 3252683 | DAVID | BAUTISTA | 4319 | MOSHER AVE | LOS ANGELES | CA | 90031 | 19980212 |
| 3255331 | LARRY | FERGUSON | 8375 | N BRITT CT | KANSAS CITY | MO | 64151 | 19980212 |
| 3256673 | DARLA | WHITE | KEYESER AVE | | COVINGTON | VA | 26847 | 19980218 |
| 3261261 | JR | IRBY | J | | | CI | OH | | 19980323 |
| 3265267 | KEN | HANSEN | 340 | W 100 S | KAYSVILLE | UT | 84037 | 19980302 |
| 3272127 | DONALD | COOK | RR 2 BOX 119 | | MARION | AL | 38756 | 19980227 |
| 3273726 | THOMAS | WELKENBACH | 1232 | ELECTRIC ST | WYANDOTTE | MI | 48192 | 19980323 |
| 3275917 | LOUI | HESLOP | 9149 | BROOKS RD | LENNON | MI | 48449 | 19980306 |
| 3276331 | THOMAS | BOSHERS | 195 | GREENWAY RD | PULASKI | TN | 38478 | 19980211 |
| 3278790 | TOM | DAUS | 1779 | BURTON RD | NILES | MI | 49120 | 19980210 |
| 3279384 | KEN | HUGHES | 6311 | N CAMELOT DR | GLADSTONE | MO | 64119 | 19980227 |
| 3282628 | JACK | PHILLIPS | 362 | MURRAY RD | ELKIN | NC | 28621 | 19980202 |
| 3283224 | GORDEN | JACOBUS | 20695 | E MARBLE CANYON WAY | MAYER | AZ | 86333 | 19980214 |
| 3283224 | GORDEN | JACOBUS | 20695 | E MARBLE CANYON WAY | MAYER | AZ | 86333 | 19980226 |
| 3286031 | JULIUS | MERRIFIELD | 3590 | ROUND BOTTOM RD, #72538 | CINCINNATI | OH | 45244 | 19980302 |
| 3287697 | DEANY | FISHER | 234 | MCLEE RD | LEXINGTON | SC | 29073 | 19980211 |
| 3290229 | TONY | EBRIGHT | 7642 | AUDUBON DRIVE | FOLLEY | AL | 36535 | 19980217 |
| 3290353 | POWELL | GIBBS | 403 | SHAWNEE PL | LOUDON | TN | 37774 | 19980227 |
| 3291963 | ROGER | & BRENDA CHAMBERS | 2703 | DITNEY TRL | PIONEER | TN | 37847 | 19980327 |
| 3293913 | BRAIN | JANECZEK | 19700 | 3 MILE HIGH WAY | ONAWAY | MI | 49765 | 19980210 |
| 3294105 | JOHN | LABRECHE | 1622 | VAN HORNE LN | REDONDO BEACH | CA | 90278 | 19980204 |
| 3296869 | JACK | PARKER | 928 | -32 LOGAN HILL RD | CHEHALIS | WA | 98532 | 19980321 |
| 3298922 | ROCCO | NOBILE | 7720 | E ROSELAND DR | LA JOLLA | CA | 92037 | 19980312 |
| 3300683 | WILLIAM | HAGEMAN | 2337 | WHITEHOUSE RD | DACULA | GA | 30211 | 19980211 |
| 3300954 | LAMORRIS | MCRAE | RR 1 BOX 329A | | PEMBROKE | NC | 28372 | 19980225 |
| 3302107 | KIM | KIRKPATRICK | 3972 | VILLAS DR | CUYAHOGA FALLS | OH | 44224 | 19980222 |
| 3302107 | KIM | KIRKPATRICK | 3972 | VILLAS DR | CUYAHOGA FALLS | OH | 44224 | 19980226 |
| 3308430 | WILLIAM | DOUGHERTY | 5052 | SILO HILL RD | DOYLESTOWN | PA | 18901 | 19980213 |
| 3310223 | NORMAN | RIVERA | 864 DAMASK ST NE | | PALM BAY | FL | 32905 | 19980312 |
| 3314512 | SAMMY | ORCUTT | 707 | MALLY | DEPEW | OK | 74028 | 19980219 |
| 3317828 | DONALD | DUNKLEY | 14646 | N 34TH ST | PHOENIX | AZ | 85032 | 19980212 |
| 3320522 | NORRIS | LOWE | RR 1 BOX 106C | | BURNET | TX | 78611 | 19980313 |
| 3320522 | ALBERT | RILEY | 1804 TETON DR | | AUSTIN | TX | 78757 | 19980313 |
| 3322818 | LACEY | EVERETTE | 1211 | PELHAM DR | LAURINBURG | NC | 28352 | 19980214 |
| 3324222 | RACHEL | LARAWAY | 11961 | S COUNTY RD 525 WEST | INDIANAPOLIS | IN | 47840 | 19980302 |
| 3325092 | MIKE | THOMPSON | 3300 Cliff Oaks Dr | | Denton | TX | 76205 | 19980302 |
| 3326571 | MIKE | QUATTRINI | 16 | YUCATAN DR | WARWICK | RI | 2889 | 19980303 |

Page 7

Exhibit 1

| ID | First | Last | Address | City | State | Zip | Date |
|---|---|---|---|---|---|---|---|
| 3328265 | JACK | COLLINS | 2800 SANDALWOOD DR | NEW ALBANY | IN | 47150 | 19980321 |
| 3329137 | ANNETTE | WOODS | 208  E MONMOUTH ST | ABINGDON | IL | 61410 | 19980211 |
| 3330657 | EUGENIO | VELEZ | 101  OLD ENGLISH LN | SPRING LAKE | NC | 28390 | 19980225 |
| 3330675 | GEORGE | COWARD | 359  LONGWOOD DR | LEXINGTON | SC | 29073 | 19980212 |
| 3331384 | ANDREW | BACHLER | 189  RICHARD RD | GEORGETOWN | TX | 78626 | 19980306 |
| 3333127 | WILLIAM | MOORE | 4115  S NINE MILE RD | ALLEGANY | NY | 14706 | 19980213 |
| 3334390 | CLIFF | BUTLER | 8831  RUSSELL PARK RD | SALT LAKE CITY | UT | 84121 | 19980212 |
| 3339030 | LON | BARNEA | 251  NE 49TH ST | FORT LAUDERDALE | FL | 33334 | 19980212 |
| 3339857 | LARRY | SKOVERA | 216  2ND STREET, #2 | STAMBAUGH | MI | 49964 | 19980220 |
| 3342911 | LAWRENCE | ZOTARA | 7022  BRANDYWINE DR | DERBY | NY | 14047 | 19980212 |
| 3347624 | JOHN | CANALLE | 9102  N CLARK RD | RICHMOND | IL | 60071 | 19980303 |
| 3348029 | TERRENCE | STAFFORD | 1304  COLLINGS AVE | WEST COLLINGSWOOD | NJ | 8107 | 19980221 |
| 3348336 | HORTENCIA | CRAWFORD | 236  RANDOLPH ST | ROCHESTER | NY | 14621 | 19980315 |
| 3348580 | CAROLYN | BARNARD | 2811  RIDGECREST DR SE | ALBUQUERQUE | NM | 87108 | 19980324 |
| 3350194 | PETE | GONZALEZ | 5251  W ARGYLE ST | CHICAGO | IL | 60630 | 19980211 |
| 3350424 | JAMES | POWERS | 72769  APIARY RD | RAINIER | OR | 97048 | 19980218 |
| 3351364 | STEVE | HANGER | 950  NOME ST | AURORA | CO | 80010 | 19980217 |
| 3351884 | GEORGE | ANTONELL | 1048  NORTH RD NE | WARREN | OH | 44483 | 19980224 |
| 3352041 | BRUCE | BAKER | 335  WARSAW RD | OSCEOLA | MO | 64776 | 19980310 |
| 3354654 | TONY | BOUMOUSSA | RR 1 BOX 104 | SIDNEY CENTER | NY | 13839 | 19980227 |
| 3356935 | TIM&JULIE | HOWLETT | RR 1 BOX 404 | BRIDPORT | VT | 5734 | 19980212 |
| 3356935 | TIM&JULIE | HOWLETT | RR 1 BOX 404 | BRIDPORT | VT | 5734 | 19980212 |
| 3357279 | LUCILLE | MCCONVILLE | 3720  VISTA DR | NAMPA | ID | 83686 | 19980209 |
| 3357958 | EUGENE | STIEFEL | 368  ROBERTS DR | SOMERDALE | NJ | 8083 | 19980205 |
| 3362710 | HELEN | BACKHAUS | 27201  CALLE JUANITA | CAPISTRANO BEACH | CA | 92624 | 19980309 |
| 3364121 | JAMES | SANDEFUR | 31  LAKE FERGUSON CT | HAMPTON | VA | 23669 | 19980220 |
| 3364352 | LADAWNA | VANCE | PO BOX 213 | DELTA | OH | 43515 | 19980316 |
| 3364668 | CHARLES | SEARS | 13644  E 45TH ST | YUMA | AZ | 85367 | 19980312 |
| 3368025 | EILEEN | HEIL | 16020  OLD MARLBORO PIKE | UPPER MARLBORO | MD | 20772 | 19980217 |
| 3369440 | RANDY | LANPHIER | 1501  S MARKET ST | OSKALOOSA | IA | 52577 | 19980306 |
| 3370419 | CHEN | DING | 17405  CATHYS PL | DALLAS | TX | 75252 | 19980312 |
| 3377329 | THOMAS | PEARCE | HO 185 RR 1498 | TUPELO | MS | 38801 | 19980223 |
| 3377467 | KAYHAN | VAHDAT | 446 Castlebury Dr | Saline | MI | 48176 | 19980305 |
| 3378877 | RON | LAST | 1112  FANCHER RD | RACINE | WI | 53406 | 19980223 |
| 3379112 | CYRUS | ALTIMUS | 301  W MCGINNIS CIR | NORFOLK | VA | 23502 | 19980306 |
| 3379294 | JANET | LEE | 4302  PRESIDENTIAL WAY | BRADENTON | FL | 34203 | 19980316 |
| 3380710 | MONIKA | LOUSCHER | 11891  MACDUFF ST | GARDEN GROVE | CA | 92841 | 19980328 |
| 3382673 | LYNDON | CAMPBELL | 2214 SYCAMORE | ORANGE | CA | 92668 | 19980324 |
| 3384396 | SHIRLEY | HALEY | 9  ARBOR CIR | NOVATO | CA | 94947 | 19980211 |
| 3387431 | NOAL | HAYES | 6422  COMPTON CIR | ROCKMART | GA | 30153 | 19980216 |
| 3388176 | JULIE | COOPER | RT 1 BOX 136B | MONTROSE | WV | 26283 | 19980323 |
| 3389124 | LLOYD | CHAISSON | 209  SAINT PAUL ST | HOUMA | LA | 70364 | 19980219 |
| 3392279 | CHARLES | RABE | 10294  62ND ST | OSKALOOSA | KS | 66066 | 19980207 |
| 3394449 | EMIL | KARVANEK | 51470  RED RUN RD | MARCELLUS | MI | 49067 | 19980217 |
| 3394452 | EDDIE | LESUEUR | 123  SNYDER RD | GRAY | TN | 37615 | 19980217 |
| 3396476 | RICHARD | EDRY | 23  VALLEYWOOD RD | HOPKINTON | MA | 1748 | 19980209 |
| 3396654 | TOM | COCKE | 29380  ARCHIE SIMMONS RD | MOUNT HERMAN | LA | 70450 | 19980214 |
| 3400501 | PAUL | HANKINS | 2244  SCOTLAND RD | COLDWATER | MS | 38618 | 19980208 |
| 3403834 | FRED | HENRY | 943  LAURIE AVE | SANTA CLARA | CA | 95054 | 19980209 |
| 3405014 | WILLIAM | MANN | 1186  PLEASANT RIDGE RD | GOODSPRING | TN | 38460 | 19980224 |
| 3407045 | LARRY | WHITED | RR 2 BOX 189A | BELINGTON | WV | 26250 | 19980323 |
| 3410229 | LARRY | HOFF | 340  POUNDSTONE STREET | GRIMES | CA | 95950 | 19980219 |
| 3411198 | GEORGE | SPLANGER | 5400  HANSLEY RD | SUGAR GROVE | OH | 43155 | 19980221 |
| 3412381 | DON | BRANSON | 926  JEFFERSON ST | OSHKOSH | WI | 54901 | 19980214 |
| 3414585 | DOUGLAS | COWAN | RT 2 BOX 42A | RAMAH | NM | 87321 | 19980225 |
| 3415066 | CAROL | PELLETIER | UPPER DUNBAR RD | SEAL HARBOR | ME | 4675 | 19980305 |
| 3417520 | EDWARD | POWERS | 6064  SHIPYARD LN | EASTON | MD | 21601 | 19980209 |
| 3421713 | GLENN | FLETCHER | 7757  BURKS HOLLOW RD | CHRISTIANA | TN | 37037 | 19980223 |
| 3425738 | JERRY | FLEMING | RR 3 BOX 409 | BALDWYN | MS | 38824 | 19980212 |
| 3425974 | JEFFREY | WINSTON | 312  62ND ST | FAIRFIELD | AL | 35064 | 19980203 |
| 3425974 | JEFFREY | WINSTON | 312  62ND ST | FAIRFIELD | AL | 35064 | 19980312 |
| 3427202 | GERAL | STRICKLAND | 4726  OLD STANTONSBURG RD | WILSON | NC | 27893 | 19980212 |
| 3428893 | JAMES | MALOY | 36  HOLYOKE RD | WAYNE | NJ | 7470 | 19980209 |
| 3430903 | RICHARD | SMITH | 153  GLEN MAURY PARK RD | BUENA VISTA | VA | 24416 | 19980211 |
| 3431910 | MICHAL | DOYLE | 1150  WAST KINGS HIGHWAY | MT EPHRAIM | NJ | 8059 | 19980307 |
| 3432674 | JAMES | NICKOLI | 3630  SAN BLAS DR | CORPUS CHRISTI | TX | 78415 | 19980216 |
| 3434881 | DELOIS | MABRY | 675  LICKLOG RD | NEWLAND | NC | 28657 | 19980209 |
| 3437845 | THELMA | WARRICK | 1619  ARRINGTON BRIDGE RD | DUDLEY | NC | 28333 | 19980212 |
| 3439110 | JOEL | RODRIGUEZ | 371  TIMBER LAUREL LN | LAWRENCEVILLE | GA | 30243 | 19980214 |
| 3440196 | PAUL | BLACK | 22  STEIERT DR | SAINT PETERS | MO | 63376 | 19980217 |

Exhibit 1

| ID | First | Last | No. | Street | City | State | Zip | Date |
|---|---|---|---|---|---|---|---|---|
| 3440244 | LES | SHIELDS | 401 | N 68TH ST | LINCOLN | NE | 68507 | 19980307 |
| 3440926 | PAUL | WILLIAMS | 10302 | NE 75TH PL | VANCOUVER | WA | 98662 | 19980312 |
| 3441388 | JUAN | RAMIREZ | | PO BOX 931 | GAYLORD | MN | 55334 | 19980304 |
| 3442030 | ANNA | BAKER | 2733 | W LAWRENCE LN | PHOENIX | AZ | 85051 | 19980218 |
| 3443596 | NEIL | NISBET | 31 | SUMMER ST | QUINCY | MA | 2169 | 19980216 |
| 3445912 | GLENN | CANTRELL | 8449 | COLONEL DR | CHALMETTE | LA | 70043 | 19980312 |
| 3447319 | MARILYN | FLETCHER | | LOCKHART SUBDIVISION | NEOGA | IL | 62447 | 19980327 |
| 3447441 | KENNETH | LASLO | 74 | HARKER RD | ALLENTOWN | NJ | 8501 | 19980211 |
| 3447780 | MARY | COLLINS | | RR 3 BOX 256A | MAXTON | NC | 28364 | 19980217 |
| 3448135 | MIGUEL | DOMINGUEZ | 23416 | ROLANDA DR | MORENO VALLEY | CA | 92553 | 19980209 |
| 3449871 | LAVOYD | WILLIAMS | 132 | MONTERREY RD | WEATHERFORD | TX | 76088 | 19980313 |
| 3452701 | PAMELA | FIFE | 10021 | S PRESTON HWY | LEBANON JCT | KY | 40150 | 19980211 |
| 3454333 | RICHARD | LEWIS | 321 | N SEMINOLE CIR | FORT WAYNE | IN | 46807 | 19980321 |
| 3455845 | FRANK | MALICKI | 110 | OLD NOD RD | CLINTON | CT | 6413 | 19980216 |
| 3458060 | CONRAD | LINDSTROM | 5533 | STANHOPE ST | WEST BLOOMFIELD | MI | 48322 | 19980228 |
| 3458244 | MARLEY | BRADFORD | 9938 | E LITTLE NUGGET WAY | GOLD CANYON | AZ | 85219 | 19980316 |
| 3459289 | RICHARD | KULINSKI | 102 | BARBADOS DR | CHEEKTOWAGA | NY | 14227 | 19980327 |
| 3463522 | ROBERTA | SPANGLER | | RR 1 BOX 551 | Depew | OK | 74028 | 19980217 |
| 3463884 | KARON | CARNEY | 406 | CHARLTON AVE | HASBROUCK HEIGHTS | NJ | 7604 | 19980209 |
| 3465758 | LOREN | FRISBIE | 501 | E 63RD ST N, #3 | WICHITA | KS | 67219 | 19980206 |
| 3466243 | DEBORAH | BYRD | | CROOS CREEK RANCH | WICKENBURG | AZ | 85358 | 19980318 |
| 3466900 | MICHAEL | FRANK | 17 | BERKELEY PL | MONTCLAIR | NJ | 7042 | 19980326 |
| 3477822 | STEVE | BARBER | 884 | SCARLET AVE | HENDERSON | NV | 89015 | 19980213 |
| 3479773 | BRYAN | KERNS | | RR 2 BOX 841 | RIDGELEY | WV | 26753 | 19980216 |
| 3482993 | DAVE | TURNER | 368 | FAIRLANE DR | BUTLER | KY | 41006 | 19980216 |
| 3483723 | LEWIS | MUCKWAY | 588 | E SOUTH RAILROAD AVE | MICHIGAN CITY | IN | 46360 | 19980222 |
| 3485896 | EUNICE | EVANS | | HWY 96 | LIMA | IL | 62348 | 19980312 |
| 3485896 | EUNICE | EVANS | | HWY 96 | LIMA | IL | 62348 | 19980318 |
| 3486023 | NELL | ANDERSON | 23619 | ANDERSON RD | SPRINGFIELD | LA | 70462 | 19980301 |
| 3486641 | SYLVESTER | GOERDT | 3938 | GERZIN RD | MOUNTAIN IRON | MN | 55768 | 19980313 |
| 3486701 | THEODORE | KAZMER | N3271 | HWY K | JEFFERSON | WI | 53549 | 19980227 |
| 3486902 | LISA | BEGAY | 4 | PINON CIR | PINE HILL | NM | 87357 | 19980304 |
| 3487518 | LARRY | SALLEE | 1712 | SAINT CT NE | ALBUQUERQUE | NM | 87112 | 19980317 |
| 3489929 | GEORGE | BRAUN | 369 | MOUNT PLEASANT RD | HARRISVILLE | RI | 2830 | 19980312 |
| 3491510 | RICHARD | MORGAN | 1005 | RIO VISTA CT | LAFAYETTE | IN | 47905 | 19980327 |
| 3491645 | ROBERT | PUNTENNEY | 119 | 21ST AVE SW | PUYALLUP | WA | 98371 | 19980313 |
| 3492084 | JOSEPH | SOLT | 4235 | GALLATIN LN | BRIDGETON | MO | 63044 | 19980223 |
| 3492084 | JOSEPH | SOLT | 4235 | GALLATIN LN | BRIDGETON | MO | 63044 | 19980223 |
| 3492623 | BARRY | WETTROTH | 5540 | ARTHUR AVE | SAINT LOUIS | MO | 63139 | 19980301 |
| 3495493 | JOHN | CHAPMAN | 8401 | N 1000TH ST | ROBINSON | IL | 62454 | 19980223 |
| 3495585 | DAVID | SANTAMARIA | 14744 | SW 99TH LN | MIAMI | FL | 33196 | 19980217 |
| 3496985 | WILEY | AYERS | 1719 | CARMACK RD | RIPLEY | TN | 38063 | 19980212 |
| 3498064 | WILLIAM | EVANGELISTA | 18601 | FINCH DR | NEOSHO | MO | 64850 | 19980213 |
| 3501229 | BRETT | KRAFT | 405 | S EVERGREEN DR | VENTURA | CA | 93003 | 19980312 |
| 3502716 | CHRIS | JENSEN | 2896 | LAKEVIEW BLVD | LAKE OSWEGO | OR | 97035 | 19980314 |
| 3508597 | PAT | MOORE | 4046 | RICHARD DR | CHERRY VALLEY | IL | 61016 | 19980213 |
| 3510159 | ROBERT | PIPPIN | 4550 | COUNTRY LN | JOPLIN | MO | 64801 | 19980301 |
| 3510216 | ROBERT | HODGSON | 6273 | S MAPLEWOOD DR | SALT LAKE CITY | UT | 84121 | 19980227 |
| 3510722 | LAURENCE | DEAN | 3800 | BRILLIANT DR | LOS ANGELES | CA | 90065 | 19980315 |
| 3512188 | RAYMOND | CHIARA | 7511 | LIBERTY AVE | PARMA | OH | 44129 | 19980323 |
| 3513983 | SCOTT | ZIEGLER | 4771 | S 2980 W | SALT LAKE CITY | UT | 84118 | 19980224 |
| 3519688 | ALLEN | BERTRAND | 175 | PALM VIEW LN | WATSONVILLE | CA | 95076 | 19980216 |
| 3522179 | BESSIE | MOSLEY | 2715 | THRUSH DR | CLARKSVILLE | TN | 37040 | 19980224 |
| 3522214 | RONEY | WHITE | 5461 | PACKHOUSE RD | WILSON | NC | 27896 | 19980316 |
| 3523351 | JASON | ANSLEY | 22961 | VALLEY VIEW DR | SOUTHFIELD | MI | 48034 | 19980214 |
| 3525324 | PEGGY | OGDEN | 4507 | W 950 S | WILLIAMSBURG | IN | 47393 | 19980205 |
| 3525894 | DAN | LOBERT | 318 | 4TH STREET | PORTLAND | MI | 48875 | 19980215 |
| 3528490 | KEITH | MOORE | 1331 | CINDER LN | KISSIMMEE | FL | 34744 | 19980322 |
| 3531642 | LYNN | CIKLIN | 129 | FLAGLER PROMENADE S | WEST PALM BEACH | FL | 33405 | 19980302 |
| 3532132 | ALI | ETEZADKHAH | 10538 | E LIVE OAK AVE | ARCADIA | CA | 91007 | 19980207 |
| 3532188 | RUTH | CRAIG | 47700 | NW CHRYSLER DR | BANKS | OR | 97106 | 19980323 |
| 3533153 | LARRY | KERN | 8204 | E MILAGRO AVE | MESA | AZ | 85208 | 19980323 |
| 3533268 | STEVEN | HASSELL | 300 | NIKE TRL | SMYRNA | TN | 37167 | 19980209 |
| 3533914 | WILLIAM | TAYLOR | 773 | MEDIA TER | SEBASTIAN | FL | 32958 | 19980216 |
| 3534232 | GERALD | BENZEL | 11650 | CUMBERLAND PKY | CONROE | TX | 77384 | 19980304 |
| 3534704 | DOMINICK | DINUCCI | 12515 | SE 199TH DR | BORING | OR | 97009 | 19980212 |
| 3534704 | DOMINICK | DINUCCI | 12515 | SE 199TH DR | BORING | OR | 97009 | 19980312 |
| 3537270 | RICHIE | CURRY JR | 124 | NW 109TH AVE, #304 | PEMBROKE PINES | FL | 33026 | 19980315 |
| 3538994 | RANDY | NICHOLSON | 3575 | ELK RIDGE DR | ARNOLD | MO | 63010 | 19980212 |
| 3539113 | DAVID | RYMER JR | 1006 | KENTWOOD DR | SUMTER | SC | 29154 | 19980212 |

Page 9

| ID | First | Last | No. | Street | City | State | ZIP | Date |
|---|---|---|---|---|---|---|---|---|
| 3539223 | LOUIS | SPERKA | | | | | | |
| 3539759 | TERRY | MCDERMOTT | 1175 | BRUSHWOOD WAY | GREENWOOD | IN | 46142 | 19980204 |
| 3540034 | FRANK | TRIPODI | 117 | BARNES LN | NORTH CROSSETT | AR | 71635 | 19980211 |
| 3540635 | RICK | CHAPMAN | 9620 | NW 13TH ST | PEMBROKE PINES | FL | 33024 | 19980211 |
| 3542183 | DAN | GREGORY | 3819 | TWEEDSMUIR DR | COLUMBUS | OH | 43221 | 19980220 |
| 3543041 | PHILIP | LUM | 512 | MAIN LAKE POWELL | LAKE POWELL | UT | 84533 | 19980307 |
| 3547082 | ROY | PROFFITT | 507 | SPRING MOSS DR | MISSOURI CITY | TX | 77459 | 19980212 |
| 3547089 | RICHARD | MILLER | 7 | KEVIN DR | EDGEWOOD | NM | 87015 | 19980227 |
| 3548049 | GEORGE | REYNOLDS JR | 14 | ANDERSON RD | WHARTON | NJ | 7885 | 19980207 |
| 350551 | JAMES | MAYO | 3488 | BUFFALO FORD RD, Lot 2 | ASHEBORO | NC | 27203 | 19980304 |
| 3552013 | DONALD | GILLES | 1810 | WOOTEN RD | BEAUMONT | TX | 77707 | 19980223 |
| 3552534 | S | BAILEY | 427 | CAMDEN AVE | MOORESTOWN | NJ | 8057 | 19980206 |
| 3552534 | S | BAILEY | 389 | CO RD 286 | CULLMAN | AL | 35055 | 19980313 |
| 3552534 | S | BAILEY | 389 | CO RD 286 | CULLMAN | AL | 35055 | 19980313 |
| 3555523 | RICHARD | EIDE | 389 | CO RD 286 | CULLMAN | AL | 35055 | 19980313 |
| 3557845 | GINGER | WEBER | 6900 | SARGENT RD | JACKSON | MI | 49201 | 19980221 |
| 3559674 | ROBERT | MIALE | 1705 | PARKVIEW WAY NE | RIO RANCHO | NM | 87124 | 19980223 |
| 3560100 | HARRY | OGLE | | RR 3 BOX 36F | KEYSVILLE | VA | 23947 | 19980312 |
| 3563452 | TODD | QUINN | 4340 | CHERRY ST | OXFORD | OH | 45056 | 19980218 |
| 3564117 | COLLEEN | SULLIVAN | 785 | COLLINS LN | CAMPBELLSVILLE | KY | 42718 | 19980213 |
| 3564279 | RACHELLE | KRUG | 216 | CATATONK CREEK RD | CANDOR | NY | 13743 | 19980210 |
| 3567978 | D JERARD | AMAN | 4 | SAMI DR | HOWELL | NJ | 7731 | 19980217 |
| 3570702 | LEWIS | WALSH | 200 | CATHCART DR. | GWYNEDD VALLEY | PA | 19437 | 19980224 |
| 3571245 | JOHN | PENNYBACKER | 7606 | COTTONWOOD AVE | HESPERIA | CA | 92345 | 19980310 |
| 3573390 | MARILYN | PUDWELL | 10935 | REUSSNER RD SW | PATASKALA | OH | 43062 | 19980306 |
| 3574270 | IRAJ | ZILAIE | 1800 | JACKSON ST | LODI | CA | 95242 | 19980225 |
| 3574848 | DONALD | PHILLIPS | 7508 | VINEYARD DR | PLANO | TX | 75025 | 19980208 |
| 3574959 | D | SNYDER | 1980 | SHOUP AVE E | TWN FALLS | ID | 83301 | 19980304 |
| 3576069 | MARK | PURVIANCE | | HOLLIS RD | MONTICELLO | MS | 39654 | 19980214 |
| 3577360 | HERMAN | HALL | 1600 | W ALAMO DR | CHANDLER | AZ | 85224 | 19980305 |
| 3577848 | LARRY | MOORE | 496 | ENON CHURCH RD | UNIONVILLE | TN | 37180 | 19980211 |
| 3579168 | ERICK | OSTEEN | 3767 | POSEYVILLE RD | HEMLOCK | MI | 48626 | 19980305 |
| 3580134 | WILLIAM | COCHRAN | 909 | PADDINGTON DR E | FORT WORTH | TX | 76131 | 19980321 |
| 3581971 | WILLIAM | DROEGEMUELLER | 1171 | MORGAN RD | WEST HARRISON | IN | 47060 | 19980209 |
| 3585703 | KEVIN | SWAIM | 1103 | BURNING TREE DR | CHAPEL HILL | NC | 27514 | 19980305 |
| 3586128 | ZEZHEN | HUANG | 18 | WYCKOFF RD | TRENTON | NJ | 8638 | 19980220 |
| 3586205 | THERESA | DORMSTEADER | 5 | BEAVER BROOK RD | CANTON | MA | 2021 | 19980223 |
| 3587119 | TERRY | SCHROEDER | 0 | RT1 BX1160 | WALNUT GROVE | MO | 65770 | 19980218 |
| 3587804 | MARK | FARLOW | 922 | E SPRING ST | NEW ALBANY | IN | 47150 | 19980218 |
| 3588183 | V | AUTRY | 2200 | HYMAN PL | NEW ORLEANS | LA | 70131 | 19980301 |
| 3588183 | VR | AUTRY | | RR 2 BOX 295 | Stedman | NC | 28391 | 19980227 |
| 3588183 | VR | AUTRY | | RR 2 BOX 295 | STEDMAN | NC | 28391 | 19980227 |
| 3588183 | VR | AUTRY | | RR 2 BOX 295 | STEDMAN | NC | 28391 | 19980227 |
| 3588988 | CARRIE | LASSWELL | | RR 2 BOX 295 | STEDMAN | NC | 28391 | 19980227 |
| 3589079 | MICHAEL | SNODGRASS | 881 | SE HIGHWAY BB | DEEPWATER | MO | 64740 | 19980215 |
| 3590434 | TERRY | STITH | 410 | SHEPHERD HOLLOW RD | INDIAN MOUND | TN | 37079 | 19980312 |
| 3591837 | DEAN | MEIER | 306 | N JACKSON ST | MOUNT PLEASANT | IA | 52641 | 19980208 |
| 3592642 | GEORGE | ACOSTA | 217 | N STATE ST | LITCHFIELD | IL | 62056 | 19980220 |
| 3593559 | WILLIAM | KING | 2205 | S PARTON ST | SANTA ANA | CA | 92707 | 19980316 |
| 3593859 | G.H. | CURTIS | 601 | KINGS RD | LAVONIA | GA | 30553 | 19980226 |
| 3596044 | WILLIAM | PRATT | 1980 | GILLY LN | CONCORD | CA | 94518 | 19980209 |
| 3598440 | TERRY | HUGHES | 583 | E 49TH ST | HIALEAH | FL | 33013 | 19980322 |
| 3598485 | ALBERT | CERVINI | 4016 | FAIRWND DR | WINSTON SALEM | NC | 27106 | 19980303 |
| 3598660 | ART | BRANSTROM | 8 | ROUNDABOUT RD | SMITHTOWN | NY | 11787 | 19980228 |
| 3598959 | MICHAEL | KEENAN | 18 | OAKMONT TER | HIGHTSTOWN | NJ | 8520 | 19980208 |
| 3598985 | R | LIGHT | 145 | MONTROSS AVE | RUTHERFORD | NJ | 7070 | 19980209 |
| 3603479 | CHARLES | KING | 10420 | BUSHY CREEK DR | HOUSTON | TX | 77070 | 19980303 |
| 3604120 | SOFIE | CHOMBOR | 140 | RIVER NORTH CT NW | ATLANTA | GA | 30328 | 19980327 |
| 3605351 | MARSHALL | JOHNSON | 14656 | COLTER WAY | MAGALIA | CA | 95954 | 19980227 |
| 3607574 | HORACE | ROMERO | 2 | ALEXANDER DR | HAMPTON | VA | 23664 | 19980226 |
| 3608302 | RAYMOND | SPEIGL | 19 | WILDWOOD LN | PERALTA | NM | 87042 | 19980228 |
| 3608330 | RICHARD | POYNER | | RR 1 BOX 525 | CLIFTON | AZ | 85533 | 19980227 |
| 3608375 | ROB | KURTZ | 510 | BIRCH AVE | RICHLAND | WA | 99352 | 19980309 |
| 3608581 | DONALD | GREEN | 1674 | LYNOAK DR | CLAREMONT | CA | 91711 | 19980319 |
| 3610163 | SAL | DI MAURO | 43727 | PARTRIDGE | CLINTON TOWNSHIP | MI | 48036 | 19980221 |
| 3610700 | STEVE | LANCZAK | 201 | S 17TH AVE E | DULUTH | MN | 55812 | 19980301 |
| 3614271 | MYRA | SMITH | 682 | W WIRBLE RD | PINCONNING | MI | 48650 | 19980218 |
| 3614922 | JARRET | JUSTICE | 2252 | HOMEWOOD WAY | CARMICHAEL | CA | 95608 | 19980217 |
| 3616289 | RODGER | WHEELER | 2211 | HICKORY PARK DR | KINGWOOD | TX | 77345 | 19980218 |
| 3618013 | DAVID | GIROUX III | 4803 | KINLOCH LN | RICHMOND | VA | 23231 | 19980207 |
| | | | 1123 | CEDAR LAKE RD | SOUTH BOSTON | VA | 24592 | 19980327 |

| ID | First | Last | Address | City | State | ZIP | Date |
|---|---|---|---|---|---|---|---|
| 3620368 | GAYIL | CALHOUN | | | | | |
| 3620420 | DARLA | PERRILL | RR 7 BOX 34 | ROGERSVILLE | MO | 65742 | 19980210 |
| 3621731 | EARLINE | NEELY | 15492  N COOPER CHAPEL RD | MARSHALL | IL | 62441 | 19980211 |
| 3622724 | RENEE | PATTERSON | 1149  ROCHELLE RD | JACKSON | TN | 38301 | 19980324 |
| 3623393 | JEANETTE | FRANCIS | 41987  ROANOAKE ST | TEMECULA | CA | 92591 | 19980210 |
| 3624942 | PAT | FIELD | 330  PARTRIDGE DR | SPRINGTOWN | TX | 76082 | 19980323 |
| 3628268 | MONTE | PEARSON | 21796  HICKERNELL S. | CONNEAUTVILLE | PA | 16406 | 19980218 |
| 3630701 | BARRY | CIASCHINI | 527  ORCHARD DR W | MONMOUTH | OR | 97361 | 19980222 |
| 3630965 | KARL | SCHEIFE | 274  CENTRE ST | INDIAN ORCHARD | MA | 1151 | 19980220 |
| 3632261 | DEBBIE | PHILIPSEN | 7160  NEW CASTLE WEST | HARTFORD | WI | 53027 | 19980213 |
| 3632380 | CAROL | COYNE | 4122  SEABERG RD | ZEPHYRHILLS | FL | 33541 | 19980301 |
| 3633855 | DENNIS | HAWKE | 44 OAKWOOD ST | LYMAN | ME | 4002 | 19980307 |
| 3634422 | AR | PATTERSON | 13270  SW CINDER DR | TERREBONNE | OR | 97760 | 19980206 |
| 3635886 | JANICE | THURMAN | 1313  OAKDALE DR | BATON ROUGE | LA | 70810 | 19980317 |
| 3638364 | NANCY | DOBLE-PAUL | 7104  FENCE LINE DR | AUSTIN | TX | 78749 | 19980218 |
| 3641843 | JERRY | STONE | 37-445  WAHWEAP N DR | PAIGE | AZ | 86040 | 19980311 |
| 3642537 | TERRY | EVANS | 521  INNSBROOK DR | COLUMBIA | SC | 29210 | 19980226 |
| 3642850 | KEN | ALLEN | PO Box 26 | Advance | MO | 63730 | 19980208 |
| 3647752 | CHARLES | SCHMALL | 803  THOMAS DR | MORRIS | IL | 60450 | 19980213 |
| 3649413 | DAVID | TAPPIN | 5744  OLD RURAL HALL RD | WINSTON SALEM | NC | 27105 | 19980213 |
| 3650603 | TOM | SAMFORD | 71 CARPENTER RD | WALPOLE | MA | 2081 | 19980316 |
| 3650637 | EMMITT | VANZANT | 5200  HIGHWAY 12 | VIDOR | TX | 77662 | 19980301 |
| 3651783 | CYNTHIA | BLANKENSHIP | 8244  SCOTTSVILLE RD | FLOYDS KNOBS | IN | 47119 | 19980224 |
| 3654386 | CHARLES | VIZVARY JR | 10411  JASPER RD, Apt.#1 | CLEVELAND | OH | 44111 | 19980213 |
| 3654680 | JERRI&DOUG | HATZENBILER | 203  BLAKE RD | EPPING | NH | 3042 | 19980217 |
| 3657204 | JOHN | PLEW | 4015  BLAIRWOOD DR | MOORPARK | CA | 93021 | 19980222 |
| 3658808 | JERI | LOMBARD | 4241  WEST L CAMINO DR | PHOENIX | AZ | 85051 | 19980224 |
| 3659725 | JOHN | SPEAR | 407  NW B ST | BENTONVILLE | AR | 72712 | 19980223 |
| 3660293 | ANGELA | KITCHEL | 3579  HIGHWAY P | LOUISBURG | MO | 65685 | 19980228 |
| 3661431 | SHERYL | FUTRELL | 3445  ADAM WAY NE | GEORGETOWN | IN | 47122 | 19980326 |
| 3661798 | RAY | HARLAND | 368  ARMSTEAD RD | VASS | NC | 28394 | 19980223 |
| 3664648 | FRANK | MONDINE | 1575  E MILLARD WAY | DINUBA | CA | 93618 | 19980212 |
| 3669372 | DAVID | HINKLE | 12236  HOBLITZELLE DR | DALLAS | TX | 75243 | 19980326 |
| 3669514 | CRAIG | NORWOOD-RUPERT | 4601  DELANEY LN | TRUSSVILLE | AL | 35173 | 19980302 |
| 3670524 | GERALD | MCDONALD | 6382  CLAREMONT AVE | RICHMOND | CA | 94805 | 19980308 |
| 3671364 | WARREN | WEST | 2551  RHAPSODY LN | FLORISSANT | MO | 63031 | 19980227 |
| 3671400 | LONI | BROWN | 4003  MONTAGUE DR | AMARILLO | TX | 79109 | 19980327 |
| 3676420 | DORIS | DURHAM | 15527  OAKWOOD DR | BROOKWOOD | AL | 35444 | 19980213 |
| 3677366 | GREGORY | SMALLS | 3592  MIDDLE SODUS RD | LYONS | NY | 14489 | 19980307 |
| 3678201 | WILLIAM | MARTIN | 279  SAWYER RD | CAMERON | NC | 28326 | 19980224 |
| 3679094 | ANN | LYON | 2243  NANTUCKET VILLAGE CIR | DALLAS | TX | 75227 | 19980222 |
| 3680765 | DAVID | POLOVICK | 9209  25TH ST E | PARRISH | FL | 34219 | 19980310 |
| 3681607 | JANNIE | PARKER | 1003  POND ST | CARY | NC | 27511 | 19980227 |
| 3683349 | JAMES | RICH | 29317  CORTEZ BLVD | BROOKSVILLE | FL | 34602 | 19980215 |
| 3683387 | SCOTT | GUTTMAN | 508  N MILL ST | VEEDERSBURG | IN | 47987 | 19980313 |
| 3683851 | PAT | WELLS | 23104  ISLAND VW, #2 | BOCA RATON | FL | 33433 | 19980321 |
| 3685222 | ANGELO | ROTOLO | 3808  W 17TH ST N | WICHITA | KS | 67203 | 19980306 |
| 3685878 | HARRY | REDFEARN | 6599  SEVILLE DR | ROME | NY | 13440 | 19980213 |
| 3686578 | MELDON | VIPPERMAN | 428  MAGNOLIA AVE | SOMERDALE | NJ | 8083 | 19980209 |
| 3688155 | ALLEN | SIKES | 19568  OPAL ST | CLINTON TOWNSHIP | MI | 48035 | 19980313 |
| 3688252 | MICHAEL | SORENSON | 560 N White Post Rd | Pinetown | NC | 27865 | 19980220 |
| 3689608 | KENNETH | GEISHEIMER | 160  VINEYARDS DR | NEWNAN | GA | 30265 | 19980312 |
| 3689939 | MIKE | ALLEN | 4108  FOXTAIL LN | PLANO | TX | 75024 | 19980312 |
| 3690350 | JOHN | CLARK | 2501  NE 71ST ST | VANCOUVER | WA | 98665 | 19980216 |
| 3692434 | M | YOUNG | RR 5 BOX 3850 | SKOWHEGAN | ME | 4976 | 19980217 |
| 3693828 | ANTONIO | MCKAY | 3683  HUERTA DR | LAS VEGAS | NV | 89121 | 19980210 |
| 3694917 | FRANKO | TERESA | 245  SPRING RIDGE DR | ROSWELL | GA | 30076 | 19980222 |
| 3695426 | TERONE | SMITH | 3341  TERRACE LN | OCEANSIDE | CA | 92056 | 19980310 |
| 3695816 | JAMES | ADKINS | 393  LIMERICK WAY | VACAVILLE | CA | 95688 | 19980224 |
| 3696563 | ALLEN | SCHROEDER | 1595  SAFFRON DR | MARYSVILLE | OH | 43040 | 19980226 |
| 3696780 | CHRIS | BASILE | 4546 Briargate Dr | Saint Charles | MO | 63304 | 19980308 |
| 3697222 | CASPER | SHEPPERT | 3203  FAYETTEVILLE RD | RAEFORD | NC | 28376 | 19980225 |
| 3703713 | JAMES | KEVERN | 94  W RICH ST | IRVINGTON | NJ | 7111 | 19980213 |
| 3704598 | GARY | RIDDLE | 3528  SHERINGER RD | MUSKEGON | MI | 49444 | 19980303 |
| 3706355 | RAMON | FAJIN | 19210  US HIGHWAY 411 | SPRINGVILLE | AL | 35146 | 19980303 |
| 3710543 | ROBERT | SMITH | 14818  SW 90TH TER | MIAMI | FL | 33196 | 19980311 |
| 3711550 | PAUL | THOMPSON JR. | 1635  ARRINGTON BRIDGE RD | DUDLEY | NC | 28333 | 19980321 |
| 3713029 | DENNIS | SPADAFORE | 3560  SUNSHINE RD | HARTVILLE | MO | 65667 | 19980303 |
| 3713216 | GEORGE | STEVENS | 15097  SW 46TH CIR | OCALA | FL | 34473 | 19980313 |
| 3713489 | RICHARD | WRIGHT SR. | 1208  BRAZOS DR | SOUTHLAKE | TX | 76092 | 19980212 |
| | | | 12901  SYCAMORE ST | GRANDVIEW | MO | 64030 | 19980208 |

| Account | First | Last | No. | Street | City | State | Zip | Date |
|---|---|---|---|---|---|---|---|---|
| 3714382 | JOHN | MCNEES | | RR 3 BOX 218 | CLINTON | IL | 61727 | 19980326 |
| 3714874 | RICARDO | BROWN | 1317 | MESENA RD | THOMSON | GA | 30824 | 19980218 |
| 3715650 | LESLEY | FOREJT | | RR 2 BOX 309 | RUFFS DALE | PA | 15679 | 19980307 |
| 3717093 | JOHN | LEE | 800 | N LOMBARD AVE | OAK PARK | IL | 60302 | 19980214 |
| 3719280 | DALE | FAY | 2125 | SCARBROUGH RD | SPRINGFIELD | IL | 62702 | 19980309 |
| 3721510 | STEVE | BAILEY | 360 | COLUMBIA ROAD 449 | MAGNOLIA | AR | 71753 | 19980309 |
| 3721861 | JOSHUA | PATLAK | 32 | W ANAPAMU ST | SANTA BARBARA | CA | 93101 | 19980216 |
| 3727088 | E | NESS | | PO Box 1441 | Bard | CA | | 19980219 |
| 3729143 | MICHAEL | JOHNSON | 1420 | PLEASANT GROVE RD | CHESTER | SC | 92222 | 19980221 |
| 3731296 | LINDA | SILVA | 107 | SUNSET CIR | PROSPERITY | SC | 29706 | 19980309 |
| 3731756 | CARL | VANDERHOOF | 3449 | US HIGHWAY 27 N | FROSTPROOF | FL | 29127 | 19980211 |
| 3732605 | ROBIN | ROCKWELL | 3140 | WASHINGTON RD | WEST PALM BEACH | FL | 33843 | 19980310 |
| 3733542 | WILLIAM | PARKER | 5120 | WADE MAIN | WALDORF | MD | 33405 | 19980219 |
| 3734323 | PATRICIA | PARSONS | 213 | STORNOWAY DR | SOUTHERN PINES | NC | 20601 | 19980301 |
| 3734399 | MOHAMMED | TOOSI | 6802 | ESTHER DR | AUSTIN | TX | 28387 | 19980207 |
| 3734786 | MARIA | MYERS | 1278 | MAYS CROSSROADS | FRANKLINTON | NC | 78752 | 19980321 |
| 3734935 | EUNICE | WILKERSON | 3404 | DAMES FERRY RD | FORSYTH | GA | 27525 | 19980210 |
| 3736478 | GARY | MOORE | 15253 | SCHOWALTER ST, A | FORT POLK | LA | 31029 | 19980215 |
| 3737362 | JAMES | KISSINGER | 10833 | W HIBISCUS DR | SUN CITY | AZ | 71459 | 19980211 |
| 3737491 | MARY | KONEFAL | 174 | KONEFAL AVE | PINE BUSH | NY | 85373 | 19980306 |
| 3738153 | WILMA | BARKER | 1153 | BRIDGE STREET | LAFEET | OR | 12566 | 19980307 |
| 3738628 | FLETCHER | JEWELL | 3023 | THREE CHOPT RD | GUM SPRING | VA | 97127 | 19980321 |
| 3738800 | SAMEUL | DALRYMPLE | 415 | SHEFFIELD CT | COPPELL | TX | 23065 | 19980310 |
| 3740462 | LEON | BROWN | 1326 | SANDY LAKE RD | RAVENNA | OH | 75019 | 19980220 |
| 3740462 | LEON | BROWN | 1326 | SANDY LAKE RD | RAVENNA | OH | 44266 | 19980213 |
| 3740570 | CHRIS | JOHNSON | 206 | BARTON RANCH RD | DRIPPING SPRINGS | TX | 44266 | 19980213 |
| 3742615 | CHARLES | KIRKSEY | 5778 | BRENNERS PL | BARTLETT | TN | 78620 | 19980313 |
| 3744558 | MARK | AGBUYA | 3843 | ATLANTIC AVE | BROOKLYN | NY | 38134 | 19980207 |
| 3745081 | JOHN | STRAUSS | | RR 1 BOX 201 | TYRONE | PA | 11224 | 19980313 |
| 3747361 | DAVID | HOKE | 5669 | S WOODCLIFFE DR | SPRINGFIELD | MO | 16686 | 19980308 |
| 3747361 | DAVID | HOKE | 5669 | S WOODCLIFFE DR | SPRINGFIELD | MO | 65804 | 19980204 |
| 3747828 | JON | LESENEY | | RR 1 BOX 68-G3 | HASTINGS | OK | 65804 | 19980314 |
| 3748022 | HERBERT | UTLEY | 2808 | BROAD ST | DURHAM | NC | 73548 | 19980210 |
| 3751982 | MARK | CARPENTER | 1949W | E MICHIGAN AVE, #28 | CLINTON | MI | 27704 | 19980309 |
| 3753009 | MARK | REARDON | 2952 | TEER ROAD | CLARENDON SPRINGS | VT | 49236 | 19980211 |
| 3753177 | | | 1088 | E Kamm Ave | Selma | CA | 5777 | 19980308 |
| 3753727 | ALBERT | PEARSON | 693 | COUNTY ROAD 207 | JEMISON | AL | 93662 | 19980223 |
| 3753755 | TONY | WOMACK | 805 | LITTLE AVE | FAYETTEVILLE | NC | 35085 | 19980309 |
| 3754387 | DOUG | GIACOBBE | 3691 | SW 106TH TER | DAVIE | FL | 28301 | 19980226 |
| 3755423 | WILLIAM | MATHERS | 326 | HUTCHINSON AVE | IOWA CITY | IA | 33328 | 19980208 |
| 3755751 | PAT | FOX | 4723 | HORIZON WAY | FLORENCE | OR | 52246 | 19980218 |
| 3757030 | DAVID | WADDELL | 2122 | MILFORD ST | HOUSTON | TX | 97439 | 19980209 |
| 3759187 | JEAN | ETHLIN | | PO Box 1006 | Elgin | OR | 77098 | 19980309 |
| 3759703 | ALEX | HAMPTON | 1330 | TARBERRY RD | HOUSTON | TX | 97827 | 19980305 |
| 3761935 | DANNY | MCGREW | 4305 | BRUNSWICK AVE | LOS ANGELES | CA | 77088 | 19980305 |
| 3763108 | PAMELA | FISCHER | 1225 | CLARA AVE | SHEBOYGAN | WI | 90039 | 19980403 |
| 3763272 | GERALD | JONES | 6527 | SHERMAN ST | OTTER LAKE | MI | 53081 | 19980210 |
| 3764360 | DONALD | TACY | 171 | S MAIN RD | OTIS | MA | 48464 | 19980323 |
| 3765664 | DON | TRACY | 3928 | MAIN ST | KETTLE RIVER | MN | 1753 | 19980220 |
| 3766053 | BOBBEY | DIXON | 435 | BROAD ST | COTTONWOOD | AL | 55757 | 19980209 |
| 3767576 | KARL | FLOYD | 1907 | HIGHWAY 15 S | WOODLAND | MS | 36320 | 19980319 |
| 3768261 | JAMES | BOHANNON | 243 | SENTINEL OAKS | PINEHURST | TX | 39776 | 19980206 |
| 3768610 | BRENDA | TOOMEY | 130 | CROSSPOINT ST SE | PALM BAY | FL | 77362 | 19980309 |
| 3770463 | JOHN | MAYER | 12600 | SECOR RD | IDA | MI | 32909 | 19980222 |
| 3771177 | HOWARD | SULLIVAN | 1250 | NW 175TH ST | SEATTLE | WA | 48140 | 19980211 |
| 3772529 | LUIS | URBINA | 4308 | FRONTIER TRL | KILLEEN | TX | 98177 | 19980212 |
| 3773206 | JOANN | JAMES SATTERWHITE | 502 | LAKESIDE DR | GARNER | NC | 76542 | 19980302 |
| 3774241 | RANDY | KVALE | 15605 | JUDICIAL RD | BURNSVILLE | MN | 27529 | 19980213 |
| 3775806 | JOHN | ZOLLNER | 17218 | HARMONY LN NE | WOODBURN | OR | 55306 | 19980303 |
| 3776920 | W | LAWING | 2301 | WICKLOW DR | PEARLAND | TX | 97071 | 19980218 |
| 3778198 | GEORGE | OLSON | 10200 | LINDSAY LN | MOKENA | IL | 77581 | 19980218 |
| 3784694 | KAREN | MILLER | 664 | OAKDALE DR | PLANO | TX | 60448 | 19980211 |
| 3784694 | KAREN | MILLER | 664 | OAKDALE DR | PLANO | TX | 75025 | 19980313 |
| 3785372 | ADRIANNE | DODGEN | 2585 | COCHRAN SPRINGS RD | OHATCHEE | AL | 75025 | 19980312 |
| 3787539 | JOE | DILLINGHAM | 2069 | W 73RD ST | CLEVELAND | OH | 36271 | 19980218 |
| 3788129 | JOHN | ARMITAGE | 722 | JOSHUA TREE DR | CHESTNUTRIDGE | MO | 44102 | 19980217 |
| 3789807 | EARL | JOHNSON | 3313 | E 4250 S | Salt Lake City | UT | 65630 | 19980323 |
| 3790287 | ROBERT | DILLMAN | 1900 | MAXWELL CIR | ALVIN | TX | 84124 | 19980220 |
| 3793629 | SHARON | SADKA | 23 | RUE LAFITTE | HATTIESBURG | MS | 77511 | 19980225 |
| 3795224 | RANDALL | HAAG | 7500 | 10TH ST | GREELEY | CO | 39402 | 19980212 |
| | | | | | | | 80634 | 19980305 |

Page 12

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3795555 | DAN | TRIPODI | 1    BURLINGHOFF MAIN | LEBANON | NJ | 8833 | 19980320 |
| 3796444 | IRA | WILSON | 3812    VIRGINIA PINE DR | CARROLLTON | TX | 75007 | 19980223 |
| 3798413 | JEFF | PHARIS | PHARIS RD282 | TUTWILER | MS | 38963 | 19980225 |
| 3798498 | BARRY | LONG | 1726    ELVA RD | MADISONVILLE | KY | 42431 | 19980325 |
| 3803207 | BAMBI | HERTEL | RR 3 BOX 880 | DICKINSON | TX | 77539 | 19980325 |
| 3804114 | GERALD | EICHWALD | 28 Genesee Trl | Harrison | NY | 10528 | 19980216 |
| 3804384 | LINDA | COX | 14517    COUNTY ROAD 2191 | WHITEHOUSE | TX | 75791 | 19980224 |
| 3804846 | CLIFTON | WHITE | 1745    PALO ALTO DR | MESQUITE | TX | 75150 | 19980313 |
| 3805606 | ROBERT | HOLLOWAY | 12317    BRISTOL AVE | GRANDVIEW | MO | 64030 | 19980218 |
| 3805924 | CURTIS | WALLACE | 3906    CHERYL LYNNE LN | HOUSTON | TX | 77045 | 19980319 |
| 3806736 | ALEX | LEUPP | 530    SANTA ROSA DR | LOS GATOS | CA | 95032 | 19980211 |
| 3807776 | PETER | URTZ | 24339    MATIAS LN | PUNTA GORDA | FL | 33955 | 19980209 |
| 3808105 | REX | PHIPPS | 1355 BUENA VISTA | LANDER | WY | 82520 | 19980324 |
| 3808844 | | | PO Box 167301 | Irving | TX | 75016 | 19980226 |
| 3809105 | JAMES | BABB | 65068    HIGHWAY 1058 | ROSELAND | LA | 70456 | 19980222 |
| 3809385 | HAIM | LORAN | 250    CARLTON RD | MILLINGTON | NJ | 7946 | 19980213 |
| 3810537 | JUAN JOSE | BARRAGAN | 1132    E. CALIFORNIA ST | SAN LUIS | AZ | 85349 | 19980217 |
| 3811385 | MIKE | SHAFFER | 3315    GUERNSEY DR | BRISTOL | VA | 24202 | 19980219 |
| 3812558 | WAYNE | DEBSKI | 5000    BAUMHOFF AVE NW | COMSTOCK PARK | MI | 49321 | 19980216 |
| 3812558 | WAYNE | DEBSKI | 5000    BAUMHOFF AVE NW | COMSTOCK PARK | MI | 49321 | 19980216 |
| 3813702 | KAREN | KRAUSE | 935    N 18TH ST | COLORADO SPRINGS | CO | 80904 | 19980210 |
| 3814171 | TODD | SCHMIDT | 204    S 8054 MICHAEL CT | MUSKEGO | WI | 53150 | 19980214 |
| 3814448 | ROY | PARKER | 105    VIEWCREST DR | CASTLE ROCK | WA | 98611 | 19980313 |
| 3814874 | MARY | PAXTON | 2401    HIGHLAND DR | ANACORTES | WA | 98221 | 19980309 |
| 3815869 | ALLEN | TRAVIS | 2979    SW 52ND CT | BELL | FL | 32619 | 19980313 |
| 3817705 | CLAYTON | JONES | 16    POINSETT ST | CHARLESTON | SC | 29403 | 19980221 |
| 3822977 | RICHARD | CARTER | 2786    GOBBLER LN | FAYETTEVILLE | NC | 28301 | 19980211 |
| 3824201 | AMIR | ZARA | 2300    SCENIC SPUR | HONOR | MI | 49640 | 19980220 |
| 3824817 | ROBERT | REDFIELD | 14849    E CHOLULA DR | FOUNTAIN HILLS | AZ | 85269 | 19980222 |
| 3825046 | FLOYD | QUINN | RR 5 BOX 881-K | LAKE CITY | FL | 32024 | 19980217 |
| 3827862 | TRACY | HOLLIS | 2072    THORNCROFT DR | GERMANTOWN | TN | 38138 | 19980225 |
| 3829434 | TED | GEISLER | N 3320    HIGHWAY 175 | BROWNSVILL | WI | 53006 | 19980209 |
| 3829480 | DIRK | MORGAN | 6146    GILMORE RD | MORROW | OH | 45152 | 19980208 |
| 3830033 | IRENE | DIAZ | 1150    COUNTRY LN | LEMONT | IL | 60439 | 19980216 |
| 3831073 | NATHAN | GORDON | 1605 W HEDDING ST | SAN JOSE | CA | 95126 | 19980318 |
| 3833666 | BOOKER | DICKERSON | 7951    BOY ST | HOUSTON | TX | 77028 | 19980210 |
| 3833985 | FRED | STULL | 5005    NE 153RD AVE | WILLISTON | FL | 32696 | 19980215 |
| 3835995 | EDWARD | SIMON | 4725    GOLDEN RIDGE DR | CORONA | CA | 91720 | 19980303 |
| 3835995 | EDWARD | SIMON | 4725    GOLDEN RIDGE DR | CORONA | CA | 91720 | 19980303 |
| 3837078 | ROBERT | MILLS | 29590    LOS ANGELES AVENUE | WELLTON | AZ | 85356 | 19980216 |
| 3837363 | ROSA | MILLER | 6209    GREENFIELD RD | FORT WORTH | TX | 76135 | 19980209 |
| 3838454 | PATRICK | GARRISON | 136    POTTER LOOP | OZARK | IL | 62972 | 19980320 |
| 3839079 | GEORGE | MESSERSMITH | 4527    S KACHINA DR | TEMPE | AZ | 85282 | 19980312 |
| 3840064 | R | LOGAN | 505    OCCIDENTAL AVE | SAN MATEO | CA | 94402 | 19980223 |
| 3843418 | DAVID | KING | 3727    MICHIGAN AVE | SAINT LOUIS | MO | 63118 | 19980215 |
| 3844068 | GLEN | FRANCIS | 2301    AUBURN KNIGHTDALE RD | RALEIGH | NC | 27610 | 19980223 |
| 3846208 | KENNETH | ROSS | 7018    OCEAN DR | EMERALD ISLE | NC | 28594 | 19980209 |
| 3846802 | RONALD | PERCINO | PO Box 445 | Casa Blanca | NM | 87007 | 19980304 |
| 3847198 | EDWIN | BLAKENSHIP | 9915    NE ST JOHNS RD | VANCOUVER | WA | 98686 | 19980214 |
| 3847280 | CHRIS | MCNEILLY | RR 1 BOX 33B | ROBBINSVILLE | NC | 28771 | 19980228 |
| 3847980 | PATSY | HOYLER | 9518    CHIPPING DR | RICHMOND | VA | 23237 | 19980218 |
| 3848627 | ROYCE | BRINSON | PO Box 382 | Jamesville | NC | 27846 | 19980305 |
| 3851977 | EMMA | CAVAZOS | 8906    TIMBER ELM ST | SAN ANTONIO | TX | 78250 | 19980302 |
| 3852143 | PAUL | MOSER | 2040    HIGHWAY A | WEST BEND | WI | 53095 | 19980318 |
| 3852143 | PAUL | MOSER | 2040    HIGHWAY A | WEST BEND | WI | 53095 | 19980323 |
| 3852203 | DENNIS | RAWLA SPENCER | 1758    TREMONT DR | BELOIT | WI | 53511 | 19980302 |
| 3853886 | WILLIAM | BUEGE | 1032    SORRENTO AVE | ALFORD | FL | 32420 | 19980220 |
| 3853898 | RICARDO | GONZALES | 593    N 2ND ST | RAYMONDVILLE | TX | 78580 | 19980225 |
| 3856247 | VERLE | MOORE | 6075    SW 171ST AVE | ALOHA | OR | 97007 | 19980218 |
| 3856881 | FRANK | SZELKOWSKI | 6120    PEACHTREE ST | PORTAGE | MI | 49024 | 19980325 |
| 3859305 | JOY | WRIGHT | 4500 MARTIN WAY E SPC 36 | OLYMPIA | WA | 98516 | 19980327 |
| 3859852 | EDDIE | HURST | 341    IRISH CUTT RD | NEWPORT | TN | 37821 | 19980208 |
| 3860923 | ED | METZNER | 9913    TIMOTHY PATH | SALINAS | CA | 93907 | 19980224 |
| 3861100 | THERESA | FOSTER | 121    PRESCOTT PL | NASHVILLE | TN | 37211 | 19980208 |
| 3861464 | CHARLES | GEHRKEN | 10320    CALIMESA BLVD, #238 | CALIMESA | CA | 92320 | 19980222 |
| 3861464 | CHARLES | GEHRKEN | 10320    CALIMESA BLVD, #238 | CALIMESA | CA | 92320 | 19980222 |
| 3862326 | ANTHONY | BRADLEY | 61    STIRRUP WAY | BURLINGTON | NJ | 8016 | 19980321 |
| 3862924 | ALISON | WEGS | 220    S EDDY ST | SOUTH BEND | IN | 46617 | 19980210 |
| 3863050 | RONALD | JONES | MARKET STREET | UNIKA | NY | 13502 | 19980209 |
| 3863806 | DEBRA | GODLEY | 223    MARVA DRIVE | WASHINGTON | NC | 27889 | 19980216 |

Page 13

Exhibit

| ID | First Name | Last Name | Address | City | State | Zip | Date |
|---|---|---|---|---|---|---|---|
| 3864734 | RUSS | GOMES | 4 BOGGY HOLE RD | OLD LYME | CT | 6371 | 19980210 |
| 3865654 | DUANE | WALSH | RT 2 BOX 103AA | DENISON | TX | 75020 | 19980311 |
| 3865654 | DWAYNE | WALSH | 6 MELROSE CIR | DENISON | TX | 75020 | 19980311 |
| 3866361 | JANIS | BANKS | 103 CLAYTON DR | WEAVERVILLE | NC | 28787 | 19980224 |
| 3866499 | WAYNE | CAMPBELL | 140 LAKE DR | HAYDEN | AL | 35079 | 19980212 |
| 3866504 | DONALD | ERWIN | 745 PISGAH RD | BRIGHTON | TN | 38011 | 19980210 |
| 3867199 | CHRISTOPHE | CASTREE | 903 17TH ST | ROCKFORD | IL | 61104 | 19980210 |
| 3867741 | VALERIE | MACHOS | 491 CANAL ST. | CHATSWORTH | NJ | 8019 | 19980213 |
| 3869836 | STEVE | SCHRODER | 3587 J 75 RD | HOTCHKISS | CO | 81419 | 19980219 |
| 3870752 | VIOLET | EPSKAMP | 715 STARK RD | MIO | MI | 48647 | 19980214 |
| 3871859 | JOEL | RADASCH | HC 79 BOX 80 | CUBA | NM | 87013 | 19980316 |
| 3872052 | ALBERT | RODRIGUEZ | 3721 LEMON DR | GRAND PRAIRIE | TX | 75052 | 19980210 |
| 3872126 | PATRICIA | WALTERS | 4724 THOCTAW ST | LEAVITTSBURG | OH | 44430 | 19980306 |
| 3872155 | ANNIE | WRIGHT | 280 SHADY GROVE RD | TIMBERLAKE | NC | 27583 | 19980308 |
| 3874896 | RUSSELL | MORSEMAN JR | 6566 COUNTY ROAD 21 | ADDISON | NY | 14801 | 19980306 |
| 3874985 | STEVE | POLLARD | 3569 CEMETARY LN | WESTMINSTER | MD | 21158 | 19980302 |
| 3875533 | NICK | RAINONE | 120 HALLVILLE RD | EXETER | RI | 2822 | 19980212 |
| 3875972 | DON | KAPLAN | 5831 GREY ROCK RD | AGOURA HILLS | CA | 91301 | 19980219 |
| 3876782 | MARILYN | OR ROBERT STALLONE | 6255 FAIRLANE DR | OAKLAND | CA | 94611 | 19980220 |
| 3877716 | IRONE | BATSON | RR 1 BOX 99 | CORNWALLVILLE | NY | 12418 | 19980319 |
| 3880701 | JOYCE | THOMAS | 7215 ARTHUR ST | OAKLAND | CA | 94605 | 19980209 |
| 3882996 | SUSAN | HAWLEY | 67 BLUE ISLAND ST | SEBASTIAN | FL | 32958 | 19980226 |
| 3883117 | EARL | HAVENS | RR 3 BOX 101 | BUTLER | MO | 64730 | 19980217 |
| 3883117 | EARL | HAVENS | RR 3 BOX 101 | BUTLER | MO | 64730 | 19980302 |
| 3883857 | MECHELL | SALTER | RR 2 BOX 3315 | NICHOLSON | GA | 30565 | 19980306 |
| 3884827 | MICHELLE | HARRIS | 715 THURMAN CRT | SMYRNA | TN | 37167 | 19980219 |
| 3884977 | MARLYS | DOERFLINGER | 10300 LANE AVE | KANSAS CITY | MO | 64134 | 19980219 |
| 3885085 | TRACY | WHEELER | 3900 E LADIKA AVE | TERRE HAUTE | IN | 47805 | 19980212 |
| 3886078 | LARRY | ZERBST | 914 E SUMMIT ST | GREENVILLE | MI | 48838 | 19980222 |
| 3886755 | LARRY | PALMER | 133 FOSTERS GROVE RD | CHESNEE | SC | 29323 | 19980223 |
| 3887017 | PEDRO | CAING | 23941 MARSHALL ST | DEARBORN | MI | 48124 | 19980318 |
| 3887392 | JESUS | PLASCENCIA | 184 LIVE OAK RD | WATSONVILLE | CA | 95076 | 19980223 |
| 3887625 | ROBERT | WILSON | 7124 BOYKIN RD, D | SIMS | NC | 27880 | 19980223 |
| 3888170 | ANTHONY | LEONE | 370 FELDSTRASSE | BIG BEAR LAKE | CA | 92315 | 19980225 |
| 3890168 | | | | | | | 19980311 |
| 3890376 | MAX | ALAMAR | PO Box 122 | Harrington | WA | 99134 | 19980228 |
| 3892040 | HAROLD | RODGERS | 5005 MOUNT OLIVE SHORES DR | POLK CITY | FL | 33868 | 19980202 |
| 3896841 | EDWARD | CANNON | 2785 75 TH AV | BATON ROUGE | LA | 70807 | 19980224 |
| 3896883 | JAMES | DEAN | 13040 LAHTI RD | KALEVA | MI | 49645 | 19980218 |
| 3896897 | GINGER | POLING | HIGH TOP ESTATE LOT 12 | CAPON SPRINGS | WV | 26823 | 19980218 |
| 3897234 | MARGRET | SMITH | 28320 E COUNTY 11TH ST. #123 | WELLTON | AZ | 85356 | 19980215 |
| 3897472 | ANGELA | GREENE | 535 BIG PINE RD | CLAYTON | NC | 27520 | 19980218 |
| 3898240 | JOE | DONATO | 4386 NEWARK RD | COCHRANVILLE | PA | 19330 | 19980225 |
| 3898587 | MELVIN | ANDERSON | 69976 195TH ST | DASSEL | MN | 55325 | 19980312 |
| 3899772 | E. O. | VICK | 1180 RED RD | WHITE PLAINS | GA | 30678 | 19980323 |
| 3900577 | DAN | FINLEY | 9350 NEWELL CREEK RD | BEN LOMOND | CA | 95005 | 19980306 |
| 3901693 | JOHN | PLOUGHMAN | 307 S DARTMOUTH ST | KALAMAZOO | MI | 49006 | 19980225 |
| 3902101 | LANCE | BRUSH | 1119E CHERRY ST | SANTA ANA | CA | 92705 | 19980226 |
| 3902692 | WILLIAM | BRIMER | 1520 LAKE LOUELLA RD | SUWANEE | GA | 30174 | 19980217 |
| 3903237 | SAMUEL | NIPPER | 5556 PENNYBROOK TRL | STONE MOUNTAIN | GA | 30087 | 19980217 |
| 3904604 | JOHNNIE | JUDD | 142 SKEET RANGE ROAD | COATS | NC | 27521 | 19980308 |
| 3904844 | MOLLY | THURMAN | 13401 N CEMENTARY RD | YUKON | OK | 73099 | 19980224 |
| 3906011 | ROBERT | MEDRANO | 13522 EMILINE ST | OMAHA | NE | 68138 | 19980323 |
| 3906131 | JERRY | NELOMS | 21 LAKEVIEW GDNS. #920 | NATICK | MA | 1760 | 19980217 |
| 3906222 | MARK | LYND | PO BOX 1361 | MEXIA | TX | 76667 | 19980216 |
| 3906262 | T | LOWELL DEAN | RR 1 BOX 266 | DAYTON | PA | 16222 | 19980303 |
| 3906283 | WILLIAM | WEBSTER | 295 TETON DR | SAULSBURY | TN | 38067 | 19980302 |
| 3906566 | TRACY | GILLETTE | 956 WICKETRUN DR | BRANDON | FL | 33510 | 19980309 |
| 3907293 | RAYMOND | STEINBERG | 5016 KYLE DR | RALEIGH | NC | 27616 | 19980213 |
| 3908582 | KENNETH | YARBER | 2212 COUNTY ROAD O | CRAIG | NE | 68019 | 19980302 |
| 3908718 | JAY | ROSENBLUM | 2538 E 65TH ST | BROOKLYN | NY | 11234 | 19980219 |
| 3908953 | ROY | CROUCH | 60 SUMP JOHNSON RD | GOLDEN | MS | 38847 | 19980212 |
| 3910527 | RON | EDWARDS | 13258 PARKWAY RD | POUND | WI | 54161 | 19980326 |
| 3913495 | CHARLES | JR | 200 Ben Speck Rd | Hedgesville | WV | 25427 | 19980227 |
| 3913864 | SUE | COLE | 1178 HOLMES RD | BRONSON | MI | 49028 | 19980208 |
| 3914877 | JAMES | POLAND | 263 E 600 N | TOOELE | UT | 84074 | 19980327 |
| 3914978 | DAVID | MCNEILLY | 1481 E BROWN SCHOOL RD | MARYVILLE | TN | 37804 | 19980226 |
| 3915881 | LOUIS | KIRBY | 2319 SHELBURNE AVE SW | DECATUR | AL | 35603 | 19980218 |
| 3918449 | GLEN | PLUTSCHAK | 21776 MARSH CREEK RD | PRESTON | MD | 21655 | 19980206 |
| 3920197 | PEGGY | ROSEBORA | 167 GALILEE CHURCH RD | KINGS MOUNTAIN | NC | 28086 | 19980212 |

Exhibit 1

| 4000080 | PHIL | MELTZER | 1191 | MILLBRIDGE LN | MEMPHIS | TN | 38120 | 19980318 |
|---|---|---|---|---|---|---|---|---|
| 4015415 | JOHN | HURBAN | | STATE RD 293 | MILTON | DE | 19945 | 19980309 |
| 4025035 | ZARMAIR | SETRAKIAN | 663 | PROSPECT AVE | RIDGEFIELD | NJ | 7857 | 19980208 |
| 4025184 | GEORGE | NOISAT | 2747 | DONOVAN AVE | SANTA CLARA | CA | 95051 | 19980305 |
| 4031746 | JACK | KRUEGER | 10360 | CLARK RD | HILLSDALE | MI | 49242 | 19980209 |
| 4033902 | HENRY | MCCLOUD | 301 | BRANDY LN | LEECHBURG | PA | 15656 | 19980216 |
| 4036474 | JOHN | SCHMIDT | 1517 | ROXIE AVE | FAYETTEVILLE | NC | 28304 | 19980313 |
| 4039902 | MARLENE | CUDLECEK | RR 1 BOX 78 | | David City | NE | 68632 | 19980301 |
| 4041222 | PAUL | BAPST JR | 11285 | HANOVER RD | HANOVER | MI | 49241 | 19980326 |
| 4042189 | CHRISTINE | WETZER | 1231 | PADRE LN | PEBBLE BEACH | CA | 93953 | 19980225 |
| 4042448 | RUSSELL | VANBEEK | 57 | CLEMONS RD. #13 | MONTESANO | WA | 98563 | 19980227 |
| 4060255 | PERRY | GOLDBERG | 3800 | DEWEY AVE | ROCHESTER | NY | 14616 | 19980210 |
| 4067770 | WOODROW | YOKUM | | SHERWAN LAKE ESTATES | BEVERLY | WV | 26253 | 19980310 |
| 4067770 | WOODROW | YOKUM | | SHERWAN LAKE ESTATES | BEVERLY | WV | 26253 | 19980310 |
| 4074542 | TERRIE | MOODY | 100 | JARRETT COURT | LAGRANGE | NC | 28551 | 19980302 |
| 4080343 | TERESA | MANES | 8192 | E FARM RD 112 | STRAFFORD | MO | 65757 | 19980209 |
| 4080343 | TERESA | MANES | 8192 | E FARM RD 112 | STRAFFORD | MO | 65757 | 19980316 |
| 4080343 | TERESA | MANES | 8192 | E FARM RD 112 | STRAFFORD | MO | 65757 | 19980316 |
| 4083700 | ALAN | PEREZ | 5000T | LEWIS RD | MOUNT PLEASANT | NC | 28124 | 19980303 |
| 4087109 | ROBERT | TIPPIE | 632 | N 191ST AVE | BUCKEYE | AZ | 85326 | 19980319 |
| 4105291 | THOMAS | BISCARDI  SR | 5030 | NEW MOON DR | FAYETTEVILLE | NC | 28306 | 19980225 |
| 4106625 | PAULINE | WILLIAMS | 4811 | MURCHISON RD | FAYETTEVILLE | NC | 28311 | 19980225 |
| 4132452 | JOSEPH | KRAUSKOPF | 1 | MEADOWCREEK CT | PORTOLA VALLEY | CA | 94028 | 19980310 |
| 4132452 | JOSEPH | KRAUSKOPF | 1 | MEADOWCREEK CT | PORTOLA VALLEY | CA | 94028 | 19980323 |
| 4155047 | ROGER | COLVIN | 1028 | E 16TH ST | LOVELAND | CO | 80538 | 19980304 |
| 4257814 | MIRGARITA | RODRIGUEZ | 6215 | ACKEL ST, 25-C | METAIRIE | LA | 70003 | 19980212 |
| 4257814 | MIRGARITA | RODRIGUEZ | 6215 | ACKEL ST, 25-C | METAIRIE | LA | 70003 | 19980303 |
| 4279375 | MARY | POE | PO Box 1053 | | Warsaw | MO | 65355 | 19980218 |
| 4481739 | VIOLET | HILLS | 4092 HWY 62 W LOT 5 | | MOUNTAIN HOME | AR | 72653 | 19980316 |
| 4521406 | SHELLY | MIEOSE | 815 N 50th Ave | | Omaha | NE | 68132 | 19980204 |
| 4527073 | GREG | FILITOWICZ | 609 Bridle Path Ct | | Bloomfield Hills | MI | 48304 | 19980222 |
| 6302276 | WADE | MARTIN | 79 | RED OAK WAY | BELLE MEAD | NJ | 8502 | 19980207 |
| 38352737 | DELORIS | RIDDICK | RR 1 BOX 27 | | Hobbsville | NC | 27946 | 19980213 |
| 77855849 | SAM | DEFRANK | 507 E Hazelcroft Ave | | New Castle | PA | 16105 | 19980228 |
| 312427743 | BEAULAH | JONES | | | | | | 19980225 |
| 1212121212 | JOSE | RESIDENT | | | | | | 19980217 |
| 1403584554 | GLADIS | BUCOVE | RR 1 BOX 104 | | Millbrook | NY | 12545 | 19980218 |
| 6008277411 | RICHARD | GIGSTEAD | E5919 State Highway 54 | | Algoma | WI | 54201 | 19980208 |
| 8048228330 | MATTHEW | STEVENS | 1191 MEDLEY RD | | ALTON | VA | 24520 | 19980327 |
| 9102594162 | DENNIS | ELYMES | 140 Basden Rd | | Burgaw | NC | 28425 | 19980212 |
| 9167219750 | BENITO | GUAJARDO | 7970 IVY HL WAY | | ANTELOPE | CA | 95843 | 19980318 |
| 9727278209 | JONATHAN | WATKINS | 2616 Royal Birkdale Dr | | Plano | TX | 75025 | 19980224 |

## Exhibit 2

### Phone Calls Received by Mariel Mulet, Kirkland & Ellis

| NAME | PHONE NO. |
|---|---|
| Gary Santalley | (801) (435) 545-2365 |
| Juan Ramirez | (507) 237-5703 |
| Billy R. Belew | (213) 752-1824 |
| Gary Saint Kelly | Montgomery County<br>Houston Texas<br>(409) 449-4526 |
| Chen Lee | (317) 926-9963 |
| Mona White | no phone number provided |
| Noma Taylor | (912) 649-3621 |
| No name provided | Memphis, Tennesse<br>(901) 323-3948 |
| Carrere | (213) 953-9385 |
| Doug Ross | (686) 873-2204<br>(606)<br>(Kentucky) |
| Linda Edwards | (Georgia) |
| James Ausbourne | (425) 255-6287 |
| Carmalina | (562) 529-5817 |
| Ricardo Camarena | (818) 890-2410 |
| Maria White, on behalf of patient at Long Beach hospital | no phone number provided |
| Joann Bates | (901) 323-3948 |
| Marvin Carrera | (213) 953-9385 |
| Doug Robinson | (606) 873-2204 |
| Linda Edwards | no phone number provided |
| Ben Johnson | no phone number provided |

EXHIBIT 2

**Exhibit 3**

## Phone Calls Received by Manuel A. Garcia-Linares, Richman, Greer, Weil, Brumbaugh, Mirabito & Cheistensen

| | | | |
|---|---|---|---|
| 1. | Kenneth Rossen | - | (313) 869-0067 |
| 2. | Rosy Capultan | - | (254) 546-0129 |
| 3. | Hunter Jones | - | (941) 739-9143 - number not in service |
| 4. | Judy Markel | - | (765) 294-7168 |
| 5. | Dale Howell | - | (602) 502-9547 |
| 6. | Alehandro Hernandez | - | (902) 992-9536 - wrong number |
| 7. | Stacy Brandt | - | (334) 575-3058 |
| 8. | Mr. Tyler | - | (912) 649-3621 |
| 9. | Juan Aburto | - | (305) 696-4009 |
| 10. | Mike Martinez | - | no phone number provided |
| 11. | Steven  Moffegg | - | (505) 776-2994 |
| 12. | Reyna Lopez | - | (954) 926-4201 |
| 13. | Jessie & Betty Goat | - | (334) 628-3042 |
| 14. | Charles Lohay | - | (909) 594-4817 |
| 15. | Shonda Smith | - | (334) 964-4095 |
| 16. | Barbara Blard | - | no phone number provided |
| 17. | Cleopatra Williams | - | (954) 797-7433 |
| 18. | Juan Garcia | - | no phone number provided |
| 19. | Linda Edwards | - | (912) 783-1244 |
| 20. | Jerald Schweiaart | - | no phone number provided |

EXHIBIT 3

| 21. | Rob Shrock | - | (219) 782-0822 |
| 22. | Mr. Santiago | - | no phone number provided |
| 23. | Mr. Herrera | - | (213) 953-9385 |
| 24. | Steven Hall | - | no phone number provided |
| 25. | Mr. Atto | - | no phone number provided |
| 26. | Patrick Pollus | - | no phone number provided |
| 27. | Mr. Stowers | - | no phone number provided |
| 28. | L.C. Peterson | - | no phone number provided |
| 29. | Arando Aguire | - | no phone number provided |
| 30. | Jerry Nevels | - | no phone number provided |
| 31. | April Simmons | - | (904) 398-5148 |
| 32. | Dorothy McClinton | - | (601) 542-3322 |
| 33. | Franklin Garnett | - | no phone number provided |
| 34. | Patricia Rowe | - | no phone number provided |

## Exhibit 4

## Correspondence Received

## OBJECTIONS & MISCELLANEOUS

1.  T. Stephen Cody
    6259 E. Timrod Street, #2
    Tucson, AZ 85711-4673
    Phone: unknown

2.  Kenneth V. Mobley
    3817 W. Crawford Street
    Tampa, FL 33614
    Phone: (813) 885-1118

3.  James C. and Toni L. Cornish
    2047 Cedar St. E.
    Port Orchard, WA 98366
    Phone: unknown

4.  Patrick C. Mullen
    12852 Jug St. Rd.
    Johnstown, Ohio 43031
    Phone: unknown

5.  Toni Freeland/Tim Freeland
    278 W. 128th Street
    Grant, MI 49327
    Phone: unknown

6.  Robert P. Buss
    6310 Laurel Valley Road
    Dallas, TX 75248
    Phone: unknown

7.  John L. McDonald
    1923 Marlberry Lane
    Houston, TX 77084
    Phone: (281) 578-2036

8.  Mike Motley
    1619 Peavy Rd.
    Dallas, TX 75228
    Phone: unknown

9.  Michael Kelly
    7126 Shelter Creek Lane
    San Bruno, CA 94066
    Phone: (415) 583-8602 (home)
               (415) 548-3255 (work)

10. D J Haseldine
    179 Hardscrabble Rd.
    Milton, Vermont 05468
    Phone: unknown

11. Nancy Best
    96145 W. Lostine Rd.
    Chetopa, KS 67336-8523
    Phone: unknown

12. James Linder
    2801 Canal Rd.
    Deltona, FL 32738-3436
    Phone: unknown

13. Robert M. Drake, Jr.
    172 W. Leo Trapnell Ave.
    Lyons, GA 30436
    Phone: unknown
    (withdrew objection)

14. Matthew Trost
    747 Meadow Mead Drive
    Allen, TX 75002
    Phone: unknown

15. Kenneth Kaufold
    27 Stern Ct.
    Farmingdale, NY 11735
    Phone: unknown

16. Steven D. Graham
    365 S. Rock River Road
    Diamond Bar, CA 91765
    Phone: unknown

EXHIBIT 4

17. Nubia Bordon
3825 Moore Street
Los Angeles, CA 90066
Phone: unknown

18. Timothy F. Zackarek
4 Tammie Drive
Bear, DE 19701
Phone: unknown

19. George Rawson
W 9375 Cth D
Beaver Dam, WI 53916
Phone: unknown

20. Peter B. Johnson
4310 Cinnabar
Houston, Texas 77072
Phone: unknown

21. Judy L. Heinrich
93 Lake Frankston
Frankston, TX 75763
Phone: unknown
(2 letters)

22. Gary L. McHatten
25 South Drive
Anderson, IN 46013
Phone: unknown

23. Larry Slavin
169 Rd. 3100
Aztec, NM 87410
Phone: (505) 334-3950

24. Esther Stephens
11625 Trotter Rd.
Argyle, WI 53504
Phone: unknown

25. Joe Hegidio, Jr.
P.O. Box 9327
Woodlands, TX 77387
Phone: unknown

26. Branden L. Welch
2610 Havens Rd
Vidor, TX 77662
Phone: unknown

27. Albert G. Burns, Sr.
74065 Jack Loyd Rd.
Abita Springs, LA 70420
Phone: unknown

28. John Clemens
1516 Palos Verde Ct
Eldorado Hills, CA 95762
Phone: unknown

29. Ted A. Hanlon
4130 Autumn Street
Las Vegas, NV 89120
Phone: unknown

30. Henry J. King
P.O. Box 5298
Fort Lee, VA 23801
Phone: unknown

31. Larry Richard Jewell
2700 Runion Road
Inman, SC 29349
Phone: unknown

32. Forrest W. Briese
216 Knollwood Drive
Clemson, SC 29631
Phone: unknown

33. Mr. Alfred Gedaly
281 Fountain Rd.
El Paso, TX 79912-3813
Phone: unknown

34. Philip Dunnagan
5210 Rose Hill Court
Greensboro, NC 27407
Phone: unknown

35. Joseph P. Marlo
1832 Erin Brooke Dr.
Valrico, FL 33594
Phone: unknown

36. David Creech
RR#2 Box 320
Crawfordsville, Indiana 47933
Phone: unknown

37. Joseph Kosik
R. 1
Townville, PA 16360
Phone: unknown

38. Roger H. Rech
735 N. Egg Harbor Rd.
Hammonton, NJ 08037
Phone: unknown

39. Catherin Vaughan
2205 Double Creek Lane
Alpharetta, GA 30004
Phone: (770) 343-9440

40. Wesely C. Snyder
1772 Dolores Street #2
San Francisco, CA 94110-5453
Phone: unknown

41. Gerald L. Languell
Route 1, Box 148-A2
Blair, OK 73526
Phone: (580) 563-2896

42. Rex William Cowdry
3101 34th Street, NW
Washington, DC 20008-3308
Phone: (202) 244-6383

43. Brian R. Monnier
1290 Danielson Road
Kalispell, MT 59901-7233
Phone: unknown

44. Ed & Jean Shoemaker
No Address
Phone: unknown

45. Daniel Kellander
2995 70th Street
Blue Earth, MN 56013
Phone: unknown

46. William Moore
312 Raintree Drive
Hendersonville, TN 37075
Phone: unknown

47. William M. Maynor
4110 N. Highway 77 #7053
Harlingen, TX 78552
Phone: unknown

48. Alex M. Postpischil
2114 S. 45th Street, #304
Omaha, NE 68106-3362
Phone: unknown

49. Mary L. Brown
240 Apaco Court
Eutawville, SC
Phone: unknown

50. Michael R. Payne
P.O. Box 69
Marble, NC 28905-0069
Phone: (704) 321-5831 (home)
(704) 837-9539 (work)

51. Rolf C. Nieuwejaar
392 Chilkat Place
La Conner, WA 98257-9507
Phone: unknown

52. Dan Bibeau
P.O. Box 3516
Edgewood, NM 87015
Phone: unknown

53. Arthur Branstrom
18 Oakmont Terrace
Hightstown, NJ 08520
Phone: unknown

54. Sally Pierce
Route 5, Box 177K
Littleton, NC 27850-9512
Phone: unknown

55. Dan and Ann Weber
672 Monday Gulch Rd.
Indian Valley, ID 83632
Phone: unknown

56. Donald Jones
317 Southshore Drive
Greenback, TN 37742-2301
Phone: unknown

57. James J. Holt, Jr.
511 Queen Anne Drive
Slidell, LA 70460-8441
Phone: unknown

58. Steven DeMars
S8441 Denzer Road
North Freedom, Wisconsin 53951
Phone: unknown

59. Charles R. Strong
6677 Gaston Avenue
Dallas, TX 75214-4027
Phone: unknown

60. Eric Stephens
324 Sunset Drive
Lebanon, Missouri 65536-2069
Phone: unknown

61. Glyn Williams, Jr.
P.O. 437
Orange Springs, FL 32182
Phone: unknown

62. Paul J. Howell
P.O. Box 462
Birmingham, MI 48012-0462
Phone: unknown

63. John D. Carley
190 Copa De Oro
Brea, CA 92823-7013

64. Gerald E. Shaw
10780 South US-1
Port St. Lucie, FL 34952

65. Suzanne Moore
Valleyoak Drive
Clemmons, NC 27012

66. James Bova
13128 Iowa Street
Crown Point, IN 46307

67. Bob Daggs
5414 Cochise Street
Simi Valley, CA 93063-2050

68. Hope H. Burla
burlafam@earthlink.net

69. Mr. & Mrs. W. W. Rogerson
13 Fairmont Street
Ocean Isle Beach, NC 28469

70. Chas Harris
4045 MH, 16 St., #310
Lauderhill, FL 33313

71. Willie Buck
P.O. Box 635
Oxford, MI 042703
Phone: unknown

72. Tony Gallman
4945 Counts Sausage Rd.
Newberry, SC 29108

## OPTOUTS

1. Randall Binford
   6078 Arden Court
   Morrow, GA 30260
   Phone: unknown

2. William R. Shoup
   6516 E. 350 S.
   Bluffton, Indiana 46714
   Phone: unknown

3. Manuel Alvarado
   8213 Broadway St.
   El Paso, TX 79915
   Phone: unknown

4. Keith A. Paul
   4411 Avenue C
   Austin, TX 78751
   Phone: unknown

5. Hance H. Oliver
   1819 Grace Street
   Winston-Salem, NC 27103
   Phone: unknown

6. Scott Stanton
   7624 Mendham Ct.
   Elk Grove, CA 95758
   Phone: unknown

7. Cecil G. and Donna J. Pace
   1200 East Ashland
   Indianola, IA 50125-2817
   Phone: unknown

8. Michael G. Guler
   963 Medina Drive
   Lilburn, GA 30047
   Phone: unknown

9. Joe R. Stewart
   9664 Betabel Rd. #5
   San Juan Bautista, CA 95045
   Phone: unknown

10. Joan Rowden
    RR 2, Box 572
    Iberia, MO 65486
    Phone: unknown

11. William P. O'Brien
    14821 High Valley Road
    Poway, CA 92064
    Phone: (619) 748-0017

12. Daniel J. Navigato
    5051 Mt. Casas Drive
    San Diego, CA 92117
    Phone: (619) 233-5365 (work)

13. Linwood F. Sparks
    659 Stuart Ct.
    Herndon, VA 20170-5435
    Phone: (703) 478-6050 (home)

14. Thomas M. Beynon
    1798 Clearwater Rd.
    Waconia, MN 55387
    Phone: unknown

15. Richard Good
    139 W. Gray Court, #216
    Spokane, WA 99205-3041
    Phone: unknown

16. Donald G. Gray
    7708 Dixon Avenue
    Lubbock, TX 79423
    Phone: unknown

April 2, 1998 (12:25pm)

17.  Kathryn DiMauro
     4480 N.W. 76th Ct.
     Ocala, FL 34482
     Phone: unknown

18.  Wyatt L. Blake, Jr.
     Star Route Box 115
     Double Springs, Alabama 35553
     Phone: unknown

19.  Donald A. Derr
     398 County Road 244
     Cullman, AL 35057
     Phone: unknown

20.  Hank C. Bischoff
     117 Lakeview Road
     South Hero, VT 05486
     Phone: unknown

21.  Lula M. Robinson
     3220 N.W. 69th Street
     Gainesville, FL 32606
     Phone: unknown

22.  Doyle G. Ellison
     4204 River Drive
     Houston, Texas 77017
     Phone: unknown

23.  J. T. Kohl
     6801 S. La Grange Rd. #137
     Hodgkins, IL 60525-4834
     Phone: unknown

24.  Adrienne Neitzke
     4767 Newton Drive
     Las Vegas, NV 89121
     Phone: unknown

25.  Tim Lee Honeycutt
     Rt 6, Box A-4
     Eldon, MO 65026
     Phone: unknown

26.  Mark M. Tippetts
     Box 386
     Auburn, WY 83111
     Phone: unknown

27.  W. E. Patten
     16468 Foxtail Rd.
     Lebanon, MO 65536
     Phone: unknown

28.  Scott & Robyn Gilbert
     #3 Ridge Pointe Ct.
     St. Charles, MO 63304
     Phone: unknown

29.  John and Trudy Feore, Jr.
     701 Old Johnson Rd.
     Wendell, NC 27591
     Phone: unknown

30.  Earl I. Cross
     H.C. 30, Post 99 Box 5
     Brownwood, TX 76801-9806
     Phone: unknown

31.  Georgia L. Wilbanks
     12442 Kayla Lane
     Houston, TX 77015-6620
     Phone: unknown

32.  Mary C. Lialy
     2009 Sugarbuch Dr.
     Holiday, FL 34640
     Phone: unknown

33.  Philip G. "Doc" Smith
     5829 Little Portage Lk Rd.
     Land O'Lakes, WI 54540
     Phone: unknown

34.  Gary McHatton
     25 South Drive
     Anderson, IN 46013
     Phone: unknown

April 2, 1998 (12:25pm)

35.  David E. Brune
     P.O. Box 1100
     Clemson, SC 29633
     Phone: unknown

36.  Larry and Cindy Lynch
     15328 County Road 30
     Elk River, MN 55330
     Phone: unknown

37.  Wilbur Eggert
     3081 N. Lakeshore
     Port Hope, Michigan 48468
     Phone: unknown

38.  Lincoln Eatmon
     16401 S.W. 99th Court
     Miami, FL 33157
     Phone: unknown

39.  Bruce N. Jamison
     RR 1 Box 506
     Norwich, NY 13815-9743
     Phone: unknown

40.  Art Newill
     P.O. Box 808
     Holly Springs, GA 30142
     Phone: unknown

41.  Tony and Janell Dodak
     8670 Block Road
     Birch Run, MI 48415
     Phone: unknown

42.  Carnetta Lampley
     P.O. Box 184
     Midway, AL 36053
     Phone: unknown

43.  Cheryl Lyles
     5735 Lee Road 54
     Opelika, AL 36801
     Phone: unknown

44.  Rodney Downie
     Route 2, Box 159
     Clayton, AL 36016
     Phone: unknown

45.  Kelly R. and Melissa D. Lawrence
     1666 Maple Grove Road
     Lafayette, TN 37083
     Phone: unknown

46.  Willie Dean Allen
     408 Trawick Street
     Abbeville, AL 36310
     Phone: unknown

47.  Hassie Billins
     Route 3, Box 134
     Abbeville, AL 36027
     Phone: unknown

48.  Angie Daniels
     P.O. Box 176
     Clayton, AL 36016
     Phone: unknown

49.  Rosa Devose
     106 Elm Place
     Eufaula, AL 36027
     Phone: unknown

50.  Mary Ford
     P.O. Box 443
     Clayton, AL 36016
     Phone: unknown

51.  Aubrey Grubbs
     Route 1, Box 35-B
     Clopton, AL 36317
     Phone: unknown

52.  Cary and Brenda Grubbs
     Route 1, Box 32C
     Clopton, AL 36317
     Phone: unknown

53. Stanley Jones
794 Sid Bush Road
Clayton, AL 36016
Phone: unknown

54. Kevin Mitchell
146 Twin Lake Road
Eufaula, AL 36027
Phone: unknown

55. Evelyn Nelson
3 Lonnie Wilson Road
Clayton, Alabama 36016
Phone: unknown

56. Deloris Person
Route 1, Box 560
Midway, AL 36053
Phone: unknown

57. Willie Dean Rumph
Box 255 Leehigh Road
Clayton, AL 36016
Phone: unknown

58. Bobby Russaw
Route 3, Box 336
Abbeville, AL 36310
Phone: unknown

59. Mary Jean Thomas
Route 1, Box 22-F
Clopton, AL 36317
Phone: unknown

60. David and Carolyn Woodley
Highway 239, 1387 Lot 2
Clayton, AL 36016
Phone: unknown

61. Frankie Grimsley
Route 2, Box 552
Abbeville, Alabama 36310
Phone: unknown

62. Carita Jones
14 Belcher Bethel Church Road
Eufaula, Alabama 36027
Phone: unknown

63. Mary McCrae
1931 County Road 53
Clayton, Alabama 36016
Phone: unknown

64. Shirley Thomas
Post Office Box 342
Clopton, Alabama 36317
Phone: unknown

65. A. B. Criss
Post Office Box 855
Clayton, Alabama 36016
Phone: unknown

66. Mark & Melody Betrozoff
17234 Crowder Rd. SE
Tenino, WA 98589
Phone: unknown

April 2, 1998 (12:25pm)

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 300 South Grand Avenue, Suite 3000, Los Angeles, California, 90071.

On **April 2, 1998**, I served the foregoing document(s) described as **DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' INTERROGATORIES** on the interested parties in this action as follows:

Michael A. Hanzman
Mark J. Heise
Hanzman Criden Korge & Charykin, P.A.
2100 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL  33131

Mark A. Dresnick, P.A.
Sean M. Ellsworth
Grand Bay Plaza, Suite 201
2665 South Bayshore Drive
Miami, FL  33133

[ ]   By transmitting via facsimile, the document(s) listed above to the fax number set forth above on this date before 5:00 p.m.  I am aware that service is presumed invalid unless the transmission machine properly issues a transmission report stating the transmission is complete and without error.

[X ]  By placing the document(s) listed above in a sealed overnight courier envelope addressed as set forth below and routing the envelope for pick up within our offices by Federal Express.  I am familiar with the firm's practice of collection for pick up and overnight delivery by Federal Express.  It is routed for daily pick up in our offices by Federal Express on that same day with overnight courier charges thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the delivery date is more than one day after date of deposit with Federal Express in this affidavit.

[ ]   By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.  I am familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]   **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]   **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed **April 2, 1998**, at Los Angeles, California.

Karmala Beasley

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

OSVALDO LUACES and
MARITZA LUACES,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

vs.

DIRECTV, INC.,

      Defendant.

_____/

          **CASE NO. 97-2324-Civ-Highsmith**
          **Magistrate Judge Dube**

## <u>AFFIDAVIT OF MICHAEL A. HANZMAN</u>

      BEFORE ME, the undersigned personally appeared MICHAEL A. HANZMAN, and after being fully duly deposed sayeth as follows:

      1.     I am an attorney licensed to practice law in the State of Florida. I am a shareholder in the firm of Hanzman Criden Korge Chaykin Ponce & Heise, P.A. Throughout this litigation, I have acted as Co-Lead Counsel for the class.

      2.     Over the last ten years, my practice has to a large extent involved the representation of Plaintiffs in class action matters, both in federal and state court. I and other members of my firm have served as court-appointed class counsel in numerous class actions, pending and concluded in both state and federal courts, in the Southern District of Florida and elsewhere throughout the country. The following are some of the recent cases in which our firm has served as either lead, or co-lead counsel: (1) *Walco Investments, Inc., et al., vs. Kenneth Thenen, et al.*, Case No. 93-2534-Civ-Moreno; (2) *Shea v. New York Life Insurance*, Case No. 96-0746 Civ-Nesbitt; (3) *Aylward v. Painewebber Incorporated*, Case No. 96-2831 Civ-Lenard; *(4) Wegweiser v. Great Western Bank et al*, Case No. 95-8543 Civ-Hurley; *and (5) Singer v. AT & T*, Case No. 95-2738 Civ-Kehoe.

Case No. 96-2831-Civ-Lenard

3.    My firm, together with Co-Counsel, was retained by the Plaintiffs in this case to pursue claims against DirecTV in connection with the removal of certain channels provided as part of a pre-paid programming contract entered into between DirecTV and approximately seven hundred and fifty thousand (750,000) subscribers.    Plaintiff hired our firm on a purely contingent arrangement whereby we were entitled to receive as our fee one-third (1/3) of any recovery achieved. Because this case was settled as a class action, Plaintiff's Counsel are entitled to receive, as our attorney's fee, a Court-awarded percentage of the "common fund" obtained on behalf of the Class, in accordance with the dictates of Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768 (11th Cir. 1991).

4.    From the commencement of this case through its conclusion, Class counsel were presented with numerous obstacles, both procedurally and substantively, including DirecTV's assertions that (a) the change in programming was contractually permissible; and (b) a majority of subscribers did not object to, and were in fact satisfied with, the change in program mix.  The latter argument could have presented an obstacle to certification of a class.

5.    After considerable negotiations, DirecTV agreed to a settlement which will provide all participating class members with the precise contractual benefit alleged to have been bargained for.  In particular, each class member may receive the removed channels, or the monetary equivalent of their value, for each month remaining on their pre-paid contract as of the date those channels were removed from the programming mix.  Pursuant to the Court's Order of Preliminary Approval, notice of the settlement was provided to approximately seven-hundred and fifty-thousand (750,000) class members.  The number of class members who excluded themselves from, or objected to, the

2

Case No. 96-2831-Civ-Lenard

settlement is negligible in light of the size of the class. Counsel has received only 91 requests for exclusions, and 77 objections to the settlement. This amounts to less than .001% objecting to the terms of the settlement.

6.    Based upon my experience in litigating commercial matters, including class actions, and my review of pertinent decisions and academic literature, I believe the result obtained on behalf of the Class is outstanding, and well above that which could have been reasonably expected at the outset of the litigation. The settlement amount is approximately one hundred percent (100%) of the estimated damages the class would be entitled to receive if Plaintiffs succeeded in certification and prevailed on all issues of liability, since the "value" of the programs removed is no greater than the amounts provided by the settlement.

7.    In addition to the value of the benefits being provided to class members, the settlement also provided that DirecTV would pay class counsels' attorney's fees and expenses. The parties agreed that the amount to be paid would be negotiated in good faith *only after* the settlement had been fully negotiated and agreed upon. DirecTV's agreement to pay attorney's fees and costs is a significant benefit to class because absent that provision the class would be required to pay a percentage fee out of the gross recovery, thereby reducing the benefits ultimately received.

8.    After the settlement was reached, counsel engaged in extensive arms length negotiations over the amount of the fees and costs to be paid by DirecTV, subject to Court approval. The parties eventually agreed that DirecTV would pay a total of $900,000 in attorney's fees and costs. That amount is significantly less than what class counsel could have requested from the Court under the percentage of the "common fund" approach established in <u>Camden I</u>. The Court also could

3

Case No. 96-2831-Civ-Lenard

have awarded less than this amount. Thus, both DirecTV and class counsel had an incentive to negotiate and resolve the attorney's fee and costs issue. Those negotiations were in good faith, were not collusive, and took place only after the settlement had been agreed upon.

9     Based upon the authorities contained in our accompanying Motion for Award of Attorneys' Fees and Costs, I believe the amount negotiated and requested as a total attorneys' fee and costs is reasonable and warranted in light of the time incurred by Plaintiff's Counsel,[1] the novelty and difficulty of the case, and most importantly, the results achieved on behalf of the class.

FURTHER AFFIANT SAYETH NAUGHT.

MICHAEL A. HANZMAN

STATE OF FLORIDA)
                )§§
COUNTY OF DADE  )

The foregoing instrument was acknowledged before me this 16th day of April, 1998 by MICHAEL A. HANZMAN who is personally known to me and who did not take an oath.

Notary Public

MIREYA CARBALLOSA
Notary Public, State of Florida
My Comm. expires Feb 22, 1999
No. CC440912

Typed, Printed or Stamped
Commission expires:

---

[1] Class Counsel have spent approximately one hundred fifty thousand dollars ($150,000.00) in time and costs in this matter, and we were prepared, and obligated to, incur considerably more time and costs without any assurance of payment.

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

JUN 2 1994

CLT. R U.S. DIST. CT.
S.D. OF FLA. MIAMI

IN RE: INTERNATIONAL RECOVERY
CORPORATION SECURITIES
LITIGATION

CASE NO. 92-1474-CIV-ATKINS

MAGISTRATE JUDGE TURNOFF

This Document Relates To:
All Actions

CASE NO. 92-1488-CIV-ATKINS
CASE NO. 92-1541-CIV-ATKINS

_____/

## FINAL JUDGMENT

This matter having come before the Court on the application of the parties for approval of the proposed settlement of this consolidated class action as set forth in the Stipulation and Agreement of Settlement dated as of February 18, 1994 and the exhibits thereto (the "Stipulation"), and the Court having considered all papers filed and proceedings had herein and otherwise being fully informed in the premises, and after due and adequate notice to all interested parties and a hearing, and good cause appearing therefor, it is

ORDERED, ADJUDGED AND DECREED THAT:

Definitions

1.    For purposes of this Final Judgment, the Court adopts and incorporates the definitions contained in the Stipulation.

Jurisdiction

2.    This Court has jurisdiction over the subject matter of this litigation, and all actions within this

MICROFILM

jurisdiction and over all parties to this litigation, including all class members.

No Admission Of Liability Or Lack Thereof

3.    This Court hereby decrees that neither the Stipulation, nor this Final Judgment, nor the fact of the settlement, is an admission or concession by any party of any liability or wrongdoing whatsoever or of any lack thereof.  This Final Judgment is not a finding of the validity or invalidity of any claims in this litigation or of any wrongdoing or lack thereof by any Defendant.  Neither the Stipulation, nor this Final Judgment, nor the fact of settlement, nor the settlement proceedings, nor the settlement negotiations, nor any related documents shall be used or construed as an admission of any fault, liability, or wrongdoing, or lack thereof, by any person. Neither the Stipulation, nor this Final Judgment, nor the fact of settlement, nor the settlement proceedings, nor the settlement negotiations, nor any related documents shall be offered or received in evidence as an admission, concession, presumption or inference against any party in any proceeding, other than such proceedings as may be necessary to consummate or enforce the Stipulation.

Fairness, Reasonableness And Adequacy Of Settlement

4.    This Court hereby approves the settlement set forth in the Stipulation and finds, in accordance with Rule 23 of the Federal Rules of Civil Procedure, that said settlement is, in all respects, fair, reasonable and adequate to the Class and all

- 2 -

approves and directs the consummation and implementation of the settlement in accordance with the terms and provisions of the Stipulation. This Court further finds that the settlement has been entered into and made in good faith, and that the Plaintiffs and their counsel have fairly and adequately represented the interests of the Class in connection with this litigation and the settlement.

<u>The Class</u>

5. For settlement purposes only, the certified class of plaintiffs (the "Class") is hereby defined to consist of: All persons who purchased the common stock of International Recovery Corp. ("IRC") during the period from February 5, 1992 through June 23, 1992, inclusive.

6. Excluded from the Class are the Defendants, members of the immediate family of each of the Individual Defendants, any officer or director of IRC, any subsidiary or affiliate of IRC, any person in which any excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any excluded person.

7. All persons who validly requested exclusion from the Class are not members of the Class.

<u>Dismissal With Prejudice</u>

8. The Court hereby dismisses with prejudice the Consolidated Amended Class Action Complaint filed herein, all of the Actions, and all claims and causes of action asserted

finally as against each and all of the Defendants, and without
costs to any of the parties as against the others.
Released Claims

9.    Following entry of this Final Judgment, upon the
Settlement Effective Date, the Plaintiffs and all members of the
Class (including its, his, her or their heirs, executors,
administrators, successors, and assigns) (the "Releasors"), and
each of them, for good and sufficient consideration, shall be
deemed to release, remise and forever discharge the Defendants
and the Related Parties (the "Releasees"), and each of them, of
and from any and all manner of actions and causes of action,
suits, obligations, claims, debts, demands, agreements, promises,
liabilities, controversies, costs, expenses and attorneys' fees
whatsoever, whether in law or in equity and whether based on any
federal law, state law, common law right of action or otherwise,
foreseen or unforseen, matured or unmatured, known or unknown,
accrued or not accrued, which the Releasors, or any of them, ever
had, now have, can have or shall or may hereafter have, either
individually or as a member of a class, against the Releasees, or
any of them, by reason of, based upon, arising from, or in any
way related to both (i) the alleged acts, failures to act,
omissions, misrepresentations, facts, events, transactions,
statements, occurrences or other subject matter which either were
or which could have been set forth, alleged, embraced, complained
of or otherwise referred to in the Actions and (ii) the purchase
of IRC common stock during the Class Period by any Plaintiff or

— 4 —

any member of the Class.  The foregoing shall not affect any of the rights or obligations of the parties under the Stipulation.

Injunction Against Assertion Of Released Claims

10.  Each Class member who did not validly request exclusion from the Class is hereby permanently barred and enjoined from asserting or continuing to assert against any of the Defendants any of the claims that he, she or it released pursuant to the provisions of paragraph 9 of this Final Judgment in any court or other forum whatsoever, including such released claims as already may have been asserted in any pending action, arbitration or other proceeding.

Adequacy Of Notice

11.  The notice given to the Class of the settlement set forth in the Stipulation and the other matters set forth therein, including the individual notice to all Class members who could be identified through reasonable effort, was the best notice practicable under the circumstances.  Said notice provided fair and reasonable notice to the Class members concerning the nature of these actions and the claims and causes of action asserted therein on behalf of the Class and the proposed settlement and the hearing with respect thereto, and provided due and adequate notice of those proceedings and of the matters set forth therein to all persons entitled to such notice.  Said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, and the United States Constitution.

- 5 -

## Continuing Jurisdiction

12.  Without affecting the finality of this judgment in any way, this Court retains continuing jurisdiction:  (a) over the implementation, administration and consummation of this settlement; (b) over any and all distributions of monies or other Settlement Consideration to Class members and the allocation among Class members of any such monies or other Settlement Consideration; (c) over disposition of the Cash Settlement Fund and other Settlement Consideration; (d) over these actions for the purpose of hearing and determining any applications for attorney's fees, disbursements, costs, expenses, including expert fees, and interest which have been or may be made by counsel for Plaintiffs; (e) over these actions until the Final Judgment contemplated hereby has become effective and each and every act agreed to be performed by the parties to the Stipulation shall have been performed pursuant to the Stipulation; and (f) over all parties to these actions and all parties to the Stipulation for the purpose of taking such other actions as may be necessary to conclude and administer this settlement and to implement and enforce the Stipulation.

## Termination Of Settlement

13.  In the event that the settlement does not become effective or is terminated in accordance with the terms and provisions of the Stipulation, then this Final Judgment shall be rendered null and void and be vacated and the Stipulation and all orders entered in connection therewith by this Court shall be

- 6 -

rendered null and void, except as provided in paragraph 28 of the Stipulation.

Attorney's Fees And Expenses

14. Plaintiffs' counsel are hereby awarded as attorney's fees (the "fee award") (a) $ 392,958.00 and (b) 30 % of either (i) the total number of shares of IRC common stock to be issued by IRC for the benefit of the Class pursuant to paragraphs 7 through 14 of the Stipulation or (ii) the Additional Cash Payment, in the event that defendant IRC elects to make such Additional Cash Payment in lieu of issuing common stock. Plaintiffs' counsel are further awarded expert's fees, costs, and expenses in the amount of $ 64,136.59 (the "expense award"). Said fees, costs and expenses have been determined by the Court to be fair, reasonable, and appropriate. Plaintiffs' counsel are also awarded interest on the cash portion of the fee award and on the expense award from the date of the Hearing (or, with respect to any portion of the fee award relating to the Additional Cash Payment, should IRC elect to make such Payment, the date such Payment is deposited by IRC for the benefit of the Class) through the date of payment of the cash portion of the fee award and the expense award to Plaintiffs' counsel at the same rate as interest is earned by the Cash Settlement Fund. The cash portion of the fee award, the expense award, and all interest shall be paid from the Cash Settlement Fund.

Plaintiffs' counsel may apply to the Court for further awards of fees, costs, and expenses relating to the administration and consummation of the settlement. Any such further applications may be made without further notice to the Class.

16. Co-Lead Counsel for Plaintiffs, the firms of Milberg Weiss Bershad Hynes & Lerach and Wolf Popper Ross Wolf & Jones, are authorized and directed to allocate the fee award and the expense award among Plaintiffs' counsel.

17. The costs and expenses associated with the consummation and/or administration of the settlement shall be paid pursuant to the terms of the Stipulation.

Entry Of Final Judgment

18. The Court finds that no just reason exists for delay in entering final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure in accordance with the Stipulation. Accordingly, the Clerk is hereby directed to enter this Final Judgment forthwith pursuant to Rule 54(b).

Dated: Miami, Florida
June 2 , 1994

C. Clyde Atkins
United States District Judge

- 8 -

94 MAR 29 PM 12: 41

T. G. CHELEOTIS
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

-------------------------------X
IN RE:  SOUND ADVICE, INC.          :    Case No. 92-6457-Civ.
        SECURITIES LITIGATION.      :    Ungaro-Benages
                                    :
                                    :
This Document Relates To:           :
     All Actions                    :
-------------------------------X



ORDER AND FINAL JUDGMENT

WHEREAS:

A.   The Action (unless indicated otherwise, all capitalized terms used herein shall have meanings as defined in the Stipulation of Settlement (the "Stipulation")) has been brought against Defendants on behalf of purchasers of the common stock of Sound Advice from May 9, 1989 through May 8, 1992;

B.   On January 26, 1994, the Class and Defendants entered into a Stipulation subject to approval of the Court; and

C.   On March 25, 1994, a hearing was held before this Court to determine whether the terms of the Stipulation and the terms and conditions of the settlement proposed in the Stipulation are fair, reasonable and adequate for the final resolution of all claims asserted; and whether judgment should be entered in the Action dismissing the Action and the Complaint on the merits with prejudice.

MICROFILM

MAR 3 0 1994

SOUTHERN DISTRICT
MIAMI

The Court, having heard and considered the matter, including all papers filed in connection therewith, and the oral presentations of counsel at said hearing, and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. The Court has subject matter jurisdiction over the Action.

2. On February 11, 1994, the Notice was mailed to all persons who, as appeared on the transfer records of Sound Advice, purchased shares of Sound Advice common stock between May 15, 1989 and May 8, 1992. The Notice, together with the Publication Notice published in the national edition of The Wall Street Journal on February 16, 1994, are hereby determined to be the best practicable notice under the circumstances and in full compliance with Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process.

3. A Settlement Class is hereby certified as follows: all Persons who purchased Sound Advice Shares from May 9, 1989 through May 8, 1992, inclusive, excluding those persons who timely and validly request exclusion from the Class and are listed in Exhibit "A" hereto. The Settlement Class shall also exclude Defendants, members of the immediate family of each of the Individual Defendants, any entity in which any Defendant has a controlling interest and the legal representative, heirs,

2

controlling persons, successors and predecessors in interest and assigns of any Defendants.

4. The Court finds that:

(a) the Class is so numerous that joinder of all members is impracticable;

(b) there are questions of law and fact common to the Class;

(c) the claims of the Representative Plaintiffs are typical of the claims of the Class;

(d) the Representative Plaintiffs will fairly and adequately protect the interests of the Class; and

(e) the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of the Action.

5. The Stipulation and the Settlement including the respective contributions, releases and other terms therein are approved as fair, reasonable and adequate and in the best interests of the Settlement Class Members, determined to have been entered into in good faith, and the parties are directed to consummate the Settlement in accordance with the terms and conditions of the Stipulation.

3

6.    All complaints filed in the Action, including the Consolidated and Amended Class Action Complaint, dated December 31, 1992 (collectively, the "Complaint"), are hereby dismissed in their entirety, with prejudice and on the merits, such dismissal to be subject to compliance by the parties with the terms and conditions of the Stipulation and any Order of the Court with regard to the Settlement, and the Settlement Class Members are deemed to have irrevocably and unconditionally released and are permanently barred and enjoined from asserting the Released Claims.

7.    The Court hereby finds that the terms and conditions of the issuance of that certain number of Warrants for Sound Advice common stock and the subsequent distribution of those Warrants pursuant to the terms of the Stipulation, are fair and adequate for purposes of exempting such Warrants from registration pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended.

8.    The six law firms representing Plaintiffs (hereinafter "Petitioners") are hereby granted an award of (a) fees in the amount of $824,500 , representing 30% of the Settlement Amount, in cash and Warrants in the same proportion as in the Settlement Amount and (b) reimbursement of expenses in the amount of $140,376.62 in cash. Both amounts will be payable at the time indicated in the Stipulation.

4

9.   Disbursements to Petitioners of fees and expenses shall be made in such amounts as determined by plaintiffs' co-lead counsel.

10.   Following the Funding Date, $2500 in cash shall be paid to each of the named plaintiffs from the Settlement Amount. Such amount shall be paid in addition to the amounts the named plaintiffs are entitled to receive as Authorized Claimants pursuant to the Stipulation of Settlement.

11.   This Order and Final Judgment is final for purposes of appeal and may be appealed notwithstanding other matters presently pending, and the Clerk is hereby directed to enter judgment thereon.

12.   Without in any way affecting the finality of this Order the Court shall retain continuing jurisdiction over all matters relating to the administration and effectuation of the Settlement.

Dated: _Mar. 25, 1994_

_Ursula Ungaro-Benages_
Ursula Ungaro-Benages
United States District Judge

5

SCHEDULE "A"

| Name | Shares Purchased | Date |
|------|------------------|------|
| Carl R. Kreitz | 200 | 2/11/92 |

H- 5/2/94

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
NORTHERN DIVISION

L. EUGENE HOLLOWAY,

      Plaintiff,

vs.

BARRY E. CHAPNICK, et al.,

      Defendants.

                        /

STEVEN KORNFELD,

      Plaintiff,

vs.

BARRY E. CHAPNICK, et al.,

      Defendants.

                        /

CONSOLIDATED CASE NO.
89-6572-CIV-PAINE

FILED by _____ SP

APR 15 1994

T. G. CHELEOTIS
CLERK U.S. DIST. CT.
S.D. OF FLA.-W.P.B.

FINAL ORDER AND
JUDGMENT APPROVING
<u>PARTIAL SETTLEMENT</u>

      This Cause came on before the Court on a Stipulation of Settlement ("Stipulation") dated December 30, 1993 by and between (i) Plaintiffs L. Eugene Holloway and Steven Kornfeld, individually and on behalf of all persons and entities who purchased or otherwise acquired shares of common stock of Commonwealth Savings and Loan Association of Florida ("Commonwealth"), a savings and loan association organized and chartered under the laws of the

State of Florida, with the transaction date occurring during the period from June 1, 1985 through and including September 23, 1988, excluding the defendants in the above-captioned actions (the "Commonwealth Shareholder Litigation") and members of their families, the subsidiaries and affiliates of Commonwealth, all officers and directors of Commonwealth on or after June 1, 1985 and members of their families, and all successors, assigns, heirs, legal representatives and agents of any of the foregoing persons and any entity in which any of the them has a controlling interest; and (ii) the following Defendants (collectively referred to hereinafter as the "Settling Defendants"): (a) Deloitte & Touche (formerly known as Deloitte Haskins & Sells); (b) Henry Forer, Sherrill Hudson, J. Michael Cook and Ferdinand Heeb (individually, as co-partners of Deloitte & Touche, and as representatives of a defendant class, consisting of all persons who were partners of Deloitte Haskins & Sells at any time from April 1, 1984 through June 30, 1988, inclusive, which was certified by this Court by Order dated July 19, 1992; (c) members of the defendant class; and (d) Herbert Adler, D. Richard McGarahan, Harry Levy, Howard Mescon, Jack L. Moss and J. W. Eason, Jr. (collectively referred to hereinafter as "Settling Outside Directors").

The Stipulation provides for final settlement (the "Settlement") of the Plaintiffs' claims, and those of a class of purchasers of Commonwealth common stock that, as set forth below, this Court has previously conditionally certified as a class (the "Class") for settlement purposes only, against the Settling

Defendants in the Commonwealth Shareholder Litigation. The Complaint in the Holloway action, which was originally filed on September 15, 1989, asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and §78t(a), by Deloitte Haskins & Sells and various other individual Defendants, including the Settling Outside Directors, and claims of common law negligence. The Complaint in the Kornfeld action, which was filed on November 14, 1989, asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and §78t(a), the RICO Act, 18 U.S.C. 1961 et. seq., and claims of common law negligence, against Deloitte & Touche, J. Michael Cook, Henry Forer, Sherrill Hudson and Ferdinand Heeb, individually and as co-partners of John Does, one through five hundred, d/b/a Deloitte Haskins & Sells, and as representatives of a class of defendants consisting of all those persons who were partners of Deloitte Haskins & Sells at any time from April 1, 1984 through June 30, 1988, and various other individual Defendants, including the Settling Outside Directors.

Following the execution of the Stipulation, the Court entered an Order Approving Notice on DECEMBER 30            , 1993, in which the Court, for settlement purposes only, conditionally determined that the action is appropriate for class adjudication and conditionally certified the Class.

The Order Approving Notice entered by this Court also directed that notice be given to the Class of the proposed Settlement, and of a hearing to determine whether the proposed

Stipulation should be approved as fair, adequate and reasonable and in the best interests of the Class, to award fees and reimburse expenses of Plaintiffs' Counsel, to consider individual awards to the named Plaintiffs, and to hear any objections to the Settlement.

Pursuant to the Order Approving Notice, notice was mailed to the members of the Class pursuant to said Order, proof of the mailing of the Notice, as directed in said Order, was filed with this Court, and a Summary Notice was published in various daily newspapers. Pursuant to the Order Approving Notice, and in accordance with Rule 23(b)(3), Federal Rules of Civil Procedure, members of the Class were given the opportunity to present written requests for exclusion from the Class on or before MARCH 20, 1994, and a sworn statement listing the persons who have timely filed such requests for exclusion has been filed with the Court. Members of the Class were also notified of their right to appear at the hearing in support of or in opposition to the proposed Settlement and award of fees and reimbursement of expenses.

The hearing was held, as noticed, on APRIL 14, 1994. The Court afforded all persons who wished to be heard and who had properly notified the Court of their objection to the Settlement an opportunity to be heard. The Court fully reviewed the Stipulation, all Exhibits thereto and any and all papers submitted in support of the Settlement. The Court considered the petition of Plaintiffs' Counsel for awards of fees, and reimbursement of expenses and awards to the named Plaintiffs. The Court heard the presentations of Plaintiffs' Counsel, on behalf of

4

Plaintiffs and the Class, and those of Settling Defendants' Counsel. The Court has determined that the Settlement as set forth in the Stipulation is fair, adequate and reasonable, and is in the best interests of the Class, that claims for contribution or indemnity or contribution, if any, against the Settling Defendants should be barred, and that the rights, if any, of those affected by the bar to a reduction in the amount of any judgment secured by the Plaintiffs should be protected as set forth herein.

Based on the foregoing, the Court hereby ORDERS, ADJUDGES AND DECREES:

1. This Court has subject matter jurisdiction over this action.

2. The Court incorporates herein by reference the definitions set forth in the Stipulation to the extent not in conflict with the provisions of this Order.

3. A plaintiff class is hereby certified under Rule 23, Federal Rule of Civil Procedure, for settlement purposes only, consisting of all persons and entities who purchased or otherwise acquired shares of common stock of Commonwealth, with the transaction date occurring during the period from June 1, 1985 through and including September 23, 1988, including, without limitation, any valid assignee of such person's right to assert any claims the assignor had with respect to the assignor's purchase or acquisition of such security, excluding the defendants in the Commonwealth Shareholder Litigation, the affiliates and subsidiaries of Commonwealth, all officers and directors of

5

Commonwealth on or after June 1, 1985, and members of the foregoing persons' families, their successors, assigns, heirs and legal representatives, and any entity in which they have a controlling interest. All such persons are found by this Court to members of the Class, for settlement purposes only.

4. The persons listed in Exhibit "1" attached hereto, who have timely and properly requested exclusion from the Class, shall not participate in the proceeds of the Settlement hereby approved or receive any benefit thereunder, and are not bound by this Final Order and Judgment.

5. The Settlement as set forth in the Stipulation is fair, adequate and reasonable, and is in the best interests of the Class, and the Settlement be and the same hereby is approved.

6. Notice to the Class required by Rule 23(c) and Rule 23(e), Federal Rules of Civil Procedure, has been given in an adequate and sufficient manner, constituting the best notice practicable, complying in all respects with such Rules and due process, including, but not limited to, the forms of notice and the methods of identifying and giving notice to the Class.

7. Plaintiffs, Class Members and the Settling Defendants shall consummate the Settlement according to the terms of the Stipulation and shall be bound by the terms thereof.

8. The Holloway and Berger actions are hereby dismissed with prejudice as to the Settling Defendants and on the merits and without award of court costs, and all Released Claims, as defined in the Stipulation, are hereby fully and finally extinguished,

6

discharged, satisfied, barred, and otherwise rendered unenforceable.

9. Plaintiffs and each and every Class Member (other than those who have been timely and properly excluded from the Class) are deemed to have irrevocably and unconditionally released, and are permanently barred and enjoined from instituting, prosecuting or asserting, either directly or indirectly, including in any representative capacity, any and all claims, causes of action in law and equity, suits, cross-claims, counterclaims, claims for contribution or indemnity, demands, rights, liabilities, damages, losses, fees, costs or expenses of any kind, nature and description whatsoever, whether they be known or unknown, pending or potential, suspected or unsuspected, fixed or contingent, against the Settling Defendants (as defined herein), or any of them; any of their respective predecessors, successors, and assigns; any of their respective former or present parents, subsidiaries and affiliates; any entity now or in the past controlled by any Settling Defendant or controlling them; any trust of which any Settling Defendant is the settlor or which is for the benefit of any Settling Defendant and/or any member of such Settling Defendant's family; any of their respective present or former partners, members, principals, officers, directors, employees, agents, attorneys (including any former or current in-house counsel, former or current outside general counsel and any former or current outside special counsel), shareholders, investors, insurers, reinsurers, both internal and independent outside auditors and accountants, underwriters,

investment bankers, advisors, affiliates, associates (as defined in
SEC Rule 12b-2, promulgated pursuant to the Securities Exchange Act
of 1934), predecessors, successors, assigns, legal representatives,
heirs, executors, administrators, or trustees of any of the above
(collectively, the "Releasees), which Plaintiffs, or any of them,
or any Class Member (except such persons who have timely and
properly excluded themselves from the Class), whether or not they
file a Proof of Claim and Release on behalf of themselves, their
heirs, executors, trustees, administrators, legal representatives,
successors or assigns or any person they represent, or any of them
(collectively, the "Releasors"), have, or formerly had, or may have
in the future, and which have been or could have been brought
against the Settling Defendants, or any of them, in the
Commonwealth Shareholder Litigation or elsewhere, and which is
based upon, relates to, arises from or is connected in any way
with, any of the following:  (i) the purchase or other acquisition
or sale of Commonwealth common stock during the Class Period; (ii)
any annual report, quarterly earnings report or other publicly
disseminated document, public statement or public disclosure by or
on behalf of Commonwealth during the Class Period; (iii) the
Settling Outside Directors' performance of any aspect of their
duties related to Commonwealth; (iv) Deloitte's performance of any
aspect of its work related to Commonwealth, including without
limitation, any claim for violation of state or federal securities
laws, state or federal RICO statutes, common law fraud, negligence,
negligent misrepresentation, breach of fiduciary duty or other

misfeasance or malfeasance; and/or (iv) the facts, transactions, events, occurrences, representations, misrepresentations, acts, decisions, omissions or matters of any kind or nature whatsoever related, directly or indirectly, to the subject matters referred to, or set forth in, the Commonwealth Shareholder Litigation or facts or claims for relief which could have been alleged or litigated in the Commonwealth Shareholder Litigation.

10.   As of the Settlement Effective Date, as defined in the Stipulation, any and all claims for contribution or indemnity by any person or entity, including, without limitation, any present or later-added defendant in the Commonwealth Shareholder Litigation, which have been, could have been or could be asserted against any of the Settling Defendants, arising, directly or indirectly, out of the Released Claims, as defined in the Stipulation, or the facts, transactions, events, decisions, acts or omissions underlying the subject matter of the Commonwealth Shareholder Litigation, and to the extent legally permissible, all other claims, however denominated, which have been or could have been asserted against any of the Settling Defendants, arising, directly or indirectly, out of the Released Claims or the facts, transactions, events, acts or omissions underlying the subject matter of the Commonwealth Shareholder Litigation, are hereby extinguished, discharged, satisfied, barred, enjoined and otherwise rendered unenforceable.

11.   In the event Plaintiffs and/or the Class secure a judgment in the Commonwealth Shareholder Litigation against any Non-Settling Defendant, such Non-Settling Defendant shall be

entitled to a judgment offset based on the proportionate fault, if any, of the Settling Defendants. The use of a proportionate method of judgment offset is adopted by the Court for purposes of the Commonwealth Shareholder Litigation only, based solely on the stipulation of the settling parties and their determination of the particular best interests of themselves and/or their constituencies in the Commonwealth Shareholder Litigation.

12. Nothing in this Final Order of Judgment or the Stipulation shall in any way affect or diminish any Settling Defendant's right to bring any claim, including but not limited to claims for contribution and indemnity, in <u>Resolution Trust Corporation v. Jason Chapnick, et al.</u>, Case No. 89-6572-CIV-PAINE, S.D. Fla.

13. The Clerk of the Court is hereby directed to enter final judgment as to all claims against all Settling Defendants, there being no just reason for delay for entry of such judgment, pursuant to Rule 54(b), Federal Rules of Civil Procedure.

14. The Settling Defendants shall cause all remaining portions of their respective shares of the Cash Payment, if any, to be made within ten days of the entry of this Final Order and Judgment.

15. Neither this Final Order and Judgment, nor the Stipulation, nor any of their provisions, nor any prior drafts, negotiations or proceedings relating to this Final Order and Judgment, the Stipulation or the Settlement, shall be deemed as an admission of any liability or wrongdoing by Settling Defendants or

any of them.   Neither this Final Order and Judgment, nor the Stipulation, nor any of their provisions, nor any exhibit or document referred to therein, nor the fact of their execution, nor any of the negotiations or proceedings related thereto, nor any action taken to carry out the Settlement, shall be offered or received in evidence in any action or proceeding of any nature, whether before a court, administrative agency, or other tribunal, or otherwise referred to or used in any manner in any court, administrative agency, or other tribunal for any purpose whatsoever, except (i) to enforce the Settlement or any provision of the Stipulation or the exhibits hereto, (ii) to enforce any provision of any related agreement or release, or, (iii) in the case of any subsequent action against any of the Settling Defendants on any or all of the Released Claims, to support a defense of res judicata, collateral estoppel, accord and satisfaction, release, or other theory of claim or issue preclusion or similar defense.

16.   Without affecting the finality of this Final Order and Judgment, jurisdiction is hereby retained as to all matters relating to administration, consummation, construction and enforcement the Settlement approved in this Final Order and Judgment, including, without limitation, the processing and allowance of claims against the Settlement Fund and distribution thereof to Class Members.

17.   Plaintiffs' Counsel are awarded the sum of $ _267,000.00_ as legal fees and $ _45,000.00_ as reimbursement of their costs

11

and out-of-pocket expenses to date. The Escrow Agent is authorized to disburse said funds in accordance with the Stipulation.

18. Each of the named Plaintiffs is awarded the sum of $ _2,000.00_ over and above their respective shares of the Settlement Fund.

THIS FINAL ORDER AND JUDGMENT IS HEREBY ENTERED at West Palm Beach, Florida, this _15th_ day of _April_ , 1994.


_James C. Paine_
JAMES C. PAINE
UNITED STATES DISTRICT JUDGE


copies to all counsel of record
and to parties of record not
represented by counsel

K:\USER\JMS\COMMONWE\FO414a

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED by _____ D.C.

SEP 2 3 1993

J. G. CHELLOTIS
CLERK U. S. DIST. CT.
S. D. OF FLA.-MIAMI

---------------------------------

IN RE ROYCE LABORATORIES, INC.
SECURITIES LITIGATION

: MASTER FILE CASE NO.
: 92-0923-Civ-MOORE

---------------------------------

This Document Relates to
ALL ACTIONS

: Magistrate Barry Garber

---------------------------------

## ORDER AND FINAL JUDGMENT

By Order dated June 22, 1993, this Court certified plaintiffs as representatives of a class including all persons who purchased the securities of Royce Laboratories, Inc. ("Royce") during the period (the "Class Period") from September 11, 1991 through July 8, 1992, inclusive, excluding defendants and certain others (the "Class"). Notice of said class certification was provided on July 2, 1993. By the same Order (the "Implementing Order") this Court preliminarily approved a Stipulation of Settlement (the "Settlement Stipulation") in settlement of all claims in the Action (the "Settlement") between plaintiffs, acting on behalf of themselves and the Class, and all defendants.

Also pursuant to the Implementing Order, this Court scheduled a hearing for September 24, 1993 at 9:00 a.m. to determine, among other things, whether the proposed Settlement set forth in the Settlement Stipulation should be approved by the Court as being fair, reasonable and adequate and whether final judgment should be entered thereon, and to consider whether to

MICROFILM

OCT 0 4 1993

SOUTHERN DISTRICT
MIAMI

approve the applications of All Class Counsel for awards of attorneys' fees, costs and disbursements. This Court ordered that the Notice of Class Action Determination, Settlement of Class Action and Settlement Hearing, substantially in the form attached to the Settlement Stipulation as Exhibit "A1" (the "Class Settlement Notice"), be mailed by first-class mail, postage prepaid, on or before July 2, 1993, to each member of the Class who could be identified, and that a Summary Notice substantially in the form attached to the Settlement Stipulation as Exhibit "A2" be published in the national edition of _The Wall Street Journal_ within 10 days after the mailing of the Class Settlement Notice.

As attested by the Affidavit of Rudolph, Palitz filed with this Court on or about August 2, 1993, the provisions of said Order as to notice were complied with. Moreover, the hearing on the proposed Settlement was duly held before this Court on September 24, 1993, at which time all interested persons were afforded the opportunity to be heard. This Court has duly considered all of the submissions and arguments presented with respect to the proposed Settlement.

NOW THEREFORE, after due deliberation, this Court hereby FINDS, CONCLUDES, ADJUDGES AND DECREES that:

1.   This Order is binding on all members of the Class as described in the Court's Order of June 22, 1993, excluding all persons who timely filed a request to be excluded from the Class,

pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure, who are not bound by any of the terms of this Order.

2.    The proposed Settlement of the Action on the terms and conditions set forth in the Settlement Stipulation is fair, reasonable and adequate, is in the best interests of the Class and should be approved, especially in light of the benefits to the Class, Royce's financial condition, the size of the officers and directors liability insurance policy, and the substantial discovery and investigation conducted and the risks of establishing liability, causation and damages.

3.    The notification provided for and given to the Class constitutes the best notice practicable under the circumstances and is in full compliance with the notice requirements of due process and Rule 23 of the Federal Rules of Civil Procedure.

4.    There is no just reason for delay in the entry of judgment as agreed upon in the Settlement Stipulation, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

5.    Entry of final judgment and final approval of the Proposed Settlement will settle all claims alleged in the Action between plaintiffs and the Class on the one hand and the defendants on the other.

6.    This Order and Final Judgment is final for purposes of appeal and may be appealed notwithstanding other matters presently pending, and the Clerk is hereby directed to enter judgment thereon.

7.    Certification under Rule 54(b) will not result in unnecessary appellate review nor will review of the adjudicated claims moot any further developments in this Action.  Even if subsequent appeals are filed, the nature of these claims are such that the appellate court would not have to decide the same issues more than once.  The reservation of jurisdiction by the Court in this matter does not affect in any way the finality of this Order and Final Judgment.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED as follows:

1.    The Settlement Stipulation and the proposed Settlement are hereby approved and shall be consummated in accordance with the terms and provisions thereof.

2.    With respect to the defendants, all Class Claims alleged in this Action are hereby dismissed in their entirety on the merits, with prejudice, and without costs to any party.

3.    With respect to the defendants, the Consolidated Complaint is hereby dismissed in its entirety on the merits, with prejudice, and without costs to any party.

4.    All members of the Class (including its, his, her, or their heirs, executors, administrators, predecessors, successors, affiliates and assigns), and each of them, for good and sufficient consideration, release, remise and forever discharge the defendants in this Action (including that individual or entity and his, her, its, or their respective spouses, heirs, executors, administrators, assigns, past, present and former

4

directors, partners, principals, officers, employees, agents, attorneys, accountants, insurers, reinsurers, subsidiaries, shareholders, parents, divisions, affiliates, predecessors or successors), and each of them, of and from any and all manner of actions and causes of actions, suits, obligations, claims, debts, demands, agreements, promises, liabilities, controversies, costs, expenses and attorneys' fees whatsoever, whether in law or in equity and whether based on any federal law, state law, common law right of action or otherwise, foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued, which the member of the Class in the Action, or any of them, ever had, now have, can have or shall or may hereafter have, either individually or as a Member of a Class, by reason of, based upon, arising from or in any way related to, the alleged acts, failures to act, omissions, misrepresentations, facts, events, transactions, statements, occurrences or other subject matter which either were or which could have been set forth, alleged, embraced, complained of or otherwise referred to in the Action or in any action which either could have been consolidated with the Action or could have been brought in any other forum relating to the purchase of Royce securities.

5. The defendants (including its, his, her, or their heirs, executors, administrators, predecessors, successors, affiliates and assigns), and each of them, for good and sufficient consideration, release, remise and forever discharge the Class Plaintiffs in the Action (including that individual or

5

entity and his, her, its, or their respective spouses, heirs, executors, administrators, assigns, past, present and former directors, partners, principals, officers, employees, agents, attorneys, accountants, subsidiaries, shareholders, parents, divisions, affiliates, predecessors or successors), and each of them, of and from any and all manner of actions and causes of actions, suits, obligations, claims, debts, demands, agreements, promises, liabilities, controversies, costs, expenses and attorneys' fees whatsoever, whether in law or in equity and whether based on any federal law, state law, common law right of action or otherwise, foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued, which the defendants, or any of them, ever had, now have, can have or shall or may hereafter have, either individually or as a member of a Class, by reason of, based upon, arising from or in any way related to, the alleged acts, failures to act, omissions, misrepresentations, facts, events, transactions, statements, occurrences or other subject matter which either were or which could have been set forth, alleged, embraced, complained of or otherwise referred to in the Action or in any action which either could have been consolidated with the Action or could have been brought in any other forum relating to the purchase of Royce securities.

6.    The Joint Petition by Plaintiffs' Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses is hereby granted.  Class Counsel, the firms of Cohen, Milstein, Hausfeld &

Toll; Savett Frutkin Podell & Ryan, P.C.; Greenfield & Chimicles; Shutts & Bowen; Abbey & Ellis; James v. Bashian; Berman, Devalerio & Pease; Berger & Montague, P.C.; Kenneth A. Elan; Gilman & Pastor; Goodkind Labaton Rudoff & Sucharow; Jaroslawicz & Jaros; Kaplan & Kilsheimer; Kaufman Malchman Kaufmann & Kirby; Levin, Fishbein, Sedran & Berman; Lowey Dannenberg Bemporad Brachtl & Selinger; Law Offices of James J. McNally, P.A.; Milberg Weiss Bershad Specthrie & Lerach; Harris J. Sklar; Susman, Saunders & Buehler; Wolf Popper Ross Wolf & Jones; Zwerling, Schachter & Zwerling; and the Law Offices of Joseph H. Weiss are hereby jointly awarded a total fee of 30% of the Settlement Fund of Eight Hundred Fifty Thousand Dollars ($850,000), or $255,000, plus accrued interest thereon from June 25, 1993, at the same rate of interest earned on the Settlement Fund. Class Counsel are also awarded as part of their fee 30% of the Stock Settlement Fund and 30% of the Warrant Settlement Fund. Plaintiffs' Co-Lead Counsel shall determine the allocation of the fee award among all plaintiffs' counsel based on their respective contributions to the prosecution of this litigation. Payment will be made from the three Settlement Funds to, or as directed by, Cohen, Milstein, Hausfeld & Toll and Savett Frutkin Podell & Ryan, P.C., for distribution to all Class Counsel after any and all appeals of this Final Judgment and Order or review proceedings thereof have been finally determined, or if no appeals are filed, after time to appeal has expired.

7.   Plaintiffs' counsel are awarded $39,724.73 as reimbursement of their actual, out of pocket litigation expenses incurred in connection with this litigation as submitted to the Court.  Such payment shall also be made from the Settlement Fund at the same time as the cash portion of the fee award is made.

8.   This Judgment, the Settlement Stipulation and all papers related to it are not, and shall not be construed to be, an admission by any of the defendants of any liability or wrongdoing whatsoever, and shall not be offered as evidence of any such liability or wrongdoing in this or any future proceeding.

9.   Jurisdiction is hereby reserved over all matters relating to the consummation of the settlement in accordance with the Settlement Stipulation.

APPROVED AND SO ORDERED:

Dated:  9/28/93

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
NORTHERN DIVISION

FILED by _____ D.C.

MAR 27 1995

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.O. OF FLA. · MIAMI

DOUGLAS LUDEMAN, on behalf of
himself and all others similarly
situated,

      Plaintiff,

vs.

CASE NO. 92-8368-
CIV-HIGHSMITH

C&S/SOVRAN CORPORATION and
BENNETT A. BROWN,

      Defendants.

_____/

## ORDER ON APPLICATION OF PLAINTIFF'S COUNSEL FOR ATTORNEYS' FEES

Pursuant to the Order and Final Judgment in this Cause, this Court has awarded Plaintiff's counsel _27.5_% of the Settlement Fund, or $_206,250.00_, as attorneys' fees in this action. The Court finds this amount to be a reasonable percentage of the common fund established for the benefit of the Class based on the factors set forth in Camden I Condominium Association, Inc. v. Dunkle, 946 F.2d 768 (11th Cir. 1991). In awarding counsel fees, the Court specifically finds:

    a.   the results obtained in this litigation have been favorable to the Class;

    b.   the award of counsel fees reflects the time and labor expended by counsel in achieving a common fund for the Class, and the results obtained for the Class;

    c.   the legal issues presented in this case were complex, and presented substantial risk in outcome for counsel prosecuting the case on a contingent basis;



d.   all counsel represented the parties in this action with a sufficient degree of skill, and consistent with their experience, reputation and ability.

e.   the percentage fee awarded is similar to fees awarded in other cases of this nature in the Eleventh Circuit and this district.

The Court has also awarded Plaintiff's counsel expenses in this action in the amount of $10,124.75. Such expenses were reasonably necessary in prosecuting this action, and are appropriate in view of the result obtained.

ENTERED this 27th day of March, 1995.

SHELBY HIGHSMITH
United States District Judge

Copies furnished:

All counsel of record

2

RECEIVED CITY

ON 12-16-94

J. G. Chelouth, Clerk
United States District Court
Southern District of Florida

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

|  |  |
|---|---|
| IN RE:    DYCOM INDUSTRIES<br>SECURITIES LITIGATION | CIVIL ACTION NO.<br>91-8395-CIV-GRAHAM<br><br>MAGISTRATE JUDGE SNOW<br>BY ORDER, NOVEMBER 16, 1992 |

### FINAL ORDER AND JUDGMENT

This proceeding (the "Litigation") is a class action brought by Class Representative Plaintiffs Bruce G. Murphy and Helen Zeeman ("Plaintiffs"), individually and as representatives of all Class Members (as hereinafter defined), against Defendants Dycom Industries, Inc. ("Dycom"), Thomas R. Pledger, Robert T. Owens, and William T. Stover (collectively referred to as the "Individual Defendants").

On June 25, 1991, a class action complaint was filed in this Court on behalf of a class of purchasers of Dycom securities, as alleged in the initial Complaint in this action, styled <u>Robert K. Greenfield, et al. v. Dycom Industries, Inc., et al.</u>, Civil Action No. 91-8395-CIV-Zloch ("Class Action"). On March 6, 1992, the Class Plaintiffs moved for leave to file the Second Amended Complaint in this action. That motion was granted on March 29, 1993.

On March 30, 1992, <u>Dycom Industries, Inc. by and through Milton Gerber v. Pledger, Adams, Cypherd, Kennedy, Owens, Roseman, Stover, Weingarten and Younkin</u>, Case No. CL-92-7950-AC, Circuit

MICROFILM



Court, Fifteenth Judicial Circuit, Palm Beach County, Florida (the "Derivative Action") was filed.

The Second Amended Complaint in the Class Action alleged, *inter alia*, violations of federal law and common law with respect to public disclosures and non-disclosures concerning Dycom during the period from February 26, 1990 through March 9, 1992. The defendants have denied the material allegations of the Second Amended Complaint and any wrongdoing and any liability to Plaintiffs or the Class they represent.

Pursuant to the Stipulation of Settlement (the "Stipulation") dated August 31, 1994, all persons who purchased or otherwise acquired the common stock of Dycom during the period from February 26, 1990 through July 30, 1992 (the "Class Period") are Class Members in connection with the Litigation. Excluded from the Class are the Defendants, and all other members of the Board of Directors of Dycom during the Class Period and any other Defendant in this or related actions, members of their immediate families, or any Released Party as defined in the Stipulation. Plaintiffs' Counsel, acting on behalf of the Class, has entered into the Stipulation and has applied to this Court for approval of the Stipulation and the terms thereof pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

On August 31, 1994, an Order With Respect to Notice, Class Certification, Settlement Hearing and Administration was entered by this Court directing that notice be given to the Class of the proposed Settlement and of a hearing to determine whether the

2

proposed Stipulation and Settlement and the Plan of Allocation (the "Plan") should be approved as fair, adequate and reasonable, to fix the fees and reimbursement of expenses of Plaintiffs' Counsel and to consider Individual Awards to the named Plaintiffs, as well as to hear any objections thereto.   Such a hearing was held, as noticed, on December 5, 1994.  Prior to the Settlement Hearing, proof of notice, as directed in said Order, was presented and filed.  Members of the Class were given the opportunity to file Requests for Exclusion from the Class on or before November 11, 1994 and a statement listing the persons who have timely filed such Requests for Exclusion has been filed with the Court.  Members of the Class were also notified of their right to appear at the hearing in support of or in opposition to the proposed Settlement and award of fees and reimbursement of expenses.

The Court having heard Plaintiffs' Counsel, on behalf of Plaintiffs and the Class, and Defendants' Counsel, on behalf of Defendants, and having reviewed all of the submissions presented with respect to the Settlement and Plan, and the Court having determined that the Settlement and Plan are fair, adequate and reasonable and that it is in the best interests of the Class to consummate the Settlement in accordance with the provisions of the Stipulation, and having considered the Petition of Plaintiffs' Counsel for an award of fees and reimbursement of expenses and awards to the named Plaintiffs and having reviewed the affidavits, schedules and exhibits submitted in support thereof, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

3

1.    The Court has subject matter jurisdiction over this action;

2.    The Court incorporates herein by reference the definitions set forth in the Stipulation;

3.    Notice to the Class required by Rules 23(c) and (e) of the Federal Rules of Civil Procedure has been given in an adequate and sufficient manner, constituting the best notice practicable, complying in all respects with such Rules and due process, including, but not limited to, the forms of notice and the methods of identifying and giving notice to the Class and to Nominees;

4.    The Notice fairly and adequately describes the nature of the claims asserted, the facts and circumstances giving rise to those claims, and the nature and extent of the Release given by the Class as part of the Settlement.

5.    The members of the Class ("Class Members") are as described above, including their spouses, heirs, executors, administrators and assigns, if any, but excluding all persons who timely filed a request to be excluded from the Class pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure as listed on Exhibit "1" hereto and whose exclusion is approved hereby;

6.    The proposed Settlement is in all respects fair, adequate, reasonable and proper and in the best interests of the Class, and is approved;

7.    Plaintiffs, Class Members and Defendants shall consummate the Settlement according to the terms of the Stipulation;

4

8.    The persons who have timely requested exclusion from the Class shall not participate in the proceeds of the Settlement hereby approved or receive any benefit thereunder, and are not bound by this Order;

9.    Plaintiffs and each and every Class Member are permanently barred and enjoined from asserting either directly or indirectly, individually or in a representative capacity, any Released Claim and/or any claim, right, demand, or cause of action which could have been asserted based upon a Released Claim, against the Defendants or any Released Party;

10.    The Plan is approved as fair, reasonable, and adequate;

11.    This Litigation is dismissed with prejudice and on the merits and without award of court costs, and all Released Claims, as defined in the Stipulation, are hereby extinguished;

12.    The following bar order agreed to between Plaintiffs, Dycom and the Individual Defendants is hereby approved:

a.    All claims for contribution or indemnity asserted against Dycom or the Individual Defendants by any person or entity which arise out of the alleged events underlying the subject matter of this action, are hereby dismissed with prejudice, barred and the future filing of such claims is enjoined;

b.    In the event that the foregoing Bar Order set forth in Paragraph 12(a) herein is later overruled, overturned on appeal or found unenforceable by a court in a subsequent action, and this or any other action subsequently determines that one or more persons or entities ("Potential Defendants") is or may be entitled

5

to indemnification or contribution from Defendants in any amount, the Court approves the parties' agreement and undertaking whereby Plaintiffs and the Class shall reduce the amount of judgment obtained in favor of Plaintiffs and/or the Class against any such Potential Defendants by an amount sufficient to eliminate any contribution to, or indemnification by, such Potential Defendants from Defendants (the "Judgment Reduction Amount"). In the event the reduction of the Plaintiffs' judgment by the Judgment Reduction Amount cannot be accomplished for any reason, then Plaintiffs shall return the Judgment Reduction Amount that Plaintiffs have actually obtained from the Potential Defendants to the Potential Defendants in satisfaction of such Potential Defendant's judgment for contribution or indemnity against the Defendants herein. Plaintiffs shall retain any funds actually recovered from any Potential Defendants, and withhold distribution of such funds until the above-described Judgment Reduction is accomplished, either by reducing Plaintiffs' judgment against such Potential Defendants or by payment of the Judgment Reduction Amount directly to the Potential Defendants in satisfaction of any claim for contribution or indemnity against Defendants. The Defendants shall not be entitled to judgment reduction or payment on any contribution or indemnity claim arising from a settlement of any contribution or indemnification claim prior to judgment without the written consent of Plaintiffs' Counsel.

13. Jurisdiction is hereby retained as to matters relating to administration, consummation, enforcement and interpretation of the

6

Settlement hereby approved, and this Judgment, including without limitation the processing and allowance of claims against the Settlement Fund and distribution thereof to Class Members. This limited retention of jurisdiction to administer the Settlement shall in no way affect the finality of this Judgment with respect to any matter in this Order. This Order is final and appealable in all respects;

14. Neither this Final Judgment nor the Stipulation of Settlement are an admission or concession by any of the Defendants of any actual or potential fault, omission, liability or wrongdoing. This Judgment is not a finding as to the validity or invalidity of any claims in the Litigation or of any wrongdoing by any of the Defendants. Neither this Judgment nor the Stipulation nor the fact of settlement, nor the settlement proceedings, nor the settlement negotiations, nor any related document shall be used as an admission of any actual or potential fault or omission by any person, nor offered or received against any party in any proceeding, except that the Stipulation may be offered as evidence in any proceeding to consummate or enforce the Stipulation;

15. Plaintiffs' Counsel are awarded the sum of $ 1,075,000.00 as legal fees and $ 131,983.71 as reimbursement of their costs and out-of-pocket expenses to date. Such fees shall be allocated by Plaintiffs' Counsel among those Plaintiffs' Counsel who have contributed to the Settlement in such proportion as Plaintiffs' Counsel determines is fair and equitable;

7

16. Each of the named Plaintiffs is awarded the sum of $ 10,000.00 over and above their respective shares of the Settlement Fund.

ENTERED this 6th day of December, 1994.

HONORABLE DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

Copies furnished:

All Counsel of Record
on Attached Service List

21759\order.fj

8

Michael J. Pucillo, Esquire
Andrew H. Kayton, Esquire
Burt & Pucillo
Esperante, Suite 960
222 Lakeview Avenue
West Palm Beach, FL 33401

Steven J. Toll, Esquire
Cohen, Milstein, Hausfeld & Toll
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005-3934

Frank Chopin, Esquire
Cadwalader, Wickersham & Taft
440 Royal Palm Way
Palm Beach, FL 33480

L. Louis Mrachek, Esquire
Gunster, Yoakley & Stewart
777 Flagler Drive
Suite 500
West Palm Beach, FL 33401

Laura Besvinick, Esquire
Davis, Scott, Weber & Edwards
66 West Flagler Street
Suite 1100
Miami, FL 33130

Lee S. Wasserman, Esquire
Deloitte & Touche
1633 Broadway
New York, NY 10019

EXHIBIT "1"

a

/ith

ntiff



LIST OF INDIVIDUALS WHO HAVE
SUBMITTED REQUESTS FOR EXCLUSIONS


Porta, Victor J. and Katherine
5116 West 64th Terrace
Prairie Village, Kansas 66208


Saxton, James A. and Sheila V.
533 East Winona Avenue
Norwood, Pennsylvania 19074

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION



FILED by _____ D.C.

NOV 2 4 1993

~~~~ ~. ~. GHELEOTIS
CLERK U. S. DIST. CT.
S.D. OF FLA.-MIAMI.

IN RE:   SOUTHEAST BANKING CORP.
SECURITIES LITIGATION

MASTER FILE
CIVIL ACTION
NO. 90-0760-CIV-MOORE

------------------------------

THIS DOCUMENT RELATES TO
ALL ACTIONS

<u>JURY TRIAL DEMANDED</u>

------------------------------/

## <u>ORDER AND FINAL JUDGMENT</u>

This proceeding (the "Litigation") consists of consolidated Class Actions brought by Class Representative Plaintiffs Harvey Wiener, William J. Hall, The Maynard Slessinger Trust, Paula P. Folkman, Gasper Sclafani, Myers L. Girsh and DCA Grantor Trust ("Plaintiffs") individually and as representatives of all Class Members (as hereinafter defined), against Defendants John D. Porta, Charles J. Zwick, Paul Hill, Kristen M. Hudak, Samuel A. Milne, Douglas E. Ebert and Florence Schust Bassett as Personal Representative of the Estate of Harry Hood Bassett (collectively referred to as the "Defendants").

On March 22, 1990, a class action complaint was filed in this Court entitled <u>Harvey Wiener v. Southeast Banking Corp., et al.</u>, Civil Action No. 90-0760, on behalf of the named Plaintiff and all others similarly situated. Another class action was subsequently filed in this Court by Plaintiff Hall, entitled <u>William J. Hall v. Southeast Banking Corp., et al.</u>, Civil Action No. 90-0838.

On April 23, 1990, the actions were filed as one consolidated, amended complaint. Thereafter, on April 27, 1990, a Second Consolidated Amended Complaint was filed, and on or about July 18, 1990, upon the stipulation of the parties, Plaintiffs were granted leave to file a Third Consolidated Amended Complaint. In that Complaint, Plaintiffs, The Maynard Slessinger Trust and Paula B. Folkman, joined in the action, alleging purchases of Southeast Banking Corp. securities during the second quarter of 1990. After the filing of the Third Consolidated Amended Complaint, this cause proceeded through motion practice. On September 20, 1992, Southeast Banking Corp. filed a bankruptcy petition under Chapter 7 of the United States Bankruptcy Code. On November 7, 1991, Plaintiffs Wiener, Hall, The Maynard Slessinger Trust and Paula P. Folkman, previously Plaintiffs in this action, as well as Plaintiffs Gasper Sclafani, Myers L. Girsh and DCA Grantor Trust, who sought to join as Plaintiffs in this action, moved to file a Fourth Consolidated Amended and Supplemental Complaint. The proposed Fourth Consolidated Amended and Supplemental Complaint deleted

Southeast Banking Corp. from the named Defendants and sought recovery, in addition to that sought in the Third Consolidated Amended Complaint, for those persons who purchased common stock and debentures of Southeast Banking Corp. subsequent to June 15, 1990 through July 3, 1991. On March 12, 1992, United States District Judge William J. Zloch granted Plaintiffs' Motion to File a Fourth Consolidated Amended and Supplemental Complaint.

The Fourth Consolidated Amended and Supplemental Complaint, as amended by this Court's order of August 27, 1993, alleges, *inter alia*, violations of federal law with respect to public disclosures and non-disclosures concerning the financial and operating condition and prospects of Southeast Banking Corp. during the period from February 27, 1989 through and including September 20, 1991. The defendants have denied the material allegations of the Fourth Consolidated Amended and Supplemental Complaint and any wrongdoing and any liability to Plaintiffs or to the Class they represent.

Pursuant to the Stipulation and Agreement of Settlement (the "Stipulation") dated August 19, 1993, all persons who purchased or otherwise acquired Southeast Banking Corp.'s publicly traded Securities including common stock, preferred stock, capital notes, notes, convertible subordinated debentures, non-convertible debentures, and/or securitized asset interests during the period from February 17, 1989 through and including September 20, 1991 (the "Class Period") are Class Members in connection with the above litigation. Excluded from

-3-

the Class are Defendants, former officers and directors of Southeast Banking Corp., or any of their spouses, heirs, executors, administrators, successors and assigns. Plaintiffs' Lead Counsel, acting on behalf of the Class, has entered into the Stipulation and has applied to this Court for approval of the Stipulation and the terms thereof pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

On August 27, 1993, an Order With Respect to Notice, Settlement Hearing and Administration was entered by this Court directing that notice be given to the Class of the proposed Settlement, and of a hearing to determine whether the proposed Stipulation and Settlement should be approved as fair, adequate and reasonable, to fix the fees and reimbursement of expenses of Plaintiffs' Counsel, and to consider individual awards to the named Plaintiffs, as well as to hear any objections thereto. Such a hearing was held, as noticed, on November 15, 1993. Prior to the Settlement Hearing, proof of notice, as directed in said Order, was presented and filed. Members of the Class were given the opportunity to submit Requests for Exclusion from the Class on or before October 18, 1993 (which deadline was extended by further stipulation and Order of this Court to 5:00 p.m., November 9, 1993) and a statement listing the persons who have timely filed such Requests for Exclusion has been filed with the Court. Members of the Class were also notified of their right to appear at the hearing in support of or in opposition to the proposed Settlement and award of fees and reimbursement of expenses.

-4-

The Court having heard Plaintiffs' Lead Counsel, on behalf of Plaintiffs and the Class, and Defendants' Representative Counsel, Lewis F. Murphy, P.A. of Steel Hector & Davis, and Robert T. Wright, Jr. of Mershon, Sawyer, Johnston, Dunwody & Cole, on behalf of Defendants, and having reviewed all of the submissions presented with respect to the proposed Settlement, and the Court having determined that the Settlement is fair, adequate and reasonable and that it is in the best interests of the Class to consummate the Settlement in accordance with the provisions of the Stipulation, and having considered the Petition of Plaintiffs' Counsel for awards of fees and reimbursement of expenses and awards to the named Plaintiffs and having reviewed the affidavits, schedules and exhibits submitted in support thereof, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1.    The Court has subject matter jurisdiction over this action.

2.    The Court incorporates herein by reference the definitions set forth in the Stipulation of Settlement.

3.    Notice to the Class required by Rules 23(c) and (e) of the Federal Rules of Civil Procedure has been given in an adequate and sufficient manner, constituting the best notice practicable, complying in all respects with such Rules and due process, including, but not limited to, the forms of notice and the methods of identifying and giving notice to the Class;

4. The members of the Class ("Class Members") are as described above, including their spouses, heirs, executors, administrators and assigns, if any, but excluding all persons who timely filed a request to be excluded from the Class pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure as listed on Exhibit A hereto, and whose exclusion is hereby approved.

5. The proposed Settlement (as provided for in the Stipulation, dated August 19, 1993) is in all respects fair, adequate, reasonable and proper and in the best interests of the Class, and is approved. The Court also finds that payment by National Union of the Settlement Funds under the Policy is in good faith, although it will deplete the Policy. Such payment is hereby authorized and approved by the Court.

6. Plaintiffs, Class Members and the Defendants shall consummate the Settlement according to the terms of the Stipulation.

7. The persons who have timely requested exclusion from the Class shall not participate in the proceeds of the Settlement hereby approved or receive any benefit thereunder, and are not bound by this Order.

8. Plaintiffs and each and every Class Member are permanently barred and enjoined from asserting either directly or indirectly, individually or in a representative capacity, any Released Claim and/or any claim, right, demand or cause of

action which could have been asserted based upon a Released Claim, against Defendants or any Released Party.

9.   This Litigation is dismissed with prejudice and on the merits and without award of court costs, and all Released Claims, as defined in the Stipulation, are hereby extinguished.

10.  Jurisdiction is hereby retained as to matters relating to the administration, consummation, enforcement and interpretation of the Settlement only.  This limited retention of jurisdiction to administer the Settlement shall in no way affect the finality of this judgment with respect to any matter in this Order.  This Order is final and appealable in all respects.

11.  Neither this Final Judgment nor the Stipulation of Settlement are an admission or concession by any of the Defendants of any actual or potential fault, omission, liability or wrongdoing.  This Judgment is not a finding as to the validity or invalidity of any claims in the Litigation or of any wrongdoing by any of the Defendants.  Neither this Judgment nor the Stipulation nor the fact of settlement, nor the settlement proceedings, nor the settlement negotiations, nor any related document shall be used as an admission of any actual or potential fault or omission by any person, nor offered or received in evidence as an admission, concession, presumption or inference against any party in any proceeding, except that the Stipulation may be offered as evidence in any proceeding to enforce the Stipulation.

-7-

Plaintiffs' Counsel, are awarded the sum of $ 1,250,000.00 as legal fees and $ 98,859.57 as reimbursement of their costs and out-of-pocket expenses to date. Such fees shall be allocated by Plaintiffs' Lead Counsel among those plaintiffs' counsel who have contributed to the Settlement in such proportion as Plaintiffs' Lead Counsel determines is fair and equitable.

13. Each of the named Plaintiffs is awarded the sum of $ 2,000.00 over and above their respective shares of the Settlement Fund.

14. This Order and Final Judgment, and the Stipulation upon which it is based, shall apply to any claims which have been or could be brought by Class Members, individually (including the equitable right to demand and to seek to pursue any derivative claim on behalf of Southeast Bank, N.A. and Southeast Bank of West Florida). However, this Order and Final Judgment, and the Stipulation upon which it is based, shall not apply to any claims which have been or could be brought by the Federal Deposit Insurance Corporation, for any alleged injury to Southeast Bank, N.A. and Southeast Bank of West Florida.

15. This Order and Final Judgment, and the Stipulation upon which it is based, shall apply to any claims which have been or could be brought by Class Members, individually (including the equitable right to demand and to seek to pursue any derivative claim on behalf of Southeast Banking

-8-

Corporation). However, this Order and Final Judgment, and the Stipulation upon which it is based, shall not apply to any claims which have been or could be brought by William A. Brandt, Jr., as Trustee of Southeast Banking Corporation, for any alleged injury to Southeast Banking Corporation.

ENTERED this 23rd day of November, 1993.

HONORABLE KEVIN MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:      To All Counsel of Record

LFM:sd/1491

–9–

Exhibit "A"

SHAREHOLDERS' REQUESTS FOR EXCLUSION
IN RE:   SOUTHEAST BANKING CORPORATION
SECURITIES LITIGATION
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION
CASE NO. 90-0760-CIV-MOORE

Name, Address

Letter Dated

Kenneth F. Palmer
& Susan E. Palmer Jt Ten.
104 Lynwood Avenue
Titusville, FL 32796-3214

09/27/93

Lester Fredel
655 Island Road
Bay Point
Miami, FL 33137-3324

10/01/93

Mary Ethel Tucker
(deceased) and
Jane G. Clenney,
Joint Tenants
4055 Myra Street
Jacksonville, FL 32205

10/08/93

American Pioneer, Inc.
by Bernard M. Brodsky
Counsel, RTC/PLS
Resolution Trust
Corporation
1717 H Street, N. W.
Washington, D. C. 20006

10/12/93

I. Fred Fredel
4000 Towerside Terrace
Tower IV, Apt. 1601
Miami, FL 33138-2235

10/08/93

Orlando A. Baro
306 Apache Trail
Brandon, FL 33511

10/11/93

A-1

Hector M. Esteve
201 Crandon Blvd., Apt. 328
Key Biscyane, FL 33149

Franicis W. and Mary                          10/15/93
Ellen Raynes, Jt. Ten.
Post Office Box 380
Oakfield, Maine 04763

Gilliam D. Bentley, Sr.                       10/12/93
Post Office Box 7446
Marietta, GA 30065-1446

Surfboard & Co.                               10/16/93
nominee name for
California Public Employees'
Retirement System
1 Enterprise Drive
North Quincy, MA 02071

                                              10/15/93

1461/10/21/93

A-2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WILLIAM WATERS AND LINDA
BARTHOLOMEW, individually and on behalf of
all those similarly situated,

CASE NO. 90-6863
CIV-UNGARO-BENAGES

     Plaintiffs,

vs.

INTERNATIONAL PRECIOUS METALS
CORPORATION, MULTIVEST, INC., JAMES
GROSFELD, Individually and as Trustee of the
Jason Grosfeld Trust, MULTIVEST REAL
ESTATE, INC., S.S. MELBOURNE, INC., and
THE CYPRESS GROUP, INC.,

     Defendants.



FILED by _____ D.C.
APR 2 1997
CARLOS JUENKE
CLERK U.S. DIST. CT.
S.U. OF FLA. - MIAMI

_____ /

### FINAL ORDER AND JUDGMENT APPROVING SETTLEMENT

The parties to this Litigation, having executed and filed the Stipulation of Settlement dated

as of January 17, 1997 and later amended through January 31, 1997 (the "Stipulation"); the

definitions of which the Court incorporates by reference herein; the Court having entered its Order

thereof dated January 31, 1997, directing the notice of the proposed Settlement of the Litigation be

mailed to all members of the Settlement Class and scheduling a hearing to determine whether the

proposed settlement including the award of attorneys' fees, expenses and costs should be approved

as fair, reasonable and adequate; said notice having been given, a hearing having been held on March

31, 1997, at which all interested persons were given an opportunity to be heard; and the Court having

read and considered all submissions in connection with the proposed settlement, and having reviewed

EXHIBIT "D"

and considered the files and records herein, the Court finds and concludes that:

Stipulations of dismissals with prejudice will be entered into by all parties to this case and will be filed in the United States District Court, Southern District of Florida in accordance with the Stipulation.

On January 31, 1997, an Order with respect to Notice, the Settlement Hearing and the Administration of the Class Action was entered by this Court directing that Notice be given to the Settlement Class of the proposed Settlement, of a hearing to determine whether the proposed Settlement should be approved as fair, adequate, and reasonable, to award fees and expense reimbursements to Plaintiffs' Settlement Counsel and Counsel for the representative Plaintiffs, as well as to consider any objections thereto. Such a hearing was held, as noticed, on March 31, 1997. Prior to the Settlement Hearing, proof of Notice, as directed in said Order, was presented and filed. Members of the Settlement Class were notified of their right to appear at the hearing in support of or in opposition to the proposed Settlement, award of fees, and reimbursement of expenses.

The Court having heard plaintiffs' Settlement Counsel and counsel for the Defendants and having reviewed all of the submissions presented with respect to the proposed Settlement, including such objections as have been asserted by members of the Settlement Class, and the Court having determined that the Settlement is fair, adequate, and reasonable, and having considered the Petition of Plaintiffs' Settlement Counsel and Plaintiffs' Class Counsel of Record for awards of fees and expense reimbursements, and having reviewed the affidavits, schedules, and exhibits submitted in support thereof and determining that there is no just reason for delay, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Court has subject matter jurisdiction over this action.

2

2.  Notice to the Settlement Class required by Rules 23(c) and (e) of the Federal Rules of Civil Procedure has been given in an adequate and sufficient manner, constituting the best notice practicable, complying in all respects with such rules and due process, including, but not limited to, the forms of notice and the methods of identifying and giving notice to the Settlement Class Members.

3.  The Members of the Settlement Class are as described in the Stipulation.

4.  The proposed Stipulation is in all respects fair, adequate, reasonable, and proper, and in the best interests of the Settlement Class Members and is approved as modified by this Order.

5.  The Plan of Allocation of the Net Settlement Amount as set forth in the Notice and Stipulation is hereby approved as modified by this Order.

6.  Plaintiffs, Settlement Class Members through Plaintiffs' Settlement Counsel, and Defendants shall consummate the Settlement according to the terms of the Stipulation as modified by this order.

7.  All Settlement Class Members are permanently barred and enjoined, absolutely and forever, from suing upon or asserting any of the Released Claims against any of the Defendants, either directly, individually, or in a representative or derivative capacity, or against any of the other Related Persons as defined in the Stipulation.

8.  This Litigation is dismissed with prejudice and on the merits as to the Defendants and without award of court costs. Judgment dismissing the claims against the Defendants shall be entered and all Released Claims as defined in the Stipulation are hereby extinguished.

9.  Each of the Released Persons, as defined in the Stipulation, are discharged, dismissed, and released from and with respect to all released Claims including Unknown Claims as defined in the Stipulation, whether class or individual, whether in law or equity, whether based on federal or

3

state law, whether based on events or actions occurring prior to or on the Effective Date, which representative Plaintiffs, or any members of the Settlement Class ever had, now have, or may hereafter have against any of the Defendants or Released Persons.

10.    Each and every Defendant is deemed to have released and discharged each and every other Defendant of any claim by Settlement Class Members of any claim asserted in this Litigation, of any Defendant's potential liability to the Settlement Class Members, or of any claim for indemnification or contribution or any other such claim arising out of the aforesaid claims and each and every Defendant is hereby barred and enjoined from suing upon or otherwise asserting any such claim against any other Defendant.

11.    Jurisdiction is hereby retained as to all matters related to administration and consummation of the Settlement hereby approved, the processing and allowance of claims against the Settlement Fund, the distribution thereof to Settlement Class Members and the continuing administration thereof until the various obligations comprising the Settlement Fund are paid in full.

12.    Neither this final order and Judgment nor the Stipulation is an admission or concession by any Defendants of any actual or potential fault, omission, liability, or wrongdoing. This Final Order and Judgement is not a finding of the validity or invalidity of any claims in the Litigation or of any wrongdoing by any of the parties. Neither this Final Order and Judgment nor the Stipulation or the fact of Settlement, nor the Settlement negotiations, nor any related document shall be used as an admission of any actual or potential fault or omission by any person or be offered or received in evidence as an admission, concession, presumption, or inference against any party in any proceeding or an accurate measure of damages, other than such proceedings as may be necessary to consummate or enforce the Stipulation except that Defendants may file the stipulation and this Final

4

order and Judgement in any action brought against them in order to support their defense therein including, without limitation any defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction on any other theory of claim preclusion or issue preclusion or similar defenses or counterclaims.

13.     With respect to the allocation of cash and Promissory Notes to be paid to Authorized Claimants, the Authorized Claimants shall be paid in cash from the Net Settlement Fund to the extent of cash from the cash portion of the Settlement Fund remaining after the payment of expenses of the Administrator of the Settlement Fund as described in §6.2 of the Stipulation, including the portion of the Fee and Expense Award which is by this order ordered to be paid in cash, with the remaining amounts owed to each Authorized Claimant to be paid in the form of the individual Promissory Notes contemplated by the Stipulation.

14.     Plaintiffs' Class Counsel is hereby awarded $13,333,333 in fees (one-third of the $40 million Settlement Fund) and the Court further awards the law firm of Raring & Lipoff costs in the amount of $74,404. The Court also currently awards the law firm of Farella Braun & Martel LLP ("FBM") costs in the amount of $141,519. The total of this current Fee and Expense Award ("The Fee and Expense Award") is therefor $13,534,256. The Fee and Expenses Award is an obligation of the Settlement Class Members (and not of Defendants) and is payable by the Settlement Administrator on behalf of the Settlement Class Members out of the Settlement Fund. The Fee and Expense Award is payable as follows and otherwise in accordance with the terms of the Stipulation:

(a)     The Fee and Expense Award shall be paid $5,000,000 in cash in accordance with Section 7.2 of the Stipulation, and the balance, as a deferred obligation of the Settlement Class Members in accordance with Section 7.1 and the other provisions of the Stipulation. (The deferred

obligation together with the interest thereon is referred to as the "Deferred Amount").

(b)     The interest of any of Plaintiffs' Settlement Counsel and Plaintiffs' Class Counsel in the Fee and Expense Award and/or Deferred Amount may be pledged, hypothecated or otherwise transferred in whole or in part, including to any one or more heirs, successors, assigns, financial institutions or other persons.

(c)     The Settlement Administrator will pay the Deferred Amount to the two law firms comprising Plaintiff's Class Counsel in the ratio directed in writing by the Plaintiff's Class Counsel or to such law firms' respective successors and assigns. The Settlement Administrator will directly pay each firm's share of the Deferred Amount by wire transfer to the bank account or accounts designated by that recipient on the day on which note Proceeds have been received by the Settlement Administrator, if Note Proceeds are received by it by 11:00 a.m. (New York City time) on a business day, otherwise on the immediately following business day.

(d)     To the extent that the cash portion of the Settlement Fund is not actually paid to Authorized Claimants or used to pay expenses of the administration of the Settlement Fund as described in §6.2 of the Stipulation, this cash portion of the Settlement Fund and interest earned thereon will be used to promptly pay down the Deferred Amount owed to the Plaintiffs' Class Counsel.

15.     The amount of the Irrevocable Letter of Credit securing the Promissory Notes and the Master Promissory Note will not be reduced below the amounts provided in the Stipulation. The Settlement Administrator will at the times at which the Irrevocable Letter of Credit is renewed or extended verify that, if the issuing or renewing bank is not NBD Bank, the bank has a long-term unsecured credit rating equal to or higher than the credit rating of Aa3 from Moody's Investor

Services, AA- from Standard & Poor's Ratings Group.

16.    The class representatives William Waters and Linda Bartholomew shall each receive a bonus of $10,000 in addition to amounts otherwise recoverable under the Stipulation. This bonus will be payable as $2,500 in cash and $7,500 in additional individual Promissory Notes for each of them.

17.    The Settlement Administrator is ordered to promptly mail written notice to each Settlement Class Member whose initially mailed notice was returned undelivered to the Settlement Administrator to the extent that new addresses are found for those Settlement Class Members as a result of the new addresses obtained by the Settlement Administrator from the efforts of Credit Bureau Information Services, Inc. and Class Action Locator Services of San Rafael, California, advising that each such Settlement Class Member shall have sixty (60) days from the mailing of this notice within which to submit their Proof of Claim and Release Form to the Settlement Administrator, notwithstanding anything to the contrary in any prior published notice or the Proof of Claim and Release Form or otherwise. The final date for these Settlement Class Members to submit their proof of Claim and Release Forms is hereby ordered extended to a date which is sixty (60) days from the date of mailing of this notice, notwithstanding any prior order of this Court.

Notwithstanding anything in the Stipulation. The Settlement Administrator shall periodically submit its reasonable fees and expenses to the Court for approval prior to payment from the Settlement Fund.

(a)    The Defendants and the Settlement Administrator agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. Section 1.468B-1. In addition, the Settlement Administrator and, as required, the Defendants shall jointly and timely

make such elections as necessary or advisable to carry out the provisions of this section, including the "relation-back election" (as defined in Treas. Reg. Section 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Settlement Administrator to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(b)    For the purpose of Section 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Settlement Administrator. The Settlement Administrator shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including without limitation the returns described in Treas. Reg. Section 1.468B-2(K)). Such returns (as well as the election described in ¶18(a)) shall be consistent with this section and in all events shall reflect that all taxes (including any interest or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided in §18(c) hereof.

(c) .    All (1) taxes (including any interest or penalties) arising with respect to the income earned by the Settlement Fund, including any taxes or tax detriments that may be imposed upon the Defendants with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "qualified settlement fund" for Federal or state income tax purposes ("Taxes") and (2) expenses and costs incurred in connection with the operation and implementation of this §18 (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this §18)("Tax Expenses"), shall be paid out of the Settlement Fund. The

8

Settlement Administrator shall indemnify and hold Defendants harmless for taxes and Tax Expenses (including, without limitation, taxes payable by reason of any such indemnification). Further, Taxes and Tax Expenses shall be treated as and considered to be, a cost of administration of the settlement and shall be timely paid by the Settlement Administrator out of the Settlement Fund without prior order from the Court and the Settlement Administrator shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to class members any funds necessary to pay such amounts including the establishment of adequate reserves for any Taxes and Tax Expenses ( as well as any amounts that may be required to be withheld under Treas. Reg. Section 1.468B-2(1)(2). The parties hereto agree to cooperate with the Settlement Administrator, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this section.

19.    In the event that the conditions to the Settlement set forth in the Stipulation are not satisfied and this Settlement is terminated pursuant to the terms of the Stipulation for any reason, then this Final Order and Judgment shall, upon further order of the Court, be rendered null and void and be vacated, and the Stipulation of Settlement and all orders entered in connection therewith shall be rendered null and void.

DONE and ORDERED in Chambers, at Miami, Florida, this ___2___ day of April, 1997.

_Ursula Ungaro-Benages_
URSULA UNGARO-BENAGES
UNITED STATES DISTRICT COURT.

cc:    Counsel of Record

9

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WILLIAM WATERS and ) Case No.
LINDA BARTHOLOMEW, ) 90-6863-Civ-UNGARO-BENAGES
)
                    Plaintiffs, )
)
        -v- )
)
INTERNATIONAL PRECIOUS METALS )
CORPORATION, MULTIVEST, INC., )
JAMES GROSFELD, MULTIVEST REAL )
ESTATE, INC., S.S. MELBOURNE, )
INC., and THE CYPRESS GROUP, INC.,)
) Miami, Florida
                    Defendants. ) March 31, 1997
_____) 9:45 a.m.


TRANSCRIPT OF FAIRNESS HEARING

BEFORE THE HONORABLE URSULA UNGARO-BENAGES

U.S. DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs        FARELLA BRAUN & MARTEL
                          BY:  NEIL A. GOTEINER, ESQ.
                          BRANDON WISOFF, ESQ.
                          JOHN L. COOPER, ESQ.
                          JEFFREY P. NEWMAN, ESQ.
                          235 Montgomery Street - Suite 3009
                          San Francisco, California  94104


For Defendants IPMC       HOMER & BONNER, P.A.
and MultiVest             BY:  R. LAWRENCE BONNER, ESQ.
                          3400 International Place
                          100 Southeast 2nd Street
                          Miami, Florida  33131

(continued)            EXHIBIT "B"

Condenseit!

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
 3   WILLIAM WATERS and           ) Case No.
     LINDA BARTHOLOMEW,           ) 90-6863-Civ-UNGARO-BENAGES
 4                                )
         Plaintiffs,              )
 5                                )
         -v-                      )
 6                                )
     INTERNATIONAL PRECIOUS METALS )
 7   CORPORATION, MULTIVEST, INC., )
     JAMES GROSFELD, MULTIVEST REAL )
 8   ESTATE, INC., S.S. MELBOURNE, )
     INC., and THE CYPRESS GROUP, INC., ) Miami, Florida
 9                                ) March 31, 1997
         Defendants.             ) 9:45 a.m.
10
11
12
13          TRANSCRIPT OF FAIRNESS HEARING
14     BEFORE THE HONORABLE URSULA UNGARO-BENAGES
15              U.S. DISTRICT JUDGE
16
17   APPEARANCES:
18   For the Plaintiffs    FARELLA BRAUN & MARTEL
                           BY: NEIL A. GOTEINER, ESQ.
19                         BRANDON WISOFF, ESQ.
                           JOHN L. COOPER, ESQ.
20                         JEFFREY P. NEWMAN, ESQ.
                           235 Montgomery Street - Suite 3009
21                         San Francisco, California 94104
22   For Defendants IPMC   HOMER & BONNER, P.A.
     and MultiVest         BY: R. LAWRENCE BONNER, ESQ.
23                         3400 International Place
                           100 Southeast 2nd Street
24                         Miami, Florida 33131
25   (continued)
```

```
 1   For Defendant Grosfeld  POLLACK & KAMINSKY
                             BY: MARTIN I. KAMINSKY, ESQ.
 2                           114 West 47th Street - Suite 1900
                             New York, New York 10036
 3
 4                           CRAVATH, SWAINE & MOORE
                             BY: PAUL M. DODYK, ESQ.
 5                           825 Eighth Avenue
                             New York, New York 10019-7475
 6   For the Receiver        MILLER, CANFIELD, PADDOCK AND STONE
                             BY: MICHAEL H. TRAISON, ESQ.
 7                           150 West Jefferson - Suite 2500
 8                           Detroit, Michigan 48226
 9   Reporter               WILLIAM G. ROMANSHIN, RMR
                            Official Court Reporter
10                          1104 Federal Courthouse Square
                            301 North Miami Avenue
11                          Miami, Florida 33128
12        (Call to order of the Court)
13        THE COURT: Okay. Good morning. You can have a
14   seat.
15        I think maybe we should get appearances on the record
16   first today. Who's here for the plaintiff class?
17        MR. GOTEINER: Good morning, Your Honor. Neil
18   Goteiner, Brandon Wisoff, John Cooper, Jeff Newman.
19        THE COURT: Okay. And who's here for the
20   defendants?
21        MR. DODYK: Paul Dodyk, Your Honor, accompanied by
22   Mr. Kaminsky and Mr. Bonner.
23        THE COURT: Okay. Fine. And let's see. Do we have
24   the receiver present?
25        MR. TRAISON: Yes, Your Honor. I'm Michael Traison
```

```
 1   of the Miller Canfield firm, and I'm here with the receiver
 2   James D. McTevia.
 3        THE COURT: Okay. Thank you. You can have a seat.
 4        I know we have some other interested people present
 5   and I'll get to them in a moment.
 6        I think, you know, ostensibly we're here to consider
 7   whether or not I should give final approval to the settlement
 8   in the Waters versus IPMC class action.
 9        But I think that before we proceed to that issue
10   there is something else that we need to determine, which is
11   whether or not the plaintiffs take the position that the
12   settlement stipulation has been breached, and if they do, what
13   they wish to do about it.
14        MR. GOTEINER: Your Honor, as we state in our papers,
15   it's plaintiffs' position that the Settlement Agreement has
16   been breached. We preserve all our rights. We don't waive any
17   rights that arise from the breach.
18        THE COURT: Okay. Well, listen, Mr. Goteiner, you
19   know, since I have the responsibility to continue to exercise
20   jurisdiction over the settlement, I do not intend to go forward
21   today if it is the position of the plaintiffs that the
22   settlement has been vitiated in any respect by the defendants'
23   conduct or if you intend to initiate any kind of legal action
24   for the recovery of money or anything else against the
25   defendants.
```

```
 1        Now, there's an ethical issue here, I believe, also,
 2   which, you know, is a separate issue. But in essence there's a
 3   legal issue, did they breach the settlement -- do you believe
 4   they breached the settlement, and if so, what do you plan to do
 5   about it; and there's an ethical issue here as to whether or
 6   not their conduct -- whether or not you believe that their
 7   conduct violates the standards regulating the profession
 8   wherever people might be practicing law.
 9        MR. GOTEINER: Your Honor, one second.
10        (Conference off the record among plaintiffs' counsel)
11        MR. GOTEINER: Your Honor, we would like the
12   settlement to proceed. We would like the settlement to be
13   approved. There may be some harm to plaintiffs' counsel
14   because of defendants' breaches. We do believe that there have
15   been repetitive breaches, and we are not going to stand in the
16   way of the approval of the settlement at all and we think it
17   should proceed.
18        And I don't want to comment right now on ethical
19   issues with respect to defendants' conduct. I don't think from
20   our point of view it's, we respectfully submit, necessary.
21        THE COURT: I understand that. But my question to
22   you is, if you believe that there has been a breach of the
23   settlement but you do not take the position that the settlement
24   has been vitiated, can you give me an idea of what it is that
25   you would propose to do about it? Because I think I have a
```

Condensit!

Page 5

1  right to know.

2      MR. GOTEINER: Your Honor, a lot of this depends on
3  where the defendants go from now.

4      At the moment, if, I guess, nothing else happens and
5  it proceeds as it should proceed under the Settlement
6  Agreement, under the settlement stipulation, and everyone is
7  satisfied that it is proceeding, as the defendants agreed that
8  it would proceed, we don't intend to take further steps.

9      If they do continue to breach and do continue to harm
10  plaintiffs' counsel, we would take certain steps.

11      I'm not trying to hide the ball here with Your Honor,
12  but we really don't know what they're going to do next. We
13  just don't know.

14      Right now, if Your Honor issues the order that we've
15  been discussing with the Court in conformity with the Court's
16  memorandum that the Court issued a few days ago, nothing else
17  happens. There probably won't be additional problems. But I
18  just don't know what defendants are going to do next.

19      THE COURT: Okay. All right. Well, you've answered
20  my question in part, which is you do not take the position that
21  the settlement's been vitiated.

22      MR. GOTEINER: That's correct.

23      THE COURT: All right. So, any contention that you
24  might have in that regard, as far as I'm concerned, has been
25  waived.

Page 6

1      All right. Now, I think that we can proceed with the
2  matters for which the hearing was scheduled today, and I want
3  to take some time to just list what the matters are that I want
4  to take up today and expect to take up today, and then I want
5  to take a little time to review the history of the case.

6      The hearing today has the following purposes:

7      First, to determine whether or not the proposed
8  settlement is fair, reasonable and adequate.

9      If so, to determine the amount of fees and costs
10  which should be awarded to class counsel.

11      Three: To determine the extent to which the fees and
12  expenses and approved claims of class members should be paid
13  from the cash portion of the settlement fund.

14      Four: To determine whether and to what extent the
15  two class representatives, Mr. Waters and Miss Bartholomew, are
16  entitled to bonuses.

17      By the way, are Mr. Waters and Ms. Bartholomew
18  present or not?

19      MR. GOTEINER: They are not, Your Honor.

20      THE COURT: Now, another matter which the before the
21  Court is the Court's approval of the agreement with the Garden
22  City Group. Is there a representative of the Garden City Group
23  here today? No, apparently. No.

24      Now, I never received in the papers that were
25  submitted, I think, by the plaintiffs' lawyers, there was an

Page 7

1  indication that a revised agreement would be provided, but I
2  never received it.

3      MR. NEWMAN: Your Honor, if I might.

4      THE COURT: Okay. Mr. Newman.

5      MR. NEWMAN: Jeff Newman. If I could speak to that,
6  I had a meeting this week with Mr. David Isaacs, who is counsel
7  for the Garden City Group, in our offices in San Francisco, and
8  he committed to get such an undertaking to us, but it has not
9  been submitted either to us or, to my knowledge, to Mr. Dodyk.

10  So we do not have it, but we anticipate that it will be
11  forthcoming and submitted to the Court for approval.

12      THE COURT: Well, I'm a little concerned about that
13  too. Don't go too far, Mr. Newman. What are the controversies
14  that are surrounding the finalization of the agreement with the
15  Garden City Group?

16      MR. NEWMAN: I wish I could answer that question
17  because I don't represent the Garden City Group. But we had
18  agreed, I believe, personally -- I had asked Mr. Buchband that
19  he would submit such a thing. He did not. That was the reason
20  for having a meeting with his counsel. His counsel expressed
21  to me chagrin at the fact that a letter agreement which he had
22  given to Mr. Dodyk prior to the time of the settlement had not
23  been shared with us at the time of the settlement or prior to
24  that, and --

25      THE COURT: It's those kinds of things that are

Page 8

1  beginning to get me alarmed.

2      MR. NEWMAN: Your Honor, I must say that was the
3  reason I wrote a letter to -- first I asked Mr. Buchband for
4  it. He verbally agreed to do it. Then two weeks went by. He
5  didn't do it. I then followed up with a letter. He still
6  hadn't done it.

7      It does trouble me, and we are trying to build a
8  decent working relationship with them, although, as you know,
9  we've had controversy over how much -- the proper procedures
10  for notifying the class, the turnaround time and other things.
11  So it has been somewhat painful, I would say.

12      But I believe we have a better working relationship
13  now, but we still do not have a written undertaking to present
14  to the Court, and nor have I seen a draft of one.

15      THE COURT: Well, as I recall -- and I could be wrong
16  about this -- the agreement did not specifically contemplate
17  that I would get involved in approving or disapproving the
18  agreement with the Garden City Group, and you all were ready to
19  go and accept the responsibility for that yourselves.

20      But, you know, so I'm not really sure whether I
21  should be concerned with this issue or not. But then when the
22  plaintiffs submitted their proposed agenda for this hearing
23  today, the issue of the arrangement with the Garden City Group
24  came up and there was a request by the plaintiffs that I
25  approve it.

Condensit!

## Page 9

1    Now, this is another issue. I don't know that I'm
2 willing to go forward today without having an agreement from
3 the Garden City Group.
4    MR. NEWMAN: Mr. Goteiner has told me that perhaps we
5 could get Mr. Buchband by phone. He said he would be
6 available. But whether that would result in a form of
7 undertaking that could be approved today is rather doubtful
8 since nobody has seen a draft of it.
9    Your Honor, unfortunately I can't speak to whether
10 you should proceed or not. We, of course, would like very much
11 to have you proceed. We know that you have ongoing
12 jurisdiction over the case, and unfortunately this thing has
13 become so contentious — as you know, I'm a business lawyer,
14 not a litigator. I've been in court three or four times in my
15 life, twice on this matter, and I'm not used to people not
16 reaching agreement. I spend my whole life making people do
17 things by consensus and not running off to court or a judge to
18 decide.
19    But I think that that has been a problem here. I
20 believe that the Garden City Group will try to be quite
21 cooperative now. I think they realize that they are in the
22 middle of something which Mr. Isaacs admitted to me was the
23 most contentious settlement he'd been involved in, and that
24 they intend to be more careful about the way they proceed in
25 the future.

## Page 10

1    But, nonetheless, I think we should have such an
2 undertaking. I don't think it will be controversial — at
3 least I certainly hope not — but since I haven't seen it, I
4 can't speak to it.
5    THE COURT: Well, what do you say about this,
6 Mr. Dodyk?
7    MR. DODYK: If Your Honor please, it is not customary
8 for the Court to review or approval those engagement letters.
9    The form of engagement letter which is in existence
10 is a document which was prepared by Garden City Group by
11 themselves in response to my request to them for a fee
12 estimate.
13    The stipulation doesn't provide for its review. I
14 don't regard the engagement letter as controlling the
15 procedures which the settlement administrator uses. Those are
16 specified in the stipulation or left to the sound judgment of
17 the Garden City Group, which is one of the largest and most
18 established organizations in that field, having once been a
19 division of Peat, Marwick & Mitchell.
20    I have seen the exchange of letters between
21 plaintiffs' counsel and the Garden City Group with respect to
22 their desires concerning an amended form of engagement letter.
23 I can't identify any issue in that exchange of correspondence
24 which would cause any failure to reach agreement. So I really
25 think that this is a bit of a red herring. I don't think it's

## Page 11

1 material to what we're doing. I certainly don't regard those
2 letters as controlling anything beyond the stipulation or in
3 any way impinging on the Court's powers.
4    THE COURT: Where are the letters? Do we have the
5 letters here in court today or not?
6    MR. DODYK: I don't have a copy with it. There was
7 one that was drafted in January or February.
8    But again, Your Honor, I don't regard that document
9 as changing anything in the stipulation or Garden City's common
10 practice, and we certainly — I have submitted a copy of that
11 to Your Honor as an attachment.
12    THE COURT: The letter?
13    MR. DODYK: Yes, your Honor.
14    THE COURT: I don't recall that. Can you remind me
15 what it was attached to?
16    MR. DODYK: I'll have to ask Mr. Bonner to help me.
17    THE COURT: There was a letter —
18    MR. GOTEINER: Your Honor, to help out a little bit.
19    THE COURT: Okay.
20    MR. GOTEINER: The letter was attached to their
21 objections to our fee petition, the original one, and
22 Mr. Newman's March 3, 1997 letter was attached to a pleading
23 plaintiffs submitted on March 6, 1997, which was entitled
24 Plaintiffs' Agenda for March 10, 1997 Telephone Conference. So
25 attached to those two —

## Page 12

1    THE COURT: I think I may have left that in my
2 office
3    MR. GOTEINER: Defendants' Objections is dated March
4 7.
5    MR. DODYK: Your Honor, I can tender a copy if you'd
6 like to see it.
7    THE COURT: Yes, please.
8    MR. DODYK: May I approach the bench?
9    THE COURT: Yes.
10    MR. DODYK: It's Exhibit 3, Your Honor.
11    THE COURT: Oh, I've got it right here.
12    MR. GOTEINER: Your Honor, would you like a copy of
13 Mr. Newman's March 3 —
14    THE COURT: I'm looking at a January 24th, 1997
15 letter from the Garden City Group. Is there anything else I
16 should be looking at?
17    MR. GOTEINER: The other letter is Mr. Newman's March
18 3, 1997 letter. Can I approach?
19    THE COURT: Yes.
20    MR. DODYK: Your Honor, there's also a further
21 exchange of correspondence, a letter from Garden City back to
22 plaintiffs' counsel, but I don't think we have a copy of that
23 with us in the courtroom.
24    THE COURT: Okay. I think what I want to do is I
25 think I want to get off the bench and review this. Okay? So

Page 13

1  we'll take a short recess.
2       (Recessed at 10:00 a.m.)
3       (Resumed at 10:09 a.m.)
4       THE COURT: Okay. Well, I reviewed this
5  correspondence.
6       Let me ask this. Does everybody agree that it is
7  customary that there be an engagement letter with the
8  settlement administrator?
9       MR. DODYK: That is customary in my experience.
10      MR. GOTEINER: Yes, Your Honor.
11      THE COURT: Well, I think the time has come to have
12 an engagement letter. So I want it faxed here. I don't care
13 what it looks like. I don't care what kind of condition it's
14 in. I want it faxed here and I want it faxed here this
15 morning.
16      MR. NEWMAN: Your Honor, if you will allow me, I'll
17 step out and call Mr. Isaacs.
18      THE COURT: Fine.
19      Now, we'll go ahead subject to my review of the
20 engagement letter.
21      Okay. Now, there's one other issue that we need to
22 get out on the table, and this is my fault and I apologize for
23 it.
24      I had intended that we send notice to the receiver
25 and the receiver's counsel of my intention really to wrap up

Page 14

1  the receivership today and to give final approval to the cost
2  and fee petitions that were filed, because it's important to me
3  to ascertain what the balance is in the receivership.
4       Does the receiver's counsel have any objection to our
5  proceeding with respect to that today?
6       MR. TRAISON: No, Your Honor. I think we received
7  notice of that. We submitted the appropriate papers and
8  accounting, and we're here to seek an order from the Court
9  approving all of that and authorizing us to go forward with the
10 disposition of the papers and then ultimately releasing and
11 discharging the receiver's counsel.
12      THE COURT: Okay. Fine. Do you wish to be taken out
13 of turn first?
14      MR. TRAISON: I would deeply appreciate it.
15      THE COURT: Okay. I think then that's what we're
16 going to take up first.
17      Now, is there anybody among the plaintiffs' counsel
18 or the defense counsel that is going to wish to be heard on the
19 issue of the receiver's fees and expenses?
20      MR. BONNER: One very brief point, Your Honor, if I
21 may.
22      THE COURT: Yes.
23      MR. BONNER: There was an order that was entered a
24 number of years ago regarding the destruction of documents. We
25 would need an order from the Court with respect to documents

Page 15

1  that are in the receiver's possession allowing for the
2  destruction of documents, and before the documents are
3  destroyed, we'd like to look through them.
4       We've already talked with the receiver. He doesn't
5  have a problem with that. But we want to make sure there's an
6  order so that there's no problem any time in the future with
7  respect to any destruction of documents.
8       THE COURT: I'm a little uncomfortable with this
9  destruction of documents concept in general. I'm wondering if
10 there isn't someone who would like to take possession of the
11 documents at least for a period of time.
12      MR. GOTEINER: Your Honor, for what period of time
13 would you like the documents to remain in existence?
14      THE COURT: Well, certainly -- well, I don't know
15 what the receiver was contemplating in terms of destruction,
16 but I think I would like the documents at least to remain in
17 existence until all appellate proceedings in connection with
18 this case have been concluded.
19      MR. GOTEINER: I think the monthly charge -- maybe
20 Mr. McTevia or Mr. Traison can help out here.
21      The answer to this is just to keep all the documents
22 in the repository, remove all the documents that have been
23 moved to a law firm in the Intercontinental Hotel complex,
24 remove all those, put them back together where the documents
25 are being kept now, and maintain them there for that period of

Page 16

1  time.
2       THE COURT: Well, who's going to pay for that? This
3  is quite an expensive proposition, storing these documents.
4       MR. TRAISON: Indeed it is, Your Honor. Michael
5  Traison for the receiver.
6       While I regret we haven't been in as much contact as
7  might have been helpful, I'm glad you made this point because
8  there has generally been the attitude on the part of the
9  receiver that he too is a little bit uncomfortable seeing
10 immediate destruction even before the appellate period has
11 run. Yet, on the other hand, that seems to be the way the
12 winds are blowing, if you will, because of the very issue Your
13 Honor mentioned and that's the cost involved. It's not an
14 inexpensive maintenance project.
15      But, if the Court was so inclined and the other
16 parties were willing, the receiver certainly would endorse a
17 program that would call for retention for some defined period
18 rather than just starting the destruction immediately.
19      THE COURT: Well, where would we retain them?
20      MR. TRAISON: The receiver's office is fully capable
21 of determining that, but hasn't undertaken that investigation.
22 There are certainly storage areas far less accessible and less
23 user friendly than the one we're maintaining the records in now
24 because we needed that type of facility given the litigation.
25      THE COURT: Right. They could be placed in a

Confidential

## Page 17

1  warehouse.

2      MR. TRAISON: I believe so.

3      THE COURT: Are you sufficiently familiar with what

4  warehouse costs would be that you could give me an idea of what

5  would be involved in that?

6      MR. TRAISON: If it would please the Court, Your

7  Honor, may the receiver address you on those tissues?

8      THE COURT: Sure.

9      Could you state your name for the court reporter,

10 please?

11     MR. McTEVIA: Yes. It's James V. McTevia, Your

12 Honor.

13     Your Honor, if it please the Court, I have a

14 suggestion that perhaps might solve the problem and keep the

15 books and records in estate so the parties in interest can take

16 a look at them.

17     I propose that the receivership estate take the books

18 and records that are presently in storage at the law firm here,

19 which is great expense to the estate, and put them, first of

20 all, for a period of time back in the area where they were in

21 Fort Lauderdale, where all the parties in interest are

22 familiar, for a period of approximately 30, 60, 90 days,

23 however long that the parties in interest feel as though that

24 they want to take a look and take whatever is left there,

25 because the defendants have suggested that they need to have

## Page 18

1  access to the books and records and maybe take some that they

2  want.

3      THE COURT: What is the cost of that?

4      MR. McTEVIA: I believe the cost of moving the

5  records and records the last time was approximately $5,000,

6  $6,000 to put them all back into place.

7      THE COURT: Right. But what is the cost of

8  maintaining them at this location is what I want to know?

9      MR. McTEVIA: I think the monthly storage was — you

10 were bearing the costs toward the end; what was it?

11     MR. GOTEINER: Was it 500 a month?

12     MR. McTEVIA: Yes, I think it was $500, $600 a

13 month. It wasn't that much. But after that, then to move them

14 from that storage area into an area where they are certainly

15 less accessible but at a much reduced rate, just putting them

16 into a storage area.

17     I'm a bankruptcy receiver, a trustee, so I know that

18 there are places that specialize in storing books and records

19 where they can be retrieved at a cost to whatever wants to

20 retrieve them but, yet, on the other hand, they're there in the

21 care and custody of the estate; and then to keep them there for

22 two, three, four, five more months, however long everybody

23 thinks is necessary, and then just simply to have that facility

24 destroy them. They have the ability to destroy also. So it

25 would be the final move.

## Page 19

1      THE COURT: All right. Well, let me tell you what my

2  ideal — my request would be, and you tell me if this is

3  doable:

4      That the documents be removed to this location in

5  Fort Lauderdale; that they be kept there for a period of not

6  more than 30 days. No documents are to be removed under any

7  circumstances. If someone wants to make copies, they can take

8  a copy machine up there at their own expense and make copies.

9  At the end of 30 days they are to be removed to the least

10 expensive facility that you can locate that also has the

11 capacity to destroy the documents. They are to remain there

12 until all appellate proceedings concerning this case are

13 concluded.

14     MR. McTEVIA: I understand, and that will be done.

15     THE COURT: Okay. Now, because I wish to conclude

16 the receivership to the extent possible, though, today and to

17 get as much money over into the settlement fund as possible, I

18 need an estimate as to what that will cost.

19     MR. TRAISON: That aspect, because the Court has the

20 submissions that indicate all the other costs, now the cost of

21 implementing the Judge's suggestion here is an undefined number

22 that is required in order to --

23     THE COURT: Right. Perhaps we could set up a reserve

24 to take care of that. That's my thought.

25     MR. McTEVIA: I can make a phone call to the

## Page 20

1  individual in my office who has been facilitating this, and

2  within short order come back and tell you approximately what

3  that would cost.

4      THE COURT: Okay. Now, as I recall — let me just go

5  back — as I recall, you were asking for a reserve in any

6  event.

7      MR. McTEVIA: That is correct.

8      THE COURT: Of, I think, either $10,000 or $20,000.

9      MR. McTEVIA: That is the estimate of taking the

10 books and records from the two places and destroying them.

11     THE COURT: So we need to add into that the cost of

12 maintaining them for, I will say, about a year.

13     MR. McTEVIA: Okay. I can get that number for you in

14 short order, Your Honor.

15     THE COURT: Okay. It could be less, hopefully it

16 will be less. But to be on the safe side, I think about a

17 year.

18     MR. TRAISON: I don't know at this point whether the

19 Court had in mind who would be preparing the order or whether

20 it would be integrated within the settlement order, but each

21 one of these elements obviously should be included in the final

22 order.

23     THE COURT: I haven't thought that through yet. But

24 it's something that we definitely need to resolve today. I

25 think my inclination is to put it in a separate order, but --

Page 21

1  MR. TRAISON: I think we'll need some kind of device
2  to trigger notice to the receiver that the appellate period has
3  ended and that he is free to go forward with the final stage.
4  THE COURT: Right. Well, of course, we can make that
5  a joint notice and, of course, it will end up coming from me.
6  Okay?
7  MR. TRAISON: Can we respond to any other inquiries
8  you might have regarding --
9  THE COURT: Well, I do have some other questions
10  about your fee and expense applications. Maybe what we can do
11  is proceed with that and then we can take a short recess while
12  you try to come up with an estimate as to what the costs would
13  be.
14  Again, Mr. Bonner commented on the fees and
15  expenses. Did the plaintiffs wish to say anything or not?
16  MR. GOTEINER: No, Your Honor.
17  THE COURT: All right. Now, let me just recap here,
18  Mr. Traison, as to what's involved. As I understand it, the
19  receiver is requesting fees of $24,084.50 through today and
20  expenses of $3,355.53. Now, that probably doesn't include the
21  expense of travelling here today.
22  MR. TRAISON: No. But I think that's anticipated in
23  the $18,500 reserve.
24  THE COURT: The reserve. Okay. Now, these are bills
25  that are submitted after the receiver apparently has been paid

Page 22

1  a very considerable sum pursuant to the authority that he was
2  granted by Judge Zloch. According to the papers that were
3  filed, the receiver has already been paid $516,396.97.
4  Now, that doesn't quite jibe with the accounting that
5  was given to me, but perhaps when we get to that you all can
6  explain it to me.
7  MR. TRAISON: Okay. I think Mr. McTevia probably can
8  address those issues to your satisfaction.
9  THE COURT: Now, in addition, the receiver is
10  requesting approval of $38,000 in fees and expense
11  reimbursement of $3,207.92 for the receiver's attorneys for
12  services rendered since October 22nd, 1993.
13  The only observation that I would have as to that is
14  that it appears that the receiver did not obtain court approval
15  for the retention of the attorneys until September 13th, 1996.
16  However, the amount that was billed for the period prior to
17  1996 is very small.
18  Finally, the receiver is requesting an additional
19  $18,500 in fees and expenses, and $33,000 in storage, rent and
20  costs associated with the destruction of the records and
21  documents to close the estate. Therefore, the total requested,
22  as I understand it, is $120,147.95.
23  Now, the balance, according to the accounting that
24  was filed, the balance in the receivership account as of
25  3-15-97 was $215,125, and I could not ascertain from what was

Page 23

1  filed whether the receiver's fees and expenses and the
2  attorneys' fees and expenses that are already reflected -- that
3  were reflected as part of the liabilities included these
4  amounts that are being requested now.
5  So I don't know whether what's in the estate is what
6  will be in the estate after I resolve these matters, or at
7  least what the receiver anticipates will be in the estate after
8  I resolve these matters, is $215,125, or whether it's $215,125
9  less $120,147.95. So I think that's the first thing I need an
10  answer to.
11  MR. TRAISON: Yes. In reviewing the papers today, I
12  was sure my paralegal for one was testing me to see if I could
13  figure out the same thing that you've asked about.
14  I can tell you that your two observations -- your
15  observation regarding the previous payment to the receiver is
16  correct, of course, and I think what is not made clear to you
17  in the papers we submitted is that the amounts being requested
18  for approval with respect to expenses and fees of the
19  receiver's counsel have already been paid or are being held in
20  a retainer account, and this does not contemplate any
21  additional payments.
22  Therefore -- and I'll ask Mr. McTevia to correct me
23  if I'm wrong -- but I believe that the balance that his staff
24  people prepared in the accounting takes into consideration a
25  net number, that is, after having already disbursed the fees

Page 24

1  and expenses with respect to legal representation since there
2  will be no more disbursements on that.
3  THE COURT: Let's just get confirmation from
4  Mr. McTevia on that, because frankly I could not make the
5  numbers mesh.
6  MR. TRAISON: I know. Sorry.
7  THE COURT: That's okay, but I just want confirmation
8  from Mr. McTevia that if I were to award all of these fees and
9  expenses that are being requested today, that the balance in
10  the receivership account would be more or less $215,000.
11  MR. McTEVIA: Your Honor, for the Court's
12  information, attached to the application, receiver's accounting
13  of assets and liabilities, there is a cumulative report of
14  receipts and disbursements from May 9 through March 15, 1997,
15  and the receipts minus the disbursements total $215,125. And I
16  gave you a summary of where that $215,125 was. On March 15th,
17  that's what there was in the estate.
18  I also gave you a balance sheet that indicated that
19  there was an asset in the estate that did not include -- that
20  was not included in the cash -- that was on the next page,
21  schedule of assets and estimated liabilities -- a $10,000
22  retainer for counsel to the receiver; and that in the bottom I
23  indicated that there was storage rent, records destruction. I
24  tried to give you a snapshot of the liabilities that were
25  outstanding in the estate, and those liabilities total

Page 25

1  $50,717.50.

2      You can see that I anticipate paying counsel for the
3  receiver fees and expenses of $10,000, which is exactly equal
4  to his retainer, which is the estimate that he gave me.

5      I anticipate that there will be additional fees for
6  the receiver of $8,500, and that I anticipate that there would
7  be $27,425 for records destruction, and a payment of $4,792.50
8  for rent through the month of April in the storage facility in
9  Miami.

10     So that if Your Honor looks at the assets of
11 $235,776, and counsel for the defendants and counsel for the
12 plaintiffs pay the receivable, the amount of money that's owed
13 to the estate, then the estate would have to write a check for
14 $50,717.50 in additional monies.

15     However, the estate would be the recipient of the
16 $10,000 contra on the retainer, the $7,400 in receivable. So
17 by adding the 10, the 74 and the 31, it appears as though that
18 there will be approximately $30,000 less when the funds are
19 turned over to the estate than the $215,125.

20     THE COURT: Okay. So about $185,000.
21     MR. McTEVIA: Beg your pardon?
22     THE COURT: About $185,000.
23     MR. McTEVIA: About $185,000.
24     THE COURT: Okay.
25     MR. McTEVIA: And that's the situation if the records

Page 26

1  destruction goes forward.

2      It would be necessary now for me to call my office
3  and find out how much additional cost would be to store those
4  records for approximately one year, and I don't think that
5  that's going to be a big number.

6      THE COURT: Okay.

7      MR. McTEVIA: And I also think that as a result of
8  that, the expense of the records destruction of $27,000, quite
9  frankly will be substantially less than that, because there's
10 the ingredient of time. We were forcing these people to rush
11 and get the books and records and hurry up and destroy them,
12 and you have to pay for that.

13     So when we come back, if you're going take a short
14 recess, I'll have that figure and we'll know pretty well what
15 the figure is. And then those funds can be, if they are
16 authorized, those funds just can be war-chested and can pay
17 them and I'll assume the responsibility of paying them and the
18 receivership can be closed, if you want to do that.

19     THE COURT: Okay. Fine. Okay. So, then, let me --
20     MR. McTEVIA: Here. I just collected $7,400 already
21 while we were talking.

22     THE COURT: Okay. Let me just make a few more
23 observations about the receiver's fee and expense applications.

24     First, I wanted to note that the receiver has not
25 submitted any proof that his fees are in the range generally

Page 27

1  charged for like services in the community. However, I do feel
2  that I am sufficiently conversant with those fees to make that
3  finding.

4      Now, I also reviewed the individual time entries, and
5  I do not have any substantial concerns with the entries
6  beginning in December of 1996.

7      It does appear that the estate was billed, and,
8  frankly, I don't know that I would have taken issue with this
9  had the defendants not taken issue with this with respect to
10 the defendants. But the defendants have made a big deal about
11 portal-to-portal billing for travel with respect to the
12 plaintiffs, and now that they've brought that issue to my
13 attention, I feel compelled to have to carry it over to the
14 receiver.

15     So there was some portal-to-portal billing with
16 respect to the receiver's flying back and forth from Michigan,
17 and also by the attorneys. So I've made some adjustments to
18 the fees requested by the receiver to eliminate some of those
19 costs, and, to be more specific, I am going to disallow the
20 eight hours billed on 12-9-96 by Mr. McTevia and the seven
21 hours billed on 12-14-96 by Mr. McTevia, which totals $3,000;
22 and the 6.3 hours billed by Ms. Vancor on 12-9-96 and seven
23 hours billed by Ms. Vancor on 12-14-96, which amounts to
24 $1463. So that I'm going to reduce the receiver's request for
25 fees by $4,463.

Page 28

1      Now, as to the -- and I'm going to add to this,
2  although I certainly don't want to visit ancient history, that
3  I do not believe that I would have appointed a receiver in this
4  case that was based in Michigan. It seems to me that the
5  receiver should have been someone -- although I have no quarrel
6  with the services performed by Mr. McTevia -- but I believe it
7  should have been someone in South Florida, for the very reason
8  of keeping down the expenses. There's just no way that you're
9  not going to increase the expenses if you have a receiver in a
10 remote location.

11     Now, as to the expenses, I'm generally in agreement
12 with the expenses submitted by the receiver. But, again, this
13 is something that the defendants have brought up with respect
14 to the plaintiffs, and I feel that it's important that it be
15 carried over here, because if we're going to have a point made
16 as to one, we should have a point made as to all and be
17 consistent.

18     I do not see what the necessity was of having
19 communicated with MOT's former customers by Federal Express,
20 and I disagree that the receiver is entitled to make a profit
21 on Xeroxing by charging 25 cents per page. I also believe that
22 the receiver's postage and miscellaneous supplies ought to be
23 considered part of the receiver's overhead.

24     So, having made the adjustments required by those
25 findings, the allowable receiver's expenses, as far as I am

Condensed!

Page 29

1 concerned, are $3,098.75.

2     Now, the receiver has not presented the Court with

3 any proof to substantiate his request that an additional

4 $18,000 in fees and expenses is necessary to close the estate,

5 but I'm not going to quarrel with it based on the discussion

6 that we've had here today. Obviously, any excess I would

7 expect to be turned over and contributed to the settlement

8 fund.

9     As to the $33,000 which was requested for the

10 anticipated document storage and destruction, I think we'd

11 better hold off on that until we get this estimate today,

12 hopefully by phone, because, as Mr. McTevia pointed out, that

13 is perhaps a smaller number now.

14     Okay. Now, with respect to receiver's counsel, there

15 is this issue of the $2,560 in fees and $11 in expenses which

16 were billed for the period of time prior to September 1996.

17 Although it probably — although I could take the position that

18 I'm not going to allow it, it's a small amount in relationship

19 to the whole, so I'm not going to quarrel with it.

20     MR. TRAISON: Thank you.

21     THE COURT: I generally have no objection to the

22 questions concerning the individual time entries, but there

23 some that I do take exception to.

24     There is .9 hours that you, Mr. Traison billed on

25 10-7-96 concerning the memorandum prepared by Mr. Bonner on

Page 30

1 comparative negligence. I fail to see how that had anything to

2 do with the receiver's responsibilities.

3     Now, I didn't calculate what that would amount to, I

4 think. What are your --

5     MR. TRAISON: That would be approximately $220, I

6 would think.

7     THE COURT: Okay. So we'll reduce your expense

8 application by $220. And there are just a few items that seem,

9 in my mind, are excessively billed.

10     Ms. Bartman of your office somehow spent two hours

11 and 30 minutes on the pro hac vice motion, something in my

12 behind which should have been taken maybe two-tenths of an

13 hour. So I'm going to reduce that to two-tenths of an hour.

14 So, let me see, that would be the elimination of — let's see,

15 two hours and 20 minutes. So, what would that come to in her

16 case?

17     MR. TRAISON: I think the rate is $100. So it would

18 be approximately $220.

19     THE COURT: Another $220.

20     And there also seems to have been some portal-to-

21 portal billing by Ms. Bates. So she had 20.5 hours in travel,

22 which I'm going reduce by one-half. So that would take it down

23 to 10 hours and 15 minutes.

24     So, what does Ms. Bates charge?

25     MR. TRAISON: She is a very junior associate. I

Page 31

1 don't have the figure in front of me, but I believe it is

2 approximately $100.

3     THE COURT: So we'll reduce her time by 1,000. How

4 is that?

5     MR. TRAISON: That's fine.

6     THE COURT: So we've got $1,440 is going to be

7 deducted from the receiver's attorneys' expenses.

8     So now I think that that's as far as we can go at the

9 moment because we need to re-estimate this issue about document

10 retention and destruction.

11     MR. TRAISON: Your Honor, I know you're going to go

12 forward, so that in the interest of minimizing any disruption,

13 may I make the following suggestion?

14     We'll exit, make the proper inquiries to get you an

15 answer and come back in the room, and when you feel it's

16 appropriate to hear from us again, we'll wait for that

17 acknowledgment and give you the additional information you

18 require, and then we will presume that ultimately an order

19 containing all of the various elements of today's discussion

20 will be prepared by somebody.

21     THE COURT: Okay.

22     MR. TRAISON: Thank you, Your Honor.

23     THE COURT: All right. Fine. Thank you very much.

24     MR. McTEVIA: Your Honor, for the Court's

25 information, when this case started in the receivership, it was

Page 32

1 a long, long time ago. For the Court's information, I did and

2 I still do maintain an office in West Palm Beach and I had

3 several staff associates, and my original counsel in this case

4 was here in Miami.

5     THE COURT: Okay. And I do realize that, but I also

6 realize from reviewing the time records that you're really

7 based in Michigan.

8     MR. McTEVIA: Right. Corporate headquarters are in

9 Michigan. There's no question about it.

10     THE COURT: And that's where you are most of the

11 time.

12     MR. McTEVIA: No. I'm a Florida resident, and quite

13 frankly, I'm here most of the time. Thank you.

14     THE COURT: Okay. But there was travel involved on

15 account of that.

16     MR. McTEVIA: Yes.

17     THE COURT: Thank you.

18     Now, I hate to shift gears like this and not be able

19 to conclude any single issue, but maybe I could get a report

20 here on what's going on with the Garden City Group.

21     MR. NEWMAN: Your Honor, if I might. I spoke with

22 Mr. Peter Buchband, and he is undertaking to get an undertaking

23 letter to the Court by fax to the Court's fax number which I

24 got from Mr. Gotciner, and to do it as quickly as possible, and

25 hopefully this morning within a couple of hours.

Condenselt!

Page 33

1 THE COURT: All right. So we'll go ahead and we'll
2 proceed subject to the Court's review of that agreement.
3 Now, before we proceed further, I want to take a
4 little time to review some of the relevant procedural history
5 that's brought us to this juncture before we hear from the
6 parties and the other individuals who are present who wish to
7 be heard.
8 I gave preliminary approval to the settlement of the
9 class action by my order dated January 31, 1997, and I want to
10 note that that preliminary approval followed upon a week of
11 intensive review and renegotiation of the terms of the proposed
12 settlement between the Court, the parties' trial counsel and
13 the parties' settlement counsel.
14 I also want to note that the proposed settlement as
15 originally conceived was first presented to me on the morning
16 of closing arguments after nearly five months of trial.
17 As I'm sure the attorneys for both sides recall, I
18 wasn't very enthusiastic about the timing of their decision to
19 resolve the case. After all, we had presumed upon the jury for
20 many months and the jury was present and ready and willing to
21 listen to the closing arguments and render a decision once and
22 for all in the case as to whether or not there had been a
23 scheme to defraud; whether or not MOI was a boiler room within
24 the meaning of the law; and whether Mr. Grosfeld was
25 responsible for it.

Page 34

1 I also was not very happy with the terms of the
2 proposed settlement to the extent that trial counsel was able
3 to outline those terms to me.
4 For example, I didn't like the idea that the class
5 members would be compensated solely in the form of individual
6 promissory notes that would not be payable any sooner than five
7 years in the future, while most of the class counsel's fees and
8 costs would be paid from the cash portion of the settlement
9 fund.
10 I was also unhappy with the amount of security for
11 the deferred obligation during the time preceding the delivery
12 of the irrevocable letter of credit, and with the parties'
13 apparent agreement at the time that a fee award of one-third of
14 the $40 million settlement fund, which everyone at the time
15 clearly understood to be approximately $13 million, was
16 reasonable under the circumstances.
17 I distinctly recall, for example, the attorneys for
18 both sides estimating that the net settlement fund which would
19 be available for distribution to the class members after the
20 fees and expenses were deducted and the administration expenses
21 were deducted would be in the neighborhood of $24 million.
22 Now, as I have already noted, several days of
23 discussions followed to deal with my concerns. During that
24 time period the jury was not discharged because I was at all
25 times prepared to go to verdict if a satisfactory agreement

Page 35

1 could not be reached. However, by the end of that week
2 sufficient changes had been made to the agreements to allay
3 most of my concerns.
4 Additionally, the parties assured me that the terms
5 of the agreement were sufficiently flexible to permit the
6 deferral of the attorneys fee and expense obligations in
7 whatever amount I deemed appropriate.
8 As further assurance that I would be free to defer
9 all or a portion of the fee and expense award, class counsel
10 agreed to waive their right to appeal those aspects of the fee
11 and expense award relating to the timing or method of payment.
12 I want to emphasize that in these discussions both
13 sides went to some lengths to convince me that a settlement
14 fund consisting of $40 million, albeit comprised of $10 million
15 in cash and the balance in notes, less a fee award of one-third
16 of the gross amount of the settlement fund and reimbursement of
17 counsel's expenses, would produce an exceptional benefit to the
18 class members.
19 Now, I'm not taking a position right now on whether
20 or not I think it was an exceptional benefit or not, but that
21 was certainly the position taken by both sides during that week
22 of discussions.
23 These efforts on both sides to persuade me at least
24 preliminarily of the significance of the result obtained in the
25 case if the settlement were approved included comparative

Page 36

1 analyses of settlements in other class actions alleging
2 improprieties in the offer and sale of securities and other
3 matters alleging fraud in the marketing of investments, and I
4 directed that those analyses be placed in the court file and
5 otherwise made a part of the public record, and I invite any
6 interested person to review those documents which were supplied
7 by both Mr. Dodyk for the defense and by class counsel.
8 Having received, reviewed and considered these
9 materials and having engaged in extensive discussions with the
10 parties concerning the terms of the proposed settlement, and in
11 the end having been persuaded by both sides that there was
12 nothing in the proposed settlement that was outside the range
13 of reasonable and adequate, but reserving to myself the
14 ultimate decision as to the fairness of the settlement and the
15 amount of fee and expenses to be awarded to class counsel, I
16 gave preliminary approval to the settlement by the order dated
17 January 31, 1997.
18 On February 21st, 1997, following entry of the order,
19 the settlement administrator, the Garden City Group, apparently
20 mailed the court-approved form of notice to all class members—
21 who could be identified or, more specifically, 20,591
22 individuals at their addresses as then known to class counsel
23 and as updated by the Postal Service's national change of
24 address database reflecting all changes of address submitted in
25 the last three years.

Page 37

```
 1        In addition, the settlement administrator has
 2  reported to the Court that the Court-approved summary notice
 3  was published in the New York Times, the Wall Street Journal
 4  and USA Today.
 5        I acknowledge that the settlement administrator has
 6  reported that approximately 7,000 of the claim packets, which
 7  included notice of today's hearing, were returned as
 8  undeliverable.  That is, of course, not surprising in light of
 9  the fact that this litigation has been ongoing for some six
10  years and the average individual claim in the case is between
11  $6,000 and $7,000.
12        In any event, the Court is satisfied that the notice
13  given, including the notices published in the newspapers of
14  national circulation, was the most reasonable and practical
15  under the circumstances and was also customary in the
16  administration of class action settlements.
17        I also note, however, that efforts are, according to
18  the settlement administrator, ongoing to mail claim packets to
19  the class members whose packets were returned as undeliverable.
20        That came about not because of the efforts
21  initiated -- not because of efforts initiated by the settlement
22  administrator, as I understand it, but because pursuant to the
23  request of class counsel the Court ended up ordering the
24  settlement administrator to contract with another vendor to
25  obtain updated addresses.
```

Page 38

```
 1        Since then the settlement administrator has advised
 2  the Court that vendor has supplied 4,743 updated addresses
 3  to which claim packets were recently mailed, and that
 4  additional updated addresses are expected shortly.
 5        Now, having found that the best notice that was
 6  reasonable, practical and customary in the circumstances has
 7  been given, this matter is now ripe for final approval of the
 8  settlement and the other matters that I outlined at the
 9  commencement of this hearing.
10        To set the stage for how I wish this hearing to be
11  conducted, I next wish to review the terms of the notice which
12  govern the participation of class members at this hearing.
13        The notice specifically required that any class
14  member opposing the settlement, including class counsel's
15  reques. for fees and expenses, to have notified the Court and
16  the parties of his or her opposition by March 17th, 1997 by,
17  first, filing with the clerk of the Court a notice of such
18  person's intention to appear together with a statement
19  indicating the basis for his or her opposition along with any
20  supporting documentation; and, second, by serving copies of
21  such notice, statement, documentation and related papers or
22  briefs upon plaintiffs' settlement counsel and defendants'
23  counsel, Martin Kaminsky.
24        Now, until this morning I was aware of only one
25  communication which had been received in response to the notice
```

Page 39

```
 1  which stated any opposition to the proposed settlement, and
 2  that communication was in the form of a pleading submitted by
 3  Carol Orkin, who I understand is present here in court.
 4        Maybe Ms. Orkin can stand so I know who she is.
 5  You're Ms. Orkin.  Okay.  Fine.  Thank you.  You can have a
 6  seat.
 7        Now, Ms. Orkin set forth several -- well, three
 8  grounds on which she was objecting to the terms of the
 9  settlement.  I don't know that she's objecting to the
10  settlement in its entirety, but she was objecting to certain
11  terms of the settlement and she, true to her word, is here
12  today to make her feelings known, and at an appropriate time
13  I'm going call on Ms. Orkin to come forward so that she can
14  state what her position is with respect to the settlement.
15        Now, this morning it was brought to my attention that
16  there is present here in court an individual named Christopher
17  Madden.  Where is Mr. Madden?
18        (Raises hand).
19        Okay.  And Mr. Madden contends that on March -- I
20  guess -- he provided me with certain documents and I think
21  copies have been provided to counsel.  The letter states that
22  be provided to me that's directed to the clerk of the Court:
23  "I plan to attend the settlement hearing on March 31 to learn
24  more about my standing in the class action suit against
25  MultiVest to verify that I have been given proper priority
```

Page 40

```
 1  within the class and find out more details about the class, the
 2  distribution and the plan of allocation.  I plan to present
 3  evidence of a previous settlement signed by the vice president
 4  of MultiVest Options."  And he enclosed a release that he had
 5  executed as a result of a reparations proceeding, I take it,
 6  that he was involved in with MultiVest Options.
 7        Now, what is the position of the -- I must tell you,
 8  Mr. Madden, that I suspect that you are -- I did not have a
 9  chance to really get into this because I only received this
10  this morning, for some reason.  But in looking at your release,
11  I suspect that you are excluded from the class.
12        But, what is the plaintiffs' position on this?
13        MR. GOTEINER:  Your Honor, we'd have to go back to
14  the ruling.  But I do provisionally believe that the language
15  in the release may mean he's excluded.  I think this is the
16  magistrate's -- the Special Master's ruling, which was
17  affirmed, but I'm not sure.
18        MR. NEWMAN:  Your Honor, if I might speak.  I don't
19  know that we actually represent Mr. Madden, but Mr. Madden told
20  me he never received the $1,900 referred to in his letter.  So
21  it may or may not be that he was released.  We just don't know
22  the facts.
23        THE COURT:  Okay.  So, what is the plaintiffs'
24  position on whether or not -- well, let me ask Mr. Madden.
25  Mr. Madden, do you wish to be heard today or are you
```

Page 41

1  simply bear to listen and to find out?

2      MR. MADDEN: Well, I'd like to be heard, but I'm not

3  sure what I'm going to say.

4      THE COURT: Okay. Well, that's fine. Have a seat.

5      Well, what do you all think? Should we at an

6  appropriate time let Mr. Madden speak or not?

7      MR. GOTEINER: Why not, Your Honor?

8      THE COURT: And what do the defendants say?

9      MR. DODYK: Your Honor, I don't have any objection to

10  that.

11      It occurs to me that this may be a nonclass problem

12  in that it sounds like Mr. Madden has an unsatisfied claim

13  against the receiver for $1,900, which is outside the class.

14  But the receiver may have a view on that.

15      THE COURT: Okay. So maybe we need for the receiver

16  to -- when the receiver returns, we'll revisit Mr. Madden's

17  situation.

18      Okay. Now, the only other communication apparently

19  which the attorneys received that was not in the nature of an

20  opposition but more in the nature of an inquiry, which was from

21  Mr. and Mrs. Dorsey in Chicago, Illinois, who I take it are not

22  here. Are the Dorseys here? The Dorseys are not present.

23      And they apparently had an account with MOI that

24  straddled the end of the class period, and inquired whether

25  they could recover for money lost in transactions after

Page 42

1  10-31-89.

2      So, although the Dorseys aren't here, I would hope

3  that class counsel would explain during their presentation the

4  rationale for the exclusions of the transactions subsequent to

5  10-31-89.

6      Now, let me also note before we proceed further that

7  class counsel have now submitted their fee and expense

8  petitions. Counsel is requesting one-third of the settlement

9  fund as their fee and also $2,665,000 in expenses.

10      Now, I do want to note that the settlement's

11  stipulation that the -- excuse me, that the fee request of

12  one-third of the settlement fund is the maximum amount of fees

13  that the parties agreed -- the parties, that's both sides --

14  agreed could be sought pursuant to the settlement stipulation

15  that the Court approved at the end of January, after being

16  assured by both sides that a fee of one-third of the gross

17  amount of the settlement fund would be well within the range of

18  reasonable.

19      Moreover, as part of the stipulation -- and it's also

20  in the order giving preliminary approval to the settlement --

21  defense counsel agreed not to oppose the fee and expense

22  application so long as the application did not exceed a request

23  for a one-third fee -- that's one-third of the settlement

24  fund -- plus expenses.

25      Now, I also want to note that I am far from committed

Page 43

1  to paying -- to the payment of the fees and expenses with 25

2  percent in cash and 75 percent as a deferred obligation that

3  the plaintiffs' counsel has more recently proposed.

4      My preliminary view, although, again, I want to hear

5  from everyone today, is that the portion allocated to cash

6  should be in a sum certain in order to avoid uncertainty

7  concerning the amount and timing of the cash distribution, to

8  avoid unnecessary administration expenses and to decrease the

9  counts for conflict.

10      Now, as I think you all can see, I also am fairly

11  intent on resolving the receivership issues today because I

12  would like to have some understanding of the extent to which

13  the contribution of the receivership to the settlement fund

14  will have in covering the expenses of the administration of the

15  settlement.

16      Now, let's turn to the main reason we're here today,

17  which is to determine whether the proposed settlement is fair,

18  reasonable and adequate, and it seems to me that we should

19  first hear from Ms. Orkin and then perhaps we'll give

20  Mr. Madden a chance to say whatever he wants, and then we'll

21  let both sides say whatever they would like with respect to the

22  settlement.

23      Yes.

24      MR. COOPER: Your Honor, my name is John Cooper.

25      I believe that there's one item I'd like to correct

Page 44

1  for the record, and that is I thought that I heard the Court

2  say that the notice was mailed on February 21st. I believe

3  that it was mailed on February 14th.

4      MR. GOTEINER: That's correct, Your Honor.

5      THE COURT: Okay. Fine. Thank you.

6      Okay. So, Ms. Orkin, do you wish to come forward and

7  say anything other than what's contained in your written

8  objections?

9      MS. ORKIN: I do object to the original plan of

10  allocation, although I do understand from my own experience

11  with class action litigations that 20 percent is not an

12  unreasonable sum to obtain back from a class action.

13      I would also like to see the filing deadline in this

14  case extended because of the fact that so many of the addresses

15  were outdated. This case is anywhere between eight and 11

16  years old as far as the addresses are concerned, and you've had

17  more than 7,000 returned, as you reported, and many of those

18  people are only just now getting their claims. I don't think

19  there's sufficient time for them to both request their monthly

20  statements, get them back, then complete a claim form.

21      This is income tax time. People are filing their tax

22  returns for April 15th. I do not think it would be

23  unreasonable to extend the filing deadline and give people an

24  additional opportunity to file claim forms.

25      THE COURT: Okay. Anything else?

Page 45

MS. ORKIN: It's just my contention. I would like to see as much of this settlement go to all of the members of the class and nothing back to the defendants.

I know that this is a reversionary settlement, but I would like to see as much of this money go to all of the plaintiffs.

Thank you.

THE COURT: Okay. Thanks.

And now, Mr. Madden, what do you want to tell us?

MR. MADDEN: I'll be very brief, and I don't have any objection to the settlement. I just don't know where I stand, if at all, in that settlement class.

Let's see. Brief background.

THE COURT: Sure.

MR. MADDEN: Ten years ago I opened an account with MultiVest, lost $3,000 due to what I believe was fraud and negligence, et cetera.

And a year before this class action was filed, I filed a notice that I intended to file an action against MultiVest, which I did do. I filed a complaint with the CFTC, and I was approached by MultiVest shortly after that via this letter, which you have a copy of, stating that they wish to settle for the amount of $1,900, which I agreed to and accepted and signed, and this letter and accompanying document was signed by officers of James McTevia and Associates on behalf of

Page 46

MultiVest, and subsequently received nothing and was told after I called them that they would not be honoring their letter.

So, basically what I'm wondering is if —

THE COURT: Did they give you any explanation as to why they weren't going to honor the letter?

MR. MADDEN: No.

THE COURT: Okay. So, how did the release end up going back to the receiver? You signed the release and sent it back anticipating you would get the $1,900?

MR. MADDEN: That's right.

THE COURT: Is that what happened?

MR. MADDEN: They said after you return the signed originals of the enclosed documents to me — this is James Robash of McTevia and Associates — I will send you MultiVest Options' check in the amount of $1,900. After I send you the check, I will file the notice of satisfaction with the CFTC.

So I sent —

THE COURT: And, again, what did they tell you as to why they weren't sending you your $1900?

MR. MADDEN: This was so many years ago, I don't exactly remember. But I think they just basically said we're not going to honor the agreement.

THE COURT: As you see, the receiver is here today. So, I think when the receiver comes back into the room, at some appropriate time we'll try to take it up with the receiver and

Page 47

try and understand what happened here.

MR. MADDEN: That will be good.

Obviously, I'm ignorant of all the legal complexities of all this, but I just learned from statements made a couple seconds ago that may or may not exclude me from the class. I don't know if that's good or bad for me. And I also knew nothing about this class action suit until a couple weeks ago when I read about it in the paper.

THE COURT: So you saw the notice in the paper.

MR. MADDEN: That's right. Actually it wasn't the notice. Since I live in Boynton Beach it was just a local news item because it's a company, or was.

Also, if I am in the class, if there's a hierarchy within the class and if this moves me higher or lower, close to the —

THE COURT: There are no priorities among the class members. Everybody's the same.

MR. MADDEN: Okay.

And basically, it would be really nice to know why something that I was able to accomplish, you know, seven years ago without paying lawyer's fees and all the other receiver's fees, now, if I do receive anything from this, I would have to pay all that, you know, additional monies on top of that; in other words, that comes out of the settlement, my part of the settlement.

Page 48

That's about all I have to say.

THE COURT: All right. Thank you.

MR. MADDEN: Thank you.

THE COURT: So who from the plaintiffs is going to speak concerning the fairness, adequacy and reasonableness of the settlement and perhaps address, hopefully address, Ms. Orkin's and Mr. Madden's concerns?

MR. GOTEINER: Your Honor, we have filed documents — Neil Goteiner on behalf of the plaintiffs.

We have filed pleadings, particularly the one on February 21, where we've set forth in some detail why we think the settlement is fair and reasonable, and I don't want to burden the Court with more discussion on that. It is a fair and reasonable settlement.

THE COURT: If you want to rest on your papers, that's okay with me.

Do you want to respond to some of the issues that Ms. Orkin raised?

MR. GOTEINER: Absolutely.

Well, Ms. Orkin raised, I think, three issues in her papers. One has to do with the reversion, and, of course, that was part and parcel of the settlement process and it enabled us to have a bigger settlement pot for those people who do come and claim. So — in fact, I've explained this to Ms. Orkin over the phone some time ago.

## Page 49

1    So we think this was a fair and reasonable part of
2  the settlement and made a lot of sense because it did create a
3  bigger pot.
4    With respect to the $50 charge, which Ms. Orkin
5  raised, that was going to be paying for the expenses that the
6  receiver was going to undergo. There has been some issues, as
7  you know, raised in the correspondence about that.
8    But the $50 was to come out of any award to a
9  particular class member. It would not be paid up front. And
10  at the time that was reasonable, it seemed to us. But there
11  has been, as I say, some correspondence on this point which the
12  Court might want to address after Mr. Buchband gets his letter
13  on file.
14    The other objection that I recall Ms. Orkin made had
15  to do with the fees. She didn't raise it orally, but, you
16  know, the Court might want to discount a little bit what I have
17  to say on this. We disagree with Ms. Orkin's written challenge
18  to our fee. I did offer Ms. Orkin to send her the materials so
19  she could make a more informed evaluation of that, and asked
20  her not to — asked her to be gentle with us on this point.
21  So, in any event, she declined to take a look at those
22  documents.
23    THE COURT: Okay. What do you think about
24  Ms. Orkin's comments concerning whether or not the bar date for
25  filing claims should be pushed back?

## Page 50

1    MR. GOTEINER: I was going to address that as well.
2    We agree. Obviously, plaintiffs think it should be
3  pushed back. I should report to you that Mr. Buchband told me
4  that when he was looking at the success rate, he was coming up
5  with a 93 percent success rate in identifying these addresses.
6    Curiously, by pure serendipity, Ms. Orkin told us
7  prior to the hearing that in fact she works with the Garden
8  City Group and she has some knowledge of this as well, and they
9  are doing a good job now of finding these addresses.
10    The Court should also know on this score that
11  Mr. Buchband further agreed that, to the extent these people
12  aren't located, that he's going to go the next route, which is
13  a $16, $15 charge, which is paid only if you get a hit, that
14  is, only if you find the address.
15    So we think these people should get an additional
16  time to file a claim.
17    THE COURT: How far back do you think the bar date
18  should be pushed?
19    MR. GOTEINER: Well, it would seem fair to me that
20  the people who are receiving the notices now should get the
21  same amount of time to file their claims with the account
22  statements as the rest of the class got.
23    THE COURT: Well, I think we need ultimately a cutoff
24  date. I mean, I don't think it can be a fluid date. I think
25  the date has to be fixed.

## Page 51

1    MR. GOTEINER: Well, that's fine.
2    THE COURT: So, what do you suggest? May 15th?
3    MR. GOTEINER: Subject to Ms. Orkin agreeing, of
4  course, May 15 would seem to be a fair enough date.
5    THE COURT: Okay. Anything else you want to say?
6    MR. GOTEINER: No.
7    THE COURT: Okay. Fine.
8    Okay. What do the defendants wish to say?
9    MR. DODYK: If Your Honor please, I only have one
10  comment to make, and that is with respect to what Ms. Orkin
11  states with respect to the current mailing.
12    And I would simply note for Your Honor that this is a
13  problem which arises customarily in the administration of class
14  actions, and the solution which is normally adopted by the
15  courts is not to postpone the date by which the claims must be
16  submitted, because typically, I think once the claims come in,
17  then the parties simply stipulate that certain late claims, in
18  occasions in which the late mailing is caused by some problem
19  in the administrative process, such as, for example, in this
20  case the decision to use the alternative source for the
21  obtaining of the addresses, is accepted by both parties as a
22  reason why with respect to those late-filed claims they will
23  still be admitted.
24    So I would encourage Your Honor simply to see what
25  happens, and I would be encouraged to think —

## Page 52

1    THE COURT: Well, you know, in most cases I would be
2  willing to do that. But in this case I'm not.
3    Is there an agreement that late-filed claims filed up
4  through May 31st will be recognized?
5    MR. DODYK: Your Honor, I can't state that at this
6  point. But I can certainly say that defendants would consent
7  to any mailing — any claim which came in late in which the
8  lateness was due to some administrative problem, and I would
9  hope that we would be able to resolve those without any further
10  litigation. I can't —
11    THE COURT: Mr. Dodyk, I mean, really at this point I
12  think you must understand that there is very little hope of
13  resolving anything in this case without additional litigation.
14    MR. DODYK: I don't believe that's true, Your Honor.
15  I really don't believe that's true.
16    THE COURT: I see. Well, what do you think that the
17  impediments are to my just pushing the bar date back?
18    MR. DODYK: I'm not sure that's possible. I've never
19  seen a case in which that's been done.
20    THE COURT: Okay.
21    MR. DODYK: And the bar date is a part of the
22  stipulation; and while the Court has powers, obviously,
23  procedurally over —
24    THE COURT: I'm not sure. I'm trying to recall
25  whether the bar date was specifically part of the stipulation

**Page 53**

1 or whether it was contained in the order.

2    MR. DODYK: The stipulation says that the bar date is

3 60 days after the mailing date, and then we put in the order

4 April 15 because it was 60 days after the February 14th mailing

5 date.

6    THE COURT: Well, actually I think that's

7 sufficiently flexible to deal with the problem. Sixty days

8 after the mailing date, whatever the mailing date might be.

9    MR. DODYK: Your Honor, that might be an appropriate

10 solution with respect to this class of claimants. I'm not

11 contesting that. All I Your Honor to do is, rather than

12 attempting to resolve it in this fashion, why don't we what

13 happens, because that's the way it normally works out.

14    THE COURT: Well, because seeing what happens in this

15 case doesn't work out very well.

16    MR. DODYK: Well, Your Honor --

17    THE COURT: Okay. So, if your representation to me

18 is that that's the language in the Settlement Agreement, then I

19 think that that pretty well does it. Sixty days from the date

20 of mailing.

21    MR. GOTEINER: Your Honor, I would just add to it

22 that I think what would be appropriate is for Mr. Buchband --

23 we'll get a new notice for those people who get late notices

24 because they have to be told that, because right now it says

25 April 15th. So those people -- Mr. Buchband knows exactly who

**Page 54**

1 those are; that there will have to be another notice sent to

2 those people extending that date.

3    THE COURT: Well, okay. So you all are in favor of

4 waiting and seeing what happens also.

5    MR. WISOFF: No, Your Honor.

6    Just to clarify it, the notices that Mr. Buchband is

7 mailing out is the court-approved form of notice which has the

8 April 15th date.

9    THE COURT: Right.

10    MR. WISOFF: We don't want people who have received

11 this and it's after April 15th to refrain from filing because

12 of that. So, what we suggest is that there be an amendment

13 included in the remailed notices to let them know they have 60

14 days from the date of mailing, so that they won't be

15 discouraged from filing a claim during that 60-day period.

16    THE COURT: So, what are you proposing? Let's be

17 concrete here. Are you proposing that Mr. Buchband simply

18 inclose some kind of brief statement?

19    MR. GOTEINER: Some of them have already been sent

20 out, Your Honor. So, with respect to some that have already

21 gone out, there's going to have to be a little one-page

22 document that says the Court has extended your time to answer

23 it until this date. All right.

24    And with respect to the ones that are going out now

25 or haven't gone out yet, something can be included within that

**Page 55**

1 notice that clarifies it.

2    THE COURT: Okay. Well, I see the defendants

3 thumbing madly through the settlement stipulation trying to see

4 what is provided.

5    MR. DODYK: Your Honor, the research isn't providing

6 any change from what I stated originally. I again would

7 encourage the Court to think in terms of seeing what happens

8 when it comes in. I understand Your Honor's view on that, but

9 that would be my recommendation.

10    THE COURT: Okay. Well, let me just say this in the

11 hope of avoiding further litigation on the point, which is that

12 if the agreement provides 60 days from the date of mailing,

13 then Mr. Buchband needs to keep records as to when the mailings

14 are occurring. Let's start there.

15    If there is a need for Mr. Buchband to notify the

16 people who received the notice late -- as I understand it,

17 there have been two mailings so far, is that right?

18    MR. GOTEINER: Your Honor, there could have been more

19 than two. What's happening is I instructed -- well, in fact,

20 Mr. Dodyk didn't oppose it -- I told Mr. Buchband to get those

21 notices out as soon as he got the addresses.

22    THE COURT: Yes, but --

23    MR. GOTEINER: So there could have been a rolling --

24    THE COURT: -- the affidavit I received from the

25 Garden City Group on March 27th conveys to me that there have

**Page 56**

1 been two mailings. At least that's the way I understand it.

2    MR. GOTEINER: I think he means, Your Honor -- I.

3 can't speak for the man -- but what he told me was that it is

4 ongoing. As he gets the batch of the addresses back from

5 Mr. Miller at this credit bureau, he sends out additional

6 notices.

7    We do know that the first mailing was on February

8 14th. That's what we do know.

9    THE COURT: And do you know when the second mailing

10 was?

11    MR. GOTEINER: Ms. Orkin, I understand, can confirm

12 for the Court that what I've told you is correct.

13    THE COURT: But Ms. Orkin, I take it, doesn't have

14 the dates of the mailings.

15    MS. ORKIN: No, I don't have that on me. But it is

16 on a rolling basis. As they come in, everything will go out.

17    THE COURT: Okay.

18    Well, it seems to me that as to the people who were

19 not -- whose packets were returned, if Mr. Buchband needs to

20 send a notice explaining to people that they have 60 days from

21 the date of mailing, then I think that that is certainly a

22 reasonable thing for him to do so the people know that they

23 have some additional time in which to make their claims.

24    And that's really, I think, all I have to say on it.

25 I say it by way of guidance in the hopes that we can avoid

Page 57

1  further litigation on this subject.
2        Yes, Mr. Newman.
3        MR. NEWMAN: Is the Court so ordering those so that
4  we can represent that to Mr. Buchband?
5        THE COURT: Yes, I am ordering that.
6        MR. NEWMAN: Thank you.
7        THE COURT: Okay. Now, I would like to know -- I
8  would like some kind of report or something filed with me when
9  the mailing has been concluded, so I know. Okay?
10       MR. GOTEINER: Yes, Your Honor. I think Mr. Buchband
11  will submit that to the Court.
12       THE COURT: Okay. All right.
13       So, I did review what the plaintiffs provided with
14  respect to their position on the fairness and adequacy and
15  reasonableness of the proposed settlement. I am generally in
16  agreement with their analysis of the situation. I do want to
17  make a few additional observations or amplify some of the
18  observations that the plaintiffs' lawyers have already made.
19       First of all, I believe that the plaintiffs have
20  applied the correct legal analysis to the issue of whether or
21  not the settlement is fair, adequate or reasonable by assessing
22  the proposed settlement in terms of its relationship to
23  investor losses, in relationship to the difficulties which were
24  incurrent in the case, in relationship to the complexity,
25  duration and expense of the litigation, in relation to the

Page 58

1  substance and amount of the opposition to the settlement, in
2  relationship to the stage of the proceedings at which the
3  settlement was achieved, and in relation to the plan of
4  allocation.
5        Now, more specifically, with respect to each of those
6  factors, I want to make the following observations:
7        In relationship to the amount of investor losses, the
8  settlement fund consists of $10 million in cash plus
9  approximately $185,000 to be transferred from the CFTC
10  receivership and $30 million in the fully secured master
11  promissory note. The master promissory notice bears interest
12  at 5.5 percent a year and will mature in 10 years, but at the
13  option of the holders of the individual promissory notes that
14  will be issued to the class members with approved claims, the
15  class members will be able, if they wish, to call their notes
16  at the expiration of five years.
17       Notwithstanding that a significant portion of the
18  class members' recovery will be deferred, I am convinced that
19  the settlement represents a substantial recovery in the
20  peculiar circumstances of this case and in comparison to other
21  class actions alleging fraud in connection with investments
22  such as securities. For reasons which may or may not be
23  touched upon in the discussion today, I concede that securities
24  fraud class actions are not the perfect analog to this case
25  but, nonetheless, are the best comparators available for

Page 59

1  assessing the reasonableness of the settlement in comparison to
2  other cases.
3        To put the significance of the recovery in numerical
4  terms, $40 million represents approximately one-third of the
5  investor losses of approximately $120 million, and even
6  allowing for the delay in payment by factoring in prejudgment
7  interest, the $40 million fund would represent about a 20
8  percent recovery.
9        The NERA study, which is in the court file and
10  attached to the Senderowitz affidavit submitted by class
11  counsel, analyze securities class action settlements from 1991
12  to mid-1996 and reach the conclusion that for that period the
13  average settlement as a percentage of investor losses was 9.13
14  percent; that the median settlement as a percentage of investor
15  losses was 5.89 percent.
16       Further, in cases where the settlement amount
17  exceeded $10 million, as in this case, the average and median
18  settlement value as a percentage of damages for that period was
19  11.1 percent and 6.6 percent respectively.
20       The defendants have previously indicated that they
21  are generally in agreement with these conclusions, and
22  Mr. Dodyk supplied the Court with his own informal list of
23  results in class actions in which he or his firm had defended,
24  and those results were not any -- the results in those cases
25  were certainly not any better than what was reflected in the

Page 60

1  NERA study.
2        So, I do believe that the recovery in the case
3  represents a substantial recovery in relationship to investor
4  losses.
5        Now, in relationship to the difficulties that were
6  inherent in the case, another factor, I think we could all go
7  on at length about the difficulties involved in the case.
8  Suffice it to say for these purposes that, as everyone has
9  acknowledged, the legal theories were novel, complex and
10  difficult. In fact, the theories were so novel and posed such
11  substantial questions of both fairness and public policy that I
12  had agreed that in the event of a plaintiffs' verdict I would
13  authorize the defendants to take an interlocutory appeal before
14  proceeding with the case further, let alone to judgment,
15  because there were additional proceedings that were necessary
16  in order to determine whether the plaintiffs were entitled to
17  anything at all even after this trial.
18       Because of the complexity and the novelty of the
19  issues, and because the appeal would necessarily have required
20  the Eleventh Circuit to certify a question to the Florida
21  Supreme Court on an important issue of Florida law, I
22  anticipated -- and I think the plaintiffs agree with this --
23  three to four years to conclude the appellate proceedings
24  stemming from the trial and then possibly additional time, if
25  the plaintiffs prevailed on appeal, and possibly another

**Page 61**

1 appeal, to resolve the remaining issues in the case and enter a
2 judgment.
3        The other aspect that I want to highlight -- but, of
4 course, this is by no means an exhaustive discussion of how
5 difficult the case was -- is that the defense was exceedingly
6 well-funded. It was numerous, tenacious and contested every
7 issue. During the four years when I presided over the case the
8 defense, to my knowledge, was represented by several law firms,
9 some of which are among the most prestigious in the country.
10 To name only the ones of which I am aware -- because I suspect
11 there were even more -- we have Cravath, Swaine & Moore; we
12 have King & Spaulding out of Atlanta; we have Honigman Miller
13 out of Detroit; Pollack & Kaminsky from New York; and the local
14 firms of Valdes-Fauli, Greenberg Traurig, and Homer and
15 Bonner.
16        The defense was able to throw massive manpower into
17 this case. I don't doubt that from time to time there may have
18 been as many as 30 lawyers for the defense working on the case
19 at any one point in time.
20        The defense lawyers were aggressive to the point that
21 the plaintiffs frequently questioned their tactics, and both
22 sides were so contentious and the issues in the case so massive
23 that a Special Master had to be appointed to deal with the
24 infinite number of issues that would arise on virtually a daily
25 basis.

**Page 62**

1        It should also be noted that the case was made more
2 difficult by reason of the fact that there was no insurance
3 from which a recovery could be obtained. The sole source of
4 any significant recovery was Mr. Grosfeld's net worth, and this
5 made the case more personal, more contentious and more
6 difficult to settle, as well as more uncertain of result
7 because collection of a judgment became potentially a problem.
8        Now, in relationship to the complexity, duration and
9 expense of the litigation, apart from what has already been
10 said on this account in the papers that have been filed and
11 what I have already said today, the large numbers of lawyers
12 staffing the defense and their ability to generate controversy
13 after controversy made any recovery uncertain, as well as did
14 the unsettled state of the law.
15        Further, it should be noted that the case began in
16 1990 in federal court in California, and it was California
17 counsel that accepted representation of Mr. Waters and
18 Ms. Bartholomew, and they accepted that representation on a
19 contingent fee basis.
20        Then the case was transferred to Florida, and unlike
21 what normally happens in securities fraud cases that are viable
22 and well-founded, someone else comes forward with some other
23 client and seeks the right to be lead counsel. Nothing like
24 that happened here.
25        So, for over six years a relatively small group of

**Page 63**

1 California lawyers had been battling a fairly large group of
2 defense lawyers in a tenacious effort to bring this case to a
3 conclusion in Miami, Florida. The logistical difficulties, not
4 to speak of the expense and inconvenience, had to be extreme.
5        In relation to the substance and amount of opposition
6 to the settlement, that factor is not -- taking nothing away
7 from Ms. Orkin, that factor doesn't have a lot of significance
8 since out of even the 13,000 people who apparently have
9 received the notice, she is the only person here objecting to
10 the settlement, although her comments are, I think, well
11 taken.
12        MS. ORKIN: I have no objection to them getting
13 one-third of the settlement at this point.
14        THE COURT: Okay.
15        MS. ORKIN: I understand the complexity of it, and I
16 think initially I was just angry at the reversionary clause and
17 wanted to punish them for it. But I do understand that they've
18 been working many, many years on this case and I have no
19 objection to that. I know that one-third is the norm.
20        THE COURT: Okay. Thanks, Ms. Orkin.
21        Did you get that, Bill?
22        THE REPORTER: Yes.
23        THE COURT: Okay.
24        Now, in relationship to the stage of the proceeding
25 at which the settlement was achieved, as I understand it, the

**Page 64**

1 settlement was arrived at after more than six years of pretrial
2 discovery and other proceedings, five months of court
3 proceedings consisting of the final pretrial conference and the
4 trial, and not until after all of the evidence had been
5 presented to the jury and the jury instructions and the form of
6 verdict had finally been determined.
7        There certainly can be no question that both sides
8 were fully aware of the strengths and weaknesses in their legal
9 and factual positions and the toll being taken by the
10 litigation generally, as well as what would be required to
11 conclude the litigation when they agreed to the settlement.
12        In relationship to the plan of allocation, the
13 stipulation of settlement provides that each class member will
14 recover from the net settlement fund in the same proportion
15 that his or her losses bore to total customer losses.
16 Therefore, the claim of any class member will not reduce or
17 increase the recovery of any other class member except to the
18 extent that the Court orders that bonuses be paid to the class
19 representatives, Mr. Waters and Ms. Bartholomew, which is a
20 subject that we still need to discuss today.
21        And finally, I think it should be noted that the
22 settlement plainly is not collusive in any respect. Both sides
23 have represented that the settlement negotiations spanned
24 several months and that a settlement was reached only after
25 exhaustive review, rejection and reconsideration of numerous

Page 65

1  earlier proposals. In fact, the contentious ugly quality of
2  this litigation has continued to be apparent and a problem
3  since the Court's preliminary approval of the settlement,
4  notwithstanding that the settlement represents a joint proposal
5  with the alleged support of both sides.
6      So, in sum, the Court finds that the settlement of
7  $40 million on the terms set forth in the stipulation, even
8  after having taken into consideration its most undesirable
9  aspects, specifically the substantial deferral of compensation
10 to the class members, strikes a fair, adequate and reasonable
11 balance among the losses suffered by the class members, the
12 length of time the class members have had to wait for any
13 recovery, and the complexities and difficulties that have been
14 inherent in and peculiar to this case.
15     So, the Court is approving the settlement as fair,
16 adequate and reasonable.
17     Now, the next matter I would like to take up is the
18 bonus issue as to Mr. Waters and Ms. Bartholomew. Class
19 counsel are requesting $10,000 bonuses for each of the class
20 representatives. Class counsel has represented that Mr. Waters
21 and Ms. Bartholomew followed the litigation for nearly seven
22 years and have pointed out that, unlike other class members,
23 they were required to submit to lengthy depositions, to respond
24 to additional discovery and to produce their personal financial
25 records.

Page 66

1      Class counsel have also opined that the bonuses
2  represent only a, quote, minor, unquote, portion of the
3  settlement, but to my knowledge have not stated how any such
4  bonus should be allocated between cash and a deferred
5  obligation, or whether their position is that it should be paid
6  entirely in cash.
7      So at this time the Court will hear the parties,
8  beginning with class counsel, on the issue of the bonuses to
9  the class representatives.
10     MR. GOTEINER: Your Honor, if we omitted to specify
11 the allocation, it should have been in the same allocation as
12 the rest of the class members, 25 percent cash, 75 percent
13 deferred obligations, promissory notes rather.
14     THE COURT: Okay. And is there anybody who -- do you
15 want to say anything else in support of the request for
16 bonuses?
17     MR. GOTEINER: Well, we have stated in our papers,
18 Your Honor pointed it out -- I would go into more, because
19 there are a couple of class members here who might have certain
20 feelings about it. It would really be to address their
21 concerns.
22     But all I can say is that these people did follow --
23 Ms. Bartholomew and Mr. Waters, did follow the litigation. It
24 was a lot of emotional drain and strain on them, and in our
25 opinion they are well entitled to it.

Page 67

1      THE COURT: Does the defense want to be heard on that
2  issue?
3      MR. DODYK: The defense takes no position on the
4  question, Your Honor.
5      THE COURT: I think that under the circumstances the
6  $10,000 bonuses for each of them is reasonable, and that it
7  should be allocated as follows: I think that they should
8  receive $2,500 in cash out of the $10 million cash portion of
9  the settlement and the balance as a deferred obligation.
10     Okay. So, I am trying to get away from this -- I'm
11 trying to make a point here, which is I'm trying to get away
12 from this percentage allocation because I doubt very much
13 that's the way I'm going to be going on the attorneys' fees
14 today.
15     MR. GOTEINER: Your Honor, just to be clear. With
16 respect to the Court's order on the class representatives, it's
17 each, each of them gets the $25,000 plus $7,500.
18     THE COURT: Yes.
19     MR. GOTEINER: $2,500, I'm sorry, plus $7,500.
20     THE COURT: Yes.
21     Now, when the receiver was out of the room, a new
22 issue arose with respect to the receiver. Maybe someone could
23 take the receiver aside with Mr. Madden over here --
24     MR. NEWMAN: I'd be happy to step outside and do that
25 for a second, explain to them what happened while they were out

Page 68

1  and then they could come back in. Would that be helpful?
2      THE COURT: Yeah. I was going to go on now to the
3  attorneys' fees issue. But maybe what I could do is take a
4  five-minute recess before we do that, and that will give you a
5  chance to talk to them about this other issue.
6      MR. NEWMAN: That would be very helpful. Let me just
7  take them outside and talk to them.
8      THE COURT: Okay. Let's take a five-minute recess.
9      (Recessed at 11:30 a.m.)
10     (Resumed at 11:46 a.m.)
11     THE COURT: Okay. Let us resume here.
12     Did the receiver's counsel and the receiver have an
13 opportunity to speak to Mr. Madden?
14     MR. TRAISON: We did, Your Honor. And we'll address
15 two issues now, Mr. Madden's issue being one and then the issue
16 originally posed by the Court regarding the storage cost so
17 that you'll have the proper figures.
18     THE COURT: Right.
19     MR. TRAISON: What I'd like to do is simply lay out
20 the facts as we've determined them.
21     It appears that sometime ago, I believe in or about
22 1990, the receiver was in the process of making settlements
23 with some claimants and in fact did complete some of those
24 settlements and actually also paid those claimants.
25     There were, however, three or four, perhaps as many

Condensch!t!™

## Page 69

1  as six, with whom a proposed settlement had been made, but
2  prior to the time that the Settlement Agreement could be
3  completed -- and certainly that would include the payment of
4  money -- the CFTC notified the receiver that it objected to any
5  more settlements being made because it felt that there would be
6  virtually dozens if not hundreds of these coming and the estate
7  would be depleted roughly, soon.
8        The receiver determined that that was probably
9  correct, but in any event, honoring the request of the CFTC,
10  stopped the process of the settlements, and in the case of
11  Mr. Madden, did not make that payment.
12        THE COURT: So the receiver's position would be that
13  the release that Mr. Madden delivered was not delivered in
14  exchange for any consideration and is void.
15        MR. TRAISON: I must say to the Court that my first
16  reaction when I began to hear these facts was that possibly
17  Mr. Madden had relied upon an agreement with the receiver to
18  his detriment, thus compelling us to honor it because of his
19  reliance; and, number two, because other parties similarly
20  situated did not appear today to raise the issue.
21        But I must advise the Court that Mr. Madden has
22  advised the receiver -- and, of course, Mr. Madden did not have
23  counsel here either, so that's a little awkward -- that he did
24  know that it would not be honored, the agreement. So that
25  makes me question the reliance issue and --

## Page 70

1        THE COURT: Well, no. My question to you is do you
2  take the position that he executed a release or not?
3        MR. TRAISON: He executed a release.
4        THE COURT: But do you take the position that the
5  release is valid, that it was given in exchange for any kind of
6  consideration?
7        What did he receive for his release, Mr. Traison?
8        MR. TRAISON: He received nothing at all for his
9  requite. Quite the opposite, he probably relied --
10        THE COURT: And he gave the release in anticipation
11  that he would receive $1,900.
12        MR. TRAISON: That is correct.
13        THE COURT: So you don't take the position that the
14  release is effective, do you?
15        MR. TRAISON: No, not that it's effective, no.
16        THE COURT: Okay.
17        MR. TRAISON: The question we were focused in on and
18  would like the Court to make the decision on is whether the
19  receiver would have permission to pay the $1,900 to Mr. Madden
20  from the receivership.
21        THE COURT: Well, I don't know. It's sort of a --
22  the fact is that Mr. Madden would benefit over and above the
23  other members of the class if the Court were to agree to that.
24        It seems to me that Mr. Madden is a member of the
25  class, and so he should assert his claim like the other class

## Page 71

1  members and receive his proportionate share of the recovery. I
2  don't see that he relied to his detriment and I don't see that
3  the release is valid.
4        Now, this raises an issue in my mind, because I would
5  like to avoid litigation in the future to the extent possible,
6  of other individuals who sent releases to the receiver who we
7  may have believed were therefore not part of the class.
8        Now, as I recall, the only people that I ruled out of
9  the class were the people that released MOI and its affiliated
10  entities basically. I haven't gone back to look at that ruling
11  in a long time, but I think that that's it. So, it's the
12  people who had the kind of language in their release that
13  Mr. Madden had that would be of concern to me.
14        Now, I don't recall that when we looked at who was in
15  and who was out of the class, at least on a preliminary basis,
16  I don't recall seeing any other releases that were executed by
17  the receiver. Now, I don't know whether any of the defense
18  lawyers who are present are in a position to speak to that,
19  because I think this is more Mr. Wasinger's bailiwick.
20        MR. KAMINSKY: I'm afraid that's correct, Your
21  Honor. We're not aware of that ourselves. We don't know what
22  the situation was one way or the other.
23        THE COURT: Well, what I would ask the receiver to do
24  is to supply me and the lawyers for both sides with a list of
25  anybody -- of the names and addresses of anyone and supporting

## Page 72

1  documentation relating to any person who delivered a release
2  who didn't get anything for the release. Okay?
3        MR. TRAISON: That should be fairly easy to do given
4  the small number involved.
5        MR. McTEVIA: To the contrary, I don't think we'd be
6  able to do that because the release --
7        MR. TRAISON: We're talking about four or five.
8        MR. McTEVIA: No, we're not. We're talking about --
9  the release issues falls into three separate categories, your
10  Honor. There were a number of checks that were written from
11  the receivership estate for people who got the releases in.
12        This is an ongoing process. We're in the process of
13  negotiating with them, and there were releases that were sent
14  out and there were a number of releases that were returned to
15  the receivership. And this happened so long ago, I don't know
16  if I would be able to reconstruct the -- that's the question I
17  had in my mind out in the anteroom here talking to Mr. Madden.
18        How in the world am I ever going to be able to
19  reconstruct who we sent releases to, who sent the releases back
20  to us where they were in our possession?
21        THE COURT: Well, let me ask you this. Do you have a
22  list of the people that you sent money to?
23        MR. McTEVIA: Yes. Of course, they would have been
24  sent money out of the receivership account, that's correct. It
25  would have been in 1990.

Page 73

1    THE COURT: How about this. How about you give us
2    all a list of the customers who received money from the
3    receiver?
4        MR. McTEVIA: Okay. I can do that. I can
5    reconstruct that through the checkbook.
6        THE COURT: And then at least when people submit --
7    if there are other people who come forward, like Mr. Madden,
8    who claim that they had some kind of an agreement with the
9    receiver that was not consummated, we can at least go to the
10    list to see whether or not they received any money from the
11    receiver, and then we can take it from there.
12        MR. McTEVIA: But for the sake of writing a check and
13    putting it in the mail, that agreement with him would have been
14    consummated, and my discussion with counsel and Mr. Madden out
15    there was all of these other people, whoever they are, were all
16    given notice of this, and Mr. Madden was the only one to show
17    up with his release and says, wait a minute, I never got a
18    check and you told me I wasn't going to get one but you never
19    told me why. So, you know --
20        THE COURT: Do we even know to a certainty that
21    Mr. Madden didn't get paid? I mean, Mr. Madden says he didn't
22    get paid. Does that jibe with your records, do you know?
23        MR. McTEVIA: Well, when we get the list of the
24    people who got paid, as Your Honor has suggested, we'll find
25    out.

Page 74

1        THE COURT: Okay.
2        Well, my position is Mr. Madden's part of the class.
3    Apparently that was the intent at the time. The intent at the
4    time was that when the receiver stopped paying with respect to
5    these disputes was that if people had claims, they were either
6    going to have to assert them directly against the company or
7    they were going to have to be part of the class, the company
8    and the related parties, or be part of the class. Is that
9    right?
10        MR. TRAISON: Yes. It was never our intention to
11    assert that the release was effective.
12        THE COURT: Okay. Fine. What about this other issue
13    concerning the --
14        MR. TRAISON: I'll ask the receiver to address that.
15        THE COURT: Mr. Madden, so what you need to do is you
16    need to submit a claim, and if you -- I don't know. I doubt
17    that anybody here has any claim forms. But you need to contact
18    the Garden City Group and get the claim forms.
19        MR. MADDEN: I have the claim forms, your Honor.
20        THE COURT: You do have the claim forms.
21        MR. MADDEN: Let me just say, if I had been aware of
22    the opportunity to exclude myself from the class a couple of
23    years ago --
24        THE REPORTER: Excuse me. I'm not hearing you. You
25    need to get near a microphone, please.

Page 75

1        THE COURT: The court reporter needs to be able to
2    take down everything that's said.
3        MR. MADDEN: If I was aware of the opportunity to
4    exclude myself from the class, I think it was two or three
5    years ago, I would have pursued that at least based on this.
6    But I never knew anything about this action or the exclusion
7    opportunity until long after that date passed.
8        THE COURT: Okay. I appreciate that. But I long ago
9    determined that the notice that was given to the class members
10    of the action was the most reasonable and practical under the
11    circumstances, and the time has long expired to challenge that.
12        MR. MADDEN: Can I also say that I spent hundreds and
13    hundreds of hours researching this and bringing this together,
14    and that's what I think, based on the merits of what I had
15    presented, the receiver agreed to pay that money, and I
16    complied with what he -- they asked me to do and never got
17    anything in return for it.
18        THE COURT: Okay. I appreciate what you're saying,
19    but at this point I don't see that there's really any -- I
20    think it would be highly inappropriate to treat you any
21    differently than any other member of the class.
22        MR. MADDEN: I am sorry you feel that way, Your
23    Honor.
24        THE COURT: Okay. What about this other issue
25    concerning the costs?

Page 76

1        MR. McTEVIA: I've contacted my office and we made
2    some telephone calls.
3        To transport all of the records from Miami back to
4    the Fort Lauderdale storage area would cost approximately
5    $7,000, which is approximately what the cost was to transfer
6    them there in the first place.
7        To pay for the storage areas that are necessary to
8    store all of the books and records in the Fort Lauderdale area
9    for a period of 12 months would run $800 a month at Shurgard
10    Storage for approximately $9,600.
11        To hire a shredder -- and the shredding company would
12    do it on the premises, Your Honor; there would be no more
13    moving of the books and records; a shredder would come to
14    wherever the books and records were and the documents would be
15    shredded after a period of one year -- would cost $15,000.
16        So, for approximately $5,000 more, these books and
17    records can be maintained in estate for one year, after which
18    they can be destroyed, and my office is prepared to coordinate
19    all the efforts.
20        THE COURT: What about, I thought you were going to
21    store them in Fort Lauderdale for 30 days in some other
22    location?
23        MR. McTEVIA: The transport of the books and records
24    to Shurgard allows for the books and records to be examined at
25    Shurgard Storage.

Condenselt!™

Page 77

1    THE COURT: Fine. Okay. And, of course, we're only
2    talking about a year as hopefully a very outside date.
3    Hopefully they would be able to give you notice sooner than a
4    year and save us that $5,000 or more.
5         MR. MCTEVIA: We will control access to the facility
6    for 30 days as you've recommended, but after that I suspect
7    that any party in interest who wants access can simply contact
8    us for a key and we can make arrangements.
9         THE COURT: Well, does anyone see a problem with
10   that?
11        I'm really not very satisfied with that. My position
12   is -- actually this is my position. My position is anybody who
13   wants to see the documents for the next 30 days can go look at
14   the documents for the next 30 days. But after that 30 days
15   those documents stay under lock and key.
16        MR. MCTEVIA: I understand, Your Honor.
17        THE COURT: Okay. So the total -- so, let me make
18   sure -- my arithmetic must be really lousy. It was $7,000 plus
19   $9,600.
20        MR. MCTEVIA: That's correct.
21        THE COURT: Plus $15,000, right?
22        MR. MCTEVIA: That's correct.
23        THE COURT: So the total is $31,600?
24        MR. MCTEVIA: That's correct.
25        THE COURT: As opposed to the $33,000 that Bekins --

Page 78

1    no, they were $27,000.
2         MR. MCTEVIA: $27,000, your Honor.
3         THE COURT: Okay. Fine. So I think that that's
4    acceptable, with the understanding that if the parties can
5    notify you that the appellate time has expired sooner than the
6    expiration of a year, then at that point the documents should
7    be destroyed.
8         MR. MCTEVIA: And the remains funds should be turned
9    over to the disbursing officer.
10        THE COURT: Right. Exactly.
11        So, now, Mr. Traison, I'm hoping you're going to draw
12   the order here on the receiver's fees and expenses and your
13   attorneys' fees and expenses. Do you need for me to recap any
14   of this?
15        MR. TRAISON: I don't think we need to trouble you
16   with that now. Perhaps I'll have those pages from the
17   transcript requested.
18        So I take it from your comment that that portion will
19   be separate from the order directing how the receiver will
20   dispose of the documents, and we'll have two orders there, one
21   for fees and expenses and one on the disposition issues.
22        THE COURT: That would be fine. I don't have a
23   problem with that.
24        MR. TRAISON: Now, would the Court like us to prepare
25   the disposition order as well --

Page 79

1    THE COURT: Yes
2         MR. TRAISON: -- with the release language, et
3    cetera?
4         THE COURT: Yes
5         MR. TRAISON: Thank you, Your Honor. We will do
6    that.
7         THE COURT: And at what point -- so, let's see. What
8    you'll end up doing is you will end up turning over to -- let's
9    figure out how much you'll be turning over now to the
10   settlement fund. Let's see. The receiver's fee, $38,000 minus
11   $4,463.
12        MR. MCTEVIA: I have it all figured out, your Honor.
13        THE COURT: Okay.
14        MR. MCTEVIA: After deducting what was disallowed and
15   allowing what I am petitioning for, the receiver's fees and
16   expenses would be $37,080.22; and counsel for the receiver's
17   fees, yours would be $10,000; and the Shurgard would be
18   $31,600.
19        THE COURT: Okay. So the total is?
20        MR. MCTEVIA: $45,380.22 is the deduction from
21   $215,125, plus the receivables of $7,455 which I've received
22   already this morning, and $3195 which I've yet to receive from
23   plaintiff.
24        MR. TRAISON: Just for the record, I think the order
25   will also need to contemplate the return by receiver's counsel

Page 80

1    of the $1,440 that was disallowed to the receivership estate.
2         THE COURT: That's right.
3         MR. MCTEVIA: So we have $225,775 in assets. How
4    much are you going to return to the estate?
5         MR. TRAISON: $1,440. $1,440.
6         MR. MCTEVIA: $1,440 is going to be returned. So the
7    net asset is $227,105 minus $45,380.22.
8         THE COURT: Okay.
9         MR. TRAISON: Okay?
10        THE COURT: Okay. So, anyhow, you'll break this all
11   down, hopefully, in the orders and we'll all have a chance to
12   review them and make sure they're okay.
13        How soon will you be able to get the orders to me?
14        MR. TRAISON: Well, we should be able to send around
15   drafts within a matter of days. I would feel comfortable if I
16   had those pages from the transcript. I don't know how long
17   that will take to get that.
18        THE COURT: Bill, can you provide him with the
19   transcripts, just the portions relating to the receivership, by
20   Friday?
21        THE REPORTER: Yes.
22        THE COURT: So we'll look for your order by the
23   following Friday, which is, I think, April 11th.
24        MR. MCTEVIA: It looks like $181,724.78 is the amount
25   that will be turned over to the disbursing officer.

Page 81

1 MR. TRAISON: We'll get all those figures and we'll
2 circulate a draft.
3 THE COURT: So it's more or less $181,000.
4 MR. METEVIA: That's correct, your Honor.
5 THE COURT: Thank you very much.
6 MR. TRAISON: Thank you, Your Honor.
7 THE COURT: Okay. Now, the next matter is the issue
8 of the attorneys' fees and costs, and again, I want to take a
9 couple of minutes to introduce the issue.
10 There have been at least two noteworthy developments
11 since I gave my preliminary approval to the settlement with
12 respect to the issue of attorneys' fees and costs. First, the
13 plaintiffs' counsel has since proposed that their fee and
14 expense award be paid 25 percent out of the cash portion of the
15 settlement fund and 75 percent as a deferred obligation to the
16 settlement class, so that the class members might similarly
17 receive 25 percent of their approved claims from the cash
18 portion of the settlement and 75 percent in the form of
19 individual promissory notes.
20 That proposal was directly responsive to the
21 dissatisfaction that I had expressed during the last week in
22 January when preliminary approval of the proposed settlement
23 was under consideration, my initial reaction having been that
24 the proposed settlement unfairly placed the inconvenience and
25 uncertainty of the deferred obligation entirely on the members

Page 82

1 of the class while the lawyers would receive an immediate
2 benefit.
3 While I don't disagree that the plaintiffs' proposal
4 is a step in the right direction, I'm not sure that the
5 deferred portion of the fees and costs must necessarily be 75
6 percent as opposed to some lesser percentage or some lesser
7 amount. After all, if they have conferred a substantial
8 benefit on the class under exceptionally difficult
9 circumstances, fairness would seem to dictate that they be
10 differentiated from the passive class members by receiving an
11 amount representing a higher percentage from the cash portion
12 of the settlement fund.
13 The other noteworthy development is that,
14 notwithstanding that the defendants agreed not to oppose the
15 plaintiffs' fee and expense applications, the defendants'
16 lawyers have taken the position that the fee, to the extent it
17 is a percentage of the fund, should be based on the actual
18 amount of approved claims and that the determination of the
19 fees and expenses should be deferred until the amount of the
20 approved claims can be ascertained.
21 They further have estimated, based upon Mr. Dodyk's
22 experience in one other class action, that the actual payout on
23 approved claims, due mainly to the failure of class members to
24 submit claims, would be as low as $3,600,000, and from this
25 estimate they argue that the plaintiffs' counsel should be

Page 83

1 limited to a fee of 33 percent or more or less this amount,
2 which would represent a loss of, of course, many millions of
3 dollars to the plaintiffs' lawyers.
4 This position poses a logistical problem for the
5 defendants, apart from the fact that they agreed not to oppose
6 the plaintiffs' attorneys' fees and expense applications; that
7 is, they argued vigorously for preliminary approval of the
8 settlement, and in the course of their arguments asserted that
9 the settlement of $40 million, albeit in cash and notes,
10 represented a substantial and unusually large recovery in a
11 class action such as this. In so arguing, they took no issue
12 at the time with the plaintiffs' lawyers' view that, depending
13 upon whether delay was considered, the recovery represented
14 between 20 percent and 30 percent of the investor losses in
15 this case.
16 To deal with this problem, Mr. Dodyk notes in his
17 submission that an actual payout of $3,600,000 would still
18 represent about three percent of the claimed total loss of
19 approximately $120 million, and he notes that because he would
20 like to see the plaintiffs' lawyers -- apparently because he
21 would like to see the plaintiffs' lawyers incur substantial
22 losses and see the settlement go through.
23 Of course, regardless of whether such a settlement
24 would be upheld on appeal, a proposition which I believe is
25 doubtful but in which Mr. Dodyk has a lot of confidence,

Page 84

1 apparently, I would not have given approval to the settlement
2 if I had believed that its true economic value were only
3 $3,600,000, not after five months of court proceedings and four
4 prior years during which I was the presiding judge over
5 litigation more contentious than I suspect most of my
6 colleagues will ever be exposed to.
7 Moreover, Mr. Dodyk's "the glass is half full and
8 empty at the same time" argument fails because, in my view, it
9 is contrary to law, specifically Supreme Court precedent. In
10 the Boeing Company versus Van Gemmert, at 100 Supreme Court
11 745, the Supreme Court held that the District Court had
12 properly awarded attorneys' fees from the total amount of the
13 class action judgment, including the unclaimed portion of the
14 judgment, since each class member had present vested interest
15 in the class recovery and could collect his or her share by
16 submitting a claim, regardless of whether he or she actually
17 did so.
18 In fact, Mr. Dodyk has provided the Court with no law
19 to support his position that this Court should only look to the
20 amount actually paid to determine plaintiffs' counsel's fees,
21 despite the thousands of class actions which have been
22 successfully concluded in this country. He simply proposes to
23 distinguish the case now before the Court because the
24 settlement stipulation in this case provides for a reversion to
25 Mr. Grosfeld of all unclaimed funds; whereas, according to

Page 85

1   Mr. Dodyk, there usually is no difference between the amounts
2   contributed to the settlement fund and the amount disbursed.
3        But Mr. Dodyk seems to forget that a reversion was
4   part of the settlement in the Boeing case. Also, I do not
5   accept that reversions are unusual because of the prescription
6   in the law against fluid recoveries, i.e., recoveries which can
7   vary up or down depending upon the number of claims asserted.
8        Finally, Mr. Dodyk's contention fails to account for
9   the public interest that the well-conceived class action
10  advances. If attorneys can only prosecute such cases at a
11  loss, which will be the end result of Mr. Dodyk's approach, no
12  attorney would be willing to undertake these difficult cases.
13       In short, Mr. Dodyk's position may have public
14  relations appeal, but is entirely contrary to law and to public
15  policy and the Court rejects it.
16       Turning now to what would be a reasonable fee and
17  expense award in this case, the parties acknowledge that the
18  Eleventh Circuit Court of Appeals decision in Camden One
19  Condominium Association versus Dunkel, at 946 F.2d 768,
20  Eleventh Circuit, 1991, supplies the appropriate method of
21  calculating a fee in a case such as this.
22       Pursuant to Camden One, quote, "Henceforth in this
23  circuit, attorneys' fees awarded from a common fund shall be
24  based upon a reasonable percentage of the fund established for
25  the benefit of the class," close quote.

Page 86

1        In making this pronouncement, the Court of Appeals
2   noted that analysis in a common fund case focuses not on the
3   plaintiffs' position as prevailing parties but on a showing
4   that the fund conferring a benefit on the class resulted from
5   their efforts. In this context, monetary results achieved
6   predominate over all other criteria.
7        The court went on to note that the majority of common
8   fund fee awards fall between 20 percent to 30 percent of the
9   fund and that, therefore, many district courts were using 25
10  percent as a benchmark to be adjusted up or down depending on
11  the circumstances in a particular case.
12       Now, having said that, dealing only with attorneys'
13  fees and not with costs, is there anything other than what is
14  contained in your papers that you would like to say concerning
15  the attorney's fee? Plaintiffs' counsel.
16       MR. GOTEINER: No, Your Honor.
17       THE COURT: And how about the defense?
18       MR. DODYK: We have nothing to add, Your Honor.
19       THE COURT: Fine. Then the Court makes the following
20  findings:
21       The only evidence before the Court from which a
22  benchmark might be selected, as required by Camden One, is the
23  NERA study of filings and settlements in shareholder class
24  actions.
25       I would note again, as I did earlier, that securities

Page 87

1   class actions may be the best comparators available for the
2   purpose of assessing the fee in this case, but there are many
3   dissimilarities between this case and the typical securities
4   class action, making this case much more difficult.
5        In any event, the NERA study includes the following
6   findings: That the average attorney's fee in securities class
7   actions in the Eleventh Circuit between 1991 and mid-1996 was
8   29.92 percent of the total settlement, and that the average and
9   median attorneys' fees awards as a percentage of settlement in
10  class actions nationwide that were settled, class actions that
11  were settled nationwide, in the range of $10 million to
12  $49 million was 31.72 percent and 33.33 percent, respectively.
13       Since this Court sits in the Eleventh Circuit, I have
14  decided to use a benchmark of 30 percent, or $12 million.
15       The next issue is whether the benchmark should be
16  adjusted up or down based upon the particular factors present
17  in this case. In making that decision the Court again looks to
18  Camden, which instructs me to apply such factors as the factors
19  in Johnson versus Georgia Highway Commission at 488 F.2d 714,
20  Fifth Circuit, 1974, as well as other relevant factors, such as
21  the amount of time required to reach a settlement, whether
22  there are any substantial objections to the settlement or fees,
23  and any nonmonetary benefits conferred upon the class by the
24  settlement and the economics involved in prosecuting a class
25  action.

Page 88

1        Applying the Johnson and related factors, the Court
2   finds as follows:
3        As to the time and labor required: Plaintiffs'
4   counsel has supplied the Court with a dearth of information
5   concerning their actual time and labor required to prosecute
6   the case. While I would have preferred more information and
7   much more detail, I am sufficiently acquainted with this case
8   as well as other class actions in this community, both as a
9   practicing lawyer and as a judge, to know to a certainty that
10  the time and labor required to prosecute this case far exceeded
11  the average investor class action.
12       The abnormally high expenditure of time and labor is
13  attributable mainly to two aspects of the case: The novelty
14  and complexity of the issues and the vigorous and unusually
15  aggressive defense. In fact, the demands on the Court's times
16  and the demands which would have been made on the assigned
17  Magistrate Judge were such that, as I noted earlier, it became
18  necessary to appoint a Special Master to oversee the pretrial
19  proceedings in this case. This factor, therefore, militates in
20  favor of an upward adjustment to the benchmark.
21       With respect to the novelty and difficulty of the
22  issues involved, virtually every issue in the case, from issues
23  of federal preemption in the area of commodities regulation to
24  the applicability of the presumption of reliance, was novel and
25  difficult.

Page 89

1    In fact, the defendants took such exception to the
2 Court's resolution of certain of the more difficult legal
3 issues in the case that they took the unusual step of seeking a
4 writ of mandamus from the Court of Appeals to prevent the trial
5 from proceeding.
6    Moreover, I was sufficiently uncomfortable with the
7 applicability of the law to the facts in this case that I had
8 made that I had agreed that the defendants could take an
9 interlocutory appeal in the event of a plaintiffs' verdict,
10 provided they could assure me that Mr. Grosfeld would not
11 remove his assets beyond the Court's jurisdiction. This factor
12 militates in favor of an upward adjustment to the benchmark.
13    The third factor is the skill requisite to perform
14 the legal services properly. For the reasons I've already
15 stated, the case required a higher degree of skill than the
16 average securities class action. This factor militates in
17 favor of an upward adjustment to the benchmark.
18    The fourth factor is the preclusion of other
19 employment. I have no doubt that the Farella Braun attorneys
20 who were actively and continuously involved in this case were
21 unable to devote any significant time to any other matters,
22 particularly during the five months that they were in Miami for
23 the final pretrial conference and the trial. This factor
24 militates in favor of an upward adjustment to the benchmark.
25    The customary fee is the fifth factor. The Court has

Page 90

1 already noted that a customary fee in a securities class
2 action, the type of action most comparable to this in which
3 there is wide experience, would be approximately 30 percent.
4 This factor is neutral with respect to the benchmark.
5    The sixth factor is whether the fee was fixed or
6 contingent. Plaintiffs' counsel have not supplied me with
7 their engagement letter with their clients. However, attorneys
8 Goteiner and Lipoff have sworn under oath that the fee
9 arrangements with Mr. Waters and Ms. Bartholomew were
10 contingent, and that the two law firms advanced the very
11 considerable costs incurred. This factor militates in favor of
12 adjusting the benchmark upward due to the substantial risks
13 accepted by plaintiffs' lawyers.
14    The seventh factor is the time limitations imposed by
15 the client or the circumstances. The clients imposed no time
16 limitations. There were, however, emergencies from time to
17 time that required quick response on the part of the
18 attorneys. This factor is neutral with respect to the
19 benchmark.
20    The eighth factor is the amount involved and the
21 results obtained. The Court has already explained that the
22 out-of-pocket losses were approximately $120 million. Those
23 losses were fixed in or around 1989, so there has been a
24 significant delay in obtaining compensation for the class. If
25 the delay were taken into account, the out-of-pocket losses

Page 91

1 including prejudgment interest would be in the neighborhood of
2 $180 million.
3    Therefore, the available of $40 million, including
4 $10 million in cash and $30 million with interest at 5.5
5 percent to compensate for those losses, represents a recovery
6 of 30 to 20 percent, depending upon whether the delay is taken
7 into account. As already noted, this represents a substantial
8 recovery for an investment-related class action.
9    The Court, however, does not consider the recovery
10 extraordinary or spectacular. In real economic terms, an
11 average class member with a claim of $6,000 will ultimately
12 receive a note or cash and notes of $1,200. At least some
13 portion of the $1,200 will not be payable for at least five
14 years, and then only if the class member demands payment.
15    The delay and expense involved in this case is not
16 attributable solely to the defendants. For example, for a
17 substantial period of time the plaintiffs together with the
18 defendants demanded to be able to try this case without time
19 limitations, and estimated that the trial would require some
20 eight months, not a very realistic prospect in a busy urban
21 district. Both sides can be faulted for drawing the case out
22 and for failing to cooperate with each other and the Court.
23    Further, as Mr. Dodyk has pointed out, after seven
24 years the number of class members actually asserting claims
25 will be significant lower than the class membership. I can

Page 92

1 also anticipate that the number of class members who end up
2 having approved claims, who will actually demand payment on
3 their notes after five years similarly will decrease, so that
4 the actual dollars paid out will be substantially less than
5 $40 million.
6    In the Court's opinion, the result is good, but the
7 deferral of the payment obligation for five or 10 years at
8 least has the potential for significantly eroding the benefit
9 to the class in favor of Mr. Grosfeld, and the settlement came
10 late at a significant cost to the class. For these reasons the
11 Court sees this factor, which is really the most important
12 factor, as having no impact on the benchmark.
13    The ninth factor is the experience, reputation and
14 ability of the attorneys. Plaintiffs have established in their
15 dealings with the Court and through their Senderowitz
16 declaration that they were experienced in commodities
17 litigation and class action litigation, and that they possessed
18 the reputation to serve reputably as lead counsel in a case
19 such as this, and that they have had the ability to prosecute
20 the case with the highest of the degree of skill. The Court
21 perceives this factor as having no effect on the benchmark.
22    The tenth factor is the undesirability of the case.
23 Unlike in most viable securities fraud class actions,
24 plaintiffs' counsel had no competition for the responsibility
25 of prosecuting this case. As already noted, the case was

Condenscit!™

## Page 93

1  unusually difficult and became unusually expensive and time-
2  consuming. This factor weighs in favor of enhancing
3  plaintiffs' counsel fee above the benchmark.
4          And the eleventh factor is the nature and extent of
5  the professional relationship with the client. The lawyers
6  have represented that prior to this case, class counsel has no
7  relationship with the class representatives except that the
8  Raring and Lipoff firm represented Mr. Waters in a dispute with
9  MOL. This factor is, it seems to me, neutral with respect to
10  the benchmark.
11          As to other possible Camden One factors, the Court
12  would address the time required to reach a settlement.
13  Pursuant to court order, the parties attended mediation in
14  1994. The mediation lasted for several days, yet no settlement
15  could be negotiated. The Court is under the impression that
16  thereafter very little was pursued in the way of settlement
17  negotiations until the trial began or it became apparent that
18  the case would actually proceed to trial.
19          The parties have represented that the settlement
20  negotiations were ongoing throughout the trial, and that the
21  agreement was reached only after several proposals and counter-
22  proposals were made, after all of the evidence had been
23  presented to the jury and the jury instructions and form of
24  verdict had been finally decided upon.
25          In the Court's experience, this was an unusual route

## Page 94

1  for the case to take, it being the case that most investor
2  litigation settles before trial. This factor militates in
3  favor of an upward adjustment to the benchmark.
4          There were also unique factors in this case. The
5  plaintiffs' attorneys argue, and the Court agrees, that apart
6  from the usual public policy aspect of any class action, that
7  is, the redress of small claims which individually would be
8  difficult, if not impossible, to prosecute, this case served to
9  put the commodities, boiler room and telemarketing industries
10  on notice that under at least some circumstances a class action
11  might be brought to seek compensation for deceptive and
12  high-pressure sales tactics.
13          So, for the reasons stated, I do believe that class
14  counsel is entitled to a small upward adjustment in the
15  benchmark of 30 percent, and that the appropriate adjustment is
16  to the percentage of the fund requested by class counsel as its
17  fee, that is, 33 and a third percent, or $13,333,333.
18          Now, this takes me to costs; and these are the
19  observations I would like to make on the cost issue, and I
20  doubt very much that we are going to be able to conclude the
21  matter of costs today.
22          The cost petition submitted by class counsel requests
23  reimbursement for expenses in the amount of $2,586,611.60 for
24  Farella, Braun & Martel, and $77,482.97 for Raring & Lipoff.
25  As originally submitted, the request consisted of listings of

## Page 95

1  broad categories and corresponding amounts with no supporting
2  documentation or supporting entries.
3          As a consequence thereof, the Court requested backup
4  documentation to support the cost request. Only Farella Braun
5  complied, and what it supplied only served to call the amount
6  of costs further into question.
7          The Court has reviewed Raring & Lipoff's request, and
8  although the backup documentation was not supplied, believes
9  that it can find, based upon its experience in actions of this
10  type, and based on its own knowledge, my own knowledge of
11  Mr. Lipoff's involvement in the case, that his request is
12  reasonable, except that the categories legal services and
13  postage costs will be disallowed and reproduction costs will be
14  cut to $1,850 on the theory that his law firm, like most law
15  firms, charge 25 cents per page for copying when the actual
16  cost is about 10 cents.
17          Therefore, the total expense reimbursement to Raring
18  & Lipoff that I believe is appropriate, although I will give
19  you all an opportunity to be heard on the matter before I make
20  my final decision, is $74,403.85.
21          Does anybody want to be heard on the Lipoff cost --
22          MR. GOTEINER: Your Honor, Neil Goteiner.
23          THE COURT: -- issue?
24          MR. GOTEINER: Mr. Raring did submit backup costs.
25          THE COURT: I never received it.

## Page 96

1          MR. GOTEINER: Okay. Well, I got a copy of it.
2          THE COURT: Do we really need to argue about $3,000?
3          MR. GOTEINER: No. I just wanted to make it clear
4  that he did submit it, but I'm not Mr. Lipoff and I'm sure
5  they'll be filing --
6          THE COURT: Well, I apologize then. I didn't see
7  it. But I don't really have a quarrel with his cost request.
8          Does anybody from the defense wish to take a position
9  on Mr. Lipoff's cost request?
10          MR. DODYK: Your Honor, we've never seen the backup,
11  but we have no position with respect to what Your Honor said.
12          THE COURT: Okay. Fine. Perhaps there was some kind
13  of problem in its transmission.
14          MR. GOTEINER: Well, it didn't come from our office.
15  It came from Raring & Lipoff's office. But I'm sure he'll be
16  satisfied with that.
17          THE COURT: Okay.
18          Now, the Court has similarly reviewed the cost
19  petition of Farella Braun, and in doing so I was, of course,
20  mindful of the fact that Camden One speaks to fees but it
21  doesn't speak to expenses, and there is still a requirement, I
22  believe, on the part of class counsel to establish that the
23  costs are reasonable and necessary -- were reasonable and
24  necessary to the prosecution of the case.
25          Now, I also am well aware that the case was expensive

Page 97

1  to prosecute. However, as the defendants have pointed out,
2  whether they should have or shouldn't have, I do have a
3  responsibility to scrutinize the costs for which reimbursement
4  is requested in order to ensure that class counsel is not
5  obtaining a secret or unintended profit.
6      The Court cannot undertake this task based on the
7  information that was provided, except there are certain
8  categories that I think are just facially reasonable and I am
9  prepared today to go ahead and award those costs. And those
10  are the costs that relate to the witness fees, service of
11  process, Special Master fees and rental and storage, and in
12  addition, there was one other bill that was provided today for
13  court reporter fees, so I'm also willing to add that additional
14  court reporter charge, which represents really a small portion
15  of the court reporter charges that appear in the expense
16  petition.
17      I don't think I have it up here.
18      MR. GOTEINER: Your Honor, it was a $20,000 bill.
19      THE COURT: $20,000.
20      MR. GOTEINER: It was only intended to address
21  something they had emphasized.
22      THE COURT: Okay. So now, what I'm going to do is
23  this.
24      We're going to disallow the remaining categories at
25  this time. I'm willing to reconsider the ruling, but only upon

Page 98

1  submission of backup information for the disallowed categories
2  that actually explains the nature of the expense, identifies
3  the payee for each expense and explains in some fashion the
4  relationship of the expense to the case.
5      Also for charges such as duplicating and secretarial
6  services, postage and the like, it will be necessary for
7  counsel to justify why the expense is not part of the law
8  firm's overhead.
9      Therefore, what the Court is willing to award at this
10  time is 126 -- unless someone wishes to be heard on this -- is
11  $126,519.07, and we'll have to figure out some mechanism for
12  the further consideration of these other matters.
13      Does anybody want to be heard on this or not?
14  Mr. Dodyk?
15      MR. DODYK: Your Honor, we take no position beyond
16  that which has been expressed.
17      MR. GOTEINER: Your Honor, if I may briefly be heard
18  on this.
19      Again, we have no problem in supplying Your Honor all
20  the backup information. We have offered to do that, and I
21  apologize if the last submission wasn't enough, but I thought
22  Your Honor was very clear you didn't want volumes of backup.
23  What we can do, and this is not --
24      THE COURT: Yeah, but the problem with it was it just
25  is really unintelligible. There's no way for me to assess

Page 99

1  why -- and maybe what needs to be done in part is there need to
2  be some affidavits submitted with the backup information that
3  explains the billing system at Farella Braun & Martel, for
4  instance, how a particular phone call would get billed to the
5  case, which phone calls get billed to the case, that kind of
6  thing.
7      MR. GOTEINER: I'd just like to explain something for
8  a minute, if I may, and make a point.
9      You know, there are a couple of cases that defendants
10  have cited to -- I think one is the Boesky case -- there are
11  issues in a lot of these cases as to whether the costs and
12  expenses are reasonable and can be allocated to the particular
13  class --
14      THE COURT: I think I have a lot of discretion. I
15  don't think I'm bound by the determinations that judges made in
16  those particular cases.
17      MR. GOTEINER: That's fine.
18      THE COURT: But I do think that you have an
19  obligation to do more than you've done. You know, what you
20  gave me was -- I don't know -- a list of maybe thousands of
21  telephone calls with no indication as to how a particular phone
22  call got billed to the file, didn't get billed to the file.
23  Some of it --
24      MR. GOTEINER: Your Honor, we can do that. You know,
25  it's very simple. You have a code that you put in before you

Page 100

1  make each phone call.
2      THE COURT: I suspect so.
3      MR. GOTEINER: If Your Honor wants to know how we
4  allocate and how we internally show those costs, we'll submit
5  declarations, all right, on that point.
6      But I want to be clear on something in terms of what
7  Your Honor doesn't want. Another approach is that defendants
8  were suggesting -- I don't even like to acknowledge --
9      THE COURT: Well, I want to know on the experts, for
10  instance, since this seems to be a big sticking point, I want
11  to know how much was paid to each expert and I want to know who
12  they were, and some of them I'll know who they are because you
13  were planning on using them at trial, or anticipated using them
14  at trial, and some of them are probably people I don't know,
15  people that you may have used as consultants that I've never
16  heard of, and you're going to have to explain to me who they
17  are.
18      MR. GOTEINER: I'm more than happy to do that. I
19  mean, in fact, you know just about every one of them either,
20  you know, by name or affidavit. But that's all right. We can
21  submit all of that.
22      But I want to be clear on one thing I started to
23  say. For instance, on telephone calls, you know, the
24  defendants are suggesting that for each telephone number we
25  demonstrate that that was -- we have to say who it was and the

## Page 101

1  subject matter.

2      THE COURT: Look, I don't know that that's necessary

3  if you can give me a declaration that explains to me --

4      MR. GOTEINER: That's fine.

5      THE COURT: -- under what circumstances a phone call

6  gets billed to the file.

7      MR. GOTEINER: Fine.

8      THE COURT: Under what circumstances a cell phone

9  call is charged at cell phone rates versus regular rates -- or

10  they make a big deal about the air phone calls. I don't know

11  what that amounts to. I didn't sit down to try to add up what

12  the air phone charges amount to. Maybe Mr. Dodyk knows.

13      Do you know what the air phone charges amount to,

14  Mr. Dodyk?

15      MR. DODYK: I don't know what that category is, but

16  it is in the thousands of dollars, Your Honor.

17      THE COURT: Okay.

18      MR. GOTEINER: Your Honor, I'd be more than happy to

19  explain why, when I'm on the plane -- it was me particularly

20  and trying to rush around coming to surprise hearings and

21  whatnot because of certain things defendants did.

22      I really don't want to luxuriate, however. A lot of

23  these costs, all right, were incurred because of the way the

24  lawsuit was fought. I had to juggle my life.

25      So, for defendants, because of certain motions they

## Page 102

1  made and certain remotions they made and remotions they made,

2  they made me fly down here so that I had to deal with -- I had

3  to deal with clients. I had to speak with my colleagues back

4  in the office on this case, and I had to do it on the plane

5  because that's the only time I had. I'll be more than happy to

6  generally make that statement.

7      But I was trying to manage my day as well and my life

8  in the midst of this case dealing with a very contentious group

9  of defendants.

10      That's not supposed to be a snipe at them. That was

11  just the reality of this case. But I will generally describe

12  why those costs were necessary and why they were reasonable.

13      THE COURT: Yes. And it might be helpful to me to

14  know what kinds of efforts you did make to economize in the

15  case -- so that the expenses were not -- this was not an exercise

16  in eating off the file.

17      MR. GOTEINER: We will. I think Your Honor knows, we

18  stayed at the Four Ambassadors, unlike the defendants, who

19  stayed at the Intercontinental. They are entitled to stay --

20      THE COURT: I must say, it would be interesting to

21  know as a benchmark what the defendants spent in costs in the

22  case.

23      MR. GOTEINER: Perish the thought that I would

24  suggest that, Your Honor. But if you want to look at their

25  jury consultant, okay, who apparently was seeing every witness,

## Page 103

1  and if you want to look at what costs they spent, I think that

2  would be an interesting benchmark.

3      THE COURT: Yeah. I think actually I would

4  appreciate that. I would like the defense to submit to me what

5  their costs were so that I have something to evaluate the

6  plaintiffs' expenses against.

7      MR. GOTEINER: Your Honor, one more point, if I may,

8  just in terms of the fairness and reasonableness of all this.

9      I know Your Honor obviously has duties to the class.

10  You want to make sure that we were not, as you say -- you want

11  to make sure no lawyer has secret profits. All right.

12      But I do want to point out one thing.

13      THE COURT: Oh, actually I'm glad you brought that

14  up. I think that the defendants do have a good point about

15  this issue about including local counsel's fees as an expense.

16  I have never seen that done before and I don't like it.

17      MR. GOTEINER: It has to be an expense.

18      THE COURT: Why? Why aren't they part of the fee

19  award?

20      MR. GOTEINER: Because -- they're not part of the fee

21  award because they were not part of the contingency arrangement

22  whatsoever.

23      Your Honor, we had several actions going in this

24  case. I had an action going in Washington on this case because

25  there were issues in terms of subpoenaing documents. I had an

## Page 104

1  action going in Detroit on this case because of the fraudulent

2  transfer action, and then I needed local counsel --

3      THE COURT: I'm talking about Zuckerman.

4      MR. GOTEINER: Then we needed the Zuckerman Spaeder

5  firm. They did not participate in the fee arrangement. They

6  were necessary --

7      THE COURT: I don't know that that matters in this

8  context.

9      MR. GOTEINER: It's out-of-pocket.

10      THE COURT: You're going to have to justify that to

11  me.

12      MR. GOTEINER: All right. We will.

13      THE COURT: Because I believe that should be part of

14  the 33 and a third percent.

15      MR. GOTEINER: It was totally out-of-pocket.

16      THE COURT: I don't care whether it was totally

17  out-of-pocket or not. I believe that they were in the case

18  with you on the same, basically on some kind of fee-sharing

19  basis with you.

20      MR. GOTEINER: Your Honor, I'm not making myself

21  clear. They rendered us a bill, and every month I paid that

22  bill and we risked not getting -- we risked, if we lost --

23      THE COURT: I understand what you're saying. But if

24  that was the arrangement, perhaps you should have told me about

25  that sooner, because I believed that they were in the case more

Page 105

1   or less on the same basis everybody else was in the case.

2       MR. GOTEINER: Well, we'll put an affidavit to that

3   effect as well.

4       THE COURT: Well, you're also going to have to

5   support this one with law, because my inclination is to say

6   this is part of the 33 and a third percent.

7       MR. GOTEINER: Well, all we can do is submit it and

8   we'll tell you how it came about, and we think we can make a

9   very good demonstration that it should not be part of the fee

10  and that it would be unfair.

11      But there's another point here that I do want to

12  raise, because Mr. Dodyk has raised it, and that has to do

13  with, you know, if Your Honor chooses to disallow any of our

14  costs, it should be clear that most of it, according to

15  Mr. Dodyk's figures, according to his figures, will go back to

16  Mr. Grosfeld, not to the class.

17      So, according to the little chart he has at the end

18  of his declaration -- at the end of his brief, that makes it

19  quite clear that if Your Honor would say to disallow $100,000

20  or $200,000, seven-eighths of that goes to Mr. Grosfeld, maybe

21  nine-tenths. Okay?

22      They were told that our cost and fees were somewhere

23  around $4 million, all right. That's what we thought they

24  were. And then when Mr. Newman stood up during that week, he

25  thought the fees were somewhere around $3 million.

Page 106

1       Defendants never asked to see --

2       THE COURT: The costs, not the fees.

3       MR. GOTEINER: The costs. I'm sorry.

4       THE COURT: No. I remember we had discussions about

5   this. I asked you all to call California and try and come up

6   with a number.

7       MR. GOTEINER: We tried to come up with the best we

8   could. But again, defendants have agreed, and they did agree

9   not to oppose our costs and fees, and most of it is being paid

10  by Mr. Grosfeld.

11      So it seemed to us to the extent that the Court

12  disallows any percentage, all right, that only a small percent,

13  according to Mr. Dodyk's figures, will benefit the class.

14      They didn't object to our costs. They could have

15  asked to see the costs. This is something that Mr. Grosfeld is

16  paying, according to Mr. Dodyk, and they could have asked to

17  see the costs, and the costs were less than what they agreed

18  they would not object to.

19      So, in any event, in any event, we should not be

20  charged that because Mr. Grosfeld as part of the settlement

21  agreed to pay the costs -- I mean agreed this would be the

22  costs and he wouldn't object.

23      So, since the reversion will go back to Mr. Grosfeld,

24  according to those figures, we think it's only fair that the

25  discount for anything Your Honor disallows, any of our costs

Page 107

1   that are disallowed, they should only be a very small

2   percentage that will go to the class, according to Mr. Dodyk's

3   figures.

4       THE COURT: I understand that.

5       MR. GOTEINER: Okay.

6       THE COURT: Okay? But the defendants did an

7   exceptional job of putting us in this position, so we'll have

8   to proceed this way.

9       However, I am going to order the defendants to supply

10  me with their expense information so that I can use that as a

11  benchmark to evaluate whether or not the costs are excessive,

12  and I would like that information within -- I think we need to

13  resolve this cost issue within the next 10 days. So I would

14  like that information supplied to me by April 10th.

15      MR. GOTEINER: All right, Your Honor.

16      THE COURT: And I would like us to have another

17  hearing on April 11th.

18      MR. GOTEINER: All right.

19      THE COURT: I'm going to need your information also

20  by, I would say, sooner than that, I would say April 7th. Is

21  that a problem?

22      MR. GOTEINER: It's just a matter of getting our

23  accounting department to get all the stuff Xeroxed and --

24      THE COURT: Let me tell you what my idea here is.

25      My idea here is I want to enter a final order today

Page 108

1   and then I want to amend, if it's going to be amended, and I

2   think that to do that, we have to do that within a certain

3   period of time.

4       Now, if you all file a motion to amend within 10

5   days, then that will keep the ball rolling, so to speak, in

6   terms of jurisdiction, and we can take a little more time to

7   address this issue. But I'm worried about finality.

8       MR. GOTEINER: Your Honor, we will speak to our

9   accounting department and see if this can be gotten to you in

10  seven days.

11      THE COURT: I guess, well, I have continuing

12  jurisdiction. I don't know what the ramifications are here of

13  my entering a final order today, which is something that I

14  really want to do, and then amending it if you can convince me

15  that you're entitled to additional costs.

16      MR. GOTEINER: I think you can retain jurisdiction

17  over the settlement and over the case to deal with costs. I

18  see no problem with that, unless defendants have some

19  objection, and even then --

20      THE COURT: Assuming, if they had a right to

21  appeal -- and they may want to appeal the issue concerning the

22  assignability of the deferred attorney's fee obligation, which

23  we haven't even gotten to yet, what the amount of that will

24  be -- but assuming they wanted to appeal, there has to be a

25  final order for which the appeal time has to run. So the fact

Page 109

1 that I have continuing jurisdiction over the settlement. I don't
2 think solves the problem of --
3      MR. GOTEINER: Your Honor, the cost bill -- this is
4 clear, they filed no objection to the costs. They've stated in
5 their March 7 brief that they are not filing an objection.
6 They didn't file one by March 17th -- by February 17th, so
7 there's no objection for them --
8      THE COURT: Listen to me. I'm not -- they may wish
9 to appeal, though, this provision in the order that we had been
10 discussing concerning the transferability of the deferred
11 attorney's fee obligation. So, presumably there's an order
12 that gets entered and then there's appeal time that runs from
13 that order, notwithstanding the fact that I have continuing
14 jurisdiction to enforce the settlement.
15      So, I'm concerned about the order, the finality of
16 the order when we've got this cost tale involved in the case.
17      So it seems to me that if we enter a final order --
18 let's be realistic -- I'll probably enter the final order
19 tomorrow. If I enter the final order tomorrow, then by when do
20 I need to resolve this cost issue in order to still have
21 jurisdiction to do that?
22      What do you think, Mr. Wisoff?
23      MR. WISOFF: My view, Your Honor, is that, you know,
24 if you wanted to protect yourself in that respect, you could
25 enter a final order as to the fairness of the settlement, the

Page 110

1 fee issue, and the costs based on the documents submitted so
2 far, and enter a Rule 54(b) finding that there's no just cause
3 to delay any appeal of those issues, and that issue would be
4 final and you would retain jurisdiction to amend any cost award
5 based on any additional papers that are submitted within
6 whatever deadline the Court orders those papers to be
7 submitted.
8      THE COURT: Or couldn't there be a supplemental cost
9 judgment?
10      MR. WISOFF: I think there could, Your Honor.
11      I don't really see this as delaying the -- you know,
12 certainly not the appeal of the fairness and adequacy of the
13 settlement itself, certainly not as to the fee award. It
14 really seems that all you're retaining jurisdiction over is the
15 cost award at this point in time.
16      THE COURT: Or we can divorce the cost award to
17 Farella Braun totally from this and just do a separate cost
18 judgment. Does anybody see a problem with that?
19      Do you see a problem with that, Mr. Dodyk?
20      MR. DODYK: No, I don't see a problem with that, Your
21 Honor.
22      The alternative is what Your Honor suggested, is
23 simply to enter the final order which would grant the things
24 that you've granted; disallow the disallowed items of expense
25 with the understanding that they would file a motion to amend

Page 111

1 within the 10-day period and we would have a hearing which
2 would resolve that question, and then you would enter an
3 amended final order and that will be it.
4      THE COURT: Right.
5      MR. GOTEINER: That would seem to work, Your Honor,
6 but I seem to remember something in the back of my mind, a case
7 on this issue. But if it's done in the fashion that Your Honor
8 just suggested, I think this will work.
9      THE COURT: All right. So that takes me to the last
10 issue, which is what to do about how much of the fees and costs
11 should be paid out of the cash portion of the settlement and
12 how much of it should be deferred.
13      The total fees and costs awarded today are
14 $13,549,255, I hope. I hope I got that right.
15      MR. NEWMAN: Could you restate the number?
16      THE COURT: $13,549,255.
17      MR. NEWMAN: Thank you.
18      THE COURT: Okay. And the last issue is the extent
19 to which the fees and costs should be paid in cash and the
20 extent to which the award should be deferred.
21      Obviously, by deferring a significant portion of the
22 fee and expense award, some cash distributions can be made to
23 class members submitting approved claims. To this end,
24 plaintiffs' counsel has suggested that the cash portion of the
25 settlement fund be used to pay 25 percent of the allowed claims

Page 112

1 of the class members and 25 percent of the fee and cost award,
2 with any balance being paid to further reduce the fees and
3 expenses owed to class counsel, that is, any balance from the
4 cash portion.
5      I appreciate plaintiffs' counsel's willingness to
6 accept that arrangement. I also believe, however, that the
7 arrangement is potentially unduly harsh on class counsel -- I
8 say potentially because we don't really know how many claims
9 will be submitted -- and could potentially confer an undue
10 benefit on the passive class members.
11      Perhaps more importantly, I believe this approach
12 will unduly complicate the administration of the settlement,
13 cause more expense to be incurred, probably engender more of
14 the kind of contentious litigation that we've experienced in
15 this case and is just unwise.
16      Therefore, what I am ordering is that $5 million of
17 the cash portion of the settlement be distributed to class
18 counsel to pay down the fee and expense award, and that the
19 balance be deferred on the same terms and conditions as the
20 individual promissory notes which will be issued to the class
21 members as is contemplated by the stipulation of settlement.
22      I also note that while this amount represents more
23 than 25 percent of the total fee and expense award, the Court
24 anticipates that the class members submitting approved claims
25 still will be paid a significant portion of their claim from

Page 113

1 the cash portion of the settlement because, as Mr. Dodyk has
2 pointed out, there is going to be an expected fall-off in the
3 number of actual claims which will be submitted.
4     So that's it.
5     Now, the last issue is the approval of the Garden
6 City agreement.
7     MR. WISOFF: Your Honor, before you move on, may I
8 ask a point of clarification because I'm not sure I understand.
9     When the Court says that $5 million will be used in
10 cash for the fee and expense award and the balance deferred,
11 what happens -- is all the remaining cash --
12     THE COURT: To be distributed to the class members.
13     MR. WISOFF: -- to be distributed to class members
14 regardless?
15     THE COURT: Yes.
16     MR. WISOFF: So they could end up being paid a
17 hundred percent.
18     THE COURT: Could be.
19     MR. WISOFF: And if the total claims do not exhaust
20 the balance of the cash -- and Your Honor will understand that
21 there is interest, significant interest being earned --
22     THE COURT: If that were to happen, it would be the
23 Court's position that that money should be paid over to class
24 counsel.
25     MR. WISOFF: To pay down the deferred obligation.

Page 114

1     THE COURT: Yes.
2     MR. WISOFF: Thank you, Your Honor.
3     THE COURT: Okay. Now, the last thing is the Garden
4 City Group contract. But maybe -- you all haven't had a chance
5 to look at it, right?
6     MR. GOTEINER: No.
7     THE COURT: Okay. And I've got it here. Melissa is
8 going to hand out copies.
9     I think what we should do is we should recess and go
10 to lunch and come back and finish this off.
11     MR. NEWMAN: Thank you.
12     MR. WISOFF: Your Honor, one other point before we
13 recess for lunch, on the timing of this.
14     I understand the Court's concern about getting the
15 cost issue resolved, and we obviously want it resolved as well,
16 since it's our costs that we're petitioning for.
17     Mr. Goteiner and myself have got ourselves embroiled
18 in another class action litigation and have an April 14th
19 deadline for filing in United States District Court in the
20 Southern District of Alabama. And I'd request that rather than
21 10 days, that the Court give us two weeks.
22     THE COURT: But here's the problem. You need to file
23 your motion to amend within 10 days of the entry of the order.
24     MR. WISOFF: Okay. That's fine.
25     THE COURT: So the motion to amend can be pretty

Page 115

1 perfunctory.
2     MR. WISOFF: That's fine, Your Honor.
3     THE COURT: All right. So, let's set some deadlines
4 right now. I'd like to see the defense expense information by
5 the 11th -- I'm sorry, the 11th of April.
6     The motion to amend, assuming I get the final order
7 entered tomorrow -- and we need to spend a little time this
8 afternoon, I think, deciding what the final order looks like
9 too, right?
10     MR. WISOFF: Yes.
11     THE COURT: Right. Okay. Assuming the final order
12 is entered tomorrow, you need to file your motion to amend
13 within 10 days, and then I'd like -- you know, and I think you
14 should do the best you can, and then if you need to supplement
15 it, you'll have to supplement it, and I think we should set a
16 hearing on the costs for, how about April 25th? That will give
17 everybody a little more time.
18     MR. GOTEINER: That should work. Your Honor. I just
19 was told by Mr. Newman --
20     THE COURT: How about, hopefully we can do this in an
21 hour and a half. So how about 10:30 on the 25th of April?
22     MR. GOTEINER: Your Honor, I think this will work.
23     The woman who is in charge of accounting, who is in
24 control of all this information, is taking some time off with
25 her kids because of the holidays. We'll know what the story is

Page 116

1 when we get back. So, if the Court could have a little bit of
2 flexibility here, I think this will work.
3     THE COURT: For now we're going to say 10:30 on April
4 25th. All right? And if that's not a good time for you, we
5 need to know that by Wednesday.
6     MR. GOTEINER: All right. We'll let you know by this
7 Wednesday.
8     THE COURT: Okay. So let's go to lunch. Let's come
9 back. Let's review the Garden City Group's engagement letter,
10 and then let's try and finalize the form of the proposed
11 order. Okay?
12     All right. We'll come back at 2:30.
13     (Recessed at 12:51 p.m.)
14     (Lunch recess)
15     (Resur...d at 2:40 p.m.)
16     THE COURT: Okay. Have a seat.
17     Well, Mr. Goteiner is not here, but can we proceed
18 with this issue concerning the Garden City group or not?
19     MR. WISOFF: Yes, Your Honor. We're ready to proceed
20 on all issues.
21     THE COURT: Well, I have this letter from the Garden
22 City Group. It makes me a little uncomfortable on several
23 counts.
24     What do you want to say about it, Mr. Newman?
25     MR. NEWMAN: Your Honor, we have had a chance to look

Page 117

1  at it, and there are a couple of things about the letter which
2  also make me uncomfortable.
3       Most particularly, we had asked for two additional
4  things that Mr. Buchband has not dealt with -- actually three
5  or four actually that he has not dealt with in his letter here,
6  and I have been unable to reach him in the break that we had,
7  so I've not had a chance to pursue why those things were left
8  out. Perhaps I could tell the Court what those things were, if
9  that's of interest to you.
10      THE COURT: Yes. I'd like to know.
11      MR. NEWMAN: Perhaps one way -- I believe that
12  Mr. Goteiner gave to Your Honor a copy of a letter dated March
13  the 4th, and I had another copy faxed to me, that was our only
14  copy, and I believe Mr. Dodyk has a copy of that letter as
15  well. Unfortunately, this is now my only copy, but it's
16  possible to -- can I approach the bench?
17      THE COURT: Yes. Thank you.
18      MR. NEWMAN: Maybe I could get a copy of this back.
19      THE COURT: Right. Okay.
20      Do you need a copy right now?
21      MR. NEWMAN: I think I can do this from memory, but
22  that is our only copy, because Mr. Goteiner gave you ours this
23  morning and we couldn't find it again.
24      THE COURT: Okay. Go ahead.
25      MR. NEWMAN: If you look at that letter, the concerns

Page 118

1  that we have were, one, that there be a budget. Mr. Buchband
2  has given a budget but only on the assumption that there was
3  only 3,000 to 7,000 claimants.
4       We would hope that there would be more, and since in
5  order to estimate the net settlement fund it's necessary to
6  have such a budget, we would have hoped that he would have
7  included a budget for a larger number. Perhaps he could do
8  that. Item one.
9       Item two is that we had asked him to keep track of
10 the costs that he was incurring in the settlement
11 administration process with some detail, and in particular with
12 respect to the $50 that was his original estimate of the cost
13 of administering sending monthly statements to the class
14 members.
15      It's my understanding that he now believes that that
16 number could be substantially less, and he has agreed to
17 maintain records that would support that. The consequences of
18 that is not something I understand exactly, but since it's way
19 different from his estimate, he agreed to keep copies or keep
20 records to that effect.
21      In addition to that, he understands that in this
22 matter that he is to submit claims in at least a series of
23 waves of claims, so that he will submit first all of those
24 claims which are timely submitted which are uncontested and
25 undisputed by him, because once he does that and this Court has

Page 119

1  approved of them 10 days later it starts something called the
2  distribution date, which is the date from which interest starts
3  to run on the deferred obligations, the notes and the deferred
4  obligation, and it also starts running the five- and 10-year
5  due dates.
6       THE COURT: Right.
7       MR. NEWMAN: And it is therefore a point of
8  contention between the plaintiffs and the defendants at that
9  time. Obviously, the earlier it starts, the quicker interest
10 starts. There's no dispute with us about it.
11      But we wanted to be sure that Mr. Buchband understood
12 what was required of him to do this series of events and not as
13 separate ones or not wait until the very end, and he had, it's
14 my understanding, had that in mind that he would do it
15 accordingly, but he doesn't seem to have given us a commitment
16 to do so.
17      In addition to that, it's my understanding that there
18 were at least some members of, or at least putative members of
19 the class who contacted us and perhaps the settlement
20 administrator and perhaps Mr. Dodyk after the notice and the
21 newspaper articles, claiming that they were members of the
22 class but had not been listed in the exhibits which are the
23 lists A and B, which were Exhibit C to the class roster, and we
24 had undertaken that we would at the appropriate time move the
25 Court to include them in the class if they were properly

Page 120

1  members of the class, on the theory that the defendants also
2  had an interest in having them included so that they would
3  settle as to them.
4       There are few of them, and I don't know the status of
5  that at this point, but he had undertaken to keep track of
6  those individuals should they submit claims.
7       In addition to that, we had asked him to estimate the
8  costs that would be incurred not just through the settlement
9  process, settlement administration process, but also those
10 costs that would be incurred after all the claims had been
11 processed and while the settlement administrator was continuing
12 in his fiduciary obligation of maintaining the notes and
13 collateral and enforcing them and so on, and he has not
14 provided an estimate of that. Of course, that number needs to
15 be counted on as a reserve in order to figure out how much the
16 net settlement fund is that's available to make payments to the
17 class members.
18      All of those are things that could be done in the
19 future. I don't think they need necessarily to be resolved
20 today, although having tried to resolve so many things, it
21 would be helpful to have the help of Your Honor in resolving
22 them, and if we could take a break at the appropriate point,
23 perhaps we could get Mr. Buchband to assist us in doing that.
24      THE COURT: What is going on here when you look at
25 Mr. Buchband's letter and you look at page 4, the fourth full

Page 121

1 paragraph? What is that about?
2     MR. NEWMAN: Page 4.
3     THE COURT: Under quality assurance, the fourth full
4 paragraph.
5     MR. NEWMAN: The one that starts "plaintiffs'
6 counsel"?
7     THE COURT: Yes.
8     MR. NEWMAN: We had understood, Your Honor, that the
9 trial exhibits which were attached to the settlement and have
10 the class lists associated with them -- they are a big, fat
11 volume, and if you look at those, they have the name of each of
12 the listed members of the settlement class and they have other
13 numbers which are extended across the page.
14     One of the things which we had discussed with the
15 settlement administrator was why -- was whether he could use as
16 a verification of the mathematics of his reconciliation of the
17 claims; that is, when the claims forms were submitted, the
18 attached statements that he had sent to the class members came
19 back, and there are arguably opportunities for mathematical
20 errors in calculating each claimant's claim.
21     And the settlement administrator's job, as we
22 understand it, is to verify that they are properly done and
23 also that all of the statements that are there were actually
24 complete, which means that if a class member submitted all the
25 statements that he thought were complete but weren't quite

Page 122

1 complete and he had other records, they have to verify all of
2 that.
3     And one of the mathematical checks that we thought
4 was a verification, not necessarily dispositive, was the
5 numbers that came from those exhibits, and the settlement
6 administrator has said that he has run some samples and most of
7 them seem to comply but not all of them and that it might be a
8 worthwhile tool. And that's the debate that's there, as to
9 whether or not those class numbers which had been before the
10 Court and as I understood it had not been contested, would be a
11 useful tool and at least a check against whether or not the
12 claims were properly completed.
13     THE COURT: And what about this stuff in here about
14 whether the promissory notes should be engraved or not
15 engraved? When he talks about the form of the promissory note,
16 is that all he's talking about or is he talking about more than
17 that?
18     MR. NEWMAN: Since I can't speak for him, this is the
19 first I've heard of this issue. I don't know. I rather doubt
20 that we will have a fight over whether it's engraved or not.
21     THE COURT: I'm concerned about his use of the
22 terminology form of the promissory note. As I recall, the form
23 of the individual promissory notes was attached to the
24 stipulation.
25     MR. NEWMAN: I believe even Mr. Dodyk would agree to

Page 123

1 that, and it's simply a matter of completing the dollar amount
2 which would go into each note. Is that correct?
3     THE COURT: I still do not understand what you
4 were -- is that right, Mr. Dodyk?
5     MR. DODYK: I think all Mr. Buchband is talking about
6 is how the notes are to be printed. The form was agreed to,
7 Your Honor.
8     THE COURT: Well, I think we all ought to agree they
9 ought to print it on the cheapest means possible.
10     Now, I still don't understand this thing about the
11 spread sheets. I'm sorry.
12     MR. NEWMAN: Perhaps Mr. Wisoff or somebody who
13 understands that issue better than I do -- my understanding
14 is -- I don't have it in front of me is my problem -- but that
15 the far right-hand column is a number which is each plaintiff's
16 claimed amount pursuant to the way in which the $119 million
17 was arrived at. And all we're suggesting, not that it's
18 binding on the settlement administrator, but that as a tool and
19 quality assurance, they compare the claim submitted with
20 that number to see whether or not there's been an error.
21     THE COURT: Fine. So these are the documents which
22 were attached to the stipulation --
23     MR. NEWMAN: That's correct.
24     THE COURT: -- which purport to say what each class
25 member's name is and what their out-of-pocket loss is. Is that

Page 124

1 right?
2     MR. DODYK: I think there's a little qualification
3 here, Your Honor, if I may.
4     The numbers to which reference is made in the spread
5 sheet do not have the concurrence of counsel, and I'm advised
6 reflect the disagreements between the counsel as to the
7 significance of the Alpha Cash report.
8     Therefore, I don't believe that cross-checking the
9 results against the arithmetic that came from the monthly
10 statements would produce any useful result because there are
11 bound to be variances between the two, and since the listing on
12 the document referred to is not agreed to by counsel, I don't
13 see the purpose of incurring the cost of doing the cross-check.
14     THE COURT: I have to say that I'm inclined to agree
15 with Mr. Dodyk about that. I mean, I think that it's okay if
16 the settlement administrator wants to use it as a cross-check,
17 but I don't think we should be requiring him to do so, because
18 it should be the monthly statements that should be
19 authoritative.
20     MR. NEWMAN: Your Honor, we don't actually disagree
21 with that. If it's useful to the settlement administrator --
22 remember, it's just a matter of entering it into his computer
23 and it would tell him whether the numbers supposedly --
24     THE COURT: But what's he supposed to do if there's a
25 discrepancy?

Condenselt!

## Page 125

1  MR. NEWMAN: Then he's to use his judgment about
2  whether or not he wants to do further investigation of the
3  monthly statements or the arithmetic to be sure that they were
4  correctly computed.
5       As I understand it, some of the monthly statements,
6  for example, are very difficult to read and that the settlement
7  administrator over the 800 number is telling people, well, just
8  do the best you can and submit them.
9       In other words, there is the possibility of
10  difficulties, and we believe the settlement administrator will
11  do the right thing here, but that this is a decent cross-check
12  to alert them to numbers that seem close but might not be the
13  same.
14       THE COURT: Well, I think the settlement
15  administrator should understand that this is a resource, but
16  it's not determinative.
17       MR. NEWMAN: We all agree with that. I think the
18  only thing that he was asked to do was whether or not it would
19  be a valuable clue to saying --
20       THE COURT: I don't think it's a good idea to say you
21  must cross-check every determination against this list.
22       MR. NEWMAN: We do not intend that he must do it. I
23  think he's left this ambiguous in the letter saying that he
24  might, and I think that's good enough.
25       THE COURT: Fine. I'm glad we talked about it

## Page 126

1  because I think that helps to clarify exactly what it is that
2  he means, because I frankly had a different impression, which
3  is that he believed that you were insisting that he do so.
4       MR. NEWMAN: Your Honor, we're not insisting. I
5  actually thought he had agreed at one time to do it. I think
6  he agreed, then did a study. It looked like it might be
7  helpful, and I think he is still in the process of trying to
8  evolve what's going to be appropriate as he works his way
9  through this, and we don't see the need to order him to do it
10  and I wouldn't insist.
11       THE COURT: Okay.
12       Why don't you respond, Mr. Dodyk, seriatim to the
13  issues raised by Mr. Newman.
14       MR. DODYK: Your Honor, my only response to the
15  issues raised is that so long as we understand that there is to
16  be no amendment to the stipulation by anything that we do with
17  respect to this letter, I don't have any problem with the form
18  of the letter or indeed with agreeing with Mr. Newman as to
19  language to the additional points.
20       THE COURT: Well, okay. I'm real concerned about the
21  budget. I can see this spinning a little bit -- spinning at
22  least a little out of control, and I think that the Garden City
23  Group for its own benefit and for my benefit and everyone
24  else's benefit ought to prepare a budget of the anticipated
25  costs through the conclusion of the administration of this

## Page 127

1  settlement, and if they're not willing to do so, then I think
2  we should find a different settlement administrator.
3       MR. DODYK: I think Mr. Buchband will be happy to do
4  that, being advised of Your Honor's disposition on the matter.
5       THE COURT: Well, should we try to get Mr. Buchband
6  on the telephone?
7       MR. DODYK: I just question, Your Honor, whether
8  that's an effective use of your time. I have no doubt that
9  Mr. Buchband will bend over backward to be accommodating to the
10  Court. This is his business, certainly.
11       THE COURT: You know, there are a lot of things that
12  happened that I don't think were a very efficient use of my
13  time in this case, so I don't mind taking the time today to get
14  Mr. Buchband on the telephone.
15       MR. DODYK: And to the end of requiring him to give a
16  complete budget?
17       THE COURT: Yes.
18       MR. DODYK: Fine. Why don't we call Peter and get
19  the call patched through to the judge and tell Peter what it
20  is --
21       THE COURT: We can just place the call right here.
22       MR. DODYK: That's fine.
23       THE COURT: Here is his copy.
24       MR. NEWMAN: The number is just on his letterhead
25  there.

## Page 128

1       (Call being placed)
2       THE COURT: Mr. Buchband?
3       MR. BUCHBAND: Yes.
4       THE COURT: Hi. This is Judge Ungaro-Benages.
5       MR. BUCHBAND: Good afternoon, Your Honor.
6       THE COURT: I'm here in court with the court reporter
7  here, and we're here with Mr. Dodyk, Mr. Kaminsky and
8  Mr. Bonner for the defense and with Mr. Wisoff and Mr. Newman
9  for the plaintiffs in the Waters case.
10       MR. BUCHBAND: Right.
11       THE COURT: And we're looking over your letter, and I
12  had a couple of comments and a request.
13       MR. BUCHBAND: Okay.
14       THE COURT: Going to my request first, I would like a
15  budget as to what this is going to cost through the conclusion
16  of the administration of the settlement. I think it's good for
17  you and it's good for us to know. So, how long would it take
18  you to work up a budget?
19       MR. BUCHBAND: Well, Your Honor, I provided an
20  estimate in our letter.
21       THE COURT: Right. I saw that. I'm not very
22  satisfied with that because of the fact that it estimates
23  volumes between $3,000 and $7,000. It talks about fees but it
24  doesn't talk about expenses.
25       MR. BUCHBAND: Okay.

Page 129

1    THE COURT: So I'm not very satisfied with that.
2    MR. BUCHBAND: All right. I can try and provide some
3  ranges within that, Your Honor, and I will also cover an
4  estimate of expenses.
5    THE COURT: Yes. I'd like you to try and be
6  considerably more precise and comprehensive.
7    MR. BUCHBAND: Okay.
8    THE COURT: Okay. Now, let me just raise a couple of
9  other issues with you with respect to your letter. You have in
10 your letter that you will work diligently to implement the
11 stipulation as cost effectively and as promptly as possible.
12    I do want to emphasize to you that I am expecting you
13 to do this as cost effectively as possible. I am very
14 concerned with the settlement, especially the cash portion of
15 the settlement, getting eaten up in settlement administration
16 fees, and I want to avoid -- I want you to avoid that to the
17 extent possible.
18    Now, having said that, it seems to me there are going
19 to be some difficulties -- there already have been some
20 difficulties in the case, and in fact I'm a little concerned --
21 I have the impression there's been quite a bit of back and
22 forth between you and the lawyers, which, of course, is time
23 which no doubt you are billing for.
24    MR. BUCHBAND: Well, that is correct, to a certain
25 extent, Your Honor.

Page 130

1    THE COURT: Well, I really think that has to be
2  brought down to an absolute minimum, and I really take issue
3  with this idea that the class members should have to suffer
4  because the lawyers are dickering with you as to what your
5  responsibilities are. Either you know what your
6  responsibilities are or maybe we should find a different
7  settlement administrator.
8    MR. BUCHBAND: Your Honor, all I can say to that is
9  that my company and I have been doing this for 12 years in
10 hundreds and hundreds of cases. I think we do understand what
11 our responsibilities are, and we certainly try to work with the
12 attorneys. But, as you know, this has been a controversial
13 situation.
14    THE COURT: Well, one of the things that's very
15 bothersome to me is because the lawyers seem to feel free to
16 get on the phone with you and dicker with you about your
17 responsibility, that I have no control over the costs. Perhaps
18 you will be willing to give me control over what the costs are,
19 the final say as to how much you should be paid.
20    MR. BUCHBAND: That is certainly the Court's
21 prerogative.
22    THE COURT: Well, then, if you have no objection to
23 that, then what I would appreciate your doing is filing
24 periodic statements with me --
25    MR. BUCHBAND: Okay.

Page 131

1    THE COURT: -- before taking money out of the
2  settlement fund so that I can pass on the reasonableness of
3  those statements, and also so that if I feel as though the
4  lawyers are taking undue advantage of you and exploiting your
5  time unnecessarily, then I can intervene and see what I can do
6  to stop that.
7    MR. BUCHBAND: That's fine. We were planning to make
8  a report to the parties and the Court as soon after -- today is
9  the end of the month -- as quickly as possible in April, we
10 were planning to do that in any event. I certainly will make
11 that application to the Court.
12    THE COURT: Okay. Fine.
13    Okay. Now, just a couple other little points. And,
14 of course, this is going to add to the expense, but because we
15 had this problem with the addresses and the updates on the
16 address, it seems to me that it is going to be necessary to
17 send some kind of notification to the class members who
18 received notice late that they have 60 days from the mailing of
19 the notice in order to make their claims, even if that turns
20 out to be after April 15th.
21    MR. BUCHBAND: Okay. Would you like me to send a
22 letter to each of the people to whom we have sent the claim
23 packets late? We could certainly do that.
24    THE COURT: Well, tell me, when was the first date
25 that a mailing was made after the initial mailing?

Page 132

1    MR. BUCHBAND: I don't have that right -- let me ask
2  my traffic manager. One second, please, Your Honor.
3    THE COURT: Okay.
4    (Pause)
5    MR. BUCHBAND: We'll have that answer in a moment,
6  Your Honor.
7    (Pause)
8    Your Honor --
9    THE COURT: Yes.
10    MR. BUCHBAND: -- the first of those examinations
11 went out March 7th, and then going forward from there on a
12 regular basis.
13    THE COURT: Okay. So it would seem that everybody
14 who received a packet after March 7th ought to be notified in
15 the cheapest way possible and in the most neutral way possible
16 that they have 60 days from the date of mailing to submit their
17 claim.
18    MR. BUCHBAND: Okay. Well, the simplest way would be
19 we will just write them a letter out of our computer and
20 provide them with that information.
21    THE COURT: Okay.
22    Yes, Mr. Dodyk.
23    MR. DODYK: Point of clarification. Your Honor said
24 every mailing after March 7th. Did you mean to include the
25 March 7th mailing?

## Page 133

1  THE COURT: Yes, I meant to include the March 7th
2  mailing.
3      MR. BUCHBAND: I'm sorry. I couldn't hear the
4  comment, Your Honor.
5      THE COURT: Mr. Dodyk just pointed out that I said
6  every mailing after March 7th, so he wanted to know whether I
7  meant to include the March 7th mailing, and I did.
8      MR. BUCHBAND: Okay.
9      THE COURT: All right.
10     Now, you raised an issue about the promissory note
11 preparation. I think the answer to that is the promissory note
12 should be prepared in the cheapest way possible.
13     MR. BUCHBAND: Okay.
14     THE COURT: Okay. As to, your letter raises this
15 issue about plaintiffs' counsel requesting that you use the
16 spread sheets as a control?
17     MR. BUCHBAND: Yes.
18     THE COURT: I am not going to require you to do
19 that. The spread sheets are there. They're available for you
20 to use as a tool. You can rely on them or cross-check on
21 them -- use them to cross-check in your own discretion as far
22 as I'm concerned.
23     MR. BUCHBAND: Okay. Fine.
24     THE COURT: And then that takes us to the fees and
25 billing.

## Page 134

1      You know, the problem I'm having here -- and I hope
2  you understand that I'm not really being critical of you -- but
3  I just know too well what goes on in this case to think that
4  your time is not going to get eaten up talking to the lawyers,
5  and I just would really like to reduce that as much as
6  possible.
7      MR. BUCHBAND: I understand, Your Honor, and in all
8  candor, we don't relish controversy either. I would wish that
9  the parties had a little more confidence in our experience and
10 in our ability to handle this thing correctly. I'm very
11 confident that we can and will do so. I certainly want to
12 reduce the expense as much as possible as well.
13     THE COURT: All right. Now, I do understand from
14 Mr. Goteiner -- correct me if I'm wrong -- that you're
15 expecting a very high percentage now of addresses, is that
16 right?
17     MR. BUCHBAND: Well, we attempted to find new
18 addresses for around 7,000 or close to 7,000 people whose
19 packets were initially returned and we have been successful in
20 all but 1,161 instances, and last Friday afternoon I sent those
21 to the company in San Rafael that was recommended by
22 Mr. Goteiner, and that company is going to do telephone
23 searches in an effort to get better addresses for those
24 people.
25     THE COURT: Okay. That's the company that charges

## Page 135

1  $16 for every successful hit, as Mr. Goteiner would say?
2      MR. BUCHBAND: That's correct.
3      THE COURT: Okay. Fine.
4      Now, what are you going to do about people who submit
5  claims who don't appear to be class members?
6      MR. BUCHBAND: Well, we will -- let me put it this
7  way.
8      If they appear to have valid statements and if they
9  have not been excluded, we have no reason to believe that
10 they're not class members. We can check them against these
11 spread sheets, these exhibits, and if they don't show up there,
12 we can certainly make those names known to the parties and the
13 Court and await a determination.
14     THE COURT: Okay. I think that that's what --
15 Mr. Newman, is that what you were requesting, more or less?
16     MR. NEWMAN: Yes, Your Honor.
17     THE COURT: Okay.
18     MR. BUCHBAND: It is my impression -- and I hope that
19 the Court or the parties will correct me -- that anyone who
20 provides appropriate MultiVest or IPMC monthly statements and
21 who is not on the exclusive list is a class member.
22     THE COURT: I think that's more or less correct.
23     MR. DODYK: Provided they bear the name of the person
24 whose name appears on the monthly statement.
25     THE COURT: So, then, is my understanding correct

## Page 136

1  that you are somehow going to keep track, keep a separate list
2  or a separate file for claims or requests that you receive from
3  people that you can't identify as class members?
4      MR. BUCHBAND: I don't know about claims or requests,
5  but certainly any claims that are filed by such people we will
6  identify.
7      THE COURT: All right.
8      Now, what else was there, Mr. Newman? Oh, we have to
9  figure out what the commencement date is going to be for the
10 purpose of interest, for when the interest runs.
11     MR. NEWMAN: Correct.
12     THE COURT: That's probably the most important issue.
13     MR. DODYK: May I speak to that, Your Honor?
14     THE COURT: Yes, Mr. Dodyk.
15     MR. DODYK: There is a complication here now because
16 of what's happened here today, and that is, I believe the
17 stipulation provides -- can Mr. Buchband hear me?
18     MR. BUCHBAND: Yes, I can hear you.
19     MR. DODYK: I believe the description provides that
20 you are to promptly file a report with the Court which lists
21 the value of the uncontested claims.
22     Now, that has been impacted by two things that have
23 happened: One is that because of the delay in determining the
24 attorneys' expenses, we have a hearing which is set I think 11
25 days now after the initial closing of the proof of claim

### Page 137

1  period, and we also have a set of proofs of claim for which the
2  response period will be the 7th of May, or thereabouts.
3       MR. BUCHBAND: Or later.
4       MR. DODYK: Or later, depending on the mailing.
5       MR. BUCHBAND: Right.
6       MR. DODYK: Therefore, I think there has to be some
7  understanding reached, Mr. Buchband, between you and Her Honor
8  as to the time as of which you're going to file that report,
9  because I believe the distribution date is defined in the
10 stipulation as the 10th business day following the filing of
11 that report.
12      MR. BUCHBAND: Well, it appears to me -- or certainly
13 it was my plan to process the proofs of claim received as
14 quickly as possible, and apart from those that are disputed or
15 incomplete or for which there is some difficulty in reading
16 statements, which I know will happen in a few instances, apart
17 from those, I was planning to make a report to the Court and
18 the parties as quickly as possible, and I understand that that
19 report, once approved by the Court, would start the clock
20 ticking and would form the basis for the calculation of all
21 subsequent catch-up claims.
22      Now, based on what was said here today, I can't give
23 you an exact date, but I was expecting that this would happen
24 sometime this summer or early fall, depending on --
25      THE COURT: Actually that probably works. Early

### Page 138

1  summer.
2       MR. BUCHBAND: Well, I don't know about early summer,
3  Your Honor. It depends how many claims are filed, among other
4  things.
5       THE COURT: Well, that probably works, summer or
6  early fall.
7       MR. BUCHBAND: Yeah.
8       THE COURT: Let me hear from Mr. Newman.
9       MR. NEWMAN: Your Honor, I think to restate the point
10 that Mr. Dodyk raised is that the question is whether we are
11 going to ask and the parties are going to agree, or Your Honor
12 will order, that Mr. Buchband process all of those claims that
13 are timely filed by April 15th and should have been filed by
14 that date as the first batch, and then have a follow-up round
15 beyond that for those that get subsequent notice and have a
16 longer period, or whether they will be all processed as a
17 single group. I think that was the point Your Honor raised.
18      THE COURT: Well, I don't have a problem with doing
19 this on a serial basis, but I don't know that it's really going
20 to be necessary.
21      MR. DODYK: There's also another problem relating to
22 the fact that until the amount of the expense is set --
23      THE COURT: Right.
24      MR. DODYK: -- there's an interrelationship.
25 Therefore, Your Honor --

### Page 139

1       THE COURT: No, I understand that.
2       Since Mr. Buchband wasn't really anticipating getting
3  this done until late summer or early fall, they ought to be
4  able to at least figure out the amount of the person's claim.
5  They may not be able to determine the actual amount that the
6  person's going to get, but they should be able to figure out
7  the percentage of the person's claim to the whole and the
8  amount -- the amount of the person's claim and the percentage
9  of the claim that represents to the whole and to the
10 settlement fund.
11      MR. DODYK: I think as a matter of administrative
12 procedure, Your Honor, what Mr. Buchband has to target is to
13 process as soon as possible, after the receipt of the proofs of
14 claim, the claims to the point where the dollar amount of each
15 claim is fixed --
16      THE COURT: Right.
17      MR. DODYK: -- which could be at some time after Your
18 Honor sets the final expense award, depending on how much time
19 it takes to process the claims.
20      And exactly how it works out best depends on how the
21 claims are coming in, because if Your Honor receives -- has a
22 hearing on the 26th of April and the bulk of the claims, for
23 example, come in on May 7, then it probably makes sense to do
24 those claims together with the original claims but probably
25 doesn't make a lot of sense to hold the whole process open for

### Page 140

1  a few claims which may come in later.
2       THE COURT: No. I agree with that. I would think
3  that what would happen is the Court would make its final
4  decision as to costs, and at that point Garden City Group would
5  proceed to complete whatever claims analysis was necessary with
6  respect to all claims that were in-house as of that time, and
7  that that would represent the first batch that would go out.
8       MR. BUCHBAND: Your Honor, if I may clarify a little.
9       THE COURT: Yes.
10      MR. BUCHBAND: We have a team of people working on
11 this, and they are shortly going to start evaluating the claims
12 that we already have in-house and, really, we are doing this on
13 a continuous basis.
14      THE COURT: So you plan to do it on a continuing
15 basis.
16      MR. BUCHBAND: Yes, ma'am.
17      THE COURT: You don't plan to hold this report until
18 all the claims are in.
19      MR. BUCHBAND: Oh, not at all.
20      What I was thinking of doing was preparing the report --
21 for the Court as soon as we have all the claims that are clean
22 that can be calculated, recognizing that there will undoubtedly
23 be a percentage, hopefully small, that may present some sort of
24 problems, such as illegible statements and so forth that may
25 take a little more time to resolve. But I would expect that

Page 141

1    that would be hopefully fewer than 10 percent.

2        THE COURT: Well, the problem, Mr. Buchband, is that
3    because we had to do subsequent mailings now, we're going to
4    have a rolling bar date.

5        MR. BUCHBAND: Uh-huh.

6        THE COURT: So that's what we're trying to deal with
7    is this rolling bar date problem.

8        So, in other words, what we're saying is instead of
9    waiting till 100 percent of the claims are in to file your
10   report, that you file a report as soon as you can with respect
11   to all of the claims that you've received, say, as of April
12   28th.

13       MR. DODYK: If I may, Your Honor. It would make some
14   sense to set the next date as May 7th, because that's the next
15   big mailing, is the 6,000 or so which went out on March 7th.
16   Then he would have virtually all of them in.

17       THE COURT: That's okay.

18       MR. NEWMAN: We would agree to that. I'm not sure
19   the number is 6,000 that went out on that day, but we would
20   agree with that.

21       THE COURT: So the next bar date would be May 7th.

22       Let's go back and let me explain something. Maybe
23   you're not aware of this, Mr. Buchband.

24       This morning, you know, we had the fairness hearing
25   on the settlement, and the idea was that I would award

Page 142

1    attorneys' fees and costs to the plaintiffs.

2        I was not able to make the cost award as a final
3    matter. So, as it turns out, I'm not going to be able to make
4    the cost award probably until the end of April.

5        Therefore, we're not going to be able to determine
6    what the net settlement fund is for a while yet, plus we need
7    to figure out what your reserve is going to be and there are
8    some other issues too. Okay?

9        MR. BUCHBAND: Right.

10       THE COURT: Okay.

11       So, in light of that, it becomes a problem. You
12   couldn't possibly right now figure out what each class member
13   is entitled to because you have no idea what the net settlement
14   fund is, and in fact you couldn't possibly figure out what
15   every class member is entitled to until sometime after I make
16   this decision on the costs and we know what your reserve is
17   going to be, which won't be until probably very late April,
18   early May.

19       MR. BUCHBAND: That's correct, Your Honor. But I was
20   planning to provide a report showing each claimant's recognized
21   loss.

22       THE COURT: Ah.

23       MR. BUCHBAND: And, of course --

24       THE COURT: And the percentage.

25       MR. BUCHBAND: I won't be able to do a percentage of

Page 143

1    the total fund, of course, until all of the claims have been
2    processed, but certainly by providing each claimant's
3    recognized loss --

4        THE COURT: And the percent that that loss bears to
5    the total losses.

6        MR. BUCHBAND: That's correct. Well, certainly to
7    the total losses up to that point, since we're dealing with a
8    moving target here.

9        THE COURT: No, no. The total losses should not be a
10   moving target.

11       MR. BUCHBAND: Oh, you're talking about the
12   $119 million.

13       THE COURT: Right, the $119 million.

14       MR. BUCHBAND: Yes, we can do that.

15       THE COURT: Okay. But the problem is that we ended
16   up having also to move the claim bar date beyond April 15th for
17   the people who got notice late.

18       MR. BUCHBAND: Uh-huh.

19       THE COURT: Okay. So, I wouldn't want to wait, I
20   don't think -- although maybe it doesn't matter, really.

21       MR. NEWMAN: Your Honor, I think Mr. Dodyk and I
22   agreed with your suggestion that it be as of May the 7th.

23       THE COURT: Okay.

24       MR. DODYK: The simplest way to do this is once Your
25   Honor decides the amount of the costs, that will give

Page 144

1    Mr. Buchband the last element he needs on the cost side to set
2    the amount distributable to all of the class members.

3        THE COURT: Right.

4        MR. DODYK: And, since he will have received,
5    presumably, by May 7 the returns from the next sizeable
6    mailing, I would suggest, Your Honor, in the interest of
7    administrative simplicity, some few days after the close of the
8    period on May 7 he can give you a report which shows the actual
9    amount being distributed to each class member, and then the
10   interest rate can be set, et cetera.

11       THE COURT: I get the impression from Mr. Buchband,
12   though, that he thinks that's going to take a lot of time.

13       MR. BUCHBAND: Well, it will take -- we haven't
14   really gotten into it and it's difficult for me to give the
15   Court a precise date.

16       THE COURT: Okay. But I guess what we're saying is
17   the first report that I would expect to see would be a report
18   which contained in it all the approved claims of people who
19   submitted their claims by May 7th.

20       MR. DODYK: May 7th.

21       MR. BUCHBAND: Okay.

22       THE COURT: And that report would also show the
23   percentage that their claim bears to the $119 million, and by
24   that time hopefully the percentage that the claim bears to the
25   net settlement fund.

Condenseit!

Page 145

1    MR. DODYK: I think it's simpler than that, Your
2  Honor. All that report has to show, since we know what the
3  algorithm is to compute it, is the amount which is awarded, and
4  certainly the backup computations will be available to the
5  Court for inspection.
6       But basically, since each claimant's distribution
7  does not depend on how many claims are submitted in this case,
8  all you have to do is to subtract the amount of the fee and
9  expense and you can calculate based on the recognized loss what
10  the amount actually distributable to each claimant is. All the
11  percentages are merely surrogates for that final number, which
12  is what's going to go in the note and the cash distribution.
13      THE COURT: Well, I don't know that I have a problem
14  with that. What do the plaintiffs say?
15      MR. NEWMAN: Your Honor, I agree with what Mr. Dodyk
16  said, with one exception: That there's one other thing which
17  is added to this, which is the interest which is earned on the
18  $185,000 from the receivership plus the $10 million which has
19  been deposited in U.S. Treasuries and earning interest as we go
20  along, and that's a sizeable number over time. So that there
21  actually is more cash than just the $10 million and the
22  $40 million and so on.
23      So that's just a mathematical calculation, but
24  somebody will have to estimate what that is, just like you
25  estimate costs.

Page 146

1    MR. DODYK: I would have to check, Your Honor, the
2  stipulation on how the interest is treated. I just didn't want
3  my silence to imply acquiescence. I don't know what the answer
4  is to that.
5       But in any event, that's another mathematical
6  computation that can be done.
7       THE COURT: I just want Mr. Buchband to be able to
8  understand what it is that he will provide to us.
9       So he will provide to us a report at some point in
10  time -- hopefully not too far beyond May 7th -- that lists
11  every person who submitted an approved claim by May 7th and the
12  amount to which that person is entitled with respect to the net
13  settlement fund. Is that right?
14      MR. DODYK: Yes, Your Honor.
15      THE COURT: You got that, Mr. Buchband?
16      MR. BUCHBAND: Yes, ma'am.
17      THE COURT: And then subsequently you'll have to
18  submit another report for the people who file approved claims
19  later than that.
20      MR. BUCHBAND: Okay.
21      THE COURT: Okay. All right.
22      Now, I can't think of anything else that we need to
23  take up with Mr. Buchband.
24      MR. BUCHBAND: I have just one question, Your Honor.
25      THE COURT: Well, actually, so, then, let's just

Page 147

1  talk -- I'm sorry, Mr. Buchband. I want to go back to this
2  interest commencement date.
3       So the interest commencement date will then be --
4       MR. DODYK: The 10th business day following Your
5  Honor's approval of that report.
6       THE COURT: Okay. For everybody.
7       MR. NEWMAN: Business days or 10 days?
8       MR. DODYK: Whatever the stipulation is. It's either
9  10 business days or 10 days.
10      THE COURT: Okay. Fine.
11      Okay. Mr. Buchband, what else did you want to
12  raise?
13      MR. BUCHBAND: I would like to go back for a moment
14  to Your Honor's request for more definitive budget information.
15      THE COURT: If you want to just give me a cap, I'll
16  be happy with a cap.
17      MR. BUCHBAND: This is difficult, because this case
18  has turned out to be more complex --
19      THE COURT: Yes.
20      MR. BUCHBAND: -- in large part because of a lot of
21  the discussions and controversies that have occurred to date.
22  I hope that going forward things will be simpler.
23      I will try to break that down by ranges for Your
24  Honor's consideration.
25      THE COURT: Okay.

Page 148

1    MR. BUCHBAND: But with the complications in this
2  case, this is not something that lends itself equitably to
3  apply per claim.
4       THE COURT: I really suggest to you, Mr. Buchband,
5  that if you get into controversies with the lawyers, that you
6  just pick up the phone and call me, because I could virtually
7  assure you based on my experience with the case that you'll be
8  able to talk to the lawyers endlessly and never reach a
9  resolution.
10      MR. BUCHBAND: Okay. I thank Your Honor for that. I
11  hope I won't have to take you up on it.
12      THE COURT: Me too.
13      Yes, Mr. Newman.
14      MR. NEWMAN: Your Honor, and for Peter Buchband, I
15  wanted to em,1asize to you, Peter, I think that the Court's
16  request of you for your budget includes all of the costs,
17  including the costs that you estimate would be incurred until
18  the notes have been completely paid off, because there has to
19  be a reserve made for all of that in order to determine how
20  much money goes to the members of the class.
21      So I just wanted to be clear that that was what I
22  thought I understood the judge to ask you for.
23      THE COURT: Yes. That's important to me.
24      MR. BUCHBAND: Well --
25      THE COURT: In other words, what I'm really going to

Page 153

1  to explain what you did and what relates to what function. So
2  I don't believe I have any other issues.
3         I had in my March 4 letter tried to confirm what I
4  had understood with you and with Mr. Isaacs to the effect that
5  you were keeping accounting records that would support what you
6  had done, and I believe you've committed to the Court to do
7  that. So I have no further items to raise at this point.
8         MR. BUCHBAND: Well, you're right. That is correct.
9         THE COURT: Okay. Thank you, Mr. Buchband.
10        MR. BUCHBAND: Thank you, Your Honor.
11        THE COURT: Okay. Looking forward to hearing from
12 you. Bye-bye.
13        MR. BUCHBAND: Thank you. Bye.
14        THE COURT: Well, so, if there's nothing else that
15 anybody wants to say, I'm satisfied with the representations
16 that Mr. Buchband has made and with the letter that he wrote.
17        MR. NEWMAN: Your Honor, I am also.
18        The one thing that does concern me is whether or not,
19 when we come to discussing the form of your order today,
20 whether it would be helpful to specifically include some
21 portion of that that directs Mr. Buchband to send out this
22 letter and moves the bar date and so on, so that there's no
23 confusion later on about what it is that he agreed to do or
24 what his letter should say on that score.
25        THE COURT: You know what? Let's turn now to the

Page 154

1  order and let's try to live through the parts that you all
2  haven't been able to agree on the last couple weeks, and then
3  we'll talk about these other portions of the order, or perhaps
4  they can be in a separate order dealing with settlement
5  administration so that it's clear that this isn't really --
6  these are really separate issues, it seems to me, that have
7  arisen that don't have anything to do with the fairness,
8  adequacy or reasonableness of the settlement or with the
9  attorneys' fees and costs, which is really what we came here to
10 do today.
11        Okay. Now, I have not even tried to redo the order
12 in a way that is consistent with what I ruled today, but I
13 wouldn't think it's going to be that difficult to modify it,
14        I think we can start with paragraph 13, and I don't
15 know that that paragraph belongs in here anymore, or at least
16 it's not going to follow. Maybe it belongs someplace else in
17 considerably different wording.
18        MR. DODYK: If I may suggest, Your Honor, if you just
19 change paragraph 13 to read $5 million of the amount payable
20 from the net settlement fund to each authorized claimant should
21 be paid in cash, with the remaining amount to be paid in the
22 form of individual promissory notes contemplated by the
23 stipulation, I think that encompasses Your Honor's intention.
24        THE COURT: What?
25        MR. DODYK: Was it $5 million?

Page 155

1         THE COURT: Yeah. But 13 doesn't have anything to do
2  with the lawyers. 13 has to do with the class members, and we
3  don't know what the balance of the cash will be.
4         MR. NEWMAN: Your Honor -- I'm sorry. I too had
5  tried to draft something. This is probably an awkward forum
6  like this, and I don't know whether it's --
7         THE COURT: Let's just take -- could we just take
8  paragraph 13 maybe and put it aside for the moment? The
9  problem, paragraph 13 isn't the attorneys' fees. Paragraph 13
10 is what goes to the class members, and we don't know that there
11 will be $5 million available to distribute to the class members
12 because we don't know what -- the settlement administrator's
13 expenses come out of the cash portion of the settlement.
14        MR. DODYK: All I'm suggesting is that the easiest
15 way to do this is to say $5 million goes to one group or the
16 other, either the plaintiffs' counsel or the class.
17        THE COURT: Right.
18        MR. DODYK: And then the remaining cash goes to the
19 other, subject to reallocation in the event that the class
20 demands are less than the amount of cash available.
21        MR. NEWMAN: Your Honor, I actually have drafted some
22 language which says exactly what Mr. Dodyk just said.
23        THE COURT: Okay.
24        MR. NEWMAN: Perhaps I could just read it.
25        THE COURT: Okay.

Page 156

1         MR. NEWMAN: This is from the existing paragraph 13,
2  but it would be amended to read as follows:
3         "With respect to the allocation of cash and
4  promissory notes to be paid to the authorized claimants, the
5  authorized claimants shall be paid in cash from the, initial
6  caps, Net Settlement Fund to the extent of cash from the cash
7  portion of the settlement fund and interest earned thereon
8  remaining after the payment of expenses of administration of
9  the settlement fund as described in section 6.2 of the
10 stipulation, including the portion of the fee and expense award
11 which is by this order ordered to be paid in cash."
12        So that basically says whatever there is in cash goes
13 to the authorized claimants. Those are the ones whose claims
14 were approved. That is consistent with Your Honor's order that
15 $5 million come to the lawyers and the rest be used to pay
16 costs of administration or otherwise to the authorized
17 claimants and none back to Mr. Grosfeld.
18        MR. DODYK: Your Honor, as I understand what's
19 happening here, first we have a question of interest, and I
20 don't think the stipulation provides that the $10 million
21 interest accrues to the benefit of the class, point one.
22        Point two, I think that this illustrates the
23 impossibility of doing it orally, because while the sentence
24 articulated by Mr. Newman may be intelligible to a corporate
25 lawyer, to a litigator it's utterly baffling.

Page 157

1    MR. NEWMAN: Your Honor, two things.
2    Perhaps it makes sense to take a break for a few
3    minutes and I could make copies of what I have drafted, and
4    perhaps Mr. Dodyk and I could work on it, perhaps with Your
5    Honor or without. That might be helpful.
6    And then secondly, to respond to Mr. Dodyk's question
7    about interest, on page 55 of the stipulation it provides in
8    section 7.1 -- remember, the stipulation contemplated that all
9    the cash would go to the attorneys, and it provides: "Any
10   portion of the plaintiffs' class counsel of record fees and
11   expenses awarded by the Court which is not paid in cash out of
12   the cash portion of the settlement fund or interest earned
13   thereon will be paid by the settlement administrator," and it
14   goes on.
15   So it clearly contemplated that the interest earned
16   on the cash portion of the settlement fund would not go back to
17   Mr. Grosfeld but --
18   THE COURT: I'm sorry. Could you tell me where that
19   is again?
20   MR. NEWMAN: Yes. It's on page 55 in the middle.
21   MR. WISOFF: Begins on the eighth line, Your Honor.
22   THE COURT: I see it.
23   Is that the only place in here that the --
24   MR. NEWMAN: Your Honor, I believe so, although I
25   could look more.

Page 158

1    The context of this was, remember, all of the cash
2    and the interest earned on it was going to pay attorneys' fees
3    in the way the stipulation was set up.
4    MR. DODYK: Your Honor, that's not true. That's not
5    true. The stipulation originally provided effectively that the
6    cash would be distributed either to the class members or to the
7    attorneys' fees. There was no agreement --
8    THE COURT: Well, but what was contemplated and what
9    was expected until I raised the issue was that while the
10   plaintiffs' fee award might exceed $10 million, that the
11   $10 million would go first to paying the fee obligation and
12   then the balance would be the deferred obligation.
13   MR. DODYK: Your Honor, that is not the case.
14   THE COURT: Well, that's what you think, but I think
15   differently.
16   MR. DODYK: With all due respect, I think the
17   stipulation provided that they might request that amount, but
18   at no time represented an agreement to any particular
19   allocation, and quite frankly, Your Honor, it was never my
20   anticipation that Your Honor would so award all of the cash.
21   THE COURT: Well, I agree that there was not an
22   agreement, but I disagree that that's not what was really
23   expected and contemplated at the time this was presented to
24   me.
25   MR. WISOFF: Your Honor, I'd just submit that, quite

Page 159

1    frankly, that issue is irrelevant to the issue we're talking
2    about now, which is what happens to the interest earned on the
3    cash portion. And I think that page 55 makes it clear that to
4    the extent that there's cash that's not used to pay the
5    attorneys' fees, that that cash that's left over and any
6    interest is going to be used to pay authorized claimants in the
7    settlement of the --
8    THE COURT: You know, given the fact that there's a
9    big lag time between putting up the $10 million in cash and the
10   distribution of the cash, it's surprising to me that the
11   agreement doesn't more directly address interest.
12   MR. DODYK: Your Honor, I think it does. But I'd
13   have to review the stipulation and present that to your Honor.
14   I can't find it at the moment.
15   MR. NEWMAN: Your Honor, if I might, I think that
16   Your Honor has correctly read the language on page 55, and the
17   language that Mr. Dodyk is referring to is at the top of page
18   42 at 6.2(e) which --
19   THE COURT: Well, on page 28 it says: "The
20   settlement administrator shall invest all cash which it holds,
21   to the extent not reasonably required for immediate
22   distribution, including the cash portion of the settlement fund
23   in United States Government securities and shall reinvest the
24   proceeds of the instruments." Hopefully it goes on to say
25   something about what happens to the income.

Page 160

1    There's all this stuff about the taxability of the
2    income, right?
3    MR. NEWMAN: Correct.
4    Your Honor, I believe that it is as you stated and I
5    tried to state.
6    THE COURT: Well, who's getting tagged with the tax
7    liability for the interest?
8    MR. NEWMAN: The taxes -- under the way in which this
9    tax system works -- and this is actually pursuant to the
10   Internal Revenue Code -- is that unless the interest is used to
11   pay other interest, that is, it's interest income, then the
12   settlement fund pays the tax on that interest income and keeps
13   the net amount.
14   But, of course, if it has expenses against it which
15   it can legitimately deduct, then it deducts it and the
16   settlement administrator has undertaken the responsibility of
17   filing those tax returns and paying that tax.
18   MR. DODYK: It may be, Your Honor, that there are
19   also provisions in the master note that read on this.
20   MR. NEWMAN: Your Honor, though, the master note is
21   probably not apt here. That is, the interest on the master
22   note doesn't begin to run until after the distribution date.
23   So there's two kinds of interest that's possible
24   here. One is interest on the $10 million, the $185,000 and so
25   on; and then there might also be interest which has commenced

Page 161

1 to run on the distribution date with respect to notes that
2 haven't yet been determined. But all of that interest
3 eventually will go either back to Mr. Grosfeld or will go to
4 the authorized claimants or will be interest on the attorneys'
5 fees. So that probably is already taken care of.
6        I think it's only the interest earned on the cash
7 that's on hand roughly today.
8        THE COURT: Well, I'm no tax lawyer, but it does seem
9 to say that it's the settlement fund that ends up paying the
10 taxes on the income.
11        MR. NEWMAN: That is correct, except to the extent
12 that they have expenses. That's correct.
13        That's because the law used to be that the individual
14 members of the class had to do it, and it was too complicated
15 for them to get notices and file their tax returns and so on,
16 so the service came up with this point of view.
17        THE COURT: Well, I'm willing to get off the bench to
18 let you look at this and try to bring the appropriate
19 provisions to my attention -- pertinent provisions to my
20 attention.
21        MR. COOPER: I would be willing to do that if we
22 could find a place to work and I could make some copies for
23 Mr. Dodyk and for Your Honor, if you'd like to participate.
24        THE COURT: I don't think I want to participate
25 except to hear argument on the record with the court reporter

Page 162

1 present.
2        MR. NEWMAN: That would be fine by me. Could we have
3 maybe 15 minutes or so?
4        THE COURT: Sure. And if you need our assistance in
5 making copies, Melissa will stay in here and give you a hand.
6 Okay?
7        MR. NEWMAN: Thank you, Your Honor.
8        (Recessed at 3:44 p.m.)
9        (Resumed at 4:10 p.m.)
10        THE COURT: Okay. Let's take up the issue of the
11 order.
12        MR. NEWMAN: Your Honor, I had given to your office
13 the form of language that Mr. Dodyk and I had worked out, and
14 we asked for copies to be distributed to you and to all of us,
15 and they haven't come back yet.
16        THE COURT: Okay. Who did you give it to?
17        MR. NEWMAN: Marie, I think.
18        THE COURT: Okay. Well, hopefully they'll pop up.
19        So, have we resolved all the controversies?
20        MR. NEWMAN: Your Honor, if I might, I think that you
21 will see when we have the language that Mr. Dodyk and I wanted
22 to suggest one change from what Your Honor had recommended with
23 respect to how the cash portion and the interest earned on it
24 was to be treated.
25        Mr. Dodyk made the point to me privately, with which

Page 163

1 I agreed, that because the interest continues to accrue on a
2 daily basis, that that means you have to keep constantly
3 recalculating how much of it goes to the members of the
4 settlement class, and since there's lots of them, it causes
5 lots of just mathematical issues; whereas if you took the
6 interest that was earned on it and used that instead to pay to
7 the attorneys, in addition to the $5 million, it would be just
8 to one party when the time came, and Mr. Dodyk was prepared to
9 acquiesce as to that.
10        I don't think it's a particularly large number, and
11 we obviously have a self-interest, but we would like to agree
12 on that. If we could do that --
13        THE COURT: Okay. That's fine. I'm having a little
14 trouble reading what was written here.
15        MR. NEWMAN: I'm just turning, and we probably should
16 all have copies. I had asked that there be sufficient copies.
17        If you would turn first to the page that's cut off at
18 the bottom of page 4, which is paragraph 13.
19        THE COURT: Right. What does it say?
20        MR. NEWMAN: Mr. Dodyk and I will share
21 the lectern, if you would like, and we can read together.
22        MR. DODYK: It was not my suggestion, Your Honor.
23        THE COURT: I can imagine.
24        MR. NEWMAN: That's not done in court? I'm sorry.
25 Whatever you think is best.

Page 164

1        In paragraph 13 there is an insert, 4(a), which is
2 handwritten.
3        THE COURT: Yes. I can't read it. I mean, I can
4 read part of it but I can't read part of it.
5        It says, with respect to the allocation of cash and
6 promissory notes to be paid to authorized claimants, the
7 authorized claimants shall --
8        MR. NEWMAN: Then insert 4(a). There is another
9 handwritten page, which is insert 4(a).
10        THE COURT: Let me see if I can find that. Do I have
11 that? Ah, insert 4(a).
12        MR. NEWMAN: And the circled language is intended to
13 come out, if Your Honor would agree to that.
14        THE COURT: Okay. I just want to make sure that we
15 understand ..hat's going on here.
16        There's no contention that the interest belongs to
17 anybody other than the settlement class, to the extent that the
18 interest and the cash is needed in order to pay the approved
19 claims or attorneys' fees and costs, is that correct?
20        MR. DODYK: That is correct.
21        THE COURT: Okay. All right. Fine.
22        So, even though that's coming out, that is the
23 understanding.
24        MR. NEWMAN: We take that interest earned thereon.
25 Frankly, if Your Honor would look down at the bottom

Page 165

1 of the next page on 14(d) and pick it up by adding it to the
2 attorneys' fees, so that we think we have completed the loop,
3 that cash will not go back to Mr. Grosfeld.
4    THE COURT: Okay. That's okay with me. As long as
5 we all understand -- and I think we have it on the record --
6 that everybody agrees that the interest on the $10 million
7 belongs to the settlement class to the extent necessary to
8 either pay approved claims -- to the extent necessary to pay
9 both approved claims, attorneys' fees and costs and settlement
10 administration expenses.
11    MR. DODYK: Yes, Your Honor.
12    THE COURT: Okay. I'm sure I'll make you do that
13 another three times. Okay. All right.
14    MR. NEWMAN: Then, Your Honor, if you will, if you
15 turn to the next page, which is paragraph 14, we have here the
16 first sentence reads: The plaintiffs' class counsel is hereby
17 awarded $13,333,333 in fees, one-third of the $40 million
18 settlement fund, and then there is a rider which is attached to
19 the back; and here we need Your Honor to confirm to us these
20 numbers. I'm not positive that we wrote them down correctly.
21    THE COURT: Okay. Wait a second.
22    MR. NEWMAN: It's the very last page of --
23    THE COURT: The Court further awards the law firm of
24 Raring & Lipoff costs in the amount of -- just a second. I
25 think that's right, $74,403.85, if it makes a difference to

Page 166

1 you. How about $74,404?
2    MR. NEWMAN: That's fine, Your Honor.
3    THE COURT: All right. And the Court also currently
4 awards the law firm of Farella Braun & Martel, et cetera, costs
5 in the amount of -- no.
6    MR. NEWMAN: We arrived at that number by taking a
7 number which was $13,549,255, subtracting $13,333,333 and the
8 $74,000 and got this number, but I'm not sure --
9    THE COURT: What? I just looked at it in terms of
10 what was being allowed in terms of costs.
11    MR. WISOFF: Your Honor, what happened was is you
12 came up with a total amount that was being allowed as of today
13 of being 13 -- we missed what you said in the costs because you
14 went through several categories in a hurry.
15    THE COURT: Okay. Well, my calculation is $126,519.
16    MR. NEWMAN: Could I ask then that Your Honor confirm
17 to us the other number, which we all heard, was 13,549,255 as
18 the total?
19    THE COURT: Well, that was intended to be. That may
20 be an error. My arithmetic is not great.
21    Let me tell you what the components are. The
22 components are 13,333,333, plus $74,404, except that I had the
23 cents before, and $126,519.
24    MR. DODYK: Why don't we add those.
25    MR. NEWMAN: We will do that with a calculator so

Page 167

1 that there is little error.
2    THE COURT: I did that yesterday, but apparently I
3 didn't do it very well.
4    MR. NEWMAN: Maybe that's why none of us are
5 accountants. So we have 13,333,333, and 74,404 and 126,519?
6    THE COURT: Yes.
7    MR. NEWMAN: That adds to $13,534,256.
8    THE COURT: Okay. Fine. I don't think anybody's
9 going to object to my being $10,000 or so off, right?
10    MR. NEWMAN: Not at this point, Your Honor.
11    THE COURT: Okay. All right. So, what's the
12 number? Give me the number again.
13    MR. DODYK: The aggregate number?
14    THE COURT: Yes. The aggregate.
15    MR. NEWMAN: $13,534,256.
16    THE COURT: Okay, I guess.
17    MR. NEWMAN: And, of course, that is, as we have
18 discussed, subject to being increased pursuant to the proper
19 motion that we make to have you consider the other costs.
20    THE COURT: Right.
21    MR. NEWMAN: Now, if we might continue, then we have
22 at the end of this then defined after the $13 million number,
23 paren, the fee and expense award, so that's what that defined
24 term is. Then we continue with the language that's here.
25    And then in 14(a) we provide, following Your Honor's

Page 168

1 ruling earlier, that the fee and expense award shall be paid
2 $5 million in cash in accordance with section 7.2 of the
3 stipulation and the balance as a deferred obligation. And I
4 might just add here that section 7.2 provides that this
5 $5 million would then be paid within three days of the entry of
6 this order, which we would mightily appreciate because it is in
7 accordance with the stipulation but also is our tax deadline
8 and --
9    THE COURT: When? I'm sorry.
10    MR. NEWMAN: It says three days after the entry of
11 your order. That's what section 7.2 provides. We don't have
12 to quote it here.
13    THE COURT: I'm sorry. Could you just go back up to
14 14? What is this word that's written in here?
15    MR. NEWMAN: Rider.
16    MR. DODYK: Rider 5(a).
17    THE COURT: Oh, rider 5(a).
18    MR. NEWMAN: Yeah. That's Mr. Dodyk's rider and
19 it's, the same words are written across the top at the very
20 last page.
21    THE COURT: Okay. Fine.
22    MR. NEWMAN: And then we skip down to paragraph D.
23 which, if I could just read it. It says: "To the extent, if
24 any, that the cash portion of the settlement fund" -- and then
25 we strike the words "and interest earned thereon," because we

Page 169

1 took that out before -- "is not actually paid to the authorized
2 claimants or used to pay expenses of administration of the
3 settlement fund as described in section 6.2 of the stipulation.
4 this cash portion of the settlement fund and interest earned
5 thereon will be used to promptly pay down the deferred amount
6 owed to the plaintiffs' class counsel."
7          So, Your Honor, what that does is it says if for some
8 reason -- which we certainly hope would not happen -- the
9 number of claims filed by the members of the class was not
10 sufficient to use up all of the cash left in the $10 million
11 and so on, that it wouldn't go back to Mr. Grosfeld but would
12 come to pay the deferred portion of the attorneys' fees.
13          And it also provides, as Mr. Dodyk and I agreed and
14 Your Honor accepted a few moments ago, that even apart from
15 that, that the interest which is earned on the $10 million
16 would be used to pay down the attorneys' fees rather than
17 having to constantly recalculate the amounts owed to the class
18 members.
19          Frankly, it doesn't reduce the amount that the class
20 members get. They are still getting their promissory notes for
21 the balance of their item.
22          THE COURT: No, but it would have increased the
23 amount that they would get in cash.
24          MR. NEWMAN: That's true, but you have to find some
25 cutoff date to deal with it, otherwise, it constantly changes.

Page 170

1 You would never know exactly what it was.
2          I think we think administratively this is okay, but
3 maybe Your Honor would like to do it in a different way.
4          MR. WISOFF: Your Honor, on that point, we'd just
5 like to point out that at some point the administrative costs
6 of sitting down and recalculating additional amounts that are
7 owed to each class member in some fashion will start to cut
8 into the value of what's then being distributed to them. But,
9 you know, this is completely up to the Court's discretion.
10          We just think from an administrative point of view of
11 trying to figure out what to do with cash that's left over, of
12 having to recalculate that amount in each share for class
13 members who claim, could become a difficult issue.
14          MR. NEWMAN: If it helps Your Honor, the suggestion
15 came from Mr. Dodyk and we accepted it.
16          THE COURT: All right. I mean, I would have
17 preferred to see the interest go also to pay the expenses of
18 administration, but I agree that there is going to be a big
19 problem with having to recalculate.
20          So, okay. That's an unenthusiastic "okay."
21          MR. NEWMAN: Well, if there's a better suggestion,
22 we're not trying to be unfair to anyone here.
23          Is Your Honor's concern -- let's just back up. Maybe
24 I missed your point, because maybe we don't have a difference.
25          We believe that the interest can be used to pay the

Page 171

1 cost of administration. It's just if it's not used to pay
2 those costs or to the authorized claimants, that it would come
3 to us rather than going back to Mr. Grosfeld. That's our
4 understanding.
5          THE COURT: Well, I think, frankly, I think the way
6 it reads is, what it's really saying is that in order to avoid
7 the recalculation problem, is that any income that's received
8 on top of the $10 million is not going to go to anybody's
9 benefit except the lawyers'.
10          MR. NEWMAN: Well, perhaps we should make a change
11 that would make you feel more comfortable. We certainly don't
12 insist.
13          Maybe we should say through the distribution date the
14 interest which has been accrued would be used to pay
15 administrative expenses. At least there would be a date at
16 which somebody could calculate it. The trouble is, even the
17 distribution date, Your Honor has to enter an order saying how
18 much goes and you don't know. We're certainly not trying to be
19 pigs here.
20          THE COURT: No, I understand that, and so I think
21 that probably this strikes the best balance that can be struck
22 under the circumstances. But it would have been nice if there
23 was a way to provide for the interest to also go to defray the
24 settlement expenses -- administration expenses.
25          MR. NEWMAN: In principle I don't object, and if you

Page 172

1 when you think about this can find a better way to draft it, we
2 would certainly accept that.
3          It's just a complicated problem when you think
4 through the timing of it. We couldn't think of an answer to
5 make it easy for people.
6          THE COURT: Well, let's go on and then we'll come
7 back to this.
8          MR. NEWMAN: The next change is in paragraph 17,
9 where Your Honor awarded $2,500 in cash and $7,500 in
10 additional promissory notes to each of Mr. Waters and
11 Ms. Bartholomew, and I think we've tried to write that down.
12          THE COURT: Fine.
13          MR. NEWMAN: And apart from that, I think we have
14 made no changes in the proposed order which is attached.
15          To be fair, Mr. Dodyk said that with respect to the
16 inserts and language that's here, he has no objection, but he
17 has filed other things as to other things and we should hear
18 him out and then perhaps we could respond.
19          THE COURT: Yeah. I think that some of these inserts
20 got cut off in my copy. So I guess I'm hoping somebody else is
21 going to type this up.
22          MR. NEWMAN: Your Honor, that's correct, and perhaps
23 I should -- is it possible that I could leave with the Court
24 these things? Or who's going to type this up?
25          THE COURT: We can type it up if we can get the rest

Condensclt!

**Page 173**

1 of these issues resolved. Let's move along and try to resolve
2 the rest of Mr. Dodyk's issues.
3         And also, if someone could make a note. I do think
4 that we made in essence a change today to the settlement, which
5 was that Garden City Group agreed to submit to Court review and
6 approval of their bills, and that is contrary to what is
7 contained in the stipulation.
8         MR. DODYK: There is an additional paragraph, Your
9 Honor, which is the paragraph relating to the mailing, the
10 delayed mailing to the class.
11         THE COURT: Right.
12         MR. DODYK: Which Mr. Newman and I have agreed to. I
13 don't know whether Your Honor would prefer --
14         THE COURT: Actually this is what's cut off. I'm
15 missing the bottom of these pages. The settlement
16 administrator is ordered to promptly mail, blah, blah --
17         MR. DODYK: That, that's it.
18         THE COURT: I can't read the last lines. But if
19 someone just gives me --
20         MR. NEWMAN: Melissa, I believe, has them.
21         MR. DODYK: Has the original?
22         MR. NEWMAN: Right.
23         Your Honor, following your direction, we drafted this
24 as though it would be a separate order.
25         THE COURT: Okay. Great.

**Page 174**

1         And it also should reflect, again, that the
2 settlement administrator is going to submit his bills
3 periodically for the Court's review and approval.
4         MR. DODYK: We need another paragraph.
5         MR. NEWMAN: Your Honor, yes, we'll draft that before
6 we leave, and Mr. Dodyk and I will agree on it and submit it to
7 you.
8         MR. DODYK: Does Your Honor wish to address the
9 remainder of the stipulation?
10         THE COURT: Let me just make sure I can read this.
11         Was unreturned, is that what that says, unreturned or
12 returned --
13         MR. DODYK: Should be returned, not unreturned.
14         MR. NEWMAN: Yes, correct.
15         THE COURT: Let me just read this out loud and make
16 sure I can follow this:
17         "The settlement administrator is ordered to promptly
18 mail written notice to each settlement class member whose
19 initially mailed notice was returned undelivered to the
20 settlement administrator to the extent that new addresses are
21 found for these settlement class members as a result of the new
22 addresses obtained by the settlement administrator from the
23 efforts of Credit Bureau Information Services, Inc. and Class
24 Action Locator Services of San Rafael, California, advising
25 that each such settlement class member shall have 60 days from

**Page 1**

1 the mailing of this notice within which to submit their proof
2 of claim and release form to the settlement administrator,
3 notwithstanding anything to the contrary in any prior published
4 notice or the proof of claim and release form or otherwise.
5         "The final date for these settlement class members to
6 submit their proof of claim and release forms is hereby ordered
7 extended to a date which is 60 days from the date of mailing of
8 the foregoing notice, notwithstanding any prior order of this
9 Court."
10         Okay. So --
11         MR. WISOFF: Actually --
12         THE COURT: Yes.
13         MR. WISOFF: When you said that, I just wanted to
14 make sure we are clear on this; that the foregoing notice,
15 we're talking about the notice that he's mailing out now or is
16 it going to be 60 days from the date they receive their
17 original --
18         MR. NEWMAN: No, no. It's the new notice.
19         MR. WISOFF: Sixty days from the new notice?
20         MR. DODYK: Maybe it should say "of this notice."
21         MR. WISOFF: Of this notice.
22         THE COURT: You know, why don't we just make this all
23 part of the same order. What do you think?
24         MR. DODYK: That would be my suggestion.
25         THE COURT: Yes. I think we should just make it all

**Page 176**

1 part of this order.
2         And then I think we need another paragraph which says
3 something like, contrary to the terms of the stipulation -- or
4 notwithstanding the terms of the stipulation, the settlement
5 administrator shall supply his -- notwithstanding -- actually I
6 had flagged this particular provision in the agreement and left
7 it in my office.
8         MR. NEWMAN: Your Honor, if you would care just to
9 draft that from your office -- if you've done it already,
10 that's fine with us.
11         THE COURT: No. I had flagged just the provision
12 that's in the stipulation that gives the settlement
13 administrator complete discretion on his fees and costs, that's
14 all. I just wanted to cite to the particular paragraph in the
15 stipulation.
16         Okay. So, how about something like this.
17 Notwithstanding the -- it's paragraph 3.3 of the stipulation,
18 the settlement administrator shall periodically seek the
19 Court's approval for the payment of its fees and necessary
20 expenses, or something like that.
21         MR. NEWMAN: Your Honor, if I might, we were doing
22 almost word for word at the beginning. Maybe I could read to
23 you what I drafted.
24         THE COURT: Sure. Go ahead.
25         MR. NEWMAN: "Notwithstanding anything in the

## Page 177

1 stipulation, the settlement administrator shall periodically
2 submit its reasonable fees and expenses to the Court for
3 approval prior to payment from the settlement fund."
4      THE COURT: Okay. That sounds okay to me. What do
5 you think?
6      MR. DODYK: Fine.
7      THE COURT: Okay. Do you want to give that to me?
8      MR. NEWMAN: I will. Thank you.
9      THE COURT: And can we just tag these on to the end
10 here of this order?
11      MR. NEWMAN: Wherever you would like.
12      Perhaps it would go other places where the settlement
13 administrator was ordered to do something. There was a couple
14 of pages like that that we had.
15      THE COURT: Right. All of those. I was going to put
16 everything about the settlement administrator perhaps after
17 paragraph 18.
18      MR. WISOFF: That sounds fine.
19      THE COURT: Okay. What else, Mr. Dodyk?
20      MR. DODYK: Your Honor, I think we can go through the
21 remaining parts of the proposed order very quickly.
22      Paragraph 14.
23      THE COURT: Okay.
24      MR. DODYK: Your Honor, we had simply made the
25 observation that the second sentence of paragraph 14 is

## Page 178

1 redundant of the stipulation and not necessary.
2      Beyond the point of redundancy, I don't see that
3 there is a substantive issue involved.
4      THE COURT: Okay. I think – you know, I agree with
5 you it's redundant, but apparently the plaintiffs feel this is
6 important for its tax purposes. So I'm going to defer to them
7 and leave it in. I don't think it changes the sense of
8 anything. Apparently you don't either.
9      MR. DODYK: Fine.
10      THE COURT: So we'll leave it.
11      MR. DODYK: I think we have covered paragraph 14(a).
12 There's no problem there.
13      14(b) is, of course, the one concerning which we had
14 a disagreement, and whatever language Your Honor thinks
15 appropriate is the language which will be used, although
16 obviously defendants don't consent to the substance of the
17 entry.
18      And I guess I should also say for purposes of the
19 record that my work with Mr. Newman here this afternoon should
20 not be construed as a consent to the substance of the
21 provisions which we were talking about. Obviously the
22 defendants retain their position --
23      THE COURT: Understood.
24      MR. DODYK: -- with respect to that.
25      Your Honor, again, paragraph (c), I think there is no

## Page 179

1 substantive change. I think the first sentence is redundant.
2 I think the second sentence is additive but unnecessary. If
3 Your Honor wishes to add paragraph (c), I don't think it will
4 work a substantive change, other than the detail which is
5 supplied by the second sentence as to which, in principle,
6 defendants have no objection.
7      THE COURT: Again, I'm going to defer to the
8 plaintiffs. If they feel they need this for some reason, we're
9 going leave it in.
10      MR. DODYK: Paragraph 16 then is the remaining
11 paragraph, and the first sentence of paragraph 16 is, again,
12 redundant, although in its altered form I don't think it
13 suffers from the defects of selectivity which infected its
14 predecessors, and the second sentence of paragraph 16 is the
15 one to which we agreed when last before the Court.
16      THE COURT: Okay. Then we'll leave it the way it is.
17 Anything else?
18      MR. DODYK: I think that covers it.
19      THE COURT: That's it.
20      MR. NEWMAN: I agree.
21      Your Honor, one thing, just to be sure. The copy of
22 the proposal that I'm working from has on the very first page.
23 I want to be sure we both have it, in the definition of
24 stipulation, I'm not sure it's in the right place because
25 "stipulation" as we use it here really means the stipulation

## Page 180

1 dated January 17th as later amended through January 31.
2      So I think the definition of stipulation needs to go
3 after January 31, '97.
4      MR. DODYK: That's probably preferable.
5      THE COURT: Okay.
6      MR. NEWMAN: Thank you.
7      THE COURT: So we're going to have two parentheticals
8 following on each other?
9      MR. NEWMAN: I guess. I'm sorry. I can't make the
10 grammar better, but I wanted to make it clear.
11      THE COURT: Okay, well, I may tinker with it.
12      Why don't we just make that not a parenthetical and
13 put a comma before it, the definitions of which the Court
14 incorporates by reference herein.
15      MR. NEWMAN: That will be excellent.
16      THE COURT: Okay. Just an aesthetics thing.
17      Is there anything else?
18      MR. NEWMAN: Your Honor, I would only just like to
19 thank the Court for your patience in dealing with this. I know
20 we try hard and I know, I can bear your frustration in dealing
21 with Mr. Buchband, and I don't have four years' or seven years'
22 experience with this, but it certainly is not our intent to
23 make this difficult at all, and we do appreciate your working
24 with us to get this far. And we will, as you've suggested,
25 proceed to submit our proper amended motion so that we can

## Page 181

1 reconsider the costs as you've suggested.
2 So we'd like to thank you for that.
3 THE COURT: Okay. Well, things went pretty smoothly
4 today.
5 MR. WISOFF: Your Honor, I have one additional point,
6 and hopefully it will keep things going pretty smoothly.
7 Obviously, the outstanding issue of the expense award
8 is a large amount and is important to plaintiffs, and I wanted
9 to make sure that everybody understands what the schedule is.
10 My understanding is by April 11th the defendants are
11 going to submit their expense detail and that we're obviously
12 going to file our motion within 10 days.
13 In terms of what we're going to file with our motion,
14 I had raised with the Court the issue of Mr. Goteiner and my
15 involvement in another case that's got a serious deadline of
16 April 14th where there's a lot of things that have to be filed,
17 and what I was going to ask the Court is if it would be
18 possible for us to file, even if we filed a motion within the
19 10 days, if we could have -- you're having your hearing on
20 April 25th. I was wondering if we could have till April 17th
21 to file all of the backup that would go along with that --
22 THE COURT: I'll tell you what. Why don't we move
23 off the date for everybody to April 18th.
24 MR. WISOFF: Okay.
25 THE COURT: Okay?

## Page 182

1 MR. WISOFF: Okay.
2 THE COURT: For the defense too. We'll just move it
3 off to April 18th.
4 MR. WISOFF: And in terms of what we're going to
5 be --
6 THE COURT: Well, you have to use your judgment, but
7 I'm not going to string it out beyond the date that's set
8 forth. But I mean, I can't believe that you don't have at this
9 point in your practice an idea of what a sufficient cost
10 petition looks like.
11 Now, I agree, there are so many entries in this case
12 that I might be willing to entertain testimony in lieu of a
13 line-by-line attribution of every phone call to the case, for
14 instance. But then what you have to provide me with are
15 affidavits that explain these things.
16 MR. WISOFF: We will do that, Your Honor.
17 THE COURT: And you can, of course, supplement it at
18 the hearing too with testimony, although we're going to have
19 limited time.
20 MR. WISOFF: Obviously, you're saying you don't want
21 to string this out and this is our shot at this and there's a
22 lot of money involved here. But the flip side of that is -- so
23 I want to give the Court everything that the Court needs, and I
24 don't want to be remiss in not providing anything.
25 The flip side of that is I don't want to ship out

## Page 183

1 here, if it's unnecessary in terms of actual receipt, backup
2 and expense reports that have been submitted over a seven-year
3 period. I mean, I could ship boxes and boxes and boxes of
4 expense reports in detail to the Court. At least I'm assuming
5 our accounting department has all of that, and I don't want to
6 do that if the Court doesn't want it.
7 THE COURT: The problem is you're going to have the
8 same problem you have with this other backup you submitted,
9 which is on its face it's not necessarily going to connect to
10 the case, except maybe that somebody wrote on it Waters or
11 something like that, or a case number or a file number. So
12 you're going to have to submit affidavits which explain some of
13 these things.
14 MR. WISOFF: Okay. Understood. And we'll bring out
15 whatever documentary evidence that we feel we need to bring
16 then and have it available for the Court's review.
17 THE COURT: Right. I think, you know, frankly, I
18 think that what's -- well, it's late in the day and I'm tired
19 now. But you need to sit down and look at what you already
20 submitted to see whether or not, the extent to which you can
21 explain it by affidavit.
22 MR. WISOFF: I understand.
23 THE COURT: And then sort of pick it up from there.
24 MR. WISOFF: We'll do everything we can to summarize
25 in affidavit form that which seems reasonable to summarize that

## Page 184

1 way, and either have --
2 THE COURT: You certainly need to, for instance,
3 break down each expert and each consultant into totals and
4 provide me with some explanation as to the total amount of time
5 involved with the expert, what it is that the expert did, why
6 the expert was necessary, that kind of thing.
7 MR. WISOFF: Okay, Your Honor. Thank you very much.
8 THE COURT: Okay. And, you know, travel; a big chunk
9 of your travel and lodging is the time you spent here in Miami
10 for the trial. So, if you break that out for me, this is the
11 time we spent in Miami for the trial, that will help.
12 MR. WISOFF: You know, I'll admit that I kind of
13 ignored the case while you all were dealing with the Special
14 Master, so I don't have a good feel for how often you were
15 here.
16 MR. WISOFF: We'll provide all that. I can tell the
17 Court that I spent a good part of 1994 in the Fort
18 Lauderdale-Miami area.
19 In addition, in terms of what the defendants are
20 submitting, are you asking -- just so that there's no issue on
21 this later, are they to provide this stuff broken down in the
22 same level of detail that you're asking us to provide?
23 THE COURT: No, I'm not asking them for that. But
24 I'm asking for the same level of detail that you originally

**Page 185**

1  provided, because I want to get an idea of what their total
2  expenses are since they're claiming yours are so excessive.
3
4      MR. WISOFF: Okay. Thank you, Your Honor.
5      MR. KAMINSKY: Your Honor, I just want to say a few
6  remarks just so we don't leave the record unclear on a few
7  aspects of what you said this morning, just so that you are
8  clear.
9      Your Honor made some suppositions that perhaps at
10  times there were 30 lawyers working against a handful of
11  lawyers. You said certain things about law firms that were
12  involved, and I think since we have a record here, and I don't
13  know if there will be further proceedings, there are just a few
14  things I'd like to say on that.
15      Your Honor is correct that this case has involved
16  seven very prestigious law firms, maybe not all, but you said
17  some of the most prestigious in this country. I think you
18  might remember that in the first four years of this case, or
19  three and a half years, there was one law firm, Honigman
20  Miller. My firm came in in a very limited role towards the end
21  of that period and did not really get involved in this case in
22  a major way until 1995.
23      Mr. Bonner's firm and the Cravath firm appeared in
24  this case only in the last year.
25      THE COURT: Well, I don't know that I agree with
that, especially as to Mr. Bonner's firm. Mr. Bonner was

**Page 186**

1  kicking around in the case for quite a long time before he
2  formally entered an appearances.
3
4      MR. KAMINSKY: He was representing witnesses in the
5  case.
6      THE COURT: So I've been told. But I don't know that
7  I accept that. But go on.
8      MR. KAMINSKY: Your Honor, I think that that's
9  probably where I have my biggest problem and where I would urge
10  Your Honor in the privacy of your thoughts to reflect on some
11  of these things. Representations have been made to you by
12  people in this court who are members of the bar of this court
13  and others. I don't think there's any basis to disagree with
14  them.
15      I think, in addition, Your Honor may wish to consider
16  the following statistic. There are seven law firms that Your
17  Honor has mentioned. There's also a receiver and receiver's
18  law firm. There's Garden City. You witnessed yourself what
19  went on and referred to remarks and contention between
20  plaintiffs' counsel and Garden City.
21      Now, isn't it curious that every one of those law
22  firms, including several of the most prestigious law firms in
23  this country, very experienced trial lawyers, very experienced
24  lawyers in these kinds of cases, suddenly had problems with the
25  same one law firm representing plaintiffs; and in that regard,
Your Honor may remember that you've seen papers in which that

**Page 187**

1  law firm representing plaintiffs had threatened the receiver,
2  our jury consultant, the law firms that are here.
3      I'm not going to try and take after anyone, but I do
4  wish Your Honor would reflect, when you think about
5  contentiousness, on some of those facts.
6      The other one thing I would ask Your Honor to think
7  about in that regard is this: Your Honor has correctly pointed
8  out that this case involved many novel issues, matters that
9  Your Honor was prepared to certify to the Eleventh Circuit,
10  that are very likely to have been certified to the Florida
11  Supreme Court.
12      It seems to me that it's somewhat inconsistent with
13  the recognition of those issues by counsel for the plaintiff,
14  counsel for the defendants and the Court to somehow suggest
15  that the defense alone, that the defense have been unduly
16  contentious. Your Honor will have the last --
17      THE COURT: Actually I tried not to say that, and I
18  want you to know that I have absolutely no problem with you
19  whatsoever.
20      MR. KAMINSKY: I appreciate that.
21      THE COURT: I think that everything that you have
22  done here has -- notwithstanding that every once in a while you
23  get angry, which is, of course, your right, and to be expected
24  under the circumstances -- I have absolutely no problem with
25  anything that you have done here.

**Page 188**

1      If I was -- I am honestly dismayed that we have a
2  stipulation in which certain commitments were made which I
3  believe at this point were not honored.
4      MR. KAMINSKY: I can speak to that if we need to. I
5  understand Your Honor's dismay. I think that in that regard, I
6  think -- again, I don't want to get into a back-and-forth with
7  the plaintiffs. Your Honor's made a ruling on this. And I
8  can't speak for everyone, and I appreciate your remarks
9  vis-a-vis me.
10      I'm not here carrying a torch for me. I'm really
11  trying to speak for all the defense counsel, save the periods,
12  when I was not even involved and cannot speak for that.
13      I think that we had the following problems --
14      THE COURT: Well, actually I do have one problem with
15  you, which is that there was all this rearguing that went on.
16      MR. KAMINSKY: Okay.
17      THE COURT: All right? But that's the only issue I
18  have with you.
19      MR. KAMINSKY: I understand that.
20      THE COURT: You know, there are a lot of issues. I --
21  don't even know that this needs -- and I have no problem with
22  your going back on the record, but maybe I could say this off
23  the record.
24      (Discussion off the record)
25      THE COURT: Do you want to be on the record or off?

Page 189

1   MR. KAMINSKY: Oh.
2   THE COURT: Okay. That's fine.
3   MR. KAMINSKY: I think again, as I say, I won't
4   address the reargument issue. We think it goes both ways.
5       But let me speak to the issue your Honor raises about
6   the, as you see it, objection to the fee and cost petitions. I
7   must tell you, Mr. Dodyk has a tremendous amount of experience
8   in this area, much more than I do. I have a fair amount
9   myself, and I believe Mr. Bonner does.
10      I've never seen an application of the nature
11  submitted to Your Honor.
12  THE COURT: You know what? And I agree with you.
13  But that's not the point.
14  MR. KAMINSKY: May I finish?
15  THE COURT: Yes.
16  MR. KAMINSKY: I understand that.
17      Now, confronted with that, as defendants -- and
18  again --
19  THE COURT: You felt I couldn't take care of myself.
20  MR. KAMINSKY: No. Nobody said that.
21  THE COURT: Yes.
22  MR. KAMINSKY: I'm probably the wrong one to do the
23  speaking here because I don't want to say something that will
24  impinge upon Mr. Dodyk's role or position. I think he's an
25  eminent person whom I have great respect for and can do this.

Page 191

1   saying -- well, frankly, I don't accept what you're saying, but
2   you and I have a disagreement about this. But what really puts
3   the nail in the coffin, as far as I'm concerned, is this
4   argument that the plaintiffs' fees to be pegged to the actual
5   amount of claims paid. That's what puts the nail in the
6   coffin.
7       Maybe I could have understood it if it had been
8   limited to the cost application. Maybe I could have, although
9   if you wish to bring things to my attention and you wish to
10  abide by the stipulation, then I think there were certainly
11  other ways you could have gone about it. And you could have
12  started, I guess -- maybe you did, maybe I don't know it -- by
13  calling Mr. Wisoff or Mr. Gotziner and saying, you know, we
14  think this cost petition is inadequate and we think it leaves
15  everyone exposed to an appeal, and here are some authorities.
16  Why don't you take a look at them and think about whether or
17  not you shouldn't be providing the Court with more detail.
18  Maybe you did that. I don't know.
19      But what really does not ring true is this contention
20  that was made that the plaintiffs' fees should be pegged to
21  actual amounts paid.
22  MR. KAMINSKY: Let me just say two things to that.
23      First, your Honor, I think that in terms of the
24  Boeing case, footnote 5 in the Boeing case I think makes clear
25  it didn't relate to this case. But I won't argue law with you.

Page 190

1       We have these questions. One, we are officers of the
2   court. We have certain responsibilities, we believe.
3       We did not come in and make formal overt objections.
4   What was pointed out to Your Honor were two things. What was
5   pointed out to Your Honor were certain authorities that might
6   be valuable, we felt useful, to the Court; and secondly, that
7   certain remarks made to the Court were not correct, were
8   inconsistent with remarks made to us and to the Court earlier.
9       Now, I don't want to get into, as I say, any sort of
10  contention or name-calling with them. But we felt that under
11  the circumstances it was important to explain that to Your
12  Honor.
13      You will remember that the day the hearing, the day
14  the settlement was brought to Your Honor on the 27th I said
15  nothing. The only thing I said to Your Honor --
16  THE COURT: Yes, I have to admit that I interpreted
17  your silence as acquiescence since you were part of the defense
18  team; and furthermore, you initialed the form -- the order on
19  the preliminary approval.
20  MR. KAMINSKY: Without question, and I support the
21  settlement and the defense counsel all support the settlement.
22      The fee application and the expenses were the only
23  thing I pointed out were a separate matter. We are not going
24  back on any agreement.
25  THE COURT: You know, I would accept what you are

Page 192

1       Secondly, we did do what you said. Your Honor will
2   recall, I wrote a letter -- no copy to the Court -- I wrote a
3   letter to Mr. Cooper in which I asked certain questions that
4   come right out of cases.
5   THE COURT: Yes, but I don't think the tone of that
6   letter was conducive to obtaining cooperation. The tone of the
7   letter was a tone of intimidation.
8   MR. KAMINSKY: Well, I'm sorry you interpret it that
9   way. It was not meant that way. It was meant to basically say
10  very much of what Your Honor said.
11      We're parties to this settlement too. We don't want
12  to be criticized in some way when we proceeded in good faith
13  that the plaintiffs would put in the kind of proofs that we are
14  used to, that we believe the Court is entitled to.
15      Now, again, that's between you and the plaintiffs.
16  We felt -- and all I can say to Your Honor is -- and I hope
17  you'll accept it at another time, if you don't at the moment --
18  the defendants proceeded in good faith. I think they have
19  certainly, in my experience during the course of this -- I hope
20  Your Honor on reflection will think of that.
21      I hope Your Honor will also remember that
22  Mr. Grosfeld is an individual. He's here before the bar, and
23  for the plaintiffs to make contentions that you ought to give
24  money to their counsel rather than let it revert to him, to
25  make remarks about the fact that he's the person paying

Page 193

1 everything, as if that makes him some sort of a bank for
2 people, when the stipulation of settlement specifically says
3 there's no admission of liability, no wrongdoing, you know that
4 that was hotly contested in your court --
5       THE COURT: If you think about it, I don't think I
6 reacted to those suggestions in any way.
7       MR. KAMINSKY: I understand that. I simply think I
8 should note it for the record so that that's clear. I'm not
9 addressing that.
10       THE COURT: All right.
11       MR. KAMINSKY: I appreciate what Your Honor has
12 said. I hope that when you reflect on it you will think a
13 little more kindly towards the intentions of defendants in this
14 regard, and I appreciate --
15       THE COURT: You all had every right to contest the
16 case as vigorously as you wanted. Mr. Grosfeld had the right
17 to put an army of people on the case if he wanted, and I accept
18 that.
19       But it is a factor that drew the case out, no
20 question about it. And they were a smaller group of people and
21 they had a lot to contend with. In the context of this case,
22 they're the little guy and you all were the big guy, and that's
23 just the way it is.
24       And I'm not upset about that, but it is -- you know,
25 one of the things that my job included today was to weigh the

Page 194

1 difficulties in the case against the result that was obtained,
2 and those things matter in terms of assessing the significance
3 of the result in this case.
4       Maybe we should go off the record again.
5       (Discussion off the record).
6       THE COURT: Go on.
7       MR. KAMINSKY: I just want to make one thing clear.
8 There were no 30 lawyers at any one time. There were
9 no handful against an army. People had different roles in
10 different ways. In the course of the trial, basically you're
11 dealing with the same number of people, and I just think that
12 that's important to make on the record.
13       Now, why don't we go off the record and we can --
14       THE COURT: How could that possibly be? I had the
15 people here in court. I had the people at Greenberg Traurig,
16 Completely unbeknownst to me there was Mr. Dodyk and whoever he
17 works with at Cravath. So, maybe there weren't 30 people, but
18 there were certainly a lot.
19       MR. KAMINSKY: Do you know who was working in San
20 Francisco for them? Do you know what was being done there? Do
21 you know what was being done by these lawyers? I'm simply
22 saying that --
23       THE COURT: Well, I do know this.
24       MR. KAMINSKY: -- that I think Your Honor is
25 proceeding under a misapprehension. I'm not saying that in any

Page 195

1 pejorative way. I just think it's important that we be clear
2 about it.
3       THE COURT: I do know that they were working on a
4 contingent fee, that they were fronting the costs, and they had
5 to account to their partners and deal with that. So it's just
6 a completely different situation between what was going on on
7 the defense and what was going on on the plaintiffs' side of
8 the room.
9       So, in any event --
10       MR. KAMINSKY: That's all that I'll --
11       THE COURT: If there is anything that is bugging me,
12 the thing that is bugging me is this issue about the
13 opposition -- and I do not think, based on the most recent
14 pleadings that were filed by Mr. Dodyk -- I do not think that
15 by any stretch of the imagination that those pleadings can be
16 construed, particularly the pleadings directed to the
17 attorneys' fees issue, as anything other than opposition to the
18 fees.
19       MR. KAMINSKY: Well, we respectfully disagree to some
20 extent, and I don't want to --
21       THE COURT: To some extent.
22       MR. KAMINSKY: -- lay anything off on Mr. Dodyk in
23 that regard, but I appreciate Your Honor having heard me out.
24       I just reiterate, in conclusion, that I think all
25 defense counsel in this regard, working together, have

Page 196

1 attempted at every point to act in good faith towards the
2 Court, and I hope the Court will remember this case in that
3 vein as time passes on here.
4       THE COURT: Okay. Well, I look forward to seeing all
5 of you again, hopefully in other circumstances, not opposing
6 each other.
7       MR. WISOFF: Your Honor, may I briefly? I
8 apologize. I had not wanted to bring any of this up.
9       This morning, because Mr. Kaminsky did put some of
10 these things on the record, I just need to put them on the
11 record, because they may have the intention of appealing their
12 own settlement agreement, which I find extraordinary, but I
13 view it as a potential reality.
14       THE COURT: I knew this would happen. I should have
15 told you you couldn't take the podium. I mean, Mr. Kaminsky, I
16 should have told you that, because this is exactly what this
17 was going to invite.
18       But go ahead, Mr. Wisoff.
19       MR. WISOFF: I apologize, Your Honor. When I heard
20 the Court's comments this morning about the litigation being
21 hard fought and contentious, I put that into the context of
22 there was a lot at stake and every issue was litigated, and, of
23 course, the Court would prefer that it didn't have to get
24 involved in everything. But I didn't hear the Court point its
25 finger at one side or the other and say anything bad about

Page 197

```
 1  anyone here this morning... and I do object to Mr. Kaminsky then
 2  getting up and making the reference that somehow this was our
 3  fault.
 4       I just point out the following, Your Honor, to put
 5  some of this in context, because the Court still does have
 6  before it a very significant portion of our expense
 7  application, which is important to us. And I would point out
 8  that this litigation was extraordinarily hard fought. We knew
 9  that. It became readily apparent to us years ago that it was
10  going to be necessary to take this case to trial and probably
11  an appeal in order to see anything out of it.
12       In the meantime I can tell you, the Court's comments
13  about having to report to partners, I had to make those reports
14  to my partners, and this case literally bled our law firm dry
15  for the last four years, and we didn't give up and we didn't
16  abandon it and we fought it and we dealt with this, and the
17  Court made comments that there may have been some problems over
18  here. I'm not going to address those because I really don't
19  know what the Court has in mind.
20       In my view, we had to fight very hard to earn an inch
21  of territory at every stretch of the litigation, and we did
22  what was necessary in the best interests of the class to do
23  that.
24       And when we came to you on January 31, after having a
25  five-month jury trial, and on the eve of judgment and the Court
```

Page 198

```
 1  making comments about even if we got a verdict the Court might
 2  have to set it aside and there would be an interlocutory appeal
 3  and there might have to be an individual rebuttal process and
 4  all this, we had to make an evaluation of where we were and
 5  where we had to go.
 6       And we thought it was time to put an end to it, to
 7  get a sum certain recovery for class members should they choose
 8  to file their claims, and to extract ourselves from this
 9  litigation as well, having achieved what we thought was
10  probably the best result we could achieve without going through
11  a very lengthy appeal process and the uncertainties that would
12  be involved in that.
13       Having said that, Your Honor, I thought that on
14  January 31, when we came in here and announced on the record
15  that we were going to apply for a third of the fund as our fees
16  and we told the Court what our costs were, and we then
17  submitted a costs bill that was actually less than that we had
18  represented, and the defendants said in no less than three
19  places in the stipulation and preliminary order that they would
20  support the stipulation, that they wouldn't attack it, and all
21  this, for them to say --
22       THE COURT: And they wouldn't oppose your fees and
23  costs petition.
24       MR. WISOFF: -- and they wouldn't oppose the fee and
25  costs application, and the Court is now raising some issues as
```

Page 199

```
 1  to our cost application, and we're going to get to the Court
 2  all of the information that the Court wants, and we think when
 3  you see that, you will see that these costs are reasonable and
 4  they are allowable.
 5       But I'd also point out, Your Honor, that on January
 6  31, when I left, after having lived my life in Miami for five
 7  months -- and I do have a life back in San Francisco -- I
 8  thought that that was the end of it and that I was going to be
 9  able to come down here on March 31 and I was going to put in a
10  fee and cost application and the Court would tell me where I
11  was right and where I was wrong, and the Court would award me
12  what it thought was appropriate.
13       What I didn't think I was going to have to do was to
14  stop what was going to be my vacation and to respond day after
15  day after day to these constant applications and attacks on the
16  very stipulation and agreement which they signed, and they're
17  not even willing to agree to the form of the order because they
18  want to preserve their chances to appeal their own settlement,
19  which I'm going to have to deal with, Your Honor.
20       I take personal offense at this. All the fighting
21  before that to reach the result, that's lawyering. I can live
22  with that. Okay? But when you review our cost application,
23  when we resubmit it with the backup detail, I hope the Court
24  will take into consideration that I have now spent hundreds of
25  hours in January, February and March on this litigation which I
```

Page 200

```
 1  didn't think I was going to have to spend, when I've already
 2  put all my other clients and all my other cases on hold for the
 3  last four years, and now I have not had a vacation, and I am
 4  right smack in the middle, this time on the defense side of
 5  things, in a class action in federal court in Alabama which I
 6  cannot put off and which I have to go forward with. .
 7       So I just raise those points, Your Honor, because
 8  regardless of this drawing the distinction between I'm not
 9  objecting as defendants, I'm objecting as an officer of the
10  court, but, by the way, anything that you don't award to the
11  plaintiffs' counsel, 99.9 percent of it goes back to our
12  client, Mr. Grosfeld. Mr. Grosfeld was able, when he entered
13  into this settlement, he knew that we were going to claim a
14  third of the fund in fees and he knew we were going to claim
15  costs of approximately $3 million, and our costs came to less
16  than that. He knew at a minimum that's what he was going to
17  have to pay, in addition to whatever class members claimed.
18       And for him and his representatives to make me spend
19  the last three months going through this again, I take personal
20  issue with and I think the Court should take that into
21  consideration, those hours of attorney time which we are not
22  being compensated any additional amounts for, when it passes
23  upon the fee and cost application.
24       I do thank the Court for its time throughout this
25  litigation. I think you did an extraordinary job of
```

Page 201

1 maintaining your temper ...oughout all of the controversy.
2 throughout the case, and I do appreciate that you gave us such
3 a large amount of your docket time in a district that's
4 extremely busy.
5
6 Thank you very much, Your Honor.
7 MR. DODYK: If Your Honor please.
8 THE COURT: Oh, no. Okay. What do you want to say,
9 Mr. Dodyk?
10 MR. DODYK: I regret to impose on your time, but I
11 think in light of what has transpired, I need to say just a
12 couple of things.
13 And the thing that I chiefly mean to say is that as
14 the issue developed before Your Honor in connection with the
15 subject of the attorneys' fees, I was extremely concerned that
16 comparisons were being made before Your Honor which compared a
17 reversionary case such as this one with pro rata cases.
18 As Your Honor knows, I was quite involved in the
19 General Development securities litigation and the settlement of
20 that, and I had attempted, Your Honor — perhaps not as
21 successfully as I should -- to avoid making statements which
22 were addressed to the exercise of Your Honor's discretion in
23 terms of what you were going to do.
24 However, we were confronted with a situation in which
25 comparison was being made between this case, which is a
reverter case, and a series of pro rata cases, being all of the

Page 202

1 comparative cases cited at that portion of the plaintiffs' --
2 THE COURT: Have you researched, Mr. Dodyk, all of
3 the NERA cases in order to be able to make that representation?
4 MR. DODYK: I'm talking about the cases that were
5 cited at that portion of the plaintiffs' brief which they used
6 as comparators. I was not --
7 THE COURT: Excuse me. What they used mainly in
8 comparators are the cases that are part of the NERA survey.
9 MR. DODYK: Well, they certainly use those as
10 comparators as well, and I'm not pretending that I know that
11 all of those cases were nonreverter cases, but I'm sure that
12 many of them were. And perhaps Your Honor will think it
13 inappropriate for me to have a concern for the Court's level of
14 awareness of the distinction between these cases, and perhaps I
15 was --
16 THE COURT: Well, gee-whiz, you could have raised it
17 a different way, Mr. Dodyk. You know --
18 MR. DODYK: Let me speak to that as well, if I may.
19 THE COURT: All right.
20 MR. DODYK: When this issue first came up in
21 connection with the letter which was written concerning the
22 fees -- I'm sorry, the expenses and the presentation of the fee
23 application, I had a personal conversation with Mr. Cooper and
24 I said, John, look, what you ought to do with Marty's letter is
25 simply take a serious look at it, see what you think you ought

Page 2.

1 to do with respect to that, and simply file a version of the
2 expense application which is more in accordance with what we
3 all understood, "all" being the defense counsel, to be the
4 minimum requirements.
5 Now, in response to that, Your Honor, at that point
6 the communications between the parties broke down. Instead of
7 addressing that question, or responding to my oral suggestion,
8 I was met with an attack on my motivation. Spite it was
9 called.
10 It was not spite, and I did attempt to enlist the
11 plaintiffs' counsel in conversation of that sort.
12 When the subsequent issue about the, in my mind,
13 misleading comparison of this reverter case with pro rata cases
14 arose, it was impossible because tempers had risen so as they
15 had in the past, and I regret that the form of presentation did
16 not make clear to Your Honor what my true concern was, but that
17 was what I was attempting to do.
18 THE COURT: Well, this is the last thing any of us
19 are going to say about this.
20 What you suggested in your pleadings, in your papers
21 was that the Court should defer the attorney's fee award until
22 after the actual and approved claims could be determined, and
23 then award the plaintiffs a percentage of the actual claims
24 paid; and if you think — you just cannot convince me,
25 Mr. Dodyk, as much as I enjoy having you around, that that does

Page 204

1 not represent opposition to the plaintiffs' fee application.
2 MR. DODYK: Your Honor, I think, with all due
3 respect, overstates what was said.
4 I will say to Your Honor that I do believe that
5 consideration of the actual payout and a consideration of the
6 fact that this is a reverter fund and not a pro rata fund is an
7 appropriate consideration for your court. But Your Honor will
8 note that --
9 THE COURT: And I gave it consideration.
10 MR. DODYK: I appreciate that. But Your Honor will
11 note that at no point in those presentations did we tell Your
12 Honor what you should do with that information.
13 THE COURT: Well, let me say, now you are tempting me
14 to find what it is you filed, but I don't think I have it up
15 here and I don't think it's worth anyone's time or effort to do
16 that.
17 But I have a distinct recollection that you made a
18 specific proposal, and the specific proposal that you made was
19 that the Court should defer making the attorney's fee award
20 until after the gross amount of the approved claims could be
21 determined, and then award the plaintiffs a percentage of the
22 actual claims paid.
23 MR. DODYK: I think it's more accurate to say that I
24 encouraged the Court to defer that decision until she could
25 know what that was, and I still, Your Honor, think that is the

1  preferred course of action in this case.

2      THE COURT: I think you are understating your

3  position. But that's all right. It's not important.

4      Well, it is. I take that back. It is important, but

5  it doesn't -- I really don't think there's anything to be

6  gained by continuing to discuss it.

7      I was happy to have you around through the end of

8  January because you made an important contribution to the

9  resolution of the case. You always have an interesting take on

10  things, I'll give you that. And I'm sorry that things ended up

11  the way they did. But my view of the situation is that you

12  breached the agreement.

13      MR. DODYK: I understand your point of view, Your

14  Honor. We respectfully disagree.

15      THE COURT: Okay.

16      MR. WISOFF: Thank you, Your Honor.

17      THE COURT: All right. Thank you.

18      (Adjourned at 5:10 p.m.)

19      *  *  *  *  *  *  *  *  *

20          C E R T I F I C A T E

21

22      I certify that the foregoing is a correct transcript

23  from the record of proceedings in the above-entitled matter.

24  _____

25  _____      _____

Cases In Which Award Of Fees
Equalled Or Exceeded 30% Of The Fund Plus Expenses

1. Beech Cinema, Inc. v. Twentieth Century Fox Film Corp., 480 F. Supp. 1195 (S.D.N.Y. 1979) (fee equal to 53.2% of recovery, plus costs);

2. Sharp v. Coopers & Lybrand, No. 75-1313 (E.D. Pa. July 2, 1981) (fee equal to 47.95% of recovery, plus expenses);

3. Abzug v. Kerkorian, No. CA000981 (Cal. Sup. Ct., L.A. County 1990) (fee equal to 45% of recovery, plus expenses);

4. Green v. Emersons, Ltd., [1987 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶93,263 (S.D.N.Y. 1987) (42.6% of the fund, plus expenses);

5. Haitz v. Meyer, No. 572968-3 (Cal. Sup. Ct., Alameda County Aug. 20, 1990) (fee award equal to 40% of recovery, plus expenses);

6. In re Atlantic Financial Management, Inc. Sec. Litig., MDL No. 584 (D. Mass. May 9, 1989) (fee equal to 40% of recovery, plus expenses);

7. Weinberger v. Jackson, C-89-2301-CAL (N.D. Cal. March 19, 1991) (fee equal to 37% of recovery, plus expenses);

8. In re Consolidated Pinnacle West Sec. Litig./Resolution Trust Corporation-MeraBank Litig., Master File No. CIV-88-1830-PHX-PAR (D. Ariz. Dec. 30, 1993) (fee equal to 35% of recovery, plus expenses);

9. Lou v. Zax, Case No. BC015017 (Cal. Sup. Ct., L.A. County Sept. 17, 1993) (fee equal to 35% of recovery, plus expenses);

10. In re De Laurentiis Entertainment Group Inc. Sec. Litig., Master File No. CV-88-1582-MRP(Bx) (C.D. Cal. Nov. 14, 1991) (fee equal to 35% of total recovery, plus expenses);

11. Cooper v. Hwang, No. C-86-20146-WAI (N.D. Cal. March 5, 1991) (fee equal to 35% of total recovery, plus expenses);

12. In re FPI/Agretech Sec. Litig., MDL No. 763 (D. Haw. Dec. 11, 1990) (fee award equal to 35% of total fund, plus expenses);

13. A&J Deutscher Family Fund v. Pacific Scientific Co., CV-85-1850-PAR(JRx) (C.D. Cal. June 16, 1989) (fee equal to 35% of recovery, plus expenses);

- 1 -

EXHIBIT "E"

14. <u>Steiner v. Whittaker Corp.</u>, CA000817 (Cal. Sup. Ct., L.A. County March 23, 1989) (fee equal to 35% of recovery, plus expenses);

15. <u>Plascow v. Clausing Corp.</u>, [1982-1983 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶99,228 (S.D.N.Y. 1983) (fee equal to 34% of recovery, plus expenses);

16. <u>In re Apple Computer Sec. Litig.</u>, Master File No. C-84-20148(a)-JW (N.D. Cal. March 30, 1992) (fee equal to approximately 34% of total recovery, plus expenses);

17. <u>In re ZZZZ Best Sec. Litig.</u>, No. CV-87-3574-RSWL(Bx) (C.D. Cal. Jan. 23, 1995) (fee equal to 33-1/3% of total recovery, plus expenses);

18. <u>In re Xytronyx Sec. Litig.</u>, Master File No. 92-194-IEG(CM) (S.D. Cal. June 15, 1994) (fee equal to 33-1/3% of recovery, plus expenses);

19. <u>Snyder v. Oneok Inc.</u>, Civil No. 88-C-1500E (N.D. Okla. Nov. 1, 1993) (fee equal to 33-1/3% of recovery, plus expenses);

20. <u>In re Rykoff-Sexton Sec. Litig.</u>, Master File No. CV-90-0689-DT(Tx) (C.D. Cal. Dec. 30, 1991) (fee equal to 33-1/3% of recovery, plus expenses);

21. <u>In re New World Entertainment Sec. Litig.</u>, Master File No. 88-06260-MRP(Kx) (C.D. Cal. Oct. 7, 1991) (fee equal to 33-1/3% of recovery, plus expenses);

22. <u>In re Seagate Technology Sec. Litig.</u>, Master File No. C-84-20756(A)-WAI (N.D. Cal. Aug. 14, 1991) (fee equal to 33-1/3% of total recovery, plus expenses);

23. <u>Mirochnick v. Glasky</u>, Civ. No. 86-6145-JMI(Px) (C.D. Cal. July 1, 1991) (fee equal to 33-1/3% of recovery, plus expenses);

24. <u>In re Digital Sound Corporation Sec. Litig.</u>, Master File No. 90-3533-MRP(Bx) (C.D. Cal. April 8, 1991) (fee equal to 33-1/3% of total recovery, plus expenses);

25. <u>Teichler v. DSC Communications Corp.</u>, CA 3-85-2005-T (N.D. Tex. 1990) (fee equal to 33-1/3% of recovery, plus expenses);

26. <u>Lee v. Steloff</u>, Civ. No. 88-00811-HLH(GHKx) (C.D. Cal. Jan. 26, 1990) (fee equal to 33-1/3% of recovery, plus expenses);

27. <u>Paul v. Western Health Plans, Inc.</u>, C-88-1182-K(M) (S.D. Cal. 1989) (fee equal to 33-1/3% of total recovery, plus expenses);

28. <u>Draney v. Wilson, Morton, Assaf & McElligott</u>, [1985-1986 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶92,360 (D. Ariz. 1985) (fee equal to 33-1/3% of recovery, plus expenses);

29. <u>Klein v. King</u>, Civ. No. C-88-3141-FMS (N.D. Cal. May 10, 1993) (fee equal to 33% of recovery, plus expenses);

30. <u>In re Public Service Company of New Mexico</u>, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,988 (S.D. Cal. 1992) (fee equal to 33% of total recovery, plus expenses);

31. <u>Malanka v. De Castro</u>, [1990-1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶95,657 (D. Mass. 1990) (fee equal to 33% of total recovery, plus expenses);

32. <u>In re Fiddler's Woods Bondholders Litig.</u>, [1987-1988 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶93,537 (E.D. Pa. 1987) (fee equal to 32.7% of recovery, plus expenses);

33. <u>Morales v. Geothermal Resources Int'l, Inc.</u>, [1981 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶98,038 (S.D.N.Y. 1981) (fee equal to 31.75% of recovery, plus expenses);

34. <u>Kronfeld v. Transworld Airlines, Inc.</u>, 129 F.R.D. 598 (S.D.N.Y. 1990) (fee equal to 31.2% of recovery, plus expenses);

35. <u>In re Coastcast Corporation Sec. Litig.</u>, Master File No. CV-94-3712-DT(AJWx) (C.D. Cal. May 6, 1996) (fee equal to 30% of recovery, plus expenses);

36. <u>In re Medeva Sec. Litig.</u>, Master File No. CV-93-4376-KN(AJWx) (C.D. Cal. Mar. 25, 1996) (fee equal to 30% of recovery, plus expenses);

37. <u>Leonard v. NetFRAME Systems, Inc.</u>, No. C-95-0238-DLJ (N.D. Cal. Mar. 20, 1996) (fee equal to 30% of recovery, plus expenses);

38. <u>Kravitz v. Iwerks Entertainment, Inc.</u>, No. CV-95-2541-KMW (C.D. Cal. March 12, 1996) (fee equal to 30% of recovery, plus expenses);

39. <u>Kurtz v. Blum</u>, No. SACV-94-1043-GLT(EEx) (C.D. Cal. Feb. 20, 1996) (fee equal to 30% of recovery, plus expenses);

40. <u>In re WCT Sec. Litig.</u>, No. C-94-6524-JMI(BQRx) (C.D. Cal. Feb. 5, 1996) (fee equal to 30% of recovery, plus expenses);

41. <u>In re Hexcel Corporation Sec. Litig.</u>, Master File No. C-92-4811-SBA (N.D. Cal. Jan. 22, 1996) (fee equal to 30% of recovery, plus expenses);

42. In re VISX Sec. Litig., Master File No. C-94-20649-EAI (N.D. Cal. Dec. 18, 1995) (fee equal to 30% of recovery, plus expenses);

43. In re Ross Systems Sec. Litig., Master File No. C-94-0017-DLJ(WDB) (N.D. Cal. Dec. 13, 1995) (fee equal to 30% of recovery, plus expenses);

44. In re National Medical Enterprises Sec. Litig., Master File No. CV-91-5452-TJH(EEx) (C.D. Cal. Dec. 8, 1995) (fee equal to 30% of recovery, plus expenses);

45. In re Storage Technology Sec. Litig., Case No. 92-B-750 (D. Colo. Dec. 1, 1995) (fee equal to 30% of recovery, plus expenses);

46. In re 4th Dimension Software Ltd., Sec. Litig., Master File No. SACV-94-279-ASH(EEx) (C.D. Cal. Nov. 20, 1995) (fee equal to 30% of recovery, plus expenses);

47. O'Sullivan v. Trident Microsystems, Inc., No. C-95-02294-EAI (N.D. Cal. Nov. 20, 1995) (fee equal to 30% of recovery, plus expenses);

48. Lee v. Sierra On-Line, Inc., No. CIV-S-92-2089-EJG-PAN (E.D. Cal. Nov. 6, 1995) (fee equal to 30% of recovery, plus expenses);

49. In re Archer Communications Sec. Litig., Master File No. CV-91-6964-R (C.D. Cal. Nov. 1, 1995) (fee equal to 30% of recovery, plus expenses);

50. Pfeifer v. McFall, No. CV-94-1862-ABC(BRx) (C.D. Cal. Oct. 23, 1995) (fee equal to 30% of recovery, plus expenses);

51. In re Proxima Corporation Sec. Litig., Master File No. 93-1139-J(LSP) (S.D. Cal. Oct. 3, 1995) (fee equal to 30% of recovery, plus expenses);

52. In re Compression Labs, Inc. Sec. Litig., No. C-95-2222-FMS(EAI) (N.D. Cal. Sept. 22, 1995) (fee equal to 30% of recovery, plus expenses);

53. In re Aurora Electronics Sec. Litig., Master File No. CV-93-3292-DT(JGx) (C.D. Cal. Sept. 5, 1995) (fee equal to 30% of recovery, plus expenses);

54. In re RasterOps Corp. Sec. Litig., Master File No. C-95-2247-EAI (N.D. Cal. Aug. 28, 1995) (fee equal to 30% of recovery, plus expenses);

55. In re National Health Laboratories Sec. Litig., Master File No. CV-92-1949-RBB (S.D. Cal. Aug. 15, 1995) (fee equal to 30% of recovery, plus expenses);

56. <u>Pleasant Overseas Corp. v. Hajjar</u>, Master File No. C-93-20197-RMW(EAI) (N.D. Cal. Aug. 10, 1995) (fee equal to 30% of recovery, plus expenses);

57. <u>In re Jenny Craig Sec. Litig.</u>, Master File No. CV-92-845-J(LSP) (S.D. Cal. June 19, 1995) (fee equal to 30% of recovery, plus expenses);

58. <u>In re SuperMac Technology, Inc. Sec. Litig.</u>, Master File No. C-94-20206-RPA(PVT) (N.D. Cal. June 12, 1995) (fee equal to 30% of recovery, plus expenses);

59. <u>In re Radius Sec. Litig.</u>, Master File No. C-92-20597-RPA(EAI) (N.D. Cal. June 12, 1995) (fee equal to 30% of recovery, plus expenses);

60. <u>In re Applied Magnetics Corp. Sec. Litig.</u>, Master File No. CV-93-6195-DT(JRx) (C.D. Cal. May 30, 1995) (fee equal to 30% of recovery, plus expenses);

61. <u>Tolan v. Adler</u>, No. C-90-20710-WAI(PVT) (N.D. Cal. May 15, 1995) (fee equal to 30% of recovery, plus expenses);

62. <u>In re Kaufman and Broad Sec. Litig.</u>, Master File No. CV-92-5049-WJR(SHx) (C.D. Cal. April 24, 1995) (fee equal to 30% of recovery, plus expenses);

63. <u>In re Digital Microwave Corp. Sec. Litig.</u>, Master File No. C-90-20241-RMW (N.D. Cal. March 17, 1995) (fee equal to 30% of recovery, plus expenses);

64. <u>In re Catalyst Semiconductor Sec. Litig.</u>, Master File No. C-93-20960-RPA(EAI) (N.D. Cal. March 17, 1995) (fee equal to 30% of recovery, plus expenses);

65. <u>Rogal v. Costello</u>, No. C-91-20195-RPA(EAI) (N.D. Cal. March 13, 1995) (fee equal to 30% of recovery, plus expenses);

66. <u>In re Alza Sec. Litig.</u>, Master File No. C-93-20290-RMW(PVT) (N.D. Cal. Jan. 27, 1995) (fee equal to 30% of recovery, plus expenses);

67. <u>In re Vitesse Semiconductor Inc. Sec. Litig.</u>, Master File No. CV-92-3993-TJH(Kx) (C.D. Cal. Jan. 9, 1995) (fee equal to 30% of recovery, plus expenses);

68. <u>In re Presley Companies Sec. Litig.</u>, Master File No. SACV-92-0545-GLT(RWRx) (C.D. Cal. Dec. 19, 1994) (fee equal to 30% of recovery, plus expenses);

69. <u>In re Software Publishing Sec. Litig.</u>, Master File No. C-93-20246-RPA(PVT) (N.D. Cal. Dec. 14, 1994) (fee equal to 30% of recovery, plus expenses);

70. <u>In re Advanced Micro Devices Sec. Litig.</u>, Master File No. C-93-20662-EAI (N.D. Cal. Dec. 12, 1994) (fee equal to 30% of recovery, plus expenses);

71. <u>In re Castle Energy Corp. Sec. Litig.</u>, Master File No. C-94-0336-DT(CHKx) (C.D. Cal. Dec. 5, 1994) (fee equal to 30% of recovery, plus expenses);

72. <u>Wortman v. FileNet Corp.</u>, No. CV-93-0011-LHM(EEx) (C.D. Cal. Nov. 30, 1994) (fee equal to 30% of recovery, plus expenses);

73. <u>Adam v. Silicon Valley Bancshares</u>, No. C-93-20399-RMW(EAI) (N.D. Cal. Nov. 28, 1994) (fee equal to 30% of recovery, plus expenses);

74. <u>In re Sierra Semiconductor Sec. Litig.</u>, Master File No. C-93-20286-EAI (N.D. Cal. Nov. 21, 1994) (fee equal to 30% of recovery, plus expenses);

75. <u>Calzone v. Video Lottery Technologies</u>, No. CV-92-068-BU (D. Mont. Oct. 4, 1994) (fee equal to 30% of recovery, plus expenses);

76. <u>In re Platinum Software Sec. Litig.</u>, Master File No. SACV-94-70-AHS(RWRx) (C.D. Cal. Sept. 26, 1994) (fee equal to 30% of recovery, plus expenses);

77. <u>Haltman v. Aura Systems, Inc.</u>, No. CV-92-3388-CM (C.D. Cal. Aug. 25, 1994) (fee equal to 30% of recovery, plus expenses);

78. <u>Bourne v. Premier Anesthesia, Inc.</u>, No. CV-93-4782-JSL(GHKx) (C.D. Cal. Aug. 24, 1994) (fee equal to 30% of recovery, plus expenses);

79. <u>In re Lockheed Corp. Sec. Litig.</u>, No. CV-89-5799-TJH(Bx) (C.D. Cal. Aug. 9, 1994) (fee equal to 30% of recovery, plus expenses);

80. <u>In re Sam & Libby, Inc. Sec. Litig.</u>, Master File No. 92-1564-WHO (N.D. Cal. Aug. 4, 1994) (fee equal to 30% of recovery, plus expenses);

81. <u>In re Altera Corp. Sec. Litig.</u>, Master File No. C-92-20399-JW(EAI) (N.D. Cal. July 29, 1994) (fee equal to 30% of recovery, plus expenses);

82. <u>In re Advanced Interventional Systems Sec. Litig.</u>, Master File No. SACV-92-723-AHS(RWRx) (C.D. Cal. July 15, 1994) (fee equal to 30% of recovery, plus expenses);

83. <u>In re Retix Sec. Litig.</u>, Master File No. C-93-1683-JSL(GHKx) (C.D. Cal. July 13, 1994) (fee equal to 30% of recovery, plus expenses);

84. _Sherman v. Widder_, Civ. No. TS-92-1827-IEG(M) (S.D. Cal. June 21, 1994) (fee equal to 30% of recovery, plus expenses);

85. _Levy v. Eletr_, No. C-88-3457-FMS (N.D. Cal. June 20, 1994) (fee equal to 30% of recovery, plus expenses);

86. _Scheatzle v. Eubanks_, No. C-92-20785-JW(EAI) (N.D. Cal. June 6, 1994) (fee equal to 30% of recovery, plus expenses);

87. _Kassover v. Huta_, Civ. No. 90-00848-IEG(LSP) (S.D. Cal. May 11, 1994) (fee equal to 30% of recovery, plus expenses);

88. _In re Pacific Enterprises Sec. Litig._, Master File No. CV-92-0841-JSL(EEx) (C.D. Cal. May 5, 1994) (fee equal to 30% of recovery, plus expenses);

89. _Weinberg v. Liebl_, Civ. No. 89-1883-IEG(M) (S.D. Cal. March 29, 1994) (fee equal to 30% of recovery, plus expenses);

90. _Shields v. Smith_, No. C-90-0349-FMS (N.D. Cal. Dec. 21, 1993) (fee equal to 30% of recovery, plus expenses);

91. _In re GE Energy Choice Light Bulb Consumer Litig._, Master File No. C-92-4447-BAC (N.D. Cal. Oct. 22, 1993) (fee equal to 30% of recovery, plus expenses);

92. _In re Amdahl Sec. Litig._, Master File No. C-92-20609-JW(EAI) (N.D. Cal. Sept. 10, 1993) (fee equal to 30% of recovery, plus expenses);

93. _In re International Technology Corp. Sec. Litig._, Master File No. CV-88-440-RMT(Sx) (C.D. Cal. Aug. 24, 1993) (fee equal to 30% of recovery, plus expenses);

94. _In re Great American Bank, SSB, Securities/Derivative Litig._, Civil No. 89-1571-N(M) (S.D. Cal. Aug. 11, 1993) (fee equal to 30% of recovery, plus expenses);

95. _In re Synoptics Sec. Litig._, No. C-91-20429-WAI(EAI) (N.D. Cal. June 28, 1993) (fee equal to 30% of recovery, plus expenses);

96. _Church v. Consolidated Freightways, Inc._, Nos. C-90-2290-DLJ and C-91-4168-DLJ (N.D. Cal. April 30, 1993) (fee equal to 30% of recovery, plus expenses);

97. _In re Falcon Cable Sec. Litig._, No. CV-91-2944-THJ(GHKx) (C.D. Cal. March 11, 1993) (fee equal to 30% of recovery, plus expenses);

98. _In re Software Toolworks Inc. Sec. Litig._, Master File No. C-90-2906-FMS (N.D. Cal. Dec. 4, 1992) (fee equal to 30% of recovery, plus expenses);

99. <u>In re Saatchi & Saatchi Sec. Litig.</u>, Master File No. 90-0669-RMT(Ex) (C.D. Cal. Oct. 5, 1992) (fee equal to 30% of recovery, plus expenses);

100. <u>Cytryn v. Cook</u>, No. C-89-20801-RFP (N.D. Cal. May 1, 1992) (fee equal to 30% of recovery, plus expenses);

101. <u>In re Wyse Technologies Sec. Litig.</u>, Civ. No. 89-1818-WHO (N.D. Cal. March 30, 1992) (fee equal to 30% of recovery, plus expenses);

102. <u>In re DCA Sec. Litig.</u>, Master File No. 1:89-CV-2195-RCF (N.D. Ga. Jan. 6, 1992) (fee equal to 30% of recovery, plus expenses);

103. <u>In re Network Equipment Technologies Sec. Litig.</u>, Master File No. C-90-1138-DLJ (N.D. Cal. Dec. 16, 1991) (fee equal to 30% of recovery, plus expenses);

104. <u>In re Cetus Corp. Sec. Litig.</u>, Master File No. C-90-2042(A)-EFL (N.D. Cal. Oct. 25, 1991) (fee equal to 30% of recovery, plus expenses);

105. <u>Perkins v. Preletz</u>, Civ. No. 90-2006-WAI (N.D. Cal. Oct. 1, 1991) (fee equal to 30% of recovery, plus expenses);

106. <u>Corron v. Koppers Co.</u>, No. Civ. S-88-429-DFL/JFM (E.D. Cal. Sept. 16, 1991) (fee equal to 30% of recovery, plus expenses);

107. <u>In re Technical Equities Federal Sec. Litig.</u>, C-86-20157(A)-WAI (N.D. Cal. July 23, 1991) (fee equal to 30% of recovery, plus expenses);

108. <u>Hartley v. Stamford Towers Limited Partnership</u>, No. C-90-2146-JPV (N.D. Cal. July 11, 1991) (fee equal to 30% of recovery, plus expenses);

109. <u>Sweet v. Hanson</u>, No. C-88-4041-DLJ (N.D. Cal. June 27, 1991) (fee equal to 30% of recovery, plus expenses);

110. <u>In re Businessland Sec. Litig.</u>, C-90-20476-RFP (N.D. Cal. June 18, 1991) (fee equal to 30% of recovery, plus expenses);

111. <u>In re Genentech, Inc. Sec. Litig.</u>, Master File No. C-88-4038-DLJ (N.D. Cal. Feb. 21, 1991) (fee equal to 30% of recovery, plus expenses);

112. <u>In re Verbatim Sec. Litig.</u>, Master File No. C-84-20164(A)-SW (N.D. Cal. Feb. 13, 1991) (fee equal to 30% of recovery, plus expenses);

113. Roberts v. Heim, [1991 Transfer Binder] Fed. Sec. L. Rep.
     (CCH) ¶96,221 (N.D. Cal. 1991) (fee equal to 30% of
     recovery, plus expenses);

114. Weinberger v. Schroeder, Civ. No. 84-20757-WAI (N.D. Cal.
     Nov. 16, 1990) (fee equal to 30% of recovery, plus
     expenses);

115. Teichler v. DSC Communications Corp., CA3-85-2005-T (N.D.
     Tex. Oct. 24, 1990) (fee equal to 30% of recovery, plus
     expenses);

116. In re Allegheny International Shareholder Litig., Civil
     Action No. 86-1651 (W.D. Pa. Sept. 20, 1990) (fee equal to
     30% of recovery, plus expenses);

117. In re National Education Corporation Sec. Litig., Master
     File No. SACV-89-405-AHS (C.D. Cal. Aug. 13, 1990) (fee
     equal to 30% of recovery, plus expenses);

118. In re Trustcorp. Sec. Litig., Civ. No. 3:89-CV-7139 (N.D.
     Ohio Aug. 3, 1990) (fee equal to 30% of recovery, plus
     expenses);

119. Feldman v. Glaze, Civ. No. C-87-20723-WAI (N.D. Cal. June 4,
     1990) (fee equal to 30% of recovery, plus expenses);

120. Sanders v. Robinson Humphrey/American Express, Inc., No.
     1:85-cv-172-RLV (N.D. Ga. May 23, 1990) (fee equal to 30% of
     recovery, plus expenses);

121. Imperial Corporation of America v. Thygerson, Civ. No.
     89-0126-JLI(M) (S.D. Cal. Feb. 22, 1990) (fee equal to 30%
     of recovery, plus expenses);

122. In re MDC Holdings Sec. Litig., [1990 Transfer Binder] Fed.
     Sec. L. Rep. (CCH) ¶95,474 (S.D. Cal. 1990) (fee equal to
     30% of recovery, plus expenses);

123. Heideman v. Toreson, Civ. No. C-86-200024-SW (N.D. Cal.
     Dec. 26, 1989) (fee equal to 30% of recovery, plus
     expenses);

124. In re Gibraltar Financial Corp. Sec. Litig., CV-87-07876-
     MRP(Bx) (C.D. Cal. Sept. 9, 1989) (fee equal to 30% of
     recovery, plus expenses);

125. In re Eagle Computer Sec. Litig., C-84-20382(A)-SW (N.D.
     Cal. 1989) (fee equal to 30% of recovery, plus expenses);

126. In re Pizza Time Theatre Sec. Litig., C-84-20048(A)-RPA
     (N.D. Cal. 1989) (fee equal to 30% of recovery, plus
     expenses);

- 9 -

127. <u>Larkins v. Singley</u>, Civ. No. 83-2533-PHX CLH (D. Ariz. Dec. 17, 1988) (fee equal to 30% of recovery, plus expenses);

128. <u>In re Cousins Sec. Litig.</u>, 84-1821-B(IEG) (S.D. Cal. 1988) (fee equal to 30% of recovery, plus expenses);

129. <u>Mancino v. McMahan</u>, No. C-84-0407-CAL (N.D. Cal. Jan. 28, 1987) (fee award equal to 30% of recovery, plus expenses);

130. <u>Eltman v. Grandma Lee's, Inc.</u>, [1986-1987 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶92,798 (E.D.N.Y. 1986) (fee award equal to 30% of total recovery, plus expenses);

131. <u>Friedland v. Barnes</u>, [1986-1987 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶92,754 (S.D.N.Y. 1986) (30% of the settlement fund awarded as attorneys' fees, plus expenses);

132. <u>McFarland v. Memorex Corp.</u>, C-79-2007 (N.D. Cal. 1985) (fee award equal to 30% of total recovery, plus expenses); and

133. <u>Epstein v. Weiss</u>, [1969-1970 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶92,588 (E.D. La. 1970) (fee award equal to 30% of total recovery, plus expenses).